UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Angel Hernandez, | Case No. 1:17-cv-456 |
| Plaintiff, | Judge Michael R. Barrett |
| v. | |
| The Office of the Commissioner of Baseball, et al. | **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

The Plaintiff, through counsel, respectfully submits the following response to Defendants' Motion to Dismiss ("Defendants' Memorandum").

## FACTS

Angel Hernandez, a Cuban born umpire, has been wrongfully passed over for crew chief, while white, less experienced umpires 7 to 10 years his junior have been promoted.  These men work in Ohio every year, are formally observed and supervised by employees of OOC both in Cincinnati and Cleveland, and have Ohio taxes withheld by Blue when they work here.

The Office of the Commissioner ("OOC") is an unincorporated association, as so stated by the Defendants.  However, that association consists of 30 baseball clubs, from which the OOC derives its revenue.[1]  Thus, part of its very existence relies upon the contributions made by the Cleveland and Cincinnati clubs, both located in Ohio.[2]

---

[1] The great game of Major League Baseball began in none other than Cincinnati, Ohio, when in 1869, the Cincinnati Red Stockings declared themselves a professional baseball team.  Of course, the Reds are still in the city, have played in and won five World Series events, and like Cleveland, is a member of the OOC.  The Cleveland Indians have been located in Ohio since 1901, having won two World Series championships.  The OOC derives income from both the Cincinnati Reds and Cleveland Indians, as it does from All Star and World Series games.

[2] Historically, Commissioner Happy Chandler relocated the Commissioner's office from Chicago to Cincinnati, Ohio in 1946.  Just a short time later, Chandler approved the contract of Jackie Robinson, thus integrating baseball.

The 76 umpires[3] are employed by Blue, but are supervised by one or more members of the OOC that are located in numerous places across the country.  (*See* West Aff. ¶¶ 3, 6, 7.)  For instance, the Director of Major League Umpires, Randy Marsh, and other directors, supervisors, evaluators, and special assistants reside in various states around the country.  In fact, only a small fraction of the OOC's employees who have input in the hiring and promotion of umpires reside in and work in New York.  (*See* West Aff. ¶ 7.)

The various umpire supervisors and evaluators work remotely (*see* West Aff. ¶ 7), completing and submitting evaluations in the various states where they reside.  These evaluations are prepared during and after the game, and as acknowledged by the Defendants, are stored electronically by these various supervisors and observers, who come from all parts of the country.  For instance, Tom Lepperd resides in Iowa.  Charlie Reliford resides in Kentucky.  Chris Jones resides in Colorado.  Rich Rieker resides in Illinois.  For quite some time, these observers have worked both in Cleveland and Cincinnati.  (*See* West Aff. ¶ 8.)

When umpires work for Major League Baseball Blue, Inc. ("Blue") in Cincinnati and Cleveland, Ohio taxes are withheld from their paychecks by Blue, making it an Ohio employer under the law.  (*See* West Aff. ¶ 2 and Hernandez Aff. ¶ 5.)  Mr. Woodfork does not deny in his affidavit that Blue is an Ohio employer.

Major League Baseball derives from Ohio millions of dollars in licensing, such as the sale of jerseys, hats, tee shirts and the like, all of which is overseen by the OOC.

---

[3] Defendants argue that Major League Baseball Blue, Inc. ("Blue") employs 76 "individuals," each a full time Major League Umpire.  Since Major League Baseball employed umpires, no African American has ever been promoted to crew chief.  Since the beginning, Major League Baseball only promoted one Latino to crew chief, and in essence fired him after a strike.  (See Hernandez Aff., ¶ 2.)

## LEGAL ARGUMENT

**I.     The Court has Personal Jurisdiction over Defendants**

While Plaintiff bears the burden of proving jurisdiction exists, the standard is low. Plaintiffs must only prove a *prima facie* showing of personal jurisdiction. *Conn v. Zakharov*, 667 F.3d 705, 711 (6th Cir. 2012). In a case where discovery has yet to be held and personal jurisdiction is brought up on a motion to dismiss, the Court must construe all evidence in favor of the plaintiff. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261–62 (6th Cir. 1996). It may be necessary to allow discovery directed at the issue of personal jurisdiction to determine if this case may proceed. *See Kinder v. City of Myrtle Beach*, No. 1:11CV712, 2015 WL 1439136, at *2 (S.D. Ohio Mar. 27, 2015), *appeal dismissed* (July 20, 2015) (granting the plaintiff's motion for discovery on the issue of personal jurisdiction).

