# Exhibit J

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: **Angel Hernandez** | From: | **Cincinnati Area Office** |
| | | **John W. Peck Fed. Bldg** |
| | | **550 Main St Room 10-019** |
| | | **Cincinnati, OH 45202** |

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
| --- | --- | --- |
| | **Vicki L. McCoy,** | |
| **473-2017-00825** | **Investigator Support Asst** | **(513) 684-6189** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court <u>WITHIN 90 DAYS</u> of your receipt of this notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

☐ More than 180 days have passed since the filing of this charge.

☒ Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒ The EEOC is terminating its processing of this charge.

☐ The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

☐ The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court <u>WITHIN 90 DAYS</u>** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

☐ The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u>** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Melanie Breen* (signature)

**JUN 28 2017**

Enclosures(s)

**Melanie L. Breen,**
**Area Office Director**

*(Date Mailed)*

cc: **Steven Gonzalez**
**SVP-Deputy General Counsel**
**MLB, OFFICE OF COMMISSIONER**
**245 Park Ave 30ᵗʰ floor**
**New York, NY 10167**

Kevin Murphy
MURPHY LANDEN JONES, PLLC
2400 Chamber Center Dr, Suite 200
P.O. Box 17534
Ft. Mitchell, KY 41017

**CONFIDENTIAL**

**DEF015738**

### INFORMATION RELATED TO FILING SUIT
### UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

**CONFIDENTIAL**                                                              **DEF015739**

CASE LOG

Page

| Charge No. | Respondent | Charging Party |
|---|---|---|
| 473-2017-00825N | MLB, OFFICE OF COMMISSIONER | Angel Hernandez |

| Date | Action | Entered By | Reviewed/ Approved |
|---|---|---|---|
| 6/13/17 | PCP's attorney mailed in a letter requesting a charge. Fwd to management for review and assignment. | JH | |
| 6-14-17 | Act- left m about needing to Sep. Charge | Qll | |
| 6.27-17 | Formalize | Qll | |
| 6-28-17 | process | Ql | |
| 6/28/17 | Submitted for service and dismissal | | |
| | NRTS on Request. | | MS |
| 6-28-17 | Notice of Charge No Htiqatn WCRTS Sent to Cd / RLGriffs | M | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EEOC Form 159 (10/94)

## MEMORANDUM

(b)(5)

To: _____ MELANIE L. BREEN _____     CHARGE NO. _____ **473-2017-00825** _____

THRU: _____ MARIA SALDIVAR _____

FROM: _____ VICKI MCCOY _____

SUBJECT: _____ ANGEL HERNANDEZ _ V. _the, OFFICE OF COMMISSIONER _OF_ _BASEBALL_
                        *Charging Party*                                          *Respondent*

(b)(5)

[ ] Failure to State a Claim                [ ] Settlement/Mediation (Including withdrawals with
                                                              benefits and successful conciliations)
[ ] No Covered ADA Disability
                                          [ ] Withdrawal without Benefits
[ ] Too Few Employees/Members
                                          [X] Right to Sue (Issued on Request)
[ ] Untimely
                                              Director must certify: processing unlikely to be completed
[ ] Not Reasonable Cause                          within 180 days of filing (Title VII/ADA).

[ ] Other _____

(b)(5)

CP's Attorney requested NORTS.

(b)(5)

Decision by /
Recommendation approved by: _____  6/28/17
                                        *(Signature)*                *(Date)*

 **MURPHY LANDEN JONES** PLLC

2400 Chamber Center Dr.
Suite 200
P.O. Box 17534
Ft. Mitchell, KY 41017-0534
P: 859.360.1123 | F: 859.578.3061

Kevin L. Murphy
Direct: 859-578-3060
KMurphy@MLJfirm.com

June 5, 2017

Melanie L. Breen
Director of Equal Employment Opportunity Commission
Cincinnati Area Office
John W. Peck Federal Office Building
550 Main Street, 10th Floor
Cincinnati, OH 45202

EEOC, CINCINNATI AREA OFFICE

JUN 0 6 2017

RECEIVED

### RE: Angel Hernandez Charge Against Major League Baseball

Dear Melanie,

Please be advised that this firm has been retained by Angel Hernandez to represent him regarding employment discrimination against Mr. Hernandez by Major League Baseball and its agents. I am writing to request a Notice of Right-to-Sue as soon as is practicable, pursuant to the Equal Employment Opportunity Commission's ("EEOC") procedures and regulations.

As is detailed more fully in the charge (a copy of which accompanies this letter), Mr. Hernandez was born in Havana, Cuba and has been employed as a Major League Baseball umpire for nearly 23 years. During this time, Mr. Hernandez has not been promoted to the position of crew chief despite being fully qualified for the position—and more qualified than others who have been promoted to crew chief instead of Mr. Hernandez. All the umpires that have been promoted to crew chief since 2000 have been white. Mr. Hernandez believes that in the history of Major League Baseball, there has never been an African American crew chief, and only one Latino crew chief, who left the game in 1999.

Furthermore, Mr. Hernandez has not been selected for a World Series assignment since the arrival of one or more individuals in 2011. All the umpires that have been given World Series assignments since 2011—save for one—have been white.

Mr. Hernandez alleges that Major League Baseball's failure to promote him to crew chief and choose him for World Series assignments is the result of discrimination on the part of Major League Baseball and its agents. Mr. Hernandez is more than qualified for the position of crew chief, based on both his yearly performance evaluations and years of experience, and still has not been promoted. Mr. Hernandez also has a wealth of postseason experience, including being selected as an umpire for two World Series (in 2002 and 2005). Despite this experience, Mr. Hernandez has not been selected for a World Series assignment since 2005.

Melanie L. Breen
June 5, 2017
Page 2

---

As you know, employees who wish to file a lawsuit against their employer under Title VII for discrimination on the basis of the employee's race, color and/or national origin are required to exhaust their administrative remedies by filing a charge with the EEOC. On May 9, 2017, Mr. Hernandez filed a charge with the EEOC's Cincinnati Area Office against Major League Baseball Enterprises, Inc. The charge number for the May 9, 2017 charge is 473-2017-00726. A copy of that charge and the Notice of Right to Sue previously issued are enclosed with this letter.

