UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X
                                       :
ANGEL HERNANDEZ,                       :
                                       :   18-CV-09035 (JPO)
                Plaintiff,             :
                                       :
        v.                             :
                                       :   500 Pearl Street
THE OFFICE OF THE COMMISSIONER OF      :   New York, New York
BASEBALL, *et al.*,                    :
                                       :
                Defendants.   :   November 26, 2019
---------------------------------------X

TRANSCRIPT OF CIVIL CAUSE FOR TELEPHONIC CONFERENCE
BEFORE THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          KEVIN L. MURPHY, ESQ.
                            Murphy Landen Jones, PLLC
                            2400 Chamber Center Drive
                            Suite #200
                            Fort Mitchell, Kentucky 41017

                            NICHOLAS J. ZAITA, ESQ.
                            Lewis DiBiasi Zaita Higgins
                            82 East Allendale Road
                            Suite #6
                            Saddle River, New Jersey 07458

For the Defendants:         NEIL ABRAMSON,
                            ADAM LUPION, ESQ.
                            RACHEL SARAH FISCHER, ESQ.
                            Proskauer Rose, LLP
                            11 Times Square
                            New York, New York 10036


Court Transcriber:          SHARI RIEMER, CET-805
                            TypeWrite Word Processing Service
                            211 N. Milton Road
                            Saratoga Springs, New York 12866


Proceedings recorded by electronic sound recording,
transcript produced by transcription service

1          THE CLERK:  In the matter of Hernandez v. The Office

2   of the Commissioner of Baseball, et al., 18-CV-9035.

3          Counsel, please state your name for the record.

4          MR. MURPHY:  Kevin Murphy and Nick Zaita, Your

5   Honor, for the plaintiff.

6          MR. ABRAMSON:  Neil Abramson, Adam Lupion and Rachel

7   Fischer for the defendants.

8          THE COURT:  Okay.  Welcome everyone.  You can be

9   seated if you're not speaking in court.

10          We are here based upon the plaintiff's motion to

11   amend docket I think 100 is the number.  So it's the

12   plaintiff's motion.  I'll hear from them first.

13          MR. MURPHY:  May it please the Court.  This is a

14   Rule 15 motion which the court should freely give when justice

15   so requires.  Yes, Rule 16 also is applicable but as you

16   stated in Topps it's a Rule 15 decision and the burden is on

17   the defendants to show prejudice or bad faith.

18          As we argued in the court in our briefing, they have

19   not shown either one of those.  In fact, the opposite is true.

20   The answer to the interrogatory listed the facially neutral

21   policy criteria utilized with the most crew chiefs, and it

22   turned out to be very misleading.  They listed the following

23   which was also included in letters to minority umpires turned

24   down from the motions to crew chiefs.  Strike zone accuracy,

25   made and missed calls, agility and position accuracy,

1   attendance, replay regulations, adherence to the four umpire

2   system and playing rules.  All of those describe a facially

3   neutral system because they're objective and that's how they

4   describe it and we call it in the briefs a crew chief

5   promotion system.

6          When we got to the depositions, which was delayed

7   for over a year due to a motion to dismiss pending in

8   Cincinnati and then it took a year and one month to get all of

9   their documents including documents after we deposed the key

10  people, we discovered that Hickox and Torres would testify

11  that the interrogatory answer was misleading at best if not

12  false.  We found out that baseball spends millions of dollars

13  on supervisors and observers to fill out the other reports to

14  submit to Park Avenue but that Torres and Hickox never look at

15  them.  We never knew that before the depositions.

16         Rather, what they consider is basically subjective.

17  Situational management, leadership and consistency.  We never

18  knew that.  They didn't look at those and we never knew that

19  they would alter the midyear and end of year reports as we

20  stated in our brief that were not contained in evaluations.

21         THE COURT:  That they would -- what was the word,

22  alter?

23         MR. MURPHY:  There was midyear and end of year

24  reviews.

25         THE COURT:  First, did you use the word alter?  I

4

1   couldn't hear you.

2              MR. MURPHY:  Well, what they said was --

3              THE COURT:  Can you just tell me what word you said

4   so I can --

5              MR. MURPHY:  If I said that let me explain.

6              THE COURT:  Okay.

7              MR. MURPHY:  Both men testified that nothing should

8   be contained in midyear and end of year reviews that were not

9   contained in the game evaluation.  Number one, they didn't

10  look nor consider the game evaluations.  Number two, we now

11  know that there are things in the midyear and end of year that

12  were not in the game evaluations.

13             THE COURT:  I thought they didn't look at them

14  anyway.

15             MR. MURPHY:  They looked at the midyear and the end

16  of year.

17             THE COURT:  They did look at those, just not at the

18  underlying ones.

19             MR. MURPHY:  Not the day by day ones.

20             THE COURT:  Got it.  Sorry.

21             MR. MURPHY:  And those are the ones which include

22  the objective criteria that they listed in the interrogatory.

23             We also have a second method, and that is what's

24  contained in <u>Watson v. Ft. Worth</u> and <u>Walmart v. Dukes</u>.  Two

25  Supreme Court cases giving discretion --

1          THE COURT:  When you say a second method, what's the

2   first method?  I'm sorry.  I lost you.

3          MR. MURPHY:  There are crew chief selection process

4   and the World Series selection process were described in

5   interrogatory answers.

6          THE COURT:  Right.  As a mix of objective and

7   subjective, okay.

8          MR. MURPHY:  That is correct.  What we found out in

9   depositions for the first time --

10         THE COURT:  Was they're relying on subjective;

11  right?

12         MR. MURPHY:  Yes, sir.

13         THE COURT:  Good.  Keep going.

14         MR. MURPHY:  So --

15         THE COURT:  Then you started talking about a case

16  law and a second method.  I wanted to make sure I knew what

17  the first method was.

18         MR. MURPHY:  Right.  The facially neutral policy as

19  described by Major League Baseball is in their interrogatory

20  answers and in their letters to umpires when minority umpires

21  would get denied a promotion to crew chief and we found out it

22  just simply wasn't true.  So there's one aspect that we

23  reached that prong.

24         The second aspect is the two Supreme Court cases I

25  mentioned wherein he gives discretion to a white person and

6

1   allow his subjective decision to promote is an employer
2   undisclosed system of subjective decision making which can
3   have the same effect as a system -- a facially neutral system.
4   That those two cases say that just simply giving subjective
5   discretion to a white person is and of itself a neutral policy
6   system that can be abused and discriminatory.
7            So that's the way I was trying to explain inartfully
8   and I apologize, the two routes for the neutral facial system
9   in effect.
10           THE COURT:  That's -- I thought I was understanding.
11  I don't understand what the two routes are.
12           MR. MURPHY:  The neutral, facially neutral policy.
13  It's the combination of the objective and the subjective that
14  they told us in the interrogatory answer.
15           THE COURT:  Okay.
16           MR. MURPHY:  And in what was contained in the
17  letters to the umpires when they were turned down.
18           THE COURT:  Right.
19           MR. MURPHY:  In the depositions we discovered that
20  Mr. Torres does not look at any of the game by game
21  evaluations.
22           THE COURT:  Any of the objective stuff.
23           MR. MURPHY:  Yes, sir.
24           THE COURT:  Okay.
25           MR. MURPHY:  Right.

7

1          THE COURT:  I understand all that.  What are the two

2    routes?  The laws were use objective and subjective and the

3    other --

4          MR. MURPHY:  The second --

5          THE COURT:  Let me finish my sentence.  We're being

6    recorded by the way.

7          MR. MURPHY:  I apologize.

8          THE COURT:  So the two routes -- I'm just not sure

9    what the two routes are.  You're saying subjective and

10   objective criteria which is what was touted as the way they

11   were doing it versus the way that you characterize their

12   deposition as showing they actually did it?  Are those the two

13   routes or am I missing something?

14         MR. MURPHY:  The Supreme Court states --

15         THE COURT:  Is the answer no and then you're about

16   to tell me the answer?  Because that was a yes/no question.

