Kevin L. Murphy (*pro hac vice*)
J. Jeffrey Landen (*pro hac vice*)
Nicholas R. Gregg (*pro hac vice*)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
(859) 360-1123

&

Nicholas J. Zaita
LEWIS DIBIASI ZAITA & HIGGINS
420 Lexington Avenue, Suite 300
New York, NY 10107
(212) 772-0943

*Attorneys for Plaintiff Angel Hernandez*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGEL HERNANDEZ<br><br>     PLAINTIFF,<br><br>V.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL AND MAJOR LEAGUE BASEBALL BLUE, INC.,<br><br>     DEFENDANTS. | CASE NO: 18-CV-09035-JPO-GWG |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Angel Hernandez ("Plaintiff"), by and through counsel, moves for partial summary judgment that he has established a prima facie case as to both his disparate treatment claims and his disparate impact claims (the "Motion") and hereby submits the following Memorandum in Support of his Motion for Partial Summary Judgment.

## I.    INTRODUCTION

Major League Baseball ("MLB"), a business that enjoys the benefit of an antitrust exemption, has a long and disgraceful history of racism.  In years past, it was open and obvious.  Some of the best players from 1925 to 1947 such as Satchel Paige, Smokey Joe Williams, and Buck Leonard, were forced to play in the Negro Leagues, before Jackie Robinson broke the color barrier.  As discovery has shown in this case, not enough has changed.

## II.    FACTS

Plaintiff is a Major League umpire, and has been since 1993 (Dkt. 52-3, ¶ 2).  His claims arise from MLB's conduct regarding its treatment of both Plaintiff and other minority umpires in relation to crew chief promotions and selections for World Series assignments.  As this Motion demonstrates, the evidence elicited in this case and discussed in this Motion shows that MLB has discriminated against Plaintiff individually and has also instituted policies and practices that have had the effect of disparately impacting both Plaintiff and other minority umpires as well.  MLB's lack of diversity in leadership positions across baseball is widely known.  Indeed, MLB itself knew that it had a diversity problem among its umpire ranks—and did next to nothing to stop it.

████    █████████████████████████████████    ████

Particularly as to umpires, MLB's discriminatory past (and, indeed, its present) is especially glaring.[2]  In its history up until the filing of this lawsuit, MLB had only one minority permanent crew

---

[1] Per Local Civil Rule 56.1, a copy of Plaintiff's Statement of Material Facts ("SMF") is attached hereto as Exhibit 1.

[2] Plaintiff acknowledges that, in 2020, MLB, for the first time, promoted an African-American umpire to the crew chief position and that MLB also promoted in 2020, for only the second time, a Latino umpire to the crew chief position.

chief, Richie Garcia.[3]  Exhibit 2, Declaration of Angel Hernandez, at ¶ 2; Collective Exhibit 3, Excerpts

of Deposition of Randy Marsh ("Marsh Dep."), 35:17-36:5.



The diversity problem with MLB's umpire staff starts at the very lowest levels.[9]  *See* SMF ¶¶

15-25.  Though MLB purports to be concerned with diversity, it's **only** attempt to rectify its admitted

umpire diversity problem had been to invite minority umpire youths to umpire camps.  Marsh Dep.,

<hr/>

However, any such promotions  are outside the period relevant to this lawsuit and have no bearing on Plaintiff's claims.
The facts recited herein are as of the filing of Plaintiff's original complaint on July 3, 2017 unless otherwise stated.

[3] In fact, the only umpire to be a crew chief prior to the 2017 season but that was not born in America is Jim McKeon,
who was born in Canada.  Excerpts of Deposition of Matt McKendry ("McKendry Dep."), attached hereto as Exhibit 4,
201:23-202:6.

[4] From 2011 to at least the beginning of the 2017 season, Woodfork held the role of Senior Vice President Baseball
Operations.  Excerpts of Deposition of Peter Woodfork ("Woodfork Dep."), attached hereto as Exhibit 5, 20:5-16.
Woodfork reported directly to Joe Torre.  *Id.*

█ ███████████████████████████████████████████████████  Manfred refused to acknowledge that MLB
has a diversity problem.  *See*, *e.g.*, Collective Exhibit 7, Excerpts of Deposition of Robert Manfred ("Manfred Dep."),
68:22-70:14, 74:16-75:16.

█ ████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████

[8] Despite these acknowledgements by lead MLB umpire department officials and despite MLB's alleged desire to become
more diverse both in umpire composition and generally, MLB has never done an investigation "to see if Minor League
Baseball is treating candidates the same as white umpires."  Manfred Dep., 60:5-61:10.

[9] As explained in Plaintiff's SMF, the pathway to becoming a Major League umpire involves a separate for-profit
corporation, and this procedure gives MLB plausible deniability when its lack of minority umpires is questioned.  *See* SMF
¶¶ 15-18.

22:9-14, 105:17-107:22; Torre Dep., 24:8-22, 178:21-180:15; Woodfork Dep., 209:17-214:25.