Defendants incorrectly assert the citizenship status of the OOC for the purpose of personal jurisdiction. Defendants point out that the OOC is "an unincorporated association headquartered in New York and [Blue] a Delaware corporation with its principal executive office in New York." (Defendants' Memorandum, Page 5, Doc. 8-1 PageID 67). However, they incorrectly conclude that accordingly, neither is a citizen of Ohio for purposes of determining jurisdiction. Instead, unincorporated business entities have been held to be citizens of all states of the residences of their members. *See Reynolds v. Int'l. Amateur Athletic Fed'n.*, 23 F.3d 1110, 1114 (6th Cir. 1994). Therefore, Defendant OOC is a citizen of the State of Ohio because two of its member clubs are located in Ohio. One of them, the Cincinnati Reds, is in the Southern District of Ohio.

Defendants erroneously cite to *Wedemeyer* as a similar case for the premise that an unincorporated association was not an Ohio citizen. *Wedemeyer v. U.S.S. F.D.R. (CV-42) Reunion Ass'n.*, No. 1-09-57, 2010 WL 1267215, at *13 (Ohio Ct. App. Apr. 5, 2010). From this overly

broad perspective, Defendants argue that no unincorporated associations can ever be citizens of Ohio. Instead, the facts of *Wedemeyer* are very different from those in this case. In *Wedemeyer*, the unincorporated association did not regularly conduct business in the state of Ohio. *Id*. It did not hold meetings there, had members all located outside Ohio, and aside from the treasurer's location, had no other connection to or business with the state. *Id*.

Here, two members of the OOC are Ohio teams. Employees of the OOC and Blue are constantly frequenting these teams, and the OOC derives millions of dollars in revenue from the licensing dollars in Ohio. As further explained below, Blue is an employer in Ohio, has employees in Ohio, and regularly does business in Ohio. So does the OOC.

### A. Ohio's Long-Arm Statute Confers Jurisdiction over Defendants

This Court has jurisdiction over the Defendants through the Ohio Long-Arm Statute. Ohio's long-arm statute confers jurisdiction upon any non-resident who acts directly or through an agent to cause an injury arising from the person's:

> (1) Transacting any business in this state;
> (2) Contracting to supply services or goods in this state;
> (3) Causing tortious injury by an act or omission in this state;
> (4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; […]

Ohio Rev. Code Ann. § 2307.382(A) (West). Here, the facts indicate that multiple provisions of the long-arm statute have been met.

### 1. Defendants transact business in Ohio

Ohio courts have interpreted this provision broadly, and have conferred personal jurisdiction when the defendants are transacting *any* business in the state. *See e.g. U.S. Diamond & Gold v. Julius Klein Diamonds LLC*, No. C–3–06–371, 2007 WL 102642, at *4 (S.D. Ohio.

Mar. 29, 2007)).  The definition of transacting business in Ohio is a fact-intensive analysis, which goes beyond merely entering into a contract in the state.  *Id*.  Personal jurisdiction will be found whenever "the business operations set in motion by the defendant have a realistic impact on Ohio commerce."  *State ex rel. Cordray v. Makedonija Tabak 2000*, 937 N.E.2d 595, 603 (Ohio Ct. App. 2010).  There is no doubt that Defendants in this case are transacting business in Ohio or that its business operations have an effect on Ohio commerce, along with interstate commerce.  Blue employs umpires who work in Cleveland and Cincinnati.  (See West Aff. ¶ 10 and Hernandez Aff. ¶ 3.)  Both Defendants transact business in this state through receiving funds from the Ohio clubs, generating revenue from All Star and World Series Games, and withholding Ohio state taxes from the pay of umpires.

### 2.  Defendants contract to provide services in Ohio

The 76 umpires are employed by Blue to staff the umpire positions of all Major League Baseball games.[4]  (*See* Defendants' Memorandum, Page 3, Doc. 8-1 PageID 65).  These games take place in the state of Ohio as well as many other states.  Defendants regulate Major League Baseball and provide umpire services to its games.  The two clubs located in the state must use the service of MLB's umpires at their games.  In their memorandum, Defendants state that through a contract, Blue provides the services of the umpires to the OOC.  (Defendants' Memorandum, Page 4, Doc. 8-1 Page ID 66).  Blue is an employer in Ohio.  Therefore, both Defendants admit to transacting business in Ohio, and to providing services by contract in the state of Ohio.

### 3.  Defendants caused tortious injury by an act or omission in Ohio

Defendants have caused injury to Plaintiff both in the State of Ohio and in other states around the country.  Defendants' unlawful discrimination has harmed Plaintiff in Ohio, and where

---

[4] This includes regular season, post-season, All Star, and Spring Training games.

the actual decision was made not to promote Plaintiff is certainly a question of fact.  We do know that by Defendants' admission, Plaintiff has umpired in the State of Ohio, and since he should have been a crew chief in these last several years, he thus has been injured in Ohio.  In particular, the lawsuit was filed on July 3, 2017, and his last game prior to that filing was in Cincinnati, Ohio, where due to the discrimination he was not acting as crew chief.