However, upon further research and investigation, Mr. Hernandez believes Major League Baseball Enterprises, Inc. is not the only entity to have participated in the discrimination against him. Thus, on June 5, 2017, Mr. Hernandez filed another charge with the EEOC's Cincinnati Area Office. The June 5, 2017 charge names additional entities that Mr. Hernandez believes participated in the discrimination against him: The Office of the Commissioner of Baseball, Major League Baseball Properties, Inc. and Major League Baseball Blue, Inc. The allegations contained in the June 9, 2017 charge include, as discussed above, failure to promote Mr. Hernandez to the position of crew chief and failure to give Mr. Hernandez World Series assignments due to discrimination based on his race, color and/or national origin in violation of Title VII.

Due to the nature of the allegations contained in Mr. Hernandez's charge, we request that the EEOC issue Mr. Hernandez a Notice of Right-to-Sue as soon as is practicable, pursuant to the EEOC's procedures and regulations.

Thank you for your time and attention to this matter. If you have any questions or concerns, do not hesitate to contact me.

Sincerely,
MURPHY LANDEN JONES PLLC

By: Kevin L. Murphy

KLM:cd
Enclosures

# CHARGE DETAILS

CONFIDENTIAL

DEF015744

June 2, 2017

Equal Employment Opportunity Commission
Cincinnati Area Office
Attn: Melanie L. Breen
John W. Peck Federal Office Building
550 Main Street, 10th Floor
Cincinnati, OH 45202

Dear Ms. Breen:

I am filing the enclosed charge with the Equal Employment Opportunity Commission. My name is Angel Hernandez. My address is ▮▮▮▮▮▮▮ My telephone number is ▮▮▮▮▮▮▮

I am filing this charge against The Office of the Commissioner of Baseball, Major League Baseball Blue, Inc. and Major League Baseball Properties, Inc. The Office of the Commissioner of Baseball's address is 245 Park Avenue, 31st Floor, New York City, New York 10167. Its telephone number is 212-931-7800. The Office of the Commissioner of Baseball's total number of employees is unknown, but, upon information and belief, it employs over 500 employees. Major League Baseball Blue, Inc.'s address is 245 Park Avenue, 30th Floor, New York City, New York 10167. Its phone number is 212-931-7800. Major League Baseball Blue, Inc.'s total number of employees is unknown, but, upon information and belief, it employs between 101-200 employees. Major League Baseball Properties, Inc.'s address is 245 Park Avenue, 34th Floor, New York City, New York 10167. It's phone number is 212-931-7977. Major League Baseball Properties, Inc.'s total number of employees is unknown, but, upon information and belief, it employs over 500 employees.

I filed an original charge against Major League Baseball Enterprises, Inc. on May 9, 2017. The charge number for the May 9th charge is 473-2017-00726. A copy of the EEOC Charge and the notice of right to sue previously issued are also enclosed for your convenience. Upon further research and investigation, I do not believe Major League Baseball Enterprises, Inc. is the only entity to have participated in the discrimination against me. I also believe the parties named above—The Office of the Commissioner of Baseball, Major League Baseball Properties, Inc. and Major League Baseball Blue, Inc.—have also participated in the discrimination against me. The Office of the Commissioner of Baseball, Major League Baseball Properties, Inc., Major League Baseball Blue, Inc. and Major League Baseball Enterprises, Inc. are collectively referred to as "Major League Baseball."

I believe I have been discriminated against on the basis of my race, color and/or national origin. As is described more fully in the accompanying exhibits to the charge, Major League Baseball has, on numerous occasions, chosen not to promote me to the position of crew chief

despite me being more than qualified for that position. The first instance of this discrimination was in February of 2008. This discrimination has occurred in every game I umpire in which I am not a crew chief. This discrimination has occurred through at least May 9, 2017, when I umpired a game in Cincinnati, Ohio between the Cincinnati Reds and the New York Yankees. Furthermore, I have also not been selected to a World Series assignment since 2005, again despite me being more than qualified for a World Series assignment. This discrimination has occurred every year in which I have not been given a World Series assignment.

A copy of the charge is enclosed with this letter. Please feel free to contact me with any questions you may have.

Sincerely,

Angel Hernandez

CONFIDENTIAL

DEF015746

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form | ☐ FEPA | |
| | ☒ EEOC | 473-2017-00825 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Angel Hernandez | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| The Office of the Commissioner of Baseball | >500 | 2129317800 |

| Street Address | City, State and ZIP Code |
|---|---|
| 245 Park Avenue | New York, NY 10167 |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|

| | | | | | Earliest | Latest |
|---|---|---|---|---|---|---|
| ☒ RACE | ☒ COLOR | ☐ SEX | ☐ RELIGION | ☒ NATIONAL ORIGIN | 2/2008 | 5/08/2017 |
| ☐ RETALIATION | ☐ AGE | ☐ DISABILITY | ☐ GENETIC INFORMATION | | | |
| ☐ OTHER (Specify) | | | | | ☒ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)).
See accompanying Exhibits A and B.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

CONFIDENTIAL

DEF015747

## EXHIBIT A

| Name | No. Employees, Members | Phone No. (*Include Area Code*) |
|---|---|---|
| **Major League Baseball Properties, Inc.** | **>500** | **2129317977** |

| Street Address | City, State and Zip Code |
|---|---|
| **245 Park Avenue, 34th Floor** | **New York, NY 10167** |

1. Angel Hernandez filed a Charge of Discrimination with the EEOC on May 9, 2017. The charge number for the May 9th charge is 473-2017-00726. The entity named in the May 9th Charge is Major League Baseball Enterprises, Inc.

2. Upon further research and investigation, Mr. Hernandez does not believe Major League Baseball Enterprises, Inc. is the only entity to have participated in the discrimination against him. Mr. Hernandez believes the parties contained in this Charge—The Office of the Commissioner of Baseball, Major League Baseball Properties, Inc. and Major League Baseball Blue, Inc.—have also participated in the discrimination against him.

3. The Office of the Commissioner of Baseball is an unincorporated association doing business as Major League Baseball ("MLB") and has as its members the Major League Baseball clubs. At all times relevant, the Office of the Commissioner of Baseball d/b/a MLB has had unified operation and common control over the agent corporations such as Major League Baseball Enterprises, Inc., Major League Baseball Properties, Inc. and Major League Baseball Blue, Inc. All do business as MLB.

4. Upon information and belief, Major League Baseball Enterprises, Inc. was merged into Major League Baseball Properties, Inc. in or around October 31, 2015. The discrimination against Mr. Hernandez occurred both before and after October 31, 2015.

5.      Major League Baseball Blue, Inc. is Mr. Hernandez's employer of record.

6.      Thus, in addition to Major League Baseball Enterprises, Inc., The Office of the Commissioner of Baseball, Major League Baseball Properties, Inc. and Major League Baseball Blue, Inc. have also participated in the discrimination against Mr. Hernandez.