17   Are those the two routes you're talking about?

18         MR. MURPHY:  The two routes that I'm talking about

19   are the one I just described and the second one is a solely

20   subjective route.

21         THE COURT:  You're talking about two legal routes to

22   proving discrimination?

23         MR. MURPHY:  Two legal routes to have a disparate

24   impact claim both considered neutral, facially neutral

25   policies.

8

1          THE COURT:  Are the two routes -- you could do it

2  with having objective criteria and the other is with

3  subjective criteria?  Are those the two routes?

4          MR. MURPHY:  Yes.

5          THE COURT:  Thank you.  Now I understand.

6          MR. MURPHY:  Again, I --

7          THE COURT:  Don't apologize.  It's all right.  We

8  just need to understand each other.  Keep going.

9          MR. MURPHY:  I just wanted to alert the Court that

10  those -- that decision of giving one person completely

11  subjective discretion to promote has been given rise to a

12  disparate impact claim by two United States Supreme Court

13  cases, and that's in my brief.

14          THE COURT:  Watson and Walmart?

15          MR. MURPHY:  Yes, sir.

16          THE COURT:  Okay.

17          MR. MURPHY:  Now, the first thing that they argue is

18  delay.  We have a document request that was not fully

19  completed by the defendants for 13 months and we were getting

20  them over the course of numerous different times in drips and

21  drabs.  At one point we came to this Court seeking help

22  because our time to take depositions was dissipating and we

23  needed all the documents.

24          THE COURT:  I think they have a simple argument.  I

25  think it's simpler if you just try to address it directly.  I

1   think their argument is we told you that there were these six,

2   eight -- I can't remember how many criteria.  Some of the

3   objective ones you're talking about and some of the subjective

4   ones that you're relying -- like leadership or whatever it is

5   that you're relying on now for the disparate impact.  So their

6   argument is you know what, you saw there were two kinds.  You

7   could have seen that we were relying on subjective criteria

8   back when we first gave this to you which was before the

9   lawsuit even began because it was in his evaluation or

10  whatever it was, and therefore you could have brought the

11  disparate impact claim when you first filed the case.

12         Os that's their argument.  You can -- I think you

13  should just address that one.

14         MR. MURPHY:  Well, that's not the case because we

15  had no idea about how these so-called facially mutual policies

16  were actually --

17         THE COURT:  Applied.  I mean their argument is, and

18  I'm not saying it's right -- I just want to lay it out there

19  for you.  Their argument is well, it doesn't matter that you

20  now think that we're using only -- we have a list of eight.

21  Four are subjective, four are not subject -- or objective.

22  Whatever claim you're making about the use of subjective you

23  didn't have to know they were the only policies.  You knew

24  they were part of the decision making process.  Therefore you

25  could have brought it -- the claim a long time ago.  That's

1  their argument.

2        MR. MURPHY:  I have three prongs that I have to

3  know.  I have to know specific employment practice or policy.

4  I have to demonstrate that that's -- that a disparity exists

5  and I have to establish a causal relationship between the two.

6        THE COURT:  Right.  So they say the specific thing

7  you're challenging was included in that list of eight and it

8  was whatever the subjective criteria are.  Let's just say it's

9  leadership judgment, judgment about an umpire's leadership.

10 So they're saying that was all there.

11       MR. MURPHY:  I have no way of knowing that --

12 umpires know that supervisors are involved and they know that

13 they're being watched and they know that they fill out forms.

14 In fact, they send it to Park Avenue.  We have no idea until

15 we depose Cory Hickox that they were never looked at.  They

16 weren't considered in the promotion process.

17       THE COURT:  So it's a dispositive significance to

18 you that some of the criteria on the list were not used and

19 that therefore that prevented you from making the claim you're

20 making now.

21       MR. MURPHY:  Yes.  What we learned in the

22 depositions was critical.

23       Moving on.  We took the depositions but we were

24 running out of time even though we still didn't have all of

25 the documents.  I'll just put one point on this and then I'll

11

1   move on.

2          I questioned Randy Marsh about his emails because I

3   had gotten emails from this fellow who was Torres number two

4   right on the eve of the deposition and I asked him when did

5   you turn over your emails and your information to the other

6   side.  He said years ago.  Then I asked him again and he said

7   well, if it's Mr. Murphy it's got to be at least six months

8   ago.  So I get them right on the eve.  In fact, there was one

9   trip I made, Your Honor, where I was on a plane when documents

10  came in, not having the opportunity to use them in

11  depositions.

12         So we were prompt and as soon as we learned from

13  Manford, Hickcox and Torres what we learned we got the

14  transcripts.  We drafted the amended complaint.  We gave it to

15  the other side.  We asked them if we can have their approval.

16         THE COURT:  That's not the period of delay they're

17  complaining about.  It's the period from the filing of the

18  complaint to the sole area with the depositions.

19         Let me ask you, and I hope the answer is no.  Are

20  you going to acquire any more fact discovery on this?

21         MR. MURPHY:  No.

22         THE COURT:  They claim they're going to need more

23  discovery and I'm going to ask them about that but I think

24  it's better if I ask them and then you can respond but if

25  there's something you want to say about their need feel free.

1        MR. MURPHY:  I can tell you this.  We listed a lot

2  of witnesses in my Rule 26 disclosures and we listed witnesses

3  in our interrogatory answers.  They took Angel Hernandez's

4  deposition twice.  The second time with your permission to

5  inquire about the amended complaint along with the union issue

6  and they took our psychologist.  That's it.  They didn't take

7  any other witnesses, any other people who are going to come on

8  the stand, ex supervisors, other umpires.  They didn't take

9  their depositions.  So I think the arguments that they need

10  discovery now on information that they claim to have known

11  throughout is disingenuous.

12        THE COURT:  Well, their issue is they didn't know

13  there was a disparate impact claim and I don't think we can

14  really blame them for that since that word was never used.

15        So I think the thing you have to address is not what

16  discovery they took on the prior complaint but what they would

17  need on the proposed complaint if I will allow the addition of

18  the disparate impact claim.

19        MR. MURPHY:  Two things.  Number one, as to the

20  delay, if they would have given me the documents within 90

21  days I would have taken the depositions way earlier than I

22  did.

23        THE COURT:  I'm not talking about delay.  I'm off

24  delay now.  I'm talking about their argu -- maybe it's better

25  to wait to hear from them.  They're going to make some

1  arguments -- counsel, please don't do that.

2          MR. ABRAMSON:  Apologies.

3          THE COURT:  I'll give everyone a chance to say

4  anything they want to say after the other side is done.  So

5  it's just better if you listen to me.

6          Counsel, do I have your attention?

7          MR. MURPHY:  Always.

8          THE COURT:  Okay.  I'm going to ask them about

9  prejudice and I think it's better if we -- you respond after

10 you hear their answer as to what they need.  So I think we

11 should do it that way.

12         Let's move on to exhaustion and failure to state a

13 claim.

14         MR. MURPHY:  Exhaustion of administrative remedies.

15 We told the EEOC MLB's practices which include one minority

16 umpire since 2011 being selected to the World Series.  We told

17 the EEOC that there were no minority umpires hired since 2011.

18 We told the EEOC that there has never been an African American

19 promoted to crew chief in the history of baseball.  We told

20 the EEOC that there's only been one Hispanic hired by Major

21 League Baseball in its history.  This is disparate impact

22 information that's reasonably related to the factual

23 allegations that was contained in the EEOC charge and the

24 Second Circuit case of <u>Brown v. Coach Doors</u> was right on point

25 that this claim, we'll call it an EEOC investigation, which

1   can reasonably be expected to grow out of the charge of

2   discrimination.  The Brown court saw that plaintiff's

3   disparate impact claim reasonably related to the failure to

4   promote claim.

5           THE COURT:  So we have a few cases out there, not a

6   lot but defendants cited some, that say if you don't say

7   disparate impact in your EEOC charge you can't add it later.

8   It's not exhausted.  Are you familiar with the cases I'm

9   talking about?  They're kind of categorical.