When asked to acknowledge that with the current process "Major League Baseball has no power whatsoever to increase the level of minorities until they get to AAA," Marsh answered as follows:

> Yes, but let me explain something.  Having taught at umpire school, I know that every year, Harry Wendelstedt, sent, contacted, the athletic directors at many major colleges and schools that had – that was mostly African American students and sent brochures, everything, trying to get them to come to umpire school.  The problem is, yeah, **they** want the job, **but they want to be in the big Leagues tomorrow, and they don't want to go through all of that.**

Marsh Dep., 100:17-101:8 (emphasis added).  Thus, according to one of MLB's top umpiring officials, the root of MLB's umpire diversity problem was not MLB's attitude towards or treatment of minorities, nor was it MLB's troubling history regarding minority umpires.  Instead, MLB's umpire

3

diversity problem was a result of African American youth purportedly not "want[ing] to go through all" that it takes to become a Major League umpire. The veiled racism implicit in the testimony of Marsh is not isolated.

    B.    *The Crew Chief Position and World Series Assignments*

        i.    **The Crew Chief Position**

           *a.*    ***Factors for crew chief promotion decisions***

The factors considered for crew chief position vary depending on what document is being reviewed and who is being asked. █████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████ ██████████████ ████████████████████████████████

████████████████████████████████████████

In its sworn answers to Plaintiff's interrogatories, MLB provided a non-exclusive list of numerous factors that are purportedly considered by MLB in making crew chief promotion decisions. *See* Exhibit 14; *see also* SMF ¶ 26. The testimony of Joe Torre ("Torre") and Woodfork, however, differs substantially from MLB's interrogatory answers.

Torre is the individual at MLB who made the final decision on crew chief promotions. Woodfork Dep., 23:16-24. He testified that an umpire's ability is not the most important aspect of an umpire's job, and that the most important aspect of that job is "[h]aving the skills to handle situations." Torre Dep., 82:10-19. Woodfork testified that Torre "focuses on leadership."[11] Woodfork Dep., 27:7-13. Woodfork also testified that "consistency," "accountability," and "experience" were other factors considered by Torre in making crew chief promotion decisions. *Id.* at 27:17-25. Additionally,

---

[11] Woodfork identified "staying above the fray, handling situations, [and] being a positive influence" as "leadership skills." Woodfork Dep. 29:2-25.

the number of games in which an umpire serves as interim crew chief is "important" and "part of the decision-making" process for crew chief promotions. Torre Dep., 197:22-199:7; *see also* Woodfork Dep., 136:24-139:22. Torre testified that the duties of an interim crew chief were the same as the duties of a permanent crew chief. Torre Dep., 37:15-18; *see also* Marsh Dep., 54:16-25, 218:8-18. As the foregoing shows, many of the factors listed by MLB in their interrogatory answers were never mentioned by Woodfork or Torre in their depositions.

### b. Crew chief promotion process

In his deposition, Woodfork described the crew chief promotion process as "fluid." Woodfork Dep., 35:23-36:19; *see also* SMF ¶ 31. ███████████████████████████████ ██████████████████, Torre and Woodfork do not rely on—or even review—those evaluations whatsoever. *See, e.g.,* Woodfork Dep., 26:2-17.

Both Mid-Year and Year-End Evaluations were also available to Torre and Woodfork, yet Woodfork testified that he did not review those evaluations in connection with making crew chief promotion decisions. Woodfork Dep., 31:24-32:25. Woodfork instead relied on his memory, "feelings" or "understanding" of an umpire's performance.[12] *Id.*; *see also* Woodfork Dep., 35:23-36:19. Though MLB began comparing crew chief candidates' performances after the filing of this lawsuit, no document produced by MLB indicates that such a process was used before this lawsuit was filed. *See* Exhibit 17, DEF 008050 – DEF 008066; Woodfork Dep., 217:25-219:2.

### c. MLB's Diversity Policy and its impact (or lack thereof) on MLB's crew chief promotion decisions

MLB has a diversity policy contained in its employee handbook (the "Diversity Policy"). *See*

---

[12] This is despite the fact that Woodfork himself admitted that, to know Plaintiff's "performance as it relates to year by year," he would need to "look at his reviews." Woodfork Dep., 190:12-25. Indeed, Woodfork testified that he could not "recall" or otherwise testified that he had no knowledge of rudimentary elements of Plaintiff's performance, such as whether Plaintiff "submits timely umpire reports," whether Plaintiff "stays in communication with the Office [of the Commissioner] when he's supposed to," or whether Plaintiff "is one of the most physically fit umpires." Woodfork Dep., 198:12-200:11.

Exhibit 18, at DEF 026058-026302. While the Diversity Policy states that "Major League Baseball provides equal employment opportunities (EEO) to all employees for employment without regard to race, ancestry, [or] color . . . (*id.* at DEF 026073) and further states that the diversity policy applies "to *all* applicants, employees, contractors, and interns, whether related to conduct engaged in by fellow employees, supervisors, directors, managers, contractors, interns, or someone not directly connected to Major League Baseball . . ." (*id.* at DEF 026075 (emphasis added)), the individuals in charge of crew chief promotion decisions had an alarming lack of knowledge of the Diversity Policy and its requirements.[13] For example, when asked whether there was a diversity policy "as it relates to the hiring and promotion of umpires," Torre stated that he did not "know how to answer that" question. Torre Dep., 21:22-22:21. Torre further testified that while the diversity policy discussed above applies to him, "[i]t really doesn't influence [his] job." Torre Dep., 26:3-20.