Major League Baseball, i.e. the OOC, regularly engages in a persistent course of conduct in Ohio, and derives millions of dollars in revenue from Ohio.  Of course, the Court can take judicial notice of individuals walking the streets of Cincinnati and Cleveland in Reds and Indians caps, jerseys, tee shirts, and the like.  Major League Baseball derives revenue through sales of these items in sporting goods stores and other places of business the jerseys throughout Ohio.  Thus, the OOC derives a great deal of money from its operations in Ohio, which in turn it distributes to the Reds and Indians.

Defendants have discriminated against Plaintiff, along with numerous other minority umpires, in both Cleveland and Cincinnati.[5]  Defendants regularly send employees of the OOC to Cincinnati and Cleveland to meet with owners and general managers of the clubs, and to observe, supervise, and evaluate umpires.  (*See* Hernandez Aff. ¶ 7.)  If Defendants agree that decisions relating to umpires are made at least in part based upon the evaluations of its employees, then once again, there can be no denying that jurisdiction exists in the State of Ohio.

Defendants have also caused tortious injury by an act outside of Ohio while regularly doing business in the state, engaging in a persistent course of conduct, and deriving substantial revenue from services rendered in Ohio.  Even if the decisions of Blue and the OOC to never promote an African American umpire to crew chief, and in its history only one Latino, were made in New

---

[5] Unfortunately, the racism that was so prevalent back when Branch Rickey, Jackie Robinson and Happy Chandler began the journey is still present today in baseball, just better disguised.

York, then that persistent course of rancid discrimination that has harmed Plaintiff is a tortious injury incurred in Ohio by Defendants deriving revenue from services in Ohio.

### 4. *Plaintiff's injury arises from Defendants' contact with Ohio*

Ohio does employ a higher standard on just one of the provisions of the long-arm statute. This is derived from the Ohio courts' interpretation of the phrase "arise from." Ohio has applied a more stringent "proximate cause" standard to their statute, as compared to the same phrase as interpreted under the due process "but for" analysis. *See Brunner v. Hampson*, 441 F.3d 457, 464-66 (6th Cir. 2006). Although the standard is slightly higher under Ohio's long-arm statute, the facts here easily rise to this elevated measure. Unlike the defendants in *Brunner*, who acted as travel guides and made arrangements for a hunting trip from Canada without otherwise acting in Ohio, Defendants here are directly providing umpire services and supervision in the state of Ohio and have been transacting business related to those services in Ohio,[6] which is directly related to the discrimination in Plaintiff's employment as an umpire. Again, both the OOC and Blue have employees in Ohio, and withhold Ohio taxes, making them employers. They discriminate in Ohio by failing to promote minority umpires such as Plaintiff to crew chief.

### A. Exercising Jurisdiction Comports with Due Process

Once jurisdiction is established under Ohio's long-arm statute, the Court must determine if it has jurisdiction under due process requirements. *Kinder*, 2015 WL 1439136 at *4 (citation omitted). Although some Ohio courts have declined to recognize general jurisdiction, they have recognized specific jurisdiction under federal due process analysis. *See, e.g. Conn*, 667 F.3d at 718 (acknowledging inconsistent conclusions on whether Ohio law recognizes general

---

[6] Pete Rose litigated in Hamilton County against the OOC regarding his disciplinary hearing, and after removing the case, the Commissioner argued that Federal Court in Cincinnati was the proper court to hear the case. *See Rose v. Giamatti*, 721 F. Supp. 924 (S.D. Ohio 1989).

jurisdiction).  It is not necessary to reach the issue of general jurisdiction in this case because specific jurisdiction has been met.  The Sixth Circuit and Ohio courts have adopted a three-factor test to determine when the exercise of specific jurisdiction comports with Constitutional Due Process requirements:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum to make the exercise of jurisdiction over the defendant reasonable.

*Bird v. Parsons*, 289 F.3d 865, 874 (6th Cir.2002); *see also S. Mach. Co. v. Mohasco Indus.,* 401 F.2d 374, 381 (6th Cir. 1968) (adopting the above test for "determining the present outer limits of *in personam* jurisdiction based on a single act").

### 1.  *Defendants have purposefully availed themselves of Ohio jurisdiction*

The due process analysis for purposeful availment is similar to the transacting business standard used in determining jurisdiction under Ohio's long-arm statute.  *See CompuServe*, 89 F.3d at 1265.  The Sixth Circuit and Ohio Courts have often affirmed under due process analysis that:

> business is transacted in a state when obligations created by the defendant or business operations set in motion by the defendant have a realistic impact on the commerce of that state; and the defendant has purposefully availed himself of the opportunity of acting there if he should have reasonably foreseen that the transaction would have consequences in that state.