7.      For the specific acts of discrimination made by the Office of the Commissioner of Baseball, Major League Baseball Properties, Inc., Major League Baseball Blue, Inc. and Major League Baseball Enterprises, Inc., see the accompanying Exhibit B. In the accompanying Exhibit B, the Office of the Commissioner of Baseball, Major League Baseball Properties, Inc., Major League Baseball Blue, Inc. and Major League Baseball Enterprises, Inc. are collectively referred to as "Major League Baseball."

## EXHIBIT B

## Angel Hernandez's Job Performance History

1.      Charging party Angel Hernandez was born in Havana, Cuba and currently resides in

2.      Mr. Hernandez has been an umpire for Major League Baseball since May 23, 1991, nearly 26 years.

3.      As of the date of the filing of this Charge, Mr. Hernandez is one of the most tenured umpires in Major League Baseball.

4.      Mr. Hernandez's duties as an umpire include calling balls and strikes as a home plate umpire, making judgment calls regarding plays in the game, getting into a position on the field that allows them to make accurate calls, making signals that accurately reflect the calls being made, handling arguments regarding an umpire's decisions and dealing with other high-tension on-field situations.

5.      Major League Baseball regularly conducts evaluations of its umpires' performances, and generally issues the evaluations both in the middle of the year and at the year's end.

6.      The evaluations are based on standards set by Major League Baseball for its umpires in various areas, including focus, hustle, demeanor, style and form of calls, reactions to developments of plays, situation management, official baseball rules and interpretations, and four-umpire mechanics.

7.      The earlier evaluations consist of observers giving individual ratings based on the games at which they were present. For example, an observer may give an umpire an "exceeds standard," "meets standard" or "does not meet standard" rating for a specific event that occurred in the game he was observing.

8.      During his nearly 26 years as an umpire for Major League Baseball, Mr. Hernandez has consistently received above average reviews on his evaluations.

9.      For instance, Mr. Hernandez's 2002 Year-End Evaluation Report Mr. Hernandez had 15 instances where he was rated as "exceeding" the standard, including for hustle, fraternization, four-umpire mechanics, demeanor and style and form of calls.

10.     In that same evaluation, Mr. Hernandez did not receive any "does not meet standard" ratings.

11.     As to Mr. Hernandez's strike zone accuracy, one of the most important statistics for home plate umpires, the Office of the Commissioner commented that his "efforts to call the 'rule book' strike zone [were] extremely obvious," and that Mr. Hernandez did "as good a job calling strikes at the upper and lower limits as any umpire on the staff." The Office of the Commissioner concluded that his work was "quite impressive." Mr. Hernandez's overall percentage of correctly called strikes and balls was 92.19% for the 2002 season.

12.     In Mr. Hernandez's 2003 Year-End Evaluation he received at least 12 "exceeds standard" ratings, including for demeanor, style and form of calls, reactions to developments of

                                                                              DEF015750

plays, situation management, official baseball rules and interpretations, and four-umpire mechanics.

13.     In that same evaluation, Mr. Hernandez did not receive any "does not meet standard" ratings.

14.     In that same evaluation, Mr. Hernandez received seven "meets standard" ratings for how he handled in game situations regarding warnings and ejections. Mr. Hernandez was praised for his "calm and professional" demeanor in handling these types of situations.

15.     For the 2003 season, Mr. Hernandez had a 92.67% rate of correct calls on strikes and balls when he was a home plate umpire. This was deemed by the Office of the Commissioner as having warranted an "exceeds standard" rating. The Office of the Commissioner also commented on his excellent work behind the plate, stating that Mr. Hernandez "adheres to the overall Rule Book definition of the strike zone as well as any umpire on the MLB staff."

16.     The General Evaluative Comments contained in Mr. Hernandez's 2003 Year-End Evaluation further reflected the Office of the Commissioner's satisfaction with his work. The comments stated that Mr. Hernandez had "done all that the Office of the Commissioner has asked as far as policies and procedures . . . are concerned." The Comments also noted Mr. Hernandez's "great passion for being a Major League umpire," and urged him to "[k]eep up the good work and [his] good work ethic."

17.     In Mr. Hernandez's 2004 Mid-Season evaluation, Mr. Hernandez received five "exceeds standard" ratings for hustle, MLB procedures, reactions to development of plays, official baseball rules and interpretations, and focus.

18.     In that same evaluation, Mr. Hernandez did not receive any "does not meet standard" ratings.

19.     In that same evaluation, Mr. Hernandez received four "meets standard" ratings for how he handled in-game situations regarding warnings and ejections.

20.     For the 2004 Mid-Season Evaluation, Mr. Hernandez had an adjusted overall percentage of 94.51% for his rate of correct calls on strikes and balls when he was a home plate umpire. The Office of the Commissioner commented that Mr. Hernandez did "an outstanding job in adhering to all portions of the strike zone," and that he was "a model for what we are looking for."

21.     Mr. Hernandez's 2004 Year-End Evaluation showed that his great performance in the first half of the 2004 season carried over into the second half, as he received an additional "exceeds standard" rating for style and form of calls where the observer noted that his work was an "absolutely phenomenal display of talent."

22.     During the second half of the 2004 season, Mr. Hernandez did not receive any "does not meet standard" ratings.

23.     In that same evaluation, Mr. Hernandez received "meets standard" ratings in ejections and situation handling as evaluated by the Office of the Commissioner, submitting umpire reports, and communication with the Office.

24.     Mr. Hernandez's excellent work accurately calling strikes and balls continued in the second half of the 2004 season, with his adjusted overall percentage of correct calls rising to 94.73% for the whole season. This once again received an "exceeds standard" rating from the

Office of the Commissioner. The Office of the Commissioner noted that Mr. Hernandez performed "at a high level every plate game" and that he "adheres to the overall strike zone extremely well."

25.    The General Evaluative Comments in Mr. Hernandez's 2004 Year-End Evaluation noted that he "had another outstanding year." They further commented that Mr. Hernandez had done "an exemplary job of implementing MLB policies and procedures."

26.    At the end of the 2004 season, Mr. Hernandez was awarded for his work throughout the season by being assigned as an umpire to the League Championship Series.

27.    In Mr. Hernandez's 2005 Mid-Season Evaluation, he received three "exceeds standard" ratings for focus, demeanor and situation management.