10          MR. MURPHY:  There's one.

11          THE COURT:  It begins with a C.

12          MR. MURPHY:  Yes, Churney [Ph.]

13          THE COURT:  So is it Brown or is there something

14   else going on?

15          MR. MURPHY:  Two things.  Number one, the

16   overwhelming majority of cases on this point belie what was

17   said in [inaudible].  Second, there was an age discrimination

18   case and the facts were such that I think the man who's 42

19   years old and was suing for age discrimination.  So the facts

20   are very dissimilar to this case.

21          But the other cases cited in this district and

22   including Brown v. Coach, if it's reasonably related to the

23   failure to promote as they would expect the EEOC would

24   investigate the complaint and how it affected minority

25   employees.  That's the broad brush that the Second Circuit has

1  declared and I don't think Churney even mentioned it.  So the

2  overwhelming majority of cases would encompass what is going

3  on here, that it would be reasonable to think that the EEOC

4  would investigate a complaint and would have assessed Major

5  League Baseball's promotion policies on how it affected

6  minority employees, and we have the same thing here.  We cited

7  a string of cases in our brief, Your Honor, and I've got them

8  on my desk.  I know you know them.  That belie what Churney

9  said and I would consider that the facts were different.  It

10 was a different claim and it's [inaudible].

11          THE COURT:  On 12(b)(6).

12          MR. MURPHY:  Your Honor, number one, I would argue

13 that that is an argument for a motion to dismiss, not for Rule

14 15 but their arguments about causation is the inextricable

15 zero matter in the Victory case.  The arguments that they're

16 going to make on 12(b)(6) are the very arguments that they're

17 putting forth now that we think none are [inaudible].

18          So, Your Honor, I think that we've made our case for

19 Rule 15 and we would ask that you grant it.

20          THE COURT:  Okay.  I'm not sure I follow what you

21 just said.  It was made in some other case.  What are you

22 talking about, 12(b)(6) argument?

23          MR. MURPHY:  I said that would be -- if that

24 [inaudible] what they're claiming then I think that is more

25 ripe for a motion to dismiss than a Rule 15.

1          THE COURT:  Well, your brief seems to understand

2    this.  I'm surprised you're not agreeing to it but on a motion

3    to amend one of the issues is futility.  If you judge futility

4    on the same standard as 12(b)(6).  So maybe I shouldn't have

5    used the word 12(b)(6) and I should have said futility but

6    your brief addressed it.  So I'm not sure why you're not

7    addressing it here.

8          MR. MURPHY:  All the arguments are the same.

9    They're basically arguing that this is a futile motion because

10   we can't make a claim based upon the arguments that they --

11   that we addressed earlier about neutral employment policies

12   and neutral employment practices.

13         THE COURT:  Well, you touched on it to some degree

14   already.  Maybe I'll hear from them and then I'll give you a

15   chance to respond.  Thank you.

16         MR. MURPHY:  Thank you for your time, Your Honor.  I

17   appreciate it.

18         MR. ABRAMSON:  Thank you, Your Honor.  Just to be

19   clear, this is the third version of the complaint and now

20   they're seeking to add an adverse impact claim.

21         THE COURT:  Disparate.

22         MR. ABRAMSON:  Or disparate impact.  The cases are

23   usually interchangeable.  I'll use disparate impact as opposed

24   to disparate treatment but disparate impact is fine.

25              Disparate impact is premised on the notion that

17

1  there is a facially neutral policy that is having a

2  statistically significant adverse impact on a protected

3  population, and that's what the civil rights act amendments

4  are designed to protect.

5      So basically it is the shift from intentional

6  discrimination to unintentional discrimination and now

7  plaintiff having waited until the end of fact discovery

8  because there's absolutely no evidence of intentional

9  discrimination now asserts -- attempts to assert another

10  theory which is unintentional discrimination.

11      I want if I could follow the lines of questioning in

12  the manner that my adversary gave his argument and also the

13  questions that you raised.  The first has to do with good

14  cause under Rule 16.  This is not a Rule 15 case and although

15  in your decision in Topps you said that Rule 15(b), those

16  cases are relevant to Rule 16 but it doesn't mean that Rule 16

17  is totally read out of the Federal Rules of Civil Procedure.

18  The plaintiff still has to establish good cause and yes,

19  prejudice may be looked at in terms of a consideration of the

20  good cause analysis but it is not going in standard under Rule

21  15(b).  This isn't a 15 amendment and the plaintiff is

22  entitled to know inference that leave to amend can be

23  fairly -- is freely given and I don't believe there's anything

24  in Topps that indicates use and otherwise.  So plaintiff bears

25  the burden.

1        The reason why this is significant is just teeing

2    off something that the plaintiff's counsel said with respect

3    to whether the EEOC was on notice of an adverse impact claim.

4    The plaintiff's attorney just represented that the EEOC charge

5    has all of this information on adverse impact.  Even though

6    they don't use the phrase adverse impact, they talk about the

7    disproportionate number of minorities who are umpired.  All

8    these pieces that they are relying on now to say to you that

9    they have exhausted because they raised it with the EEOC but

10   on the other hand, Your Honor, their position is they could

11   not have known to plead an adverse impact claim until after

12   the conclusion of discovery.  Those are two arguments, Your

13   Honor, that cannot be reconciled.

14       Plaintiff can't establish good cause because the

15   supposed basis for this second amended complaint that MLB

16   relies on subjective criteria like decision making and

17   leadership in its promotion decisions was information that

18   plaintiff has known or at the very least should have known

19   certainly before the filing of the EEOC charge and we have now

20   heard knew about it at least at the time of the EEOC charge.

21   MLB decision makers rely on subjective criteria.

22       THE COURT:  I think I said this.  You're -- and I

23   characterized your argument I think accurately.  You can tell

24   me otherwise.  His answer is well, it was in the list of eight

25   or whatever it is, the leadership, and so forth.  Subjective

1   matters but I didn't know that you were throwing out wholesale
2   all these objective things and that made it for a different
3   case and that wasn't -- it didn't seem fruitful for me to
4   challenge the subjective discrimination -- subjective criteria
5   when I knew it was captioned by these objective criteria but
6   now it does seem appropriate.  That's his argument.
7            MR. ABRAMSON:  Yes.  Your Honor, the problem with
8   that argument is that since it's their burden moving forward
9   and they presented the deposition testimony to you that they
10  want you to rely on to reach that conclusion none of that
11  deposition testimony says that.  The deposition -- this all
12  comes down to their sole threat of why now they realize they
13  have an adverse impact claim is that the daily observation
14  reports which in turn, as Your Honor I think correctly pointed
15  out, go into the midterm evaluation reports and the final
16  evaluation reports which are in turn relied upon for decisions
17  and include both objective and subjective criteria that the
18  plaintiff here is talking about.
19           Because the witness testified they did not look
20  specifically at the daily game reports that somehow objective
21  criteria was totally excluded.  They have to -- under Rule 16
22  they have to come forward with sufficient evidence for you to
23  conclude that they have made out that theory.  None of the
24  supporting documentation supports that theory that they put
25  before you.  That's number one.

1          Number two, even if that's true --

2          THE COURT:  I kind of lost you on that.  What is --

3    did you mean Rule 16?  I lost you.  What was -- what's your

4    point now?

5          MR. ABRAMSON:  They have the burden of showing under

6    Rule 16 that they have good cause to the amendment and their

7    argument that the plaintiff's counsel is making that now they

8    didn't learn until the depositions that it was to the

9    exclusive of objective criteria is not supported by the

10   evidence that they have submitted in support of this motion.

11         The evidence, the deposition testimony, our

12   interrogatory responses, the collective bargaining agreement

13   all show that there's a combination of objective and

14   subjective criteria.  If for purposes of Rule 16 they are

15   going to attempt to make the argument that this was a

16   lightening bolt, that they never would have known that, they

17   have to show that to you under Rule 16 and the transcript

18   references that they have put forward do not at all support

19   the claim that you have heard today that was to the exclusion

20   of objective criteria.  It is a combination of subjective and

21   objective criteria because there are more than one source of

22   the objective criteria.