### ii. World Series Assignments

When determining which umpires to assign to the World Series, Woodfork testified that MLB looks "at performance, both, in the current season and past performance and consistency in the umpires." Woodfork Dep., 67:23-68:2. Torre testified that MLB looks at the umpires' "combination [of] experience and performance for the year," as evidenced by that umpires' evaluations for the year in question[14], when determining which umpires will be assigned to the World Series. Torre Dep., 31:7-16. Marsh stated in his deposition that "seniority, [and] special event experience" were considered, and that "[s]upervisor evaluations" were also considered. Marsh Dep., 80:8-82:14. Woodfork testified that MLB's "chief diversity officer" does not get involved in the promotion of umpires to the crew chief position or the selection of umpires to the World Series. Woodfork Dep., 203:24-204:17.

---

[13] Manfred confirmed that the diversity policy applies to the Office of the Commissioner. Manfred Dep., 38:6-39:12.
[14] Torre specifically pointed to the Mid-Year Evaluation as an evaluation MLB utilizes in making World Series selections. Torre Dep., 34:22-35:17.

C.    *MLB's Umpire Evaluations*

MLB provides evaluations to its umpires in three separate forms: (i) Umpire Evaluation Reports ("UERs"), (ii) Mid-Year Reviews, and (iii) Year-End Reviews.[15] UERs are completed by umpire supervisors or observers for each umpire regarding each of the games that the supervisors or observers actually observe. Marsh Dep., 158:4-6. Mid-Year Evaluations are cumulative evaluations that are done on a "rolling basis as games are still being played." McKendry Dep., 139:8-11. Both Torre and Marsh testified that there should not be any comments in the Mid-Year Evaluations that are not found in the UERs issued during that same time period. Marsh Dep., 46:7-11; Torre Dep., 34:10-21. Year-End evaluations are issued by MLB at the end of each season and are a result of "[s]upervisors aggregate[ing] all of the end of game reports an umpire has received through the season and assign[ing] an overall grade to each category." Marsh Dep., 89:19-90:8; *see also* Exhibit 6, at DEF 015092. Torre testified that both the Mid-Year Evaluations and the Year-End Evaluations "come from" the UERs. Torre Dep., 132:15-24.

Moreover, MLB evaluates each of the Major League umpires' accuracy calling balls and strikes. As can be seen in ¶¶ 53 of the attached SMF, MLB's evaluation of the strike zone is subject to interpretation.

D.    *Plaintiff's Qualifications*

Plaintiff has consistently received praise from MLB regarding his performance as an MLB umpire. In addition to the evaluations discussed below, Plaintiff "comes to work every day" and has never had significant injury issues in his career that have caused him to miss substantial time on the field. *See* Marsh Dep., 98:2-24; *see also* Torre Dep., 172:13-19.

i.    **2006-2009 Seasons**

From 2006-2009, Plaintiff received 24 "Exceeds Standard" ratings in individual games. *See*

---

[15] For a more complete discussion of MLB's umpire evaluation system, see SMF ¶¶ 44 - 52.

Collective Exhibit 21, Plaintiff's 2006-2009 Year-End Evaluations. During that same time frame, Plaintiff received only one "Does Not Meet" rating, which was for an ejection in 2006. *See id.* at DEF 15601. For each year from 2006-2009, Plaintiff received an "Exceeds Standard" rating for his accuracy calling balls and strikes as a home plate umpire. *Id.* at DEF 15605 (2006), DEF 15625 (2007), DEF 15643 (2008), and DEF 15659-15660 (2009).

### ii. 2011-2016 Seasons

From 2011-2016, Plaintiff received a total of 9 "Exceeds Standard" ratings in his UERs, including at least one "Exceeds Standard" rating in each of those years. In that same time frame, Plaintiff received two "Does Not Meet" ratings, but at least one of those "Does Not Meet" ratings was incorrectly given to Plaintiff by MLB.[16] *See* SMF ¶¶ 61-63; Torre Dep., 64:20-66:20

Though Plaintiff consistently received "Exceeds Standard" ratings in his UERs, Plaintiff's Year-End Evaluations for the 2011-2016 seasons are not nearly as positive.[17] While Plaintiff received a total of nine "Exceeds Standard" ratings from 2011-2016, with at least one "Exceeds Standard" rating in each season during that time period, he received only four "Exceeds Standard" ratings on Year-End Evaluations for the 2011-2016 seasons.[18] *See* Collective Exhibit 25, Plaintiff's 2011-2016 Year-End Evaluations. MLB failed to give Plaintiff any "Exceeds Standard" ratings for the 2013, 2014 or 2015 seasons, despite Plaintiff receiving one "Exceeds Standard" rating in his 2013 UERs, three "Exceeds Standard" ratings in his 2014 UERs, and one "Exceeds Standard" rating in his 2015 UERs. *Id.* Thus, though Year-End Evaluations are supposed to reflect and "come from" the UERs given

---

[16] Additional documents produced by MLB call into question whether Plaintiff's UERs even contain all of the "Exceeds" ratings Plaintiff was actually given. For example, Plaintiff's supervisor reported an "EXCEEDS" by email in 2013 for a game that took place on April 4 of that year. *See* Exhibit 32, DEF 007930. Yet, Plaintiff's UERs, as produced by MLB, reveal no such "Exceeds" rating can be found on a UER of that date. *See* Collective Exhibit 28, at DEF 001852.