*Mohasco Indus.,* 401 F.2d at 382-83 (footnote omitted).  Furthermore, while a single business transaction within a state may not be sufficient to determine purposeful availment on its own, interactions that are intended to continue in the future on an ongoing basis are indicative of fulfilling this factor.  *See CompuServe*, 89 F.3d at 1265; *see also Leighton v. Poltorak*, No. 16 Civ. 2898, 2017 WL 1399839, at *5 (N.D. Ohio Apr. 19, 2017) (finding purposeful availment when company entered into a multi-year contract with Ohio citizens, "that was expected to last for a very long time.").  Here, umpires are regularly working games in Ohio by a contract with Blue.  The

OOC sends observers and supervisors to Ohio on a regular basis, and as recently as seven weeks ago, the Commissioner was in Cincinnati visiting with the owners of the Reds. This is not a single, rare instance of business conduct, but rather it is part of a lengthy, multi-year agreement with extensive impact on the commerce of Ohio. This prong gives the Court jurisdiction over the Defendants.

### 2. Plaintiff's cause of action arises from Defendants' acts in Ohio

Unlike the cases cited by Defendants, this case arises directly from Defendants' contact with Ohio. Defendants have been and continue to conduct business in Ohio. Defendants provide officials to regulate the professional sport of baseball. Defendants consist of and contract with the 30 professional baseball clubs across the country and in Canada to employ umpires at every professional baseball game. It is Defendants' discriminatory treatment of Plaintiff while performing his employment duties as an umpire within Ohio that gives rise to these causes of action and his injuries. Each time he has umpired in Ohio for the last several years, he has been the victim of discrimination.

### 3. Jurisdiction is reasonable because Ohio has a substantial connection to Defendants' actions

This final factor in the due process analysis requires that the exercise of jurisdiction is reasonable. This has been interpreted to mean that jurisdiction will "comport with traditional notions of fair play and substantial justice." *Reynolds*, 23 F.3d at 1117 (quotation omitted). If the first two factors of the due process analysis are present, then there is a strong inference that this final factor has also been met. *CompuServe*, 89 F.3d at 1268; *see also Leighton*, 2017 WL 1399839 at *6 (finding that since the first two factors were met, because the defendant was aware of and hoped to profit from its business in Ohio, the third factor was met). The Court must then analyze a series of additional factors to determine if the presumption should be disregarded. These factors

include:

> the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.

*Conn*, 667 F.3d at 718 (citation omitted).   Defendants have availed themselves of Ohio's jurisdiction and should be prepared to litigate in a state where they generate millions of dollars in revenue from World Series, playoff and All Star Games, licensing, disciplines umpires, players and owners, and withholds Ohio taxes from their employees, including umpires.

Ohio also has a great interest in adjudicating this dispute due to the historical significance of baseball in the state and the vast number of baseball fans located here, who have a strong interest in seeing that their sport is played fairly both on the field and in its regulatory management practices.   Plaintiff has selected this forum for its convenient location near the middle of the country and because Ohio courts are well equipped to handle this case.   Additionally, witnesses are spread throughout the country and will find the Ohio location far more convenient and efficient. Evidence needed in this case is expected to be portable and primarily available through electronic records based on evaluations and comments.   And finally, while all states have an interest in protecting their citizens—as spectators, fans, athletes, and officials—from discriminatory conduct, this means that Ohio is as good a jurisdiction as any in ensuring a color blind sport, especially when OOC's membership consists of two Ohio clubs.

Here, the first two factors have been met.   Therefore, there is no reason to deny the third factor.   Accordingly, personal jurisdiction also exists under a due process analysis.

## II.   Plaintiff Does State a Claim Under the Ohio Civil Rights Act Because Defendants Are Ohio Employers, Plaintiff Is an Ohio Employee and the Discrimination <u>Occurred in Ohio</u>

Defendants contend that Count Three of Plaintiff's Complaint, stating a claim against them

under the Ohio Civil Rights Act, O.R.C. § 4112.02 (the "OCRA"), should be dismissed because the statute has no extraterritorial effect.  Defendants somehow contend they are not "employers" and Plaintiff is not an "employee" under the OCRA—thus, the statute cannot apply to them. O.R.C. § 4112.01 completely belies their argument, as does Woodfork's silence on the issue in his affidavit, rendering their argument completely baseless.  Since Defendants are employers and Plaintiff is an employee under the OCRA, the Court need not reach the issue of the extraterritorial application of the statute.