28.    In that same evaluation, Mr. Hernandez did not receive any "does not meet standard ratings."

29.    In that same evaluation, Mr. Hernandez received two "meets standard" ratings for situations involving warnings and ejections.

30.    For his 2005 Mid-Season Evaluation, Mr. Hernandez had an adjusted overall percentage of 93.69% for his rate of correct calls on strikes and balls when he was a home plate umpire. Though the evaluation did state that he should focus on his accuracy calling outside pitches, the Office of the Commissioner noted that Mr. Hernandez "adhere[d] to overall strike zone quite well."

31.    In the second half of the 2005 season, as shown in his 2005 Year-End Evaluation Mr. Hernandez received another "exceeds standard" rating.

32.    Mr. Hernandez did not receive any "does not meet standard" ratings in the second half of the 2005 season.

33.    Mr. Hernandez continued to handle in-game situations involving warnings and ejections calmly and effectively, receiving another four "meets standard" ratings for such situations.

34.    Mr. Hernandez also received "meets standard" ratings in ejections and situation handling as evaluated by the Office of the Commissioner, submitting umpire reports, communications with the Office, and pace of game procedures.

35.    Mr. Hernandez continued to shine in his accuracy calling balls and strikes as a home plate umpire, with his adjusted overall accuracy percentage rising to 94.85% for the entire 2005 season. The Office of the Commissioner commented that Mr. Hernandez was "to be commended for continued application of the strike zone."

36.    The General Evaluative Comments in Mr. Hernandez's 2005 Year-End Evaluation congratulated him "on another outstanding season." The Office of the Commissioner commended him for his "superb" work ethic, and his "cooperation with supervisory staff and with the umpire program . . . particularly [his] work with less-experienced umpires."

37.    During the 2005 season, Mr. Hernandez was an interim crew chief filling in for another umpire, for which the Office of the Commissioner commented that he did a "fine job."

38.    As a result of the high quality of his work in the 2005 season, Mr. Hernandez was awarded postseason assignments in both the Division Series and the World Series.

39.    Mr. Hernandez's 2006 Year-End Evaluation showed that he continued to perform his duties as an umpire for Major League Baseball well. For the 2006 season, Mr. Hernandez

**CONFIDENTIAL**                                                                                      **DEF015752**

received 11 "exceeds standard" ratings for focus, style and form of calls, MLB procedures, situation management, and reactions to development of plays.

40. Once again, Mr. Hernandez did not receive any 'does not meet standard" ratings for the 2006 season.

41. Mr. Hernandez had ten different situations in the 2006 season where he had to handle a warning and/or an ejection. For each of these situations, Mr. Hernandez received a "meets standard" rating.

42. For the 2006 season, Mr. Hernandez also received a "meets standard" rating for ejections and situation handling as evaluated by the Office of the Commissioner, submitting umpire reports, communications with the Office and pace of game procedures.

43. Mr. Hernandez received six "exceeds standard" ratings in his 2007 Year-End Evaluation for style and form of calls, hustle, reactions to development of plays, demeanor and focus.

44. Once again, Mr. Hernandez did not receive any "does not meet standard" ratings for the 2007 season.

45. In the 2007 season, Mr. Hernandez continued to calmly and effectively handle in-game situations involving warnings and ejections. He received six "meets standard" ratings for these situations, and one "exceeds standard" rating for his handling of a situation, wherein a pitcher was throwing at the head of the batter.

46. Once again, Mr. Hernandez received "meets standard" ratings in 2007 for ejections and situation handling as evaluated by the Office of the Commissioner, submitting umpire reports, communication with the Office and pace of game procedures.

47. Mr. Hernandez's excellent work behind the plate continued in 2007, with his adjusted overall percentage of accurately called balls and strikes was 96.40%. This warranted an "exceeds standard" rating, and the Office of the Commissioner commented that Mr. Hernandez had an "excellent performance in adhering to the overall strike zone." The Office of the Commissioner did not indicate any area in the strike zone in which Mr. Hernandez could improve.

48. The General Evaluative Comments indicated that the Office of the Commissioner continued to be impressed by Mr. Hernandez's work. The Comments stated that "the Office of the Commissioner felt [he] had an excellent season overall." It noted that he "continue[d] to show a willingness to learn and improve—even though [he has] become a veteran Major League umpire." The Office of the Commissioner also greatly appreciated how Mr. Hernandez set an "excellent example for the junior umpires."

49. As a result of Mr. Hernandez's excellent 2007 season, he was awarded with a League Championship Series assignment in the postseason.

50. In Mr. Hernandez's 2008 Year-End Evaluation, he received two "exceeds standard" ratings for situation management.

51. Once again, Mr. Hernandez did not receive any "does not meet standards" ratings in the 2008 season.

52. For the 2008 season, Mr. Hernandez received three "meets standard" ratings and one "exceeds standard" ratings for his handling of in-game situations involving warnings and

ejections. The observers noted that Hernandez had a "professional demeanor" in handling these situations.

53. Mr. Hernandez once again received "meets standard" ratings for ejections and situation handling as evaluated by the Office of the Commissioner, submitting umpire reports, communication with the Office and pace of game procedures.

54. Mr. Hernandez's work as a home plate umpire in the 2008 season was once again excellent, with his adjusted overall accuracy percentage on calling balls and strikes at 96.35%. This received an "exceeds standard" rating. The Office of the Commissioner noted that Mr. Hernandez had an "excellent performance in adhering to the overall strike zone as defined." The Office of the Commissioner did not indicate any areas for improvement regarding Mr. Hernandez's strike zone accuracy.

55. The General Evaluative Comments also stated that Mr. Hernandez is "a solid umpire, who is conscientious and takes his job seriously," further commenting by saying that his "dedication and desire to excel are evident in [his] day-to-day approach and professionalism."

56. Following the 2008 season, the format of the evaluations changed to make them more standardized. Instead of individual observers' comments and ratings, the Office of the Commissioner rated the umpires according to the same "exceeds standard," "meets standard" and "does not meet standard" ratings. These ratings were given in various areas, including Effort and Professionalism, Game and Situation Management, Field Proficiency, and an Administrative Component and Judgment Component.

57. The Effort and Professionalism category includes the following sub-categories: focus, hustle, demeanor, appearance, mobility, and fraternization.

58. The Game and Situation Management category includes the following sub-categories: MLB procedures, official baseball rules and interpretations and situation management.

59. The Field Proficiency category includes the following sub-categories: style and form of calls, four-umpire mechanics and reactions to development of plays.