23         THE COURT:  Right.  I'm not even sure plaintiff went

24   so far as to say it was to the total exclusion.

25         MR. ABRAMSON:  Well --

1          THE COURT:  Let me just finish.

2          MR. ABRAMSON:  I'm sorry.

3          THE COURT:  I think what he said was that there was

4    an emphasis placed on -- on the subjective matters that hadn't

5    been obvious before and that there was certain things that

6    were not looked at at all -- some of the subjective criteria

7    were not looked at all.  There were some things that were in

8    those daily reports that were not in the midterm final

9    reports.

10          MR. ABRAMSON:  Your Honor, whatever those -- in the

11   daily reports get summarized in the midterm and the final

12   reports.  That's why that argument, Your Honor, is in fact a

13   red herring.  Nothing is different than what they knew from

14   when they filed the original complaint.  There is some

15   subjectivity.  The degree of subjectivity may be in question

16   but at least there is -- has always been some subjectivity

17   because it's in the denial letters, the denial letters which

18   indicate that he was denied the opportunity for promotion

19   because of things like leadership and in a situation decision

20   making.

21          The other point of that, Your Honor, is that if

22   their exhaustion has been satisfied and at least the EEOC was

23   put on notice at least by the time they filed a complaint to

24   investigate this as an adverse impact claim, how is it that

25   plaintiff now can say we didn't know about it until the close

1   of discovery?  Those are flatly inconsistent positions.

2            THE COURT:  Well, they're not inconsistent if he

3   admits that -- and he's argued it certainly that the EEOC

4   didn't state a claim of disparate impact but that they failed

5   to allege it there but they're safe by the doctrine in Brown

6   of reasonable relationship.  So that's how he solves that.

7            MR. ABRAMSON:  Well, with respect to the issue of

8   reasonable relationship, and I'll go back to this.  The other

9   case that I think -- in addition to [inaudible] is Burgess

10  which came after Coach.  Burgess is a Second Circuit decision

11  in 2015.  That held pretty clearly that the plaintiff failed

12  to exhaust a disparate impact claim based on charges alleging

13  only individualized disparate treatment.

14           The question that I think we have to deal with is

15  whether it was reasonable at the time for them not to include

16  it in the EEOC charge if they're going to argue that it was

17  reasonably included within the EEOC's investigation but if

18  that's the case there's no justification why they waited to

19  include the adverse impact claim here because it is the same

20  fact pattern that is alleged in the EEOC charge.  It is also

21  the same fact pattern that is alleged in the first complaint.

22           In the initial complaint they say there are no

23  minority umpire crew chiefs [inaudible] selections to the

24  World Series.  Therefore, there must be discriminatory animus

25  in the complaint.  They attribute that discriminatory animus

23

1    directly to Mr. Torres.  Now they say well, without

2    discriminatory animus there's still an adverse impact

3    resulting somewhere from this decision making process and as a

4    consequence of that we have an adverse impact claim.  There's

5    no rationale for excusing the failure to exhaust in this case

6    but at the same time saying that they have satisfied their

7    diligence under Rule 16.

8            The other --

9            THE COURT:  Just to make clear.  I'm not sure why

10   everyone is citing Topps although I did write it but I wrote a

11   much later decision after some Second Circuit case -- some

12   Second Circuit case law came out called Fresh Del Monte

13   Produce and I go through this exhaustively and I come to the

14   following conclusion which I have not changed which is the

15   district court -- I'm quoting now.  "A district court has

16   discretion to grant a motion to amend even where the moving

17   party has not shown diligence in complying with the deadline

18   for amendments in Rule 16 scheduling order."  It turns on

19   prejudice.

20           So I just want you to know that your

21   characterization that if they can't show diligence that's the

22   end of it I'm not agreeing with it.

23           MR. ABRAMSON:  I understand with respect to the Del

24   Monte case and I'm not saying that diligence is after Del

25   Monte the end of the conclusion but it certainly is one

24

1   significant factor that has to be examined if you're

2   reconciling Rule 16 and Rule 15(a).

3        THE COURT:  Let's move to prejudice and see if that

4   seems to be an important thing.  I'd like to understand --

5   let's separate out fact discovery and expert discovery.  I

6   read several times your brief on this and I really couldn't

7   follow the logic of it.  So expert discovery I understand and

8   we can talk about that in a moment but what fact discovery --

9   if this amendment were allowed, what fact discovery would you

10  need that you didn't -- that you either don't already have

11  access to because it's your own people or that you would need

12  to take.

13        MR. ABRAMSON:  Well, there's a relationship between

14  the determination here of prejudice and what the statement of

15  the claim is.  The plaintiff needs to demonstrate what the

16  employment process is that resulted in the disparate

17  treatment.  So far we have not heard it.

18        THE COURT:  I think it's the use of the subjective

19  criteria.

20        MR. ABRAMSON:  Well, the case law, Your Honor,

21  respectfully, is very clear that broad brush reference to

22  subjective criteria alone does not establish an adverse

23  impact.

24        THE COURT:  No.  It -- but I mean as part of the --

25  it's specific with respect to the World Series chief, the

1    World Series assignment and the crew chief.

2            MR. ABRAMSON:   The subjective criteria, Your Honor,

3    in the cases that have issued out of this court all relate to

4    circumstances where the subjective criteria are then used to

5    [inaudible] the decision making process with some neutral

6    element of decision making which has an adverse impact.

7            THE COURT:   That's what he's alleging.

8            MR. ABRAMSON:   But what he needs to allege is what

9    is the neutral criteria that ends up having the significant

10   disproportionate impact.   That's Judge --

11           THE COURT:   Not criteria.   Practice.

12           MR. ABRAMSON:   Practice or criteria.   There has to

13   be something specific.

14           THE COURT:   The thing on your list would with the

15   subjective -- the leadership thing and so forth.   That's what

16   he seems to be alleging.

17           MR. ABRAMSON:   Well, Your Honor, this is why that --

18   there's a relationship between that and futility and what the

19   prejudice in discovery would be necessary.   For example, the

20   Fire Department cases it was held that you can have adverse

21   impact case based on subjectivity because the evidence

22   demonstrated or at least they allege that the subjectivity

23   allowed issues like nepotism which could be facially neutral

24   and other criteria, nepotism, favoritism to [inaudible] the

25   hiring process which had significantly -- sophistically

1  significant adverse impact.

2         Here, if they're arguing [inaudible] the process

3  that have an adverse impact is leadership then it becomes

4  futile because when you turn to the stage the next step would

5  be to show business necessity and the plaintiff has already

6  admitted that leadership is one of the criteria for crew

7  chiefs.  It's not like a paper and pencil --

8         THE COURT:  You may win this in two seconds.  I'm

9  not denying that.

10        MR. ABRAMSON:  But with respect to the issue of

11 futility, if the allegation -- at a minimum the plaintiff has

12 to plead so we can test this.

13        THE COURT:  He doesn't have to plead your business

14 necessity defense.

15        MR. ABRAMSON:  I don't mean to suggest that.  But

16 the plaintiff has to plead the specific employment practice

17 that results in the disparate treatment.  The case laws saying

18 subjective is not enough.  The case law I think, Your Honor,

19 respectfully, is very clear on that.  It has to be subjective

20 leads to a certain criteria in the process resulting in an

21 adverse impact on a population.

22        THE COURT:  Leads to a certain criterium?

23        MR. ABRAMSON:  Yeah, leads to a certain criteria

24 being in the decision making process because we end up just

25 deposing subjectivity.  If the claim is that the process is

1  subjective and as a result of it being subjective as a

2  consequence of that their discriminatory animus comes up

3  freely.  That's a disparate treatment claim, right?

4          THE COURT:  Well, if you're throwing in animus

5  disparate treatment does not -- they're not alleging animus as

6  part of this claim.