[17] Plaintiff also received three "Exceeds Standard" ratings and zero "Does Not Meet" ratings in the 2010 season. *See* Exhibit 23, Plaintiff's 2010 Year-End Evaluation. MLB did not produce UERs for the 2010 season for either Plaintiff or any other umpire.

[18] As discussed below, there are a number of discrepancies in Plaintiff's Year-End Evaluations that call into question whether MLB accurately captured the excellent quality of Plaintiff's job performance in the 2011-2016 seasons.

during that season (*see* Torre Dep., 34:10-21, 132:15-24; Marsh Dep., 46:7-11), Plaintiff's Year-End Evaluations for the 2011-2016 seasons do not accurately summarize Plaintiff's actual performance in those seasons.[19]

During that same time frame, Plaintiff only received one "Does Not Meet" rating on his Year-End Evaluations. *See* Collective Exhibit 25 at DEF 001520. That "Does Not Meet" rating was for an isolated, off-field incident in which Plaintiff got baseballs autographed for a fellow umpire. *Id.* That "Does Not Meet" rating was given by MLB despite MLB acknowledging that "[f]or the greater part of [that] season, [Plaintiff] did a commendable job of operating within the guidelines laid out in the policies distributed to umpires." *Id.* This is an example of what Marsh identified in his deposition when he acknowledged that MLB can "take isolated incidents" from any umpire's performance and use it against that umpire. *See* Marsh Dep., 85:21-86:5.[20]

### iii. Plaintiff's interim crew chief experience

As discussed above, the number of games in which an umpire acts as interim crew chief is also considered by MLB when determining which umpires to promote to the crew chief position. *See, e.g.,* Torre Dep., 197:22-199:7; *see also* Woodfork Dep., 136:24-139:22. While Plaintiff has served as an interim crew chief for parts of each of the 2011-2016 seasons (Hernandez Dep., 85:16-86:10), Plaintiff served as interim crew chief for the vast majority of the 2012 season. *See* Collective Exhibit 27, Plaintiff's 2012 UERS. The UERs submitted for the 2012 season heap substantial praise on Plaintiff for his work in that capacity. *See generally id.* Torre agreed in his deposition that Plaintiff "did a great

---

[20] Ironically, Marsh himself engaged in incredibly similar conduct when Marsh himself was a crew chief (and, ultimately, an umpire official for MLB). *See* Marsh Dep., 86:6-89:18. Marsh was also punished by MLB for that conduct. *Id.* Yet, Marsh was able to get an executive crew chief position and a position with MLB after retiring as an umpire, and his conduct was not held against him. *Id.*

job [in 2012] taking over Rapuano's crew and everything seemed to go well." Torre Dep., 210:10-19.

E.  *Additional Examples of MLB's Disparate Treatment of Plaintiff*

In addition to MLB's failures to promote Plaintiff to crew chief and to assign him to the World Series, MLB has also treated Plaintiff differently than it treats white umpires in a number of other ways, as well:

i.  **The Cleveland Game**

When discussing Plaintiff's performance as an MLB umpire, several of the MLB executives deposed in this case pointed to an incident during a May 9, 2013 game between the Oakland Athletics and the Cleveland Indians,[21] wherein Plaintiff followed MLB protocol to the letter in determining that a hit late in that baseball game was a double and not a home run.[22]  *See* Exhibit 36, DEF 014664 – DEF 014665.  Plaintiff was roundly criticized by the media for that call, and MLB was indisputably aware of that criticism.  *See, e.g.*, Exhibit 39, DEF 007890 - DEF 007893; Exhibit 40, DEF 007894 – DEF 007895.  Due to MLB's prohibition on umpires "mak[ing] public comments that create an appearance of lack of impartiality towards a player or club that are critical to the Commissioner of Baseball or that are otherwise inimical to the best interest of baseball," Plaintiff was unable to defend himself from the onslaught of criticisms, given MLB's failure to defend him and his integrity as an umpire.  Torre Dep., 167:24-169:18.  MLB failed to do so.[23]

---

[21] Despite the MLB officials' repeated references to that game, Marsh testified that he told Plaintiff that Plaintiff had "kept himself totally under control in a very difficult situation" after that Cleveland game.  Marsh Dep., 276:24-278:6.