### A.  Both Defendants are employers under the OCRA

Under O.R.C. § 4112.01(A)(2), an "employer" is defined as "*any person employing four or more persons within the state*, and any person acting directly or indirectly in the interest of an employer" (emphasis added).  Person is defined in O.R.C. § 4112.01(A)(1) as "one or more individuals, partnerships, *associations*, *organizations*, *corporations*, legal representatives, trustees . . . *and other organized groups of persons*.  'Person' also includes, but is not limited to, any *owner* . . . *agent*, [and] *employee* . . ." (emphasis added).  Thus, for the purpose of the OCRA, an employer is anyone who employs four or more associations, organizations, corporations, owners, agents or employees in the state of Ohio.

In addition to the plain reading of the statute, courts interpreting Ohio law have discussed the intent "to bring as many persons or entities within [the OCRA's] ambit as is possible." *Sublett v. Edgewood Universal Cabling Systems, Inc.*, 194 F. Supp. 2d 692, 698 (S.D. Ohio 2002).  After noting this intent, the *Sublett* Court went on to state, "the Court believes that the Ohio Supreme Court would hold that an out-of-state corporation who has four employees working within the state at the time the alleged discrimination occurred is an 'employer' within the meaning of the Ohio Civil Rights Act." *Id*.  "This strong public policy," the *Sublett* Court noted, "would be subverted

if a company were able to set up shop just outside of Ohio's border, send workers into Ohio to work at various job sites and yet escape liability from the anti-discrimination laws by claiming not to be an Ohio employer." That is exactly what the Defendants are doing.

Based on the definition of employer found in O.R.C.§ 4112.01(A)(2), and the public policy considerations as discussed in *Sublett*, both Defendants are "employers" under the definition contained in O.R.C. § 4112.01(A)(2). The OOC, as discussed above, is an unincorporated association made up of the 30 Major League Baseball teams. Two of those teams—the Cincinnati Reds and the Cleveland Indians—are located in Ohio. Each of those teams employs dozens if not hundreds of individuals, from the players themselves to concession stand workers. Furthermore, executives and other employees from the OOC, such as umpire observers, frequently work games at those teams' stadiums. (See Hernandez Aff. ¶ 3 and West Aff. ¶ 8.)

Blue, like the OOC, also regularly employs four or more individuals in Ohio. Mr. Woodfork's affidavit does not deny that Blue employs umpires in Ohio. Any time there is a game in Cincinnati or Cleveland, four umpires take the field to call the game.[7] These umpires are employed by Blue and supervised by the OOC. (*See* West Aff. ¶¶ 1, 3-5.) Also, when these umpires take the field in Cincinnati and Cleveland, Blue withholds Ohio taxes from their paychecks—clearly making both Defendants Ohio employers. To argue otherwise runs contra to the public policy against discrimination embodied in the OCRA and detailed fully in *Sublett* and other cases interpreting Ohio law. Such a strong public policy requires a finding that both the Defendants are "employers" under the OCRA. As such, Defendants' Motion should be denied.

**B. Plaintiff is an employee under the OCRA**

The definition of "employee" for purposes of the OCRA is simple: "an individual

---

[7] In All Star, playoffs and World Series Games, six umpires are used.

employed by *any employer*" (emphasis added).  O.R.C § 4112-01(A)(3).  As discussed at length above, both Defendants are employers under the OCRA.  Plaintiff receives his paycheck from Blue, and the OOC has employees in Ohio, including observers and supervisors to evaluate umpires.  (See Hernandez Aff. ¶¶5, 3.)  Plaintiff has umpired games in Ohio for 24 years, and when he does Blue withholds Ohio taxes from his paycheck.  For these reasons, Plaintiff is an "employee" under the OCRA, and Defendants' arguments to the contrary are frivolous.

### B. The continuing discrimination described in the Complaint occurred in Ohio while Defendants employed four or more individuals in the state

Defendants employed four or more individuals in Ohio at the time of discrimination.  *See Sublett*, 194 F. Supp. 2d at 698 (stating that "the question remaining is whether [the defendant] employed four employees in Ohio at the time of the alleged discrimination").  The discrimination against Plaintiff by Defendants is not the singular or isolated event Defendants make it out to be.  Rather, the discrimination in Ohio is the culmination of years of umpiring and reviews, which took place at stadia across the country—including the stadium located in this district, Great American Ball Park.  (See Hernandez Aff. ¶ 7 and West Aff. ¶ 8.)  This continuing discrimination occurs each and every time Plaintiff takes the field in Ohio as an umpire but not as a crew chief, including in Cincinnati, Ohio. (*See* Plaintiff's Complaint, ¶ 102.)  Additionally, at the time the Complaint was filed on July 3, 2017, the last umpiring activity Plaintiff had engaged in was umpiring a game between the Chicago Cubs and the Cincinnati Reds at Great American Ball Park on the afternoon of July 2, 2017.  (*See* Hernandez Aff. ¶ 4.)