60. The new format of the evaluations limited the amount of influence the individual observers had on the overall evaluations, with there being no standard ratings for individual instances. Instead, the ratings were given by the Office of the Commissioner in a review of the individual observers' reports.

61. The Administrative Component of the evaluation includes the following sub-categories: ejections and situation handling, submitting umpire reports, communication with office and application of pace of game procedures.

62. The Judgment Component of the evaluation includes the following sub-categories: plate judgment and base judgment.

63. In Mr. Hernandez's 2010 Year-End Evaluation, he received three "exceeds standard" ratings in various sub-categories, including hustle, situation management and application of pace of game procedures.

64. For the rest of the sub-categories, Mr. Hernandez received a "meets standard" rating for the 2010 season.

65. Mr. Hernandez did not receive any "does not meet standard" ratings in any of the sub-categories for the 2010 season.

CONFIDENTIAL                                                                            DEF015754

66. In that same evaluation, Mr. Hernandez was praised for his "work ethic," his "good umpiring instincts," and his "marked improvement in the handling of situations."

67. Mr. Hernandez had a 96.55% accuracy in calling balls and strikes as a home plate umpire for the 2010 season. That was nearly a full 1% higher than the umpire staff average for that season. Despite his above average accuracy, Mr. Hernandez received only a "meets standard" rating and was instructed to focus on the upper and lower portions of the strike zone.

## Joe Torre's Arrival in the Office of the Commissioner

68. Following the 2010 season, there was a change in the Office of the Commissioner as Joe Torre was named Executive Vice President for Baseball Operations on February 26, 2011. In this position, Torre was charged with overseeing Major League Baseball's umpires.

69. Torre is now Major League Baseball's Chief Baseball Officer. He still oversees Major League Baseball's umpires in this position.

70. Torre has a history with Mr. Hernandez, dating back to at least May 4, 2001, when Torre insulted Mr. Hernandez to the media when he was the manager of the New York Yankees.

71. After what Torre perceived to be an incorrect call by Mr. Hernandez, Torre took to the media to insult him and call into question his skill as a Major League umpire.

72. Torre is quoted as saying that Mr. Hernandez "seems to see something nobody else does," quipping that "you'd like to have him sit down and watch the video, something I'm sure he doesn't do. . ." Torre went on to say that, if Mr. Hernandez had reviewed the video, "he would look like a fool."

73. Torre further commented on Mr. Hernandez's call by saying "I think he just wanted to be noticed over there."

74. Following Torre's hiring in Major League Baseball's front office, the notion that Mr. Hernandez "just wanted to be noticed" permeated Mr. Hernandez's yearly evaluations, as did Torre's general negative attitude towards Mr. Hernandez.

75. In Mr. Hernandez's 2011 Mid-Year Evaluation, he did not receive any "exceeds standard" ratings despite having received multiple for every year since at least 2002. Most notably, under the "Administrative Component" of the evaluation, there was the following comment from the Office of the Commissioner to Mr. Hernandez: "You need to work on your communication skills with on-field personnel, particularly because your approach has fostered a Club perception that you try to put yourself in the spotlight by seeing things that other umpires do not."

76. Prior to 2011, Mr. Hernandez was never rebuked by the Office of the Commissioner for attempting to "put himself in the spotlight" by failing to act in accordance with the rules. In fact, as recently as 2010, Mr. Hernandez received an "exceeds standard" rating for his in-game situation management.

77. These comments were made despite the fact that Mr. Hernandez had been routinely praised for his handling of situations involving on-field personnel, including situations involving warnings and ejections. Mr. Hernandez had never received lower than a "meets

standard" rating in the previous 9 years, and had received multiple "exceeds standard" ratings for his handling of precarious situations such as these.

78.     For his "Base Judgment," Mr. Hernandez received a "meets standard" rating despite the comments stating that he worked "with a tremendous amount of instinct," that he hustles "to see every play clearly and have a positive 'feel' for the game," and further noting that he had not missed a call for the first half of the 2011 season.

79.     Following the All-Star Break in the middle of the season, the Office of the Commissioner, for no valid reason, decided to break up Mr. Hernandez and his long-time crew chief Joe West. Mr. Hernandez was then placed on Gerry Davis' crew.

80.     In his 2011 Year-End Evaluation, Mr. Hernandez was given a "meets standard" rating for his "demeanor," despite receiving multiple "exceeds standard" ratings for his demeanor in previous evaluations. Again, the Office of the Commissioner's comments noted that Mr. Hernandez was "battling the perception of the Clubs and the media that [he was] routinely attempting to put [himself] in the spotlight."

81.     This is despite the individual observer's reports never showing there was a time where Mr. Hernandez acted in such a way as to "put himself in the spotlight" during the 2011 season. During instances where he was tasked with handling high-tension on-field situations, the observers routinely noted that Mr. Hernandez was "calm," "professional," "businesslike," and/or "composed." No observer noted that Mr. Hernandez ever acted in any other way during these situations.

82.     Furthermore, one observer noted that "Amgel [sic] is a hard worker and great example for other umpires." Another commented that Mr. Hernandez "is a very good umpire."

83.     These observer comments indicate that the Office of the Commissioner's remarks regarding Mr. Hernandez's on-field demeanor were not based on facts.

84.     Mr. Hernandez's performance in base judgment did improve over the course of the 2011 season, earning him his only "exceeds standard" rating in his 2011 Year-End evaluation. Thus, on objective criteria, Mr. Hernandez always performed well.

85.     Mr. Hernandez's accuracy calling balls and strikes behind the plate was 96.21% for the 2011 season, compared to the staff average of 95.67% for the same season.

86.     In Mr. Hernandez's 2012 Year-End Evaluation, he received two "exceeds standard" ratings for his hustle and mobility. The Evaluation noted that Mr. Hernandez's hustle and mobility allowed him to get into position to make proper calls.

87.     Mr. Hernandez received his first "does not meet standard" rating since at least 2002. This rating was received in the area of MLB Procedures. This is despite the fact that the Office of the Commissioner commented that "for the greater part of the season, [Mr. Hernandez] did a commendable job of operating within the guidelines."

88.     For all other categories, Mr. Hernandez received a "meets standard" rating.

89.     The Office of the Commissioner noted that Mr. Hernandez had taken "great strides" in the 2012 season regarding his situation management. One individual observer even gave him an "exceeds standard" rating for his handling of a situation towards the end of the season. However, despite commenting on how well Mr. Hernandez did in this area, he still only received a "meets standard" rating in this category.