7          MR. ABRAMSON:  Right.

8          THE COURT:  Give me that sentence again and then

9  I'll tell you whether I agree or not.

10         MR. ABRAMSON:  If their argument is the subjective

11 nature of the decision making process --

12         THE COURT:  Let me focus it a little bit because I

13 know you're broadening it but I'll tell you how I'm reading

14 the complaint.  The way I'm reading the complaint is the

15 things on your -- that list which includes leadership and so

16 forth, those are being evaluated in a subjective manner in

17 such a way that it results in the non promotion to these

18 positions.

19         MR. ABRAMSON:  And what is the nex -- Your Honor,

20 respectfully not to ask a question, but what is the nexus as a

21 matter of causality between those criteria and the rejection?

22 Now, nepotism makes sense to me.

23         THE COURT:  The nexus is I find these people over

24 here have no leadership qualities.  I'm not going to hire them

25 and I find these people over here had leadership qualities, I

1   am going to hire them.  Absolutely causal nexus.

2          MR. ABRAMSON:  But the nexus of why leadership as a

3   criteria results in an adverse impact the allegation, and this

4   is the same thing as --

5          THE COURT:  He doesn't know why.  That's the whole

6   point of disparate impact.  He doesn't notice that when Torres

7   or whoever it is going through this process.  It shakes out

8   the way it does and it has a disparate impact on minorities.

9          MR. ABRAMSON:  But he does know why because he's

10  pled why and this is why this is not an alternative pleading.

11  He has pled that Torres and others were motivated by animus.

12         THE COURT:  No, no, no, no.  Not in this -- maybe we

13  disagree on that.  In his proposed amended complaint he's

14  absolutely not alleging motive that they're motivated by

15  animus and it's inconsistent with the other claim in the

16  complaint and that's allowed under Rule 8.

17         MR. ABRAMSON:  Your Honor, that is allowed if there

18  is some other demonstration of nexus besides animus.  This is

19  no different than the cases that have come out of this court

20  where somebody broadly says it's a subjective process, it's

21  had an adverse impact.  Therefore, I have -- or disparate

22  impact.  Therefore I have a disparate impact and the reality

23  is that the only causal relationship that has been established

24  is not leadership as a criteria but that the subjective nature

25  of the decision making has allowed the decision making to be

1  tainted by animus which is a -- this is why on the issue of

2  futility, Your Honor, we say that this is no different than a

3  disparate treatment claim.  The only difference here is is in

4  the initial pleading --

5          THE COURT:  I understand this and there may be some

6  cases that come towards what you're saying with their other

7  cases such as the second Gordon case and <u>Martin v. Coin Match</u>.

8  I don't know if you're familiar with that.  It's a 2016 case

9  from Judge Nathan.

10         That pretty much say if you are specifying what it

11  is that this -- what the subjective -- where it happened in

12  the process and that it led to your being impacted adversely

13  through not being promoted or hired that that is enough.

14         MR. ABRAMSON:  Except that at least with respect to

15  Gordon there's a step in between.  It's not subjectivity leads

16  to an adverse impact.  It's subjectivity led to the use of

17  nepotism as a criteria which resulted in an adverse --

18         THE COURT:  No, no, you got the wrong case.  Gordon

19  is the lawyer for the Law Department and there was no

20  nepotism.

21         MR. ABRAMSON:  I may have it wrong.  It's Gordon and

22  -- the cases involving -- [inaudible] but --

23         THE COURT:  Gordon to Gordon is the New York City

24  lawyer case.

25         MR. ABRAMSON:  Right.

1          THE COURT:  He was being subjectively evaluated as

2     to his performance.  They didn't have, you know, any kind of

3     objective measurement and he said you know what, that's --

4     whatever is going on here I'm not saying it's intentional but

5     it had disparate impact and the judge let it go through.

6     They're having trial Monday by the way if anyone wants to

7     watch.

8          MR. ABRAMSON:  Your Honor, I would say at least -- I

9     don't mean to disagree with you but with respect to the cases

10    that I have seen, the number of cases that I have seen had

11    said that just saying the promotion process as a whole or the

12    subjectivity of the promotion process as a whole resulted in

13    adverse impact has not been sufficient to state an adverse

14    impact claim.

15         THE COURT:  Let me ask you this question.  I think

16    there are cases that are going all over the place and I don't

17    think can necessarily reconciled but there's the question.

18    Don't tell me it's not this case because I already know that.

19         If I am an employer and I want to hire someone for a

20    job making widgets and I say you know what, the only criteria

21    I'm going to use -- I'm going to use to do it is I'm going to

22    have an interview and I'm going to make a judgment about their

23    widget making ability based upon our conversation to see if

24    they'd be a good widget maker and I go through 100 interviews

25    and I hire all white people.  Half the applicants for

1  minority, half are white.  I'll hire all white people.  Can

2  that person state a disparate impact claim, the person who

3  wasn't hired?

4  　　　　MR. ABRAMSON:  The person could only do that if they

5  were unable to unravel the process.

6  　　　　THE COURT:  I just told you the whole process.  It's

7  one guy.  He sits there, makes a judgment about widget making.

8  　　　　MR. ABRAMSON:  I would argue, Your Honor, that that

9  does not satisf -- that would have to be pled as a disparate

10  treatment claim, not as an adverse impact claim because until

11  Title VII there has been no identification of the particular

12  process that ends up kicking these folks out.  If they can

13  make the claim, which is not really being made here, that

14  because of the way the process is shrouded in mystery they

15  can't determine what the specific criteria was that led to the

16  rejection that's one thing but --

17  　　　　THE COURT:  There's no mystery.  I told you the

18  whole process.  It's Mr. CEO making a judgment about widget

19  making based on a conversation.  I think this guy would do a

20  good job making them.  I think this guy wouldn't.

21  　　　　MR. ABRAMSON:  What -- when you go to the next state

22  and you think about how this is going to be presented and the

23  burden shifts to show business necessity.  So in our case

24  under that theory we would show business necessity is

25  leadership in order to be a crew chief.  What is the

32

1  articulated -- I guess the question would be and the reason

2  why the adverse impact analysis --

3           THE COURT:  You may win and my guy may lose because

4  my guy -- my guy may -- my guy will say you know what, the

5  only way you can judge widget making ability is to have a

6  conversation with someone and they would have someone come in

7  and say are you crazy.  You put someone in a room with the

8  assembly kit for the widget and you have them assemble it,

9  that's the way to do it and that -- my person might lose.  You

10 may win because you may have the only way of doing it.

11          MR. ABRAMSON:  And that's called -- in my view

12 that's called establishing pretext under disparate treatment.

13          THE COURT:  My guy is not a racist.  He's just -- he

14 uses his criteria and this is how it comes out and the

15 plaintiff is not alleging he's a racist.

16          MR. ABRAMSON:  I want --

17          THE COURT:  It's unconscious but he's not -- he's

18 not doing this deliberately.

19          MR. ABRAMSON:  I don't want to take it too far.  It

20 doesn't matter with respect to that part of it if you show to

21 the jury that -- your point.  If you're going to determine who

22 makes the best widgets it is much better to have them actually

23 sit down and do the widgets and then the argument is the

24 rationale that was articulated by the employer is pretextual

25 in a disparate treatment case.

1          THE COURT:  You can call it pretextual but you can

2    still do a disparate treatment claim that doesn't allege

3    animus from my hypothetical and the person would lose not

4    because we say ah hah we proved you're racist but we proved

5    that there was not a business necessity to have this totally

6    subjective process of having a conversation.  You could have

7    done this a much better way and therefore the plaintiff wins

8    the disparate impact claim.

9          MR. ABRAMSON:  We can -- we can disagree on that.  I

10   think the distinction also that you have in that circumstance

11   is there's no showing here of why leadership would necessarily

12   result -- this is the problem here, right?  Why would

13   leadership result in rejecting more minorities unless it was

14   being used as a way to [inaudible] the process with

15   discriminatory animus.  The purpose of the adverse impact

16   theory I had thought was to get at facially neutral practices

17   which have an adverse impact so that employers could then

18   adopt neutral practices that had less of an adverse impact

19   which means there has to be some nexus between the process and

20   criteria and the result.