[22] The primary reason Plaintiff was required to uphold the call on the field—that the hit was a double and not a home run—was because the screen on which umpires reviewed replay at the time was small and was not in high definition.  *See, e.g.*, Collective Exhibit 37 (four pictures showing the type of TV that was used for replay review at the time); Marsh Dep., 120:22-121:2; Torre Dep., 90:12-91:8, 94:13-15, 98:7-99:25.  Thus, Plaintiff and the other umpires reviewing the replay were required by the rules to uphold the call, because there was not a clear enough picture to reverse the call.  Indeed, at least one MLB official admitted in his deposition that a high definition television would have been better.  Marsh Dep., 123:2-9.  At least one media personality suggested that the replay equipment did not even work correctly.  *See* Exhibit 38, DEF 015031.  Torre expressed ignorance in his deposition regarding why Plaintiff and other umpires at that time were forced to use inferior replay equipment, including the small, non-high definition TV shown in Collective Exhibit 37.  Torre Dep., 93:4-95:6.  Torre also inexplicably testified that MLB "can't help" that the TV in use at the time was not high definition, despite the fact that MLB is a "$10 billion business."  *Id.* at 105:12-23; Manfred Dep., 31:11-14.

[BLACK REDACTION BARS]

10

In the past, however, MLB had publicly supported white umpires in similar situations. For example, in 2011, umpire Jerry Meals incorrectly called a player "safe" at home plate, ending a 19-inning baseball game. *See* Exhibit 41 (Exhibit 79 to Torre Dep.). Following the game, MLB issued a public statement acknowledging that the call was missed and saying that Umpire Meals is a "hard-working, respected umpire, and no one feels worse than him" about the missed call. *Id.* MLB further stated that it knew that the mistake "was not a product of a lack of effort." *Id.* Despite that incident, Jerry Meals was ultimately promoted to crew chief in the 2014 season. Marsh Dep., 142:3-10.

Unfortunately, MLB did not do the same with Plaintiff. *See* Exhibit 42, DEF 007950. While MLB publicly praised and supported Umpire Meals despite his missed call, MLB simply stated as to Plaintiff and his incident that "[i]n the opinion of [Plaintiff], who was last night's crew chief, there was not clear and convincing evidence to overturn the decision on the field. It was a judgment call, and as such, it stands as final." *Compare id.* and Exhibit 41.

## ii. MLB's emphasis on the "perception" of Plaintiff

As discussed in Plaintiff's Complaint, after Torre arrived in the MLB front office for the 2011 season, Plaintiff's Year-End Evaluations contained numerous adverse references to the "perception" of Plaintiff.[24] *See generally* Dkt. 35; *see also, e.g.*, Collective Exhibit 26 at DEF 001505, DEF 001508, DEF 001519, DEF 001527, DEF 001530. At times, MLB went so far as to supplement one of Plaintiff's Mid-Year Evaluations to include comments on perception, and that supplementation was praised by at least one MLB executive. *See, e.g.*, Exhibit 43, DEF 008045; Exhibit 44, DEF 014826. Though MLB repeatedly harped on the "perception" of Plaintiff (and, as discussed below, other minority umpires), Marsh testified that he knew of nothing other than certain balks called by Plaintiff that warranted MLB comments about the "perception" of him. Marsh Dep., 174:24-175:23.

"Perception" is not a listed criteria for promotion to crew chief.  *See* Exhibit 14.

███  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████  ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████  ██

██████  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  █  ██

████████████████████████████████████████████████████████████

████████████████████████████████  ██

████████████████████████████████████████████████████████████

[25] MLB is acutely aware of Plaintiff's desire to be a crew chief and that MLB continually passing him over for that position in favor of white umpires has greatly upset Plaintiff.  *See, e.g.,* Exhibit 48, DEF 015066 – DEF 015067; Exhibit 49, DEF 015528 – DEF 015529; Exhibit 50, DEF 023961 – DEF 023963; Marsh Dep., 218:19-219:12, 248:7-14. 267:2-269:2; Woodfork Dep., 167:10-18.
[26] Manfred approved those promotions.  *See* Exhibit 53, DEF 008044.

█  ██████████████████████████████████████████████████████████

██████████████████████████████████████████



[REDACTED]

---

[28] Plaintiff technically received two "Does Not Meet" ratings but, as discussed above, one of those ratings was indisputably a mistake and that rating should not have been given.





[31] No contemporaneous documentation has been provided about MLB's reasoning for why umpires are promoted to crew chief and why other umpires are not. ████████████████████████████████████████████████████████ Those letters are created after the promotion decisions are made, and contain after-the-fact rationales for not promoting those umpires. *Id.* MLB at times may have held a conference call to discuss crew chief candidates, but no minutes or other written notes reflecting those meetings were produced by MLB. *See, e.g.*, Exhibit 93, at DEF 007620.

██████████████████████████████████ His excellence continued even after the filing of this lawsuit. *See, e.g.*, DEF 014699 – DEF 014703.