Therefore, Plaintiff has been discriminated against by Defendants—employers under the OCRA—multiple times in Ohio over the course of his career.  Given the number of employees both Defendants had at that July 2, 2017 game, a claim under the OCRA Plaintiff can rightfully bring a claim against them.  Since both Defendants are employers, Plaintiff is an employee under

the OCRA, and both Defendants had four or more employees working in Ohio during the discrimination, Defendants' Motion to Dismiss Plaintiff's OCRA claim must be denied.

Defendants cited *Ferrer v. Medastat USA, LLC*, 145 F. App'x 116, 120 (6th Cir. 2005) to demonstrate that the Sixth Circuit has refused to apply state civil rights laws to acts that occurred outside of the relevant state.  However, this example is inapposite, for the very reason Defendants seek to exploit it.  The plaintiff in *Ferrer* attempted to apply Kentucky Civil Rights law to an act of employment retaliation that occurred in Florida.  *Id*.  In *Ferrer*, the Sixth Circuit interpreted a Kentucky Supreme Court case.  *Id*.  The Kentucky state court reasoned that when the U.S. Congress enacted the ADEA, individual states were encouraged to enact their own versions in their own civil rights statutes.  *Union Underwear Co. v. Barnhart*, 50 S.W.3d 188, 192 (citation omitted).  The Kentucky Supreme Court explained that when states enacted their own versions of the ADEA, it naturally leads to variations in the uniformity of the statutes.  *Id.*  It is inapposite in this case to apply a ruling made on state-specific statutory law from Kentucky to Plaintiff's claims under the OCRA.  Unlike the plaintiff in *Ferrer*, Plaintiff seeks to apply the OCRA to discrimination that occurred in Ohio because Defendants discriminated against him there.

## III.    <u>Venue is Proper in this District</u>

Under both the Title VII venue provision (42 U.S.C. § 2000e-5(f)(3)) and § 1391(b)(1), this litigation is proper in the Southern District of Ohio.  42 U.S.C. § 200e-5(f)(3) states that a Title VII action may be brought in: 1) any judicial district in the State in which the unlawful employment practice is alleged to have been committed; 2) in the judicial district in which the employment records relevant to such practice are maintained and administered; or 3) in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice. At least two of these prongs are met here, resulting in the Southern District of Ohio being a proper

venue for this action.[8]

### A.  Venue is proper under the first prong of Title VII's venue provision

The first prong is met as Defendants have discriminated against Plaintiff in this district, and he has felt the effects of that discrimination here.  Although the Sixth Circuit has not directly addressed this issue, in a case cited numerous times in other jurisdictions,[9] the Ninth Circuit discussed Title VII's venue provision in detail, and stated that "the effect of Title VII's venue provision is to allow suit in the judicial district in which the plaintiff worked or would have worked."  *Passantino v. Johnson and Johnson Consumer Products, Inc.*, 212 F.3d 493, 505 (9th Cir. 2000),  The *Passantino* Court further stated that "[p]laintiffs unlawfully denied a promotion, […] feel the effects of their injury where they actually work."  *Id*.  Finally, the *Passantino* Court held that venue is proper in Title VII cases "in both the forum where the employment decision is made <u>and</u> the forum in which that decision is implemented or <u>*its effects are felt*</u>."  *Id*. at 506 (emphasis added).  As discussed above, Plaintiff is discriminated against—and feels the effects of that discrimination—every time he takes the field to umpire a baseball game in Ohio.  This has occurred numerous times in this district, and most recently occurred in this district on July 2, 2017, the day before Plaintiff filed his Complaint.  (*See* Hernandez Aff. ¶ 4.)

Defendants attempt to circumvent *Passantino* by citing to *Whipstock v. Raytheon Co.*, a decision issued by the Eastern District of Michigan.  That Court held, unlike the Ninth Circuit in

---

[8] Actually, all three are met, given that the head of all umpires, Randy Marsh, lives less than 10 miles from the Court, and evaluates and supervises umpires at the stadium in Cincinnati.  These records and "documents" are mostly electronic, and supervisors and observers work and reside all over the country.  (See West Aff. ¶ 7.)

[9] A number of other jurisdictions have also held that venue is proper in Title VII actions in the district where the effects of the discriminatory actions are felt.  *See e.g. Cox v. Nat'l Football League,* 1997 WL 619839, at *3 (N.D. Ill. 1997)) ("To hold otherwise would encourage employers everywhere to make their decisions to terminate and discipline in far away offices in order to protect themselves from litigation."); *see also Richardson v. Alabama State Bd. of Educ.*, 935 F.2d 1240, 1248 (11th Cir. 1991) (citation omitted); *see also In re McDonnell–Douglas Corp.,* 647 F.2d 515, 517–18 (5th Cir. Unit A 1981)).