90.     Mr. Hernandez was also praised for his "improved disposition" on the field during situations involving warnings and ejections. Once again, however, despite the praise, Mr. Hernandez received only a "meets standard" rating for ejections and situation handling.

91.     As was the case in his 2011 Year-End Evaluation, the Office of the Commissioner commented that Mr. Hernandez was "still battling the perception of the Clubs and media that you are routinely attempting to put yourself in the spotlight."

92.     Mr. Hernandez filled in for most of the 2012 season as an interim crew chief, with the Office of the Commissioner noting that he "should be proud of a lot of" his work in this regard.

93.     For the 2012 season, Mr. Hernandez's accuracy calling balls and strikes behind the plate was 95.22%.

94.     In spite of high marks on the objective criteria, Mr. Hernandez was awarded an assignment to the American League Division Series in the 2012 postseason and once again was not assigned to the World Series.

95.     In his 2013 Year-End Evaluation, Mr. Hernandez did not receive any "exceeds standard" or "does not meet standard" ratings—he was given a "meets standard" rating in all categories.

96.     Mr. Hernandez received a "meets standard" rating in Style and Form of Calls despite the comment that his "mechanics were picture perfect and emulated by less-experienced umpires."

97.     The Office of the Commissioner noted that Mr. Hernandez had shown a "consistent effort to maintain a professional approach on the field."

98.     Once again, however, the Office of the Commissioner commented on Mr. Hernandez's on-field demeanor, stating "You will likely battle the perception of the Clubs and media that you are routinely attempting to put yourself in the spotlight for some time." It also commented that "As you know in this 'perception is reality'-based business, any bump in your professional behavior will be magnified by the media and the fans."

99.     Mr. Hernandez's accuracy calling pitches behind the plate was 96.72% for the 2013 season.

100.    In Mr. Hernandez's 2014 Year-End Evaluation, he once again did not receive any "exceeds standard" or "does not meet standard" ratings.

101.    Despite not receiving any "exceeds standard" ratings, Mr. Hernandez was commended by the Office of the Commissioner for displaying the appropriate knowledge of the rules and applying them correctly "in most instances" and for handling in-game situations "in a calm and professional manner."

102.    In the 2014 Year-End Evaluation, the Office of the Commissioner addressed for the first time Mr. Hernandez's desire for a "greater leadership role among the staff."

103.    The comments stated that Mr. Hernandez needed "to continue to take steps forward in [his] communication and [his] accountability before" a greater leadership role could be given.

104.    The Office of the Commissioner specifically noted in Mr. Hernandez's 2014 Year-End Evaluation that he had a discussion with Torre where Torre explained to him that Mr. Hernandez needed "to be accountable to [himself] and let things from the past go."

105. For the 2014 season, Mr. Hernandez's accuracy calling pitches behind the plate was 95.73%.

106. Mr. Hernandez once again did not receive any "exceeds standard" or "does not meet standard" ratings for the 2015 season in his 2015 Year-End Evaluation, receiving a "meets standard" rating in every category.

107. Under the "Rules and Interpretations" category, the Office of the Commissioner commented that "this component should be an area of focus" for Mr. Hernandez as he looked to have a greater leadership role on the staff.

108. The Office of the Commissioner continued to comment on the so-called "perception" of Mr. Hernandez off the field, stating in the comments under the "Professionalism" category that that he needed to be aware of "the perception [he was] giving off on the field."

109. The Overall Evaluative Comments of the 2015 Year-End evaluation noted that Mr. Hernandez had "performed well" during the 2015 season.

110. As a result of his performance during the 2015 season, Mr. Hernandez was awarded an assignment to the American League Division Series in the 2015 postseason.

111. In his 2016 Year-End Evaluation, Mr. Hernandez received only one "exceeds standard" rating. This was in the "style and form of calls" category.

112. Mr. Hernandez received "meets standard" for all other categories in the 2016 season.

113. Mr. Hernandez was deemed to have missed 12 calls over the course of the 2016 season. This is despite him not missing more than three over the course of any of the previous 14 seasons.

114. The Office of the Commissioner's comments noted that Mr. Hernandez was "close to not meeting standard" for the 2016 season for his field judgment. It further stated that "there [was] some concern with [his] field judgment."

115. Mr. Hernandez had only received one "does not meet standard" rating since 2002.

116. The Office of the Commissioner had never before been so critical of Mr. Hernandez's on-field judgment. In fact, Mr. Hernandez had received multiple "exceeds standard" ratings in past seasons regarding his on-field judgment, and had been praised for his ability to get into position to make the correct call, and then making the correct call.

117. For the 2016 season, Mr. Hernandez had an accuracy percentage of 96.88% in calling balls and strikes as a home plate umpire.

118. The Evaluative Comments for Mr. Hernandez's 2016 Year-End Review once again harped on "the long-standing perception" of Mr. Hernandez throughout the league, five years after mentioning it for the first time in Mr. Hernandez's 2011 evaluations.

119. Since Torre's arrival in 2011, nearly every evaluation discusses the "perception" that Mr. Hernandez makes calls not to be correct, but to "put himself in the spotlight"—despite this never being discussed before Torre's arrival in the League's front office, nor by any individual observers in that 20-year time frame.

### History of Umpire Promotion and Umpire Postseason Assignments In Major League Baseball Since 2000 and Under Torre

120. Since Torre's arrival in the Office of the Commissioner in early 2011, there have been six World Series in Major League Baseball. Each World Series has an umpire crew comprised of six umpires, for a total of 36 individual assignments.

121. In the six World Series games since Torre's arrival in the Office of the Commissioner, there has been only one non-white umpire assigned to umpire the World Series: Alfonso Marquez, an umpire born in Mexico, was selected in both the 2011 and 2015 World Series.

122. The other 34 umpires selected during Torre's time in the Office of the Commissioner were all white.

123. Mr. Hernandez has not been given a World Series assignment since Torre's arrival, despite being assigned to the World Series in both 2002 and 2005.

124. Mr. Hernandez is fully qualified to be assigned to the World Series, as he has worked the World Series before, has consistently received above average performance reviews, and has substantial experience in umpiring both regular season and postseason games.

125. Mr. Hernandez believes Torre's attitude towards him has influenced the Office of the Commissioner's decision to not give the Charging Party a World Series assignment.

126. Mr. Hernandez believes that Torre's attitude is due to the Charging Party's race, color and/or national origin.

127. Mr. Hernandez believes that because of the Charging Party's race, color and/or national origin, the Charging Party has not received a World Series assignment since Torre's arrival in the Office of the Commissioner.