21         So when you have a paper and pencil test it says you

22   have to be able to do twelfth grade algebra you may have an

23   adverse impact regardless of discriminatory animus because the

24   different educational levels of the relevant population in the

25   pool.

1          But when you say I am going to measure leadership,

2    the only rationale of why that claim could go forward as to

3    why that would have an adverse impact on a protected

4    population under that theory is if it is not leadership

5    quality -- leadership as a standard but the way the leadership

6    has been applied to reject a number in the population and it's

7    that application, the application of leadership, not

8    leadership itself which makes that a disparate treatment

9    claim.

10          THE COURT:  Right.

11          MR. ABRAMSON:  Not an adverse impact claim.

12          THE COURT:  Disparate treatment.  No, I'm sorry.  I

13    had you to the last word.  That is exactly what Watson

14    allowed.  That seems to me that's exactly what Watson said.

15    When I first learned all this stuff in law school before

16    Watson I would have totally agreed with you but then Watson

17    said you know what, you can have this purely subjective

18    employment criteria that is facially neutral and adopted --

19    I'm quoting now.  "Adopted without discriminatory intent and

20    they can have effects that are the same as an intentionally

21    discriminatory process and you get to do a disparate treatment

22    claim for those -- I'm sorry, impact claim for those."

23          MR. ABRAMSON:  That's how you get to the issues of

24    like -- when you have relationships or you have a nepotism

25    policy because the subjective policy allows it -- allows

1   nepotism which is facially neutral to be viewed in the

2   decision making process.  Here --

3           THE COURT:  Nepotism is one -- I'm not sure that's -

4   - I wouldn't call that necessarily a subjective employment

5   criteria.  Frankly that's objective.  You can figure out

6   exactly whose someone's relatives are.  Subjective to me seems

7   something that's going on in someone's head to make a judgment

8   about someone else.

9           Let's move -- we went down this road and we kind of

10  now bled into the merits but I am akin to hear your claim as

11  to prejudice on fact discovery if this claim is allowed to go

12  forward.

13          MR. ABRAMSON:  So if the -- if -- [inaudible] back

14  to that.  If the rationale here is that leadership resulted in

15  the adverse impact --

16          THE COURT:  Well, if -- let me just tell you how I

17  would frame it.  The rationale is that the subjective elements

18  of your list of leadership being a prominent, a very prominent

19  one, and I think one that was mentioned in the deposition, not

20  that that's relevant to what I'm asking you, if -- if the

21  theory is is that those subjective determinations led to

22  minorities being disproportionately taken out of the pool of

23  the -- of the promotions.  So with that in mind, where do we

24  go on fact discovery?

25          MR. ABRAMSON:  You have to do -- you would need fact

1  discovery with respect to both actually the selected and the

2  non selected in order to determine -- in order to see whether

3  there are disputed issues of fact as to why they were kicked

4  out of the process.  In other words, it --

5          THE COURT:  Why didn't you need -- why didn't you

6  need that anyway?  They were the obvious comparators of the

7  other people who are at the same -- in the same job as the

8  plaintiff and you had --

9          MR. ABRAMSON:  Well --

10         THE COURT:  Hold on.  It seems to me you should have

11 expected that as part of their claim they would -- he's going

12 to get up and say you know what, I'm just as good as all these

13 other guys and I was singled out because of my ethnicity and

14 the classic way of doing disparate treatment is to look at

15 comparators.  So aren't you talking about the same thing?

16         MR. ABRAMSON:  No.  Respectfully, it's the reverse

17 side of that.  It is why since -- adverse impact ends up

18 taking the animus out of the equation.  It becomes about -- in

19 part it becomes about numbers.  So why are the numbers smaller

20 for minorities.

21         Now, in disparate treatment claims his -- it's an

22 individual claim.  This isn't a pattern and practice case.  He

23 has an individual claim to show that he was discriminated

24 against.  Once you broaden this to an adverse impact analysis

25 it necessarily expands the scope because then the question

1  becomes okay, we have the burden to show why you have those

2  numbers.

3          Now, for example, it could just as well -- it could

4  just be that somebody applied and then decided not to pursue

5  the application or because somebody had injuries.  If there

6  are going to be factual disputes about why the minorities in

7  the population were not ultimately represented in the number

8  of promotions then that opens up the door to a whole bunch of

9  discovery that's not otherwise probative because it's not

10  relevant to his case.

11          THE COURT:  Well, if the complaint is allowed it

12  might be relevant.  It seems to me these are your people.

13  First of all, he has [inaudible] information and he's not

14  asking for it.  So -- and these are your people.  Are they

15  not?

16          MR. ABRAMSON:  No.  This would be not our people.

17  These would be other umpires who are -- these would have to be

18  third party depositions.

19          THE COURT:  You don't employ the umpires.

20          MR. ABRAMSON:  We employ the umpires but they're

21  represented by the collective bargaining -- in a collective

22  bargaining agreement by collective bargaining --

23          THE COURT:  No, no.  But you have information about

24  them.

25          MR. ABRAMSON:  We have information about them but we

1  don't have their own personal knowledge as to why they may not

2  have pursued the opportunity to promote here.

3        THE COURT:  That would be -- you have all the data

4  you need about them.

5        MR. ABRAMSON:  No.  We have dates and times and we

6  have reasons why someone might not have been selected from our

7  perspective but now we're going to have potential disputed

8  issues of fact that somebody may say no, I dis -- somebody who

9  is in the group of the rejected to say no, I dispute that

10 that's why I was rejected.  I was actually rejected because of

11 I guess leadership.  That's why I'm saying there has to be a

12 nexus between what the allegation of the adverse impact

13 process is and the ultimate -- the ultimate claim.

14        So take, for example, if you'll just indulge me.

15        THE COURT:  I'm shaking my head.  Go ahead.

16        MR. ABRAMSON:  That's --

17        THE COURT:  Let me tell you what I'm not following

18 here.

19        MR. ABRAMSON:  Okay.

20        THE COURT:  Let's go through what the disparate

21 impact claim is.  Let me just see if I have it written in some

22 convenient place.

23                  [Pause in proceedings.]

24        THE COURT:  So he has to identify the specific

25 employment practice which is the use of the subjective

1  criteria in making the hiring decision.

2          MR. ABRAMSON:  Can I just pause you there?

3          THE COURT:  Sure.  I know you disagree but I don't

4  want to go over it again.

5          MR. ABRAMSON:  Okay.  I just want --

6          THE COURT:  I know you don't agree on that.

7          He has to demonstrate a significant adverse impact

8  on the protected class.  So a statistician may be needed to

9  say X number of people who were eligible for the promotion or

10  applied for the promotion, what their races were, minimal

11  discovery so far from your point of view to defend against

12  that, and establish a causal connection between the employment

13  practice and the adverse impact and that is the fact that

14  these -- according to him that Torres is going to say that

15  these leadership -- this leadership subjective thing was

16  highly important to him in making the decision about -- to

17  promote and therefore there's obviously a causal connection.

18          MR. ABRAMSON:  But --

19          THE COURT:  Hold on.  So -- so far just on that I

20  don't see why you need any fact discovery.  You may need an

21  expert about what the statistics show but why do you need fact

22  discovery on that?  I haven't gotten to your defense yet.

23          MR. ABRAMSON:  Your Honor, I think we clearly need

24  fact discovery with respect to the issue of causality and

25  number three.  We may have evidence that says this is why

1   somebody was rejected but we can't wait until trial for one of

2   the rejected minority applicants to come up and say everything

3   that Joe Torres said was ridiculous.  That's not why I was

4   rejected.  We have to know that in advance because he's going

5   to be in the pool that the jury is going to hear is being

6   mentioned again.

7           THE COURT:  He's given you witness disclosures;

8   right?