█████████████████████████████████████████████ ▪

████████████████████████████████████ ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ ▬ █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████ ▪ ████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

▪ ████████████████████████████████████████████████████████

████████████████ Both Torre and Marsh confirmed in their depositions that the duties of an interim crew chief were the same as the duties of a permanent crew chief.  Torre Dep., 37:15-18; *see also* Marsh Dep., 54:16-25; Marsh Dep., 218:8-18.

[36] Plaintiff and Umpire Danley were the two most senior umpires that applied for the 2017 crew chief position, yet neither was promoted.  *See* Exhibit 89, DEF 008128.

both Danley's injuries and certain of his personal matters against him, using the time missed in conjunction with those issues as a justification, along with allegations of perceived laziness and "body language" issues, for not promoting Danley to crew chief.[37] Marsh Dep., 37:13-38:16, 252:8-11; Woodfork Dep., 139:23-140:7. Torre also confirmed that Danley had not been promoted to crew chief in part because he has allegedly "spent a lot of time off the field." Torre Dep., 143:10-12.

For the 2016 season, Plaintiff, Marquez and Danley were the most senior "number two" umpires on MLB's staff.[38] *See* Dkt. 52-6; Torre Dep., 201:4-202:5. Curiously, Plaintiff, Marquez and Danley were the *only* number two umpires on MLB's umpire staff in 2016 to have crew chiefs with less seniority than them.[39] Dkt. 52-6. Moreover, Plaintiff and Kerwin Danley were the most senior umpires who applied for the crew chief positions for the 2017 season. *See* Exhibit 89 at DEF 008128. Neither was promoted to crew chief—instead, non-minority umpires with far less experience were selected. *See id.*; Torre Dep., 156:3-14.

G.      *MLB's World Series Selections*

In his deposition, Woodfork described the World Series selection process as one in which a number of MLB employees meet to discuss candidates and supervisors provide recommendations. Woodfork Dep., 22:14-23:15. Torre further testified that supervisors' subjective recommendations were "a big consideration" in World Series assignment decisions. Torre Dep., 154:16-155:8.

To be eligible to work in the World Series, MLB must first give the umpire an assignment to the Division Series in that same postseason. Woodfork Dep., 68:3-6. MLB has purportedly moved away from seniority as a factor in determining which umpires will receive World Series assignments. Torre Dep., 153:23-154:15. Instead, MLB focuses on "the combination [of] experience and

---

[38] A "number two" umpire is the second in command on each umpire crew.
[39] In his deposition, Manfred claimed not to know that the only number two umpires with more seniority than their crew chiefs were Plaintiff, Umpire Danley and Umpire Marquez—all minorities. Manfred Dep., 63:1-10.

performance for the year." Torre Dep., 31:7-11. Woodfork testified that the umpires selected to the World Series may, in fact, "not be [the] highest performing umpires." Woodfork Dep., 67:21-68:25.

Plaintiff was last selected to umpire a World Series in 2005. Exhibit 9 at DEF 007654. Prior to the 2016 season, Plaintiff had umpired in 18 total postseason games: the Division Series eight times, the League Championship series eight times, and the World Series twice. *See id.* From 2011-2016, out of at least 42 selections, MLB selected only one minority umpire to the World Series: Alfonso Marquez, who was selected twice, once in 2011 and again in 2015. Documents produced by MLB, however, suggest that Plaintiff was likely to be selected for the 2015 World Series until MLB officials intervened and—without explanation—removed him from consideration.

Plaintiff was qualified for assignment to the 2015 World Series and received at least one supervisor vote that year.[40] *See* Exhibit 152, DEF 007615; Exhibit 153, DEF 007813. Indeed, Plaintiff was a candidate for the 2015 World Series. *See* Exhibit 151, DEF 008002. But, in an email titled "WS Totals," sent by Rich Rieker (an MLB employee) to Woodfork on October 16, 2015, Rieker writes to Woodfork that Woodfork can "[t]ake Angel out if [he] want[s]" and that Woodfork and Torre should put "who they want in from the suggestions." Exhibit 158, DEF 007912. That same day, Woodfork texted Torre that "Angel is going to be a no for Rob." Exhibit 159, DEF 015451; *see also* Woodfork Dep., 151:16-156:11. Those communications suggest that Plaintiff was on track to be selected for the 2015 World Series before MLB officials intervened, and the dates of the foregoing email and text message support that conclusion. *See* Marsh Dep., 265:18-266:4; Woodfork Dep., 151:25-153:19.

Plaintiff was qualified to be selected for the 2016 World Series as well, had MLB chosen to give him a Division Series assignment, which they considered but ultimately chose not to do. *See* Exhibit 160 at DEF 014727. Umpires Guccione, Hirschbeck, Holbrook, Hudson, Randazzo, Vanover

---

[40] Plaintiff also received votes for at least the 2011 and 2012 World Series. *See* Exhibit 154, DEF 007608; Exhibit 155, DEF 007884; Exhibit 156, DEF 007991; Exhibit 157, DEF 007999; Marsh Dep., 220:5-9, 222:6-8.

and West were assigned to the 2016 World Series.  *See* Declaration of Angel Hernandez, at ¶ 5.  At the time of that selection, four of those umpires—Guccione, Hudson, Randazzo and Vanover—had never been selected for a World Series.  *See* Exhibit 161 at DEF 007618.  Marsh had previously pointed out to MLB supervisors and Woodfork that using "four new umpires in the World Series" was "unusual" and that MLB had "usually used two or three [new umpires] at the maximum."  Exhibit 162 at DEF 007813.  Rather than select Plaintiff for a World Series assignment in 2016, MLB again decided to do something it admits is "unusual" by selecting four new white umpires for the 2016 World Series.