*Passantino*, that the first prong of the Title VII venue statute limits venue of a Title VII action to "only where the unlawful employment practice is alleged to have been committed, regardless of where its effects are felt." *Whipstock v. Raytheon Co.*, Case No. 07-11137, 2007 WL 2318745, at * 3 (E.D. Michigan August 10, 2017). This decision, however, is an outlier, and against the weight of authority found in numerous other cases. The majority view shows that the first prong of Title VII's venue provision does not limit the appropriate venue of Title VII actions only to those districts where the discriminatory decision was made, and thus the Court should deny Defendants' argument that venue is not appropriate under the first prong of 42 U.S.C. § 2000e-5(f)(3).

In addition, Defendants' argument injects a factual scenario into this issue, thus another reason to deny the motion. *Whipstock* can also be distinguished from this case on factual grounds. First, the *Whipstock* Court noted that the plaintiff's reliance on *Passantino* in that case was "misplaced" because *Passantino* was a failure to promote case, and *Whipstock* was alleging discrimination based on a decision not to hire him at all. *Id.* at *4. Also, the *Whipstock* plaintiff would not have worked in Michigan (the original venue of that case) at all—if he had been hired, he would have worked in Pennsylvania. However, here one of Plaintiff's primary claims is that he was not promoted on the basis of his race, color or national origin, and that discrimination has occurred in Ohio. This is unlike the *Whipstock* plaintiff, who was not hired at all, and more similar to the circumstances presented in *Passantino*. Also unlike the *Whipstock* plaintiff, Plaintiff would have worked as a crew chief in this district and in Cleveland but for Defendants' discrimination. Thus, *Whipstock* is both legally and factually distinguishable from this case, and should not be applied. Plaintiff has met the first prong of Title VII's venue provision.

### B. Venue is also proper under the third prong of Title VII's venue provision

The third prong of Title VII's venue provision states that venue is appropriate for Title VII

actions "in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice." 42 U.S.C. § 2000e-5(f)(3). Plaintiff is discriminated against every time he takes the field in Ohio to umpire a game. Had it not been for Defendants' discrimination—promoting white, less experienced and less qualified umpires—Plaintiff would have worked in this district as a crew chief. Venue in this court is thus appropriate.

Defendants cite to authority demonstrating the narrow interpretation of this venue provision by this Court as well as the D.C. Circuit. While it is true that this Court has interpreted the third prong of the Title VII venue provision narrowly, the facts of this case are vastly different from those of the cases cited by Defendants. In *Lalor-Brown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 05 Civ. 597, 2006 WL 181992, at *2 (S.D. Ohio Jan. 24, 2006), this Court held that the plaintiff had not met her burden of proving proper venue when she lived in Florida and all of the discrimination occurred there. The only connection to Ohio, was that the defendant, a Delaware corporation, conducted business in Ohio. *Id.* at *1.

Defendants also cite to a D.C. Circuit case, which in addition to not carrying precedential weight here, the facts are inapplicable here. In *James*, the plaintiff worked from the defendant company's Maryland office on the account of a client that was located in the District of Columbia. *James v. Booz-Allen & Hamilton, Inc.*, 227 F. Supp. 2d 16, 24 (D.C. 2002).[10] Here, Plaintiff works consistently in Ohio, has been evaluated regularly in Ohio, pays taxes in Ohio, and would have been promoted to crew chief in Ohio. Therefore, "but for" the discrimination he experienced, he would have been promoted in Ohio and venue is proper under Title VII.

### C. Venue is proper under 28 U.S.C. § 1391(b)(1)

Under 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2), venue is appropriate in any district where

---

[10] Although the plaintiff did work in the Washington D.C. office for a short period of six weeks, the court ruled that this was temporary and not part of his regular employment. *James*, 227 F. Supp. 2d at 24.

Defendants are "residents," which is defined as "any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question." As stated in Section I, *supra*, Defendants *are* subject to personal jurisdiction in Ohio, contrary to their assertions in their Motion to Dismiss. Thus, venue would also be appropriate under 28 U.S.C. § 1391(b)(1).

**IV.   The Court Should Not Transfer this Action to the Southern District of New York, as the Factors for Transfer Weigh in Plaintiff's Favor**

Defendants also argue that this case should be transferred under 28 U.S.C. § 1404(a) to the Southern District of New York "for the convenience of the parties and the interests of justice." Defendants correctly point out that granting a § 1404(a) transfer is a two-step process. First, the Court must determine if the lawsuit could have been brought in the transferee court. Second, the Court must look to a number of public interest and private interest factors to determine whether the case should be transferred, which include; (i) the convenience of the witnesses; (ii) the location of the operative facts; (iii) the ability to compel unwilling witnesses; (iv) the interests of justice; (v) ease of access to sources of proof; (vi) the convenience of the parties; and (vii) Plaintiff's choice of forum. Finally, as this Court has recognized, the party moving for a transfer of venue must establish that **all** of these factors weigh "strongly in favor of transfer." *E.E.O.C. v. L.A. Pipeline Const. Co.*, No. CIV.A. 2:08-CV-840, 2009 WL 1162890, at *2 (S.D. Ohio Apr. 29, 2009) (citation omitted).