128. Pursuant to §15(d)(6) of the Basic Agreement Between the Office of the Commissioner and the World Umpires Association (the "Union Agreement"), "all umpires who work the World Series on the field or as a regular Replay Official shall receive Twenty-Eight Thousand Five Hundred Dollars ($28,500.00)."

129. Due to his race, color and/or national origin, Mr. Hernandez has missed numerous opportunities to be assigned to the World Series and receive the World Series bonus mentioned above.

130. During Torre's time in the Office of the Commissioner to date, ten umpires have been promoted to crew chief.

131. All ten umpires that have been promoted during Torre's tenure have been white.

132. Of the ten umpires promoted to crew chief, only one had more experience than Mr. Hernandez.

133. The discrimination against minorities as crew chiefs has existed since before Torre's arrival in the Office of the Commissioner.

134. The position of crew chief has existed in Major League Baseball since at least the early 1900's.

135. Since the American League and the National League joined together in 2000, there have been at least 23 umpires promoted to crew chief.

136. All 23 umpires promoted to crew chief in this period have been white.

137. In each Major League Baseball season from 2000 to 2016, there were 162 games.

138.    From 2000 to 2016, there were 30 teams playing in Major League Baseball each season.

139.    This extrapolates to 2,592 games for each individual team played from 2000 to 2016.

140.    The total number of games played from 2000 to 2016 is 77,760.

141.    For those 77,760 games since the American League and National League joined together in 2000, there has not been a permanent minority crew chief.

142.    This is despite the fact that minority umpires, including Mr. Hernandez, have served as interim crew chiefs throughout portions of some of these seasons.

143.    Under § 4(c)(1) of the Union Agreement, seniority is considered when determining whether an umpire is to be promoted to crew chief.

144.    Mr. Hernandez has not been promoted to crew chief despite having more experience than nine of the ten umpires that were promoted since 2011, and even though he had served as an interim crew chief in 2005 and 2012.

145.    Mr. Hernandez was fully qualified for a promotion to crew chief, as he had the experience necessary for the position, had served as an interim crew chief in the past, had received numerous positive performance reviews since at least 2002, saw his accuracy calling balls and strikes behind the plate increase from 92.19% in 2002 to 96.88% in 2016, and has been routinely mentioned as being a good role model and teacher for newer umpires.

146.    Mr. Hernandez has applied for the position of crew chief at least four times since 2011.

147.    Mr. Hernandez most recently applied for the position of crew chief for the 2017 season.

148.    Mr. Hernandez was not chosen to be a crew chief for the 2017 season.

149.    Under § 4(c)(2) of the Union Agreement, "the Office of the Commissioner must, if requested, furnish to each umpire who has expressed interest but who is not selected a written statement of the reason(s) why the umpire was not chosen." The written explanation from the Office of the Commissioner must be provided to the applying umpire by the beginning of the championship season.

150.    Both Mr. Hernandez and the World Umpires Association requested a written explanation from the Office of the Commissioner as to why Mr. Hernandez was not promoted to crew chief.

151.    On March 27, 2017, nearly two months after Mr. Hernandez and the World Umpires Association had submitted letters requesting an explanation for Mr. Hernandez not being promoted to crew chief, Torre responded on behalf of the Office of the Commissioner.

152.    In the March 27, 2017 letter, Torre stated that Mr. Hernandez needed to "gain greater mastery of the Official Playing Rules and Replay regulations, continue to improve [his] situation management, and display an ability to refocus and move forward after missing calls or receiving constructive feedback from the Office." Of course, this is completely belied by his reviews.

153.    In the same letter, Torre recognized that Mr. Hernandez shares "many of the same qualities and abilities with the selected umpires that the Office of the Commissioner relied on in its selection process, including [his] passion and dedication."

CONFIDENTIAL                                                                    DEF015760

154.    The areas Torre addresses are ones that have only become an "issue" for Mr. Hernandez after Torre took his position in the Office of the Commissioner.

155.    Prior to Torre's arrival in the Office of the Commissioner, Mr. Hernandez has consistently received commendations for his handling of in-game situations and for his ability to get into position and then make the correct call.

156.    Prior to Torre's arrival in the Office of the Commissioner, Mr. Hernandez consistently received praise for adhering to the rules. There had not been any comments regarding Mr. Hernandez's alleged lack of knowledge of the rules before Torre's arrival in 2011.

157.    However, since Torre was placed in the Office of the Commissioner, there was a noticeable tonal shift in Mr. Hernandez's evaluations.

158.    Following Torre's arrival, Mr. Hernandez received less "exceeds standard" ratings in his evaluations.

159.    Following Torre's arrival, there was an increased criticism of his on-field situation handling, his ability to make correct calls in the game, and his overall quality as an umpire—areas in which Mr. Hernandez has consistently received praise before 2011.

160.    Instead of promoting Mr. Hernandez to the position of crew chief, Major League Baseball chose instead to promote individuals who were white and generally had less experience than Mr. Hernandez.

161.    In recent years, Major League Baseball has asked umpires who did not even apply for the position of crew chief to take a crew chief job. If those umpires wanted the job, Major League Baseball would select them over umpires who did correctly apply, including Mr. Hernandez.

162.    Requesting umpires to take the position of crew chief who did not apply, and then selecting those umpires over the umpires who did apply, is in violation of § 4(c) of the Union Agreement.

163.    Mr. Hernandez believes the League's and Torre's attitude has influenced the Office of the Commissioner's decision not to promote the Charging Party to crew chief.

164.    Mr. Hernandez believes the League's and Torre's attitude is due to the Charging Party's race, color and/or national origin.

165.    In violation of Title VII, 42 U.S.C. § 2000 et seq., Mr. Hernandez believes that he has not been promoted to crew chief because of his race, color and/or national origin.

166.    Every day that Mr. Hernandez is not a crew chief, he is being discriminated against in many cities around the United States, including in the city of Cincinnati, Hamilton County, Ohio.

167.    The refusal to hire Mr. Hernandez as a crew chief has been a continuing act of discrimination since at least February, 2008.

168.    Crew chiefs are compensated an extra $100 a game for their crew chief responsibilities, according to § 4(c)(5) of the Union Agreement.

169.    As stated, 34 out of the 36 umpires selected to work the World Series during Torre's tenure were white.

170.    Since crew chiefs were selected many years ago, there has never been an African-American crew chief, and, with the exception of one American born umpire of Latino descent,

no other minority umpire (including African-Americans, Mexicans, Cubans and other Latinos) has been selected to be crew chief.