9           MR. ABRAMSON:  Yes.

10          THE COURT:  Are any of these people on the list?

11          MR. ABRAMSON:  Those people are on the list but

12  they're not relevant to a disparate treatment claim.  They're

13  only relevant to an adverse impact claim because only in the

14  adverse impact claim do you get to the question of why aren't

15  they in the final pool selected.  In the disparate treatment

16  claim we only have to worry about -- he was treated and why

17  and what evidence or pretext there is.

18          In the adverse impact claim we have to justify why

19  there was fewer minority selected and in order to do that we

20  end up having to deal with whatever the minorities who are

21  involved may claim that our articulated reason was false.

22          THE COURT:  But this is just not how disparate

23  impact claims are dealt with.  They're dealt with on a

24  statistical basis.  When you have a disparate impact claim

25  about 5,000 firefighters and says you know what, the written

1   test was too high or the physical test was at too high a level

2   and excluded women or whatever it was you don't bring in each

3   individual person to find out what they could or could not --

4   whether they had the leadership quality or not.  It's just not

5   how it's done.

6          MR. ABRAMSON:  Precisely true.  That's exactly why I

7   agree with you that this is not an adverse impact case because

8   there's this amorphous subj -- they're saying their subjective

9   process that ends up kicking people out that they don't have

10  to identify what the process is other than it's a subjective

11  process and then the burden shifts to us to explain why they

12  have not made it to the selective --

13         THE COURT:  The way you do that is you say you know

14  what, we can't -- there's no test for leadership.  All we do

15  for leadership -- the only way to judge leadership is this

16  amorphous judgment based upon watching games and talking to

17  people and whatever that's how we judge leadership and you'll

18  say you know what, this is a business necessity.  We can't do

19  a written test on leadership.  We have to have these

20  subjective criteria.

21         Then he's going to have to say you know what, there

22  is an objective test for leadership and here's how you should

23  have done it and so forth.

24         MR. ABRAMSON:  No.  I think in the first --

25         THE COURT:  None of this has any requirement to

42

1  deposing either tens or hundreds of individuals.

2         MR. ABRAMSON:  Well, Your Honor, respectfully, I

3  don't think -- I think what ends up happening is one of the

4  rejected candidates ends up being called and says yes,

5  [inaudible] leadership but I was an Eagle Scout.  I led my --

6         THE COURT:  But that's not -- that is no statistical

7  significance.

8         MR. ABRAMSON:  None of this is, Your Honor.  That is

9  why none of this is about statistics because it's not like you

10 have the 5,000 who are in the fire department who get rejected

11 because they score low on a paper and pencil test.  This is

12 you have an application process, it's part objective, part

13 subjective.  Okay.  But as a result of that you end up with a

14 smaller population of minorities, go prove our negative.

15        THE COURT:  They have to show a statistically

16 significant adverse impact from this process.

17        MR. ABRAMSON:  But they also have to show -- I know.

18 They also have to show the causal connection between the two.

19        THE COURT:  All right.

20        MR. ABRAMSON:  And in order to do that that's what's

21 going to be the -- that's one of the issues that I think we're

22 going to need discovery on with the third parties.

23        THE COURT:  I don't see how -- they can bring in

24 someone to say the leadership interview or whatever does not -

25 - is not a good test for being a crew chief or a World Series

1   ump or whatever it is.  That they can do.  That's part of the

2   generic process of doing a disparate impact claim but they

3   can't bring back individual -- they can't bring in, and if it

4   helps you you can have a motion in limine, but they can't

5   bring in individual people to say you know what, I'm a great

6   leader and I got rejected.  That would not be permitted in my

7   view.

8           MR. ABRAMSON:  So then if that's the case then they

9   can't really make out their showing of causality because it

10  has to be the leadership that resulted in them being rejected,

11  not discriminatory animus of how you apply leadership.

12          THE COURT:  Yes, there's no animus involved here.

13  That's their claim.

14          MR. ABRAMSON:  So then it's futile because they

15  can't make out causality.

16          THE COURT:  We don't know -- I can't at this stage

17  say what's going to happen when -- first of all, they don't

18  have to plead your business necessity.  Maybe you'll -- maybe

19  someone will say you know what, leadership, that's total BS,

20  you don't need that for an ump.  Pardon my language if there

21  was language.  You don't need that for an ump or they might

22  say -- they might bring in someone to say you know what, or

23  talk a jury into believing you know what, there are other ways

24  to do leadership and you could have done it some other way.

25          That's going down the road and I can't deal with

44

1  that at this stage of the proceedings.

2          MR. ABRAMSON:  But, Your Honor, I respect that but

3  that's why under the Civil Rights Act Amendments of 1991 it

4  requires that there be some specificity as to what part of the

5  process kick them out.

6          THE COURT:  We've gone through this so many times.

7  I note your objection and I understand it.

8          I think -- have we covered exhaustion.  I don't

9  think you got to talk about it.  No, you talked about

10  exhaustion.

11          MR. ABRAMSON:  I talked about it.

12          THE COURT:  I think you talked about everything now

13  but if there's something else you want to say feel free.

14          MR. ABRAMSON:  I think I talked about everything.  I

15  don't know if you had questions with respect to the

16  inconsistency and exhaustion and how that would apply but if I

17  can just close with this.

18          THE COURT:  Go ahead.

19          MR. ABRAMSON:  When you get to the issue of

20  exhaustion there really is no way to reconcile their position

21  that the EEOC had all of the evidence in front of it to do an

22  adverse impact analysis even though they didn't mention it but

23  on the other hand they didn't know about an adverse impact

24  claim so they couldn't plead it until after the close of

25  discovery.

45

```
 1              THE COURT:  Right.  As I think I mentioned to you
 2    lack of due diligence is not necessarily the be all and end
 3    all.
 4              MR. ABRAMSON:  But it goes to -- it goes to
 5    futility.  Exhaustion is a futility defense, not a Rule 16
 6    motion.
 7              THE COURT:  I'm sorry.  I thought you were making a
 8    different point.  I thought you were saying that if they
 9    didn't do -- if -- I'm sorry.  If they -- if they properly
10    exhausted they can't now come in and claim due diligence.  I
11    thought that's what you were just saying.
12              MR. ABRAMSON:  Well, it's actually the reverse.
13              THE COURT:  Okay.
14              MR. ABRAMSON:  It's because they didn't exhaust.
15    When we look at -- if you have the Del Monte overlay to Rule
16    16 and Rule 15, when you look at this it's almost -- it's
17    almost more than just exhaustion.  It's almost -- it almost
18    goes to the question of estoppel.  If they knew everything
19    they knew in order to plead it at the time so that the EEOC
20    was on notice for purposes of futility and exhaustion, to have
21    the close of discovery come and now make that allegation it
22    seems to me that that's more than just -- that's more than
23    just delay.  That's more than just the rule -- the type of
24    Rule 16 delay.  I would want for lack of a better word call
25    that delay plus.  There's an intentionality --
```

1          THE COURT:  I'm not familiar with the delay plus.

2  Are you looking for the fallen factor of bad faith perhaps?  I

3  don't know if you were going down that road.  I don't know

4  what else you're talking about.

5          MR. ABRAMSON:  I think when we look at what you

6  heard today about the EEOC having all of the information on

7  notice and now only after the close of discovery where there's

8  some question about whether there is evidence of

9  discriminatory treatment to then switch and say this is now an

10  adverse impact claim or alternatively we're going to also

11  argue adverse impact.  I would say that under Del Monte as I

12  remember it the way you go through the factors yes, in Del

13  Monte I think you said delay alone is -- would not be

14  sufficient but then you also looked at the other factors and

15  law --

16          THE COURT:  Prejudice being the most important but

17  go ahead.

18          MR. ABRAMSON:  Prejudice being important but I also

19  say that -- you also as far as I recall took into

20  consideration the circumstances in which the supplemental

21  pleading was made and here whether you call it just delay, I

22  don't think it is, or you -- you're trying to -- not you but

23  you wind up depriving the EEOC of its statutory right to

24  investigate these claims and ameliorate and conciliate at the

25  outset.  It's not -- as you know, this is not just a

1  procedural mechanism.  There's a real purpose for it.  To wait

2  until all of discovery is completed and say ah hah, here's an

3  adverse impact claim, the EEOC knew enough if they wanted to

4  pursue it seems to me to be more than just what's [inaudible]

5  Del Monte.

6          THE COURT:  Thank you.  Anything you want to add

7  from the plaintiff's side?