## II.  ARGUMENT

Plaintiff is entitled to partial summary judgment that he has establish a *prima facie* case as to both his disparate treatment claims and his disparate impact claims.

### A.  *Disparate Treatment*

For a Title VII disparate treatment discrimination claim, "[t]o state a prima facie case of race discrimination, a plaintiff must proffer evidence that (1) he belongs to a protected group; (2) he was qualified for his position; (3) his employer took an adverse action against him; and (4) the adverse action occurred in circumstances giving rise to an inference of race discrimination."  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).  "The burden of establishing a prima facie case of disparate treatment is not onerous."  *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).  Moreover, the "burden[s] of proof and production for employment discrimination claims under Title VII, § 1981 . . . and the NYSHRL are identical."  *Sandler v. Montefiore Health Sys., Inc.*, No. 16-CV-2258 (JPO), 2018 WL 4636835, at *6 (S.D.N.Y. Sept. 27, 2018) (internal citations omitted).  Plaintiff's NYCHRL claim "must be construed 'independently from and more liberally than' his federal claim[s]."  *Id.* at *7 (internal citations omitted).

Here, Plaintiff meets all four elements of a *prima facie* case of disparate treatment

discrimination.  First, it is undisputed that Plaintiff belongs to a protected group—Plaintiff is a Cuban-born Latino umpire.  *See* Dkt. 52-3, Dkt. 35, ¶ 108.

Second, Plaintiff was (and is) qualified for the position of crew chief and for World Series assignments.  "In order to satisfy the qualifications requirement in alleging a *prima facie* case of discriminatory failure to promote, 'all that is required is that the plaintiff establish basic eligibility for the position at issue.'"  *Gordon v. City of New York*, No. 14-CV-6115 (JPO), 2018 WL 4681615, at *13 (S.D.N.Y. Sept. 28, 2018) (internal citations omitted).  Plaintiff's qualifications far exceed the "basic eligibility" for the position of crew chief and for World Series assignments.  Plaintiff had more experience as a Major League umpire than each of the individuals promoted to crew chief that are discussed at length above in.  Plaintiff received "Exceeds Standard" ratings in UERs for every year from 2011-2016, displaying the type of consistency MLB insists is necessary in promoting umpires to crew chief and selecting umpires to the World Series.  As discussed more fully above, Plaintiff is more than qualified for those positions, and the second element of establishing a *prima facie* case has thus been met.

As to the third element, MLB indisputably took adverse employment action against Plaintiff by refusing to promote him to crew chief and refusing to select him to the World Series.  Rather than promote Plaintiff to the crew chief position or give him World Series assignments, MLB instead promoted and selected white umpires whose qualifications were inferior to Plaintiff's.

Finally, MLB's adverse actions occurred in circumstances giving rise to an inference of race discrimination.  In order to satisfy this element, "[a] plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Island R.R.*, 230 F.3d 34, 38–39 (2d Cir. 2000) (internal citations omitted)  Here, Plaintiff was not promoted to crew chief, with MLB promoting only non-minority umpires to crew chief from 2011 to the start of the 2017 season.

Plaintiff was also not assigned to the World Series, with MLB assigning only one minority umpire (Marquez) to the World Series on two separate occasions between 2011 and 2016. In addition, Plaintiff has been treated differently than non-minority umpires in his evaluations. Furthermore, in situations involving Plaintiff, such as the Cleveland incident detailed in § ____, *supra.*, MLB has treated Plaintiff differently than it treated non-minority umpires in similar situations.

Plaintiff has met all four elements required to establish a *prima facie* case of disparate treatment discrimination against MLB. Plaintiff is thus entitled to partial summary judgment on that issue.

### B. Disparate Impact

"Title VII prohibits not only overt and intentional discrimination, but also facially neutral practices that have a disparate impact on protected groups."[41] *Wright v. Stern*, 450 F. Supp. 2d 335, 367 (S.D.N.Y. 2006) (internal citations omitted). To prevail on a disparate impact discrimination claim, the plaintiff must first meet his *prima facie* burden of demonstrating that an employer "'uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" *Wright*, 450 F. Supp. 2d at 367 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)). "Specifically, plaintiffs 'must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two.'" *Id.* (citing *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 158 (2d Cir. 2011)). Disparate impact claims brought pursuant to the New York State Human Rights Law ("NYSHRL") are analyzed the same as claims brought pursuant to Title VII. *Gordon v. City of New York*, No. 14-Civ.-6115-JPO-JCF, 2016 WL 4618969, at *2 (S.D.N.Y. Sept. 2, 2016). Plaintiff's New York City Human Rights Law ("NYCHRL") disparate impact claims are analyzed under a "more lenient standard." *Id.* As discussed below and as previously discussed with

---

[41] As discussed above, MLB has also engaged in intentional discrimination against Plaintiff. As stated in *Wright*, "[t]here is nothing inconsistent with acting with intent to discriminate while adopting a facially neutral policy that has a disparate impact; the two are not mutually exclusive." *Wright*, 450 F. Supp. at 369; *see also Martin v. Coinmach Corp.*, No. 15-cv-8137 (AJN) (SN), 2016 WL 6996182, at *6 (S.D.N.Y. Nov. 29, 2016).

the Court, all of the elements of a *prima facie* case of disparate impact discrimination are present here.