**A.  The Southern District of Ohio is far more convenient for the potential witnesses**

Defendants contend that the Southern District of New York is a more convenient forum for this case because (i) Joe Torre "lives in Harrison, New York"[11] and so are the OOC's headquarters,

---

[11] Upon information and belief, Joe Torre, at the time of the filing of this lawsuit, had a California driver's license and a Beverly Hills, California address. This was conveniently omitted from Mr. Woodfork's declaration.

and (ii) because "both Defendants and their personnel are based in New York."  However, that is not exactly true.  The facts suggest that the Southern District of New York would be far less convenient for the witnesses in this case than the Southern District of Ohio.

The Director of Major League Umpires, Randy Marsh, lives in Northern Kentucky, less than 10 miles from the federal courthouse in Cincinnati.  (*See* Hernandez Aff. ¶ 6.)  Mr. Marsh is a key witness because of his role in the season-long process of evaluating and reviewing Major League umpires, including Plaintiff.  For Mr. Marsh, there is no more convenient venue than this Court.  Furthermore, the "Umpire Executive" page on Major League Baseball's website shows that the individuals in charge of observing and evaluating Major League umpires live and work all over the country, such as Colorado, Florida, California, Arizona, Illinois and Iowa.  (See West Aff. ¶ 3 and attached Exhibit A.)  For these supervisors and observers, the convenience of travelling to Cincinnati for this case far outweighs New York.  Cincinnati is closer to these individuals' residences than New York.  Finally, travelling and staying in Cincinnati is less expensive than it is to travel and stay in New York.

### B.  The location of the operative facts and the convenience of witnesses

This is not a case where facts must be culled from tens of thousands of documents located at the OOC's headquarters in New York.  Rather, this case will turn on the testimony of umpires, supervisors, and observers, and electronic based umpire evaluations, emails and communications.  While Plaintiff admits that Joe Torre is a witness in this matter, so too is Randy Marsh, and the numerous individuals listed in the preceding section, many of whom have submitted glowing reviews of Plaintiff over the years.  Those individuals live everywhere except New York, and the Southern District of Ohio is far more convenient for them.  As such, this factor also weighs heavily in Plaintiff's favor.

### C. Plaintiff chose the Southern District of Ohio, and that choice must be given deference

Plaintiff chose this district for this case. While it is true that Plaintiff does not reside in the Southern District of Ohio, for the reasons previously discussed, it is a far more convenient district for Plaintiff than the Southern District of New York, and as stated, Ohio has two members of the OOC, and the chief witness lives less than 10 miles from the courthouse. The plaintiff's choice of forum is entitled to "substantial consideration." *L.A. Pipeline*, 2009 WL 1162890, at *3; *see also Lalor-Brown*, 2006 WL 181992 at *2. Furthermore, this Court has recognized that it is insufficient to transfer venues from one "inconvenient" venue to another. *AC Strip v. Loge Grp., LLC*, No. CIVA2:10-CV-081, 2010 WL 1494984, at *1 (S.D. Ohio Apr. 14, 2010), *report and recommendation adopted,* No. 2:10-CV-081, 2010 WL 3292975 (S.D. Ohio Aug. 19, 2010) ("Transfer pursuant to § 1404 must be to a *more* convenient forum, not to a forum likely to prove equally convenient or inconvenient.") (quotation omitted) (emphasis added)).

## <u>CONCLUSION</u>

This Court, along with its colleagues in this District, have repeatedly warned against "East Coast practice," as recently as the last swearing in ceremony. No witness can testify under oath that Blue is not an Ohio employer, including Woodfork. Yet the Defendants filed a Motion to Dismiss anyway. The OOC has litigated in this very courthouse before without questioning personal jurisdiction, yet filed this motion to multiply and delay the proceedings needlessly.[12] For the reasons stated above, Defendants' Motion should be denied.

---

[12] If this is a harbinger of things to come, perhaps a reconsideration of the *pro hac* orders would be appropriate.

Respectfully submitted,

*/s/ Kevin L. Murphy*
Kevin L. Murphy, Esq. (#0021810)
J. Jeffrey Landen (#0018174)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
P.O. Box 17534
Fort Mitchell, KY 41017-0534
Tel:  (859) 578-3060
Fax:  (859) 578-3061
kmurphy@MLJfirm.com
jlanden@MLJfirm.com
Counsel for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 22, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notice to all counsel of record.

*/s/ Kevin L. Murphy*
Kevin L. Murphy