171.    The discrimination against Mr. Hernandez that is the subject of this Charge has occurred wherever Mr. Hernandez has worked as an umpire for Major League Baseball without having been promoted to the position of crew chief.

172.    This continuing discrimination has occurred through at least May 9, 2017 in Cincinnati, Ohio, where Mr. Hernandez worked as an umpire for the Major League Baseball game between the New York Yankees and the Cincinnati Reds.

**U.S. Equal Employment Opportunity Commission**

|  | PERSON FILING CHARGE |
|---|---|
| ⌐                                                ¬ | |
| | **Angel Hernandez** |
| | THIS PERSON (check one or both) |
| **MLB, OFFICE OF COMMISSIONER**<br>**245 Park Ave**<br>**New York, NY 10167** | [X] Claims To Be Aggrieved |
| | [ ] Is Filing on Behalf of Other(s) |
| ⌊                                                ⌋ | EEOC CHARGE NO.<br>**473-2017-00825** |

### NOTICE OF CHARGE OF DISCRIMINATION
*(See the enclosed for additional information)*

This is notice that a charge of employment discrimination has been filed against your organization under:

[X] Title VII of the Civil Rights Act (Title VII)    [ ] The Equal Pay Act (EPA)    [ ] The Americans with Disabilities Act (ADA)

[ ] The Age Discrimination in Employment Act (ADEA)    [ ] The Genetic Information Nondiscrimination Act (GINA)

The boxes checked below apply to our handling of this charge:

1. [X] No action is required by you at this time.

2. [ ] Please call the EEOC Representative listed below concerning the further handling of this charge.

3. [ ] Please provide by a statement of your position on the issues covered by this charge, with copies of any supporting documentation to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

4. [ ] Please respond fully by to the enclosed request for information and send your response to the EEOC Representative listed below. Your response will be placed in the file and considered as we investigate the charge. A prompt response to this request will make it easier to conclude our investigation.

5. [ ] EEOC has a Mediation program that gives parties an opportunity to resolve the issues of a charge without extensive investigation or expenditure of resources. If you would like to participate, please say so on the enclosed form and respond by
to
If you DO NOT wish to try Mediation, you must respond to any request(s) made above by the date(s) specified there.

For further inquiry on this matter, please use the charge number shown above. Your position statement, your response to our request for information, or any inquiry you may have should be directed to:

**Vicki L. McCoy,**
**Investigator Support Asst**

*EEOC Representative*

*Telephone*    **(513) 684-6189**

**Cincinnati Area Office**
**John W. Peck Fed. Bldg**
**550 Main St  Room 10-019**
**Cincinnati, OH 45202**
**Fax: (513) 246-0218**

Enclosure(s): [X] Copy of Charge

CIRCUMSTANCES OF ALLEGED DISCRIMINATION

[X] Race   [X] Color   [ ] Sex   [ ] Religion   [X] National Origin   [ ] Age   [ ] Disability   [ ] Retaliation   [ ] Genetic Information   [ ] Other

**See enclosed copy of charge of discrimination.**

| Date | Name / Title of Authorized Official | Signature |
|---|---|---|
| **June 28, 2017** | **Melanie L. Breen,**<br>**Area Office Director** | |

**CONFIDENTIAL**        **DEF015763**

## INFORMATION ON CHARGES OF DISCRIMINATION

### EEOC RULES AND REGULATIONS

Section 1601.15 of EEOC's regulations provides that persons or organizations charged with employment discrimination may submit a statement of position or evidence regarding the issues covered by this charge.

EEOC's recordkeeping and reporting requirements are found at Title 29, Code of Federal Regulations (29 CFR): 29 CFR Part 1602 (see particularly Sec. 1602.14 below) for Title VII and the ADA; 29 CFR Part 1620 for the EPA; and 29 CFR Part 1627, for the ADEA. These regulations generally require respondents to preserve payroll and personnel records relevant to a charge of discrimination until disposition of the charge or litigation relating to the charge. (For ADEA charges, this notice is the written requirement described in Part 1627, Sec. 1627.3(b)(3), .4(a)(2) or .5(c), for respondents to preserve records relevant to the charge – the records to be retained, and for how long, are as described in Sec. 1602.14, as set out below). Parts 1602, 1620 and 1627 also prescribe record retention periods – generally, three years for basic payroll records and one year for personnel records. Questions about retention periods and the types of records to be retained should be resolved by referring to the regulations.

**Section 1602.14  Preservation of records made or kept.** . . . . Where a charge ... has been filed, or an action brought by the Commission or the Attorney General, against an employer under Title VII or the ADA, the respondent ... shall preserve all personnel records relevant to the charge or the action until final disposition of the charge or action. The term *personnel records relevant to the charge*, for example, would include personnel or employment records relating to the aggrieved person and to all other aggrieved employees holding positions similar to that held or sought by the aggrieved person and application forms or test papers completed by an unsuccessful applicant and by all other candidates or the same position as that for which the aggrieved person applied and was rejected. The date of *final disposition of the charge or the action* means the date of expiration of the statutory period within which the aggrieved person may bring [a lawsuit] or, where an action is brought against an employer either by the aggrieved person, the Commission, or the Attorney General, the date on which such litigation is terminated.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Section 704(a) of Title VII, Section 207(f) of GINA, Section 4(d) of the ADEA, and Section 503(a) of the ADA provide that it is an unlawful employment practice for an employer to discriminate against present or former employees or job applicants, for an employment agency to discriminate against any individual, or for a union to discriminate against its members or applicants for membership, because they have opposed any practice made an unlawful employment practice by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the statutes. The Equal Pay Act contains similar provisions. Additionally, Section 503(b) of the ADA prohibits coercion, intimidation, threats, or interference with anyone because they have exercised or enjoyed, or aided or encouraged others in their exercise or enjoyment, of rights under the Act.

Persons filing charges of discrimination are advised of these Non-Retaliation Requirements and are instructed to notify EEOC if any attempt at retaliation is made. Please note that the Civil Rights Act of 1991 provides substantial additional monetary provisions to remedy instances of retaliation or other discrimination, including, for example, to remedy the emotional harm caused by on-the-job harassment.

### NOTICE REGARDING REPRESENTATION BY ATTORNEYS

Although you do not have to be represented by an attorney while we handle this charge, you have a right, and may wish to retain an attorney to represent you. If you do retain an attorney, please give us your attorney's name, address and phone number, and ask your attorney to write us confirming such representation.

**CONFIDENTIAL**

**DEF015764**