8          MR. MURPHY:  Pretty much covered it.  One of the

9  arguments they make about [inaudible] is the causal

10 relationship and we cited [inaudible] and you know that

11 already about statistical evidence and the fact that there's

12 no hiring of minority employees for crew chief and only one

13 out of I think 51 selections to the World Series according to

14 [inaudible].

15         The other thing I would like to put on the record

16 for you, Your Honor, is I have a list of productions that goes

17 to two-thirds of the table on how they produce.

18         THE COURT:  I'm sorry.  A list of productions?

19         MR. MURPHY:  Of documents.

20         THE COURT:  And you're telling me about this because

21 why?

22         MR. MURPHY:  Because he indicated that delay was one

23 of their biggest arguments under futility.

24         THE COURT:  Your delay.  So you're going to defend

25 yourself by saying he delayed on something?  Is that where

1  we're going with this?

2         MR. MURPHY:  What I'm saying to you is I needed

3  documents --

4         THE COURT:  Can you just answer my question?  Are

5  you now addressing that argument by saying he delayed on

6  production?

7         MR. MURPHY:  Yes.

8         THE COURT:  Don't spend more than a minute on it.

9  All right.

10        MR. ABRAMSON:  All right.  That's how [inaudible]

11 spend money.

12        THE COURT:  Okay.  Good choice.

13        MR. MURPHY:  Thank you.  I appreciate your time,

14 Your Honor.

15        THE COURT:  Okay, folks.  I'm going to give you my

16 decision now orally.  I want to thank you all for the

17 arguments.  Both sides did an excellent job, extremely helpful

18 to me.

19        I think I've to some degree expressed in my

20 questions in the oral argument some of my views on this

21 starting with the issue of delay.

22        I think that there -- there was very murky facts

23 here in terms of whether the plaintiff was diligent.  I think

24 it would have been possible to express a disparate impact

25 claim based upon the knowledge from day one that there was

1  subjective criteria being used here and his own claim that he

2  was good on the objective criteria.

3       So I don't know that diligence has been very fully

4  demonstrated.  Nonetheless, and unfortunately I have to cite

5  myself because it expresses it the way I want to express it.

6  As I stated in the case of <u>Fresh Del Monte Produce v. Del</u>

7  <u>Monte Foods</u>, 304 F.R.D. 170, there has to be a balancing

8  between the Rule 16 deadline and Rule 15 which mandates that I

9  have to allow amendments to be freely given.  If Rule 16

10 weren't here I would really have no -- the Rule 16 deadline

11 were not at issue I really would have no problem finding that

12 there is no prejudice that resulted from this delay.

13      It frequently happens that people come up with

14 different causes of action to fit a certain set of facts and

15 as long as there's no duplicative discovery or a significant

16 delay that results from that it's in my view within the spirit

17 of the Federal Rules of Civil Procedure to allow the amendment

18 to go forward.

19      In this case I don't see any duplication of effort

20 at all.  I'm not going to allow the plaintiff certainly to

21 conduct any additional discovery.  It seems to me that records

22 of the defendants supply what they really need in order to

23 defend against this claim and I don't really see any need for

24 additional fact discovery.  Now, there may be a need for --

25 and I'm not saying sitting here right now I'm going to refuse

50

1   to allow some fact discovery if the defendants ask for it but

2   I don't think the likelihood of their need is sufficient that

3   I would go against the Rule 15 strictures of allowing

4   amendments to be freely given.

5        Certainly whatever discovery is it seems to me is

6   not -- can never be duplicative of anything they've already

7   done.  The plaintiff has said everything he has to say about

8   this and I assume every document he has about this.  So I

9   haven't heard of any other information that's needed from the

10  plaintiff on this claim.

11       There may be some expert that that would not

12  otherwise have been required.  I understand that but that's

13  not duplicative and that's not going to lead to significant

14  delay.

15       So as I said in Fresh Del Monte, I can grant the

16  motion to amend even when there has not been diligence shown

17  in complying with the Rule 16 deadline.  The Second Circuit in

18  cases such as Gorchowsky and Casner cited in Del Monte make

19  clear that the Rule 16(b) deadline is not the only

20  consideration here and that I can balance the Rule 15

21  direction to allow amendments freely against that deadline

22  especially when I don't see real prejudice to the defendants

23  which I really don't see here.  It's not like we're on the eve

24  of trial.  I've already described where I think we are in the

25  discovery stage.

1        Now, turning to the futility argument.  First on

2   exhaustion, I don't think the disparate treatment claim was

3   stated -- I'm sorry, the disparate impact claim was stated to

4   the EEOC in the charge but there is a way out and that's what

5   the Second Circuit described in Brown I think it was.  One

6   second.

7                    [Pause in proceedings.]

8        THE COURT:  Well, regardless of the case name.  It

9   just needs to be reasonably related and that means where the

10  conduct complained of would fall within the scope of an

11  investigation that would reasonably be expected to come out of

12  the charge of discrimination.  I mean there's no way you can

13  investigate that charge without trying to figure out what the

14  criteria would have been used in order to make the

15  determinations regarding the crew chief and World Series

16  promotions or assignments.

17       I recognize that there are some cases that rather

18  rigidly say if you don't specifically do a disparate impact

19  charge you can't bring it later.  I don't think we can be that

20  rigid and this was -- there's a close enough connection

21  between what the plaintiff was complaining about before the

22  EEOC which is going through the process they had having --

23  pointing to all this evidence of no minorities being given

24  these assignments that I can't imagine any EEOC investigation

25  would not have looked to the fact that they were -- that

1  subjective criteria were an important part of this process and

2  even if done without racial animus resulted in the disparate

3  impact we're talking about.

4        Then on the merits I've been over this a few times

5  with the defense counsel.  I think that there is a practice

6  that's been pointed to.  Hold on a second.

7                      [Pause in proceedings.]

8        THE COURT:  Which is the practice of using the

9  subjective criteria to make the decisions regarding the

10  assignments.  Certainly there's been enough to meet a

11  complaint allegations regarding statistical differences.  Case

12  law is pretty clear that you don't have to be very detailed

13  about statistics.  So certainly the plaintiffs in the case

14  itself are going to have to do a lot more than what they did

15  in the complaint but for purposes of pleading the case law

16  does not require that level of detail.

17        Again, I think there's been a causal connection

18  alleged which is that this was -- the subjective criteria were

19  -- drove this process.  The judgment and leadership and so

20  forth and that's what caused -- and that the minorities did

21  not do it along that and that's what caused this to happen.

22        So for the reasons I've just stated I'm going to

23  allow the amended complaint as presented by the plaintiff to

24  be filed.

25        I think what happens -- needs to happen now is you

53

1   need to think about whether you want or need any discovery and

2   then you should talk to the other side and see what you can

3   agree to and if you can't agree you come to me but in either

4   event you need to report to me about where we are in terms of

5   deadlines and whether we're going to meet the current

6   deadlines or something else has to happen.

7               Any questions from the plaintiff's side?

8               MR. MURPHY:  No, Your Honor.  I presume that expert

9   discovery will be set after any discovery if it happens.

10              THE COURT:  We had not previously set expert

11  discovery deadlines.  I'm asking.

12              MR. ABRAMSON:  We have, Your Honor.

13              THE COURT:  So they're in effect unless you want to

14  ask me to extend them which I'm going to be happy to do.  So

15  you'll have to let me know.

16              Anything from defendants?

17              MR. ABRAMSON:  No.  Thank you, Your Honor.

18              THE COURT:  Thank you everyone.

19                          * * * * *

20

21

22

23

54

1       I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                              _Shari Riemer_____

6                              Shari Riemer, CET-805

7   Dated:   December 2, 2019