As to the first element, Plaintiff has previously identified the policies or practices of MLB that are the subject of his disparate impact claims: (i) the process actually employed by MLB in determining which umpires will be promoted to crew chief (the "Crew Chief Promotion Process") and (ii) the process employed by MLB in determining which umpires will be given World Series assignments (the "World Series Selection Process"). *See* Dkt. 99, 100.[42] To briefly summarize, MLB purports to describe its Crew Chief Promotion Process in an interrogatory answer; in that interrogatory answer, MLB lists criteria relating to large amounts of objective data that is collected by MLB over the course of an umpire's career. But in reality, MLB relied almost exlusively on the whim of Joe Torre.[43] MLB also ignored objective criteria, instead focusing on subjective and amorphous criteria such as "leadership" and "situation management." *See Watson v. Fort Worth Bank*, 487 U.S. 977 (1988). Similarly, for the World Series Selection Process, MLB focused on "the combination [of] experience and performance for the year." Torre Dep., 31:7-11. Neither Torre nor Woodfork review the UERs submitted by umpire supervisors, and instead rely on their subjective opinions of an umpire's qualifications. Woodfork Dep., 26:14-27:3; Torre Dep., 32:9-19. Plaintiff's identification of MLB's use of subjective criteria in place of objective criteria in its Crew Chief Promotion Process and World Series Selection Process establishes the first prong of a *prima facie* case of disparate impact discrimination.

The second element of a *prima facie* case of disparate impact discrimination is also met, as a disparity indisputably existed at the time Plaintiff brought his claims. For the 2011-2016 seasons, MLB promoted ten umpires to the crew chief position. All of those ten umpires were white.

---

[42] That motion, and its memoranda in support (Dkt. 100, 106), are incorporated herein by reference.

[43] ███████████████████████████████████████████████████████████████████ ████████████ That data is also ignored when MLB makes decisions regarding crew chief promotions and World Series assignments.

Moreover, prior to this 2017 lawsuit, MLB had *never* promoted an African-American umpire to crew chief and had promoted only one Latino or Hispanic to that position. This is despite the fact that MLB had full knowledge of its diversity issues and the disparate impact its Crew Chief Promotion Process and World Series Selection Process has caused, as discussed more fully in above.

The facts that not a single minority umpire has been promoted to crew chief for any of the 2011-2016 seasons, and that only one minority umpire has ever held the position of crew chief in the history of Major League Baseball, results in the "inexorable zero," which "in and of itself support[s] an inference of discrimination." *Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 823 (E.D.N.Y. 1999); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23; *see also United States v. City of New York*, 713 F. Supp. 2d 300, 317–18 (S.D.N.Y. 2010). Because MLB's Crew Chief Promotion Process resulted in zero minority umpires being promoted to crew chief in the relevant time period, and because of MLB's long-running lack of diversity in the crew chief position, causation is established for purposes of Plaintiffs *prima facie* case on his disparate impact discrimination claims.

Plaintiff has met all the elements required to establish a *prima facie* case of disparate impact discrimination against MLB. Plaintiff is thus also entitled to partial summary judgment on that issue.

Dated: April 24, 2020

Respectfully submitted,

MURPHY LANDEN JONES PLLC

By: *Kevin L. Murphy*
Kevin L. Murphy (*pro hac vice*)
J. Jeffrey Landen (*pro hac vice*)
Nicholas R. Gregg (*pro hac vice*)
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: 859-360-1123
KMurphy@MLJfirm.com
JLanden@MLJfirm.com
NGregg@MLJfirm.com

&

LEWIS DIBIASI ZAITA & HIGGINS
Nicholas J. Zaita
420 Lexington Avenue, Suite 300
New York, NY 10107
Tel: (212) 772-0943
nzaita@ldzhlaw.com
*Attorneys for Plaintiff Angel Hernandez*

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to: Neil H. Abramson, Esq., Adam M. Lupion, Esq., Rachel S. Philion, Esq., and Rachel S. Fischer, Esq., PROSKAUER ROSE LLP, Eleven Times Square, New York, New York 10036-8299.

Respectfully Submitted,

MURPHY LANDEN JONES PLLC

By: *Kevin L. Murphy*
Kevin L. Murphy (*pro hac vice*)
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: 859-360-1123
*Attorney for Plaintiff Angel Hernandez*