NEIL H. ABRAMSON
ADAM M. LUPION
RACHEL S. PHILION
RACHEL S. FISCHER
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Defendants*
THE OFFICE OF THE COMMISSIONER
OF BASEBALL and MAJOR LEAGUE
BASEBALL BLUE, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGEL HERNANDEZ,<br><br>        Plaintiff,<br><br>      v.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL and MAJOR LEAGUE BASEBALL BLUE, INC.<br><br>        Defendants. | No. 18 Civ. 9035 (JPO) (GWG) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>MOTION TO EXCLUDE DR. GREGORY W. BAXTER</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

BAXTER'S REPORT........................................................................................................ 4

      A.     MLB's Umpire Evaluation Processes ...................................................... 4

      B.     Baxter's Background .............................................................................. 5

      C.     Baxter's Analysis .................................................................................. 6

      D.     Baxter's Conclusions ............................................................................ 9

ARGUMENT .................................................................................................................. 10

    I.      BAXTER IS UNQUALIFIED TO OFFER CONCLUSIONS ON MLB's EVALUATION AND PROMOTION PROCESSES ........................................... 11

    II.     BAXTER'S ANALYSIS LACKS ANY SPECIALIZED EXPERTISE ............. 12

    III.    BAXTER DID NOT APPLY RELIABLE PRINCIPLES AND METHODS...... 14

      A.     Baxter Did Not Compare His Results With a Control Group of Non-Minority Umpires..................................................................................... 15

      B.     Baxter Deliberately Ignored Alternative Explanations For His Observed Outcomes. ................................................................................ 17

      C.     Baxter Failed to Use A Replicable Protocol. ........................................... 20

      D.     Baxter's Methodology is Inherently Unreliable. ...................................... 22

    IV.    Baxter's Analysis is Irrelevant to Hernandez's Claims ........................ 24

CONCLUSION................................................................................................................ 26

# TABLE OF AUTHORITIES

Page(s)

CASES

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ................................................................................................14

*Anderson v. Sotheby's Inc. Severance Plan*,
  No. 04-cv-8180 (SAS) (DF), 2005 WL 1412965 (S.D.N.Y. June 13, 2005) ........................13

*Andrews v. Metro N. Commuter R.R. Co.*,
  882 F.2d 705 (2d Cir. 1989) .................................................................................................13

*Arista Records LLC v. Lime Grp. LLC*,
  No. 06-cv-5936 (KMW), 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ................................11

*Austin v. Mabey*,
  No. 00-728-D-1 (M.D. La. Nov. 24, 2004) ..........................................................................15

*Bethea v. Equinox Fitness Club*,
  544 F. Supp. 2d 398, 399 (S.D.N.Y. 2008), *aff'd sub nom Mass v. Equinox
  Fitness Club*, 354 F. App'x 556 (2d Cir. 2009) ...................................................................14

*Brink v. Union Carbide Corp.*,
  41 F. Supp. 2d 402 (S.D.N.Y. 1997) .....................................................................................13

*Campbell v. Nat'l R.R. Passenger Corp.*,
  311 F. Supp. 3d 281 (D.D.C. 2018) ......................................................................................20

*Caruso v. Bon Secours Charity Health Sys. Inc.*,
  No. 14-cv-4447 (VB), 2016 WL 8711396 (S.D.N.Y. Aug. 5, 2016), *aff'd* 703
  F. App'x 31 (2d Cir. 2017) ...................................................................................................20

*Cross v. FPP Operating Partners, L.P.*,
  No. CIV. A. 799CV160-R, 2001 WL 1143159, at *8 (N.D. Tex. Sept. 25,
  2001) .....................................................................................................................................15

*Cunningham v. Cornell Univ.*,
  No. 16-cv-6525 (PKC), 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ...............................22

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993) ...........................................................................................................4, 10

*Doe v. Colgate Univ.*,
  760 F. App'x 22 (2d Cir. 2019) ............................................................................................12

*Eatman v. United Parcel Serv.*,
194 F. Supp. 2d 256 (S.D.N.Y. 2002)....................................................................25

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
No. 11-cv-6201 (DLC), 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015)....................16

*Forte v. Liquidnet Holdings, Inc.*,
No. 14–cv-2185 (AT), 2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015), *aff'd*
675 F. App'x 21 (2d Cir. 2017) ............................................................................17

*Garcia v. Daniel Industries, Inc.*,
No. H-97-3475 (S.D. Tex. Nov. 6, 1998) .........................................................14, 15

*In re Fed. Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*,
281 F.R.D. 174 (S.D.N.Y. 2012) ...........................................................................23

*In re Lyondell Chem. Co.*,
558 B.R. 661 (Br. S.D.N.Y. 2016).........................................................................14

*In re Puda Coal Sec. Inc., Litig.*,
30 F. Supp. 3d 230 (S.D.N.Y. 2014), *aff'd sub nom Querub v. Hong Kong*,
649 F. App'x 55 (2d Cir. 2016) .............................................................................12

*Knight v. City of N.Y.*,
303 F. Supp. 2d 485 (S.D.N.Y. 2004), *aff'd* 147 F. App'x 221 (2d Cir. 2005)......24

*Koppell v. N.Y. State Bd. of Elections*,
97 F. Supp. 2d 477 (S.D.N.Y. 2000).....................................................................22

*Linde v. Arab Bank, PLC*,
920 F. Supp. 2d 282 (E.D.N.Y. 2011) ...................................................................24

*LinkCo, Inc. v. Fujitsu Ltd.*,
No. 00-cv-7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002)....................13

*LVL XIII Brands v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd* 720 F. App'x 24 (2d Cir. 2017)........22

*Mello v. Siena Coll.*,
No. 15-cv-0013 (GTS) (ATB), 2017 WL 1013077 (N.D.N.Y. Mar. 14, 2017) ....13

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010).....................................................................17

*Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*,
324 F. Supp. 3d 387 (S.D.N.Y. 2018).....................................................................20

*Sec. & Exch. Comm'n v. Lek Sec. Corp.*,
370 F. Supp. 3d 384 (S.D.N.Y. 2019)......................................................................22

*Tardif v. City of N.Y.*,
344 F. Supp. 3d 579 (S.D.N.Y. 2018)....................................................................17

*Toth v. 59 Murray Enters., Inc.*,
No. 15-cv-8028 (NRB), 2019 WL 95564 (S.D.N.Y. Jan. 3, 2019) .......................25

*U.S. v. Tin Yat Chin*,
371 F.3d 31 (2d Cir. 2004)....................................................................................11

*Wilson v. Muckala*,
303 F.3d 1207 (10th Cir. 2002) .............................................................................13

**OTHER AUTHORITIES**

2000 Amendments to Adv. Committee Notes to Fed. R. Evid. 702.............................17

Federal Rule of Evidence 702................................................................................ passim

## PRELIMINARY STATEMENT

Defendants The Office of the Commissioner of Baseball and Major League Baseball Blue, Inc. (together, "Defendants" or "MLB") respectfully submit this memorandum in support of their motion to exclude the opinions and testimony of Dr. Gregory W. Baxter ("Baxter"), Plaintiff Angel Hernandez's ("Plaintiff" or "Hernandez") purported "human resources expert." In Plaintiff's motion for partial summary judgment, he relies on Baxter's report (the "Report") to support his claim that MLB's review process did not accurately reflect what Baxter perceived to be Plaintiff's actual performance and was therefore unfair to him and other minority umpires. (Dkt. 142, at 9 n. 19; Dkt. 142-1 ¶ 69). Baxter lacks even the most basic qualifications to make these assessments, and the methodology he used to reach these conclusions is infected with so many flaws that his opinion is wholly unreliable. The Report should be excluded.

Baxter's analysis was purposefully limited to a review of year-end performance evaluations for three minority umpires—Hernandez, Alfonso Marquez, and Kerwin Danley. Baxter purported to "compare" language in the year-end evaluations to Field Evaluation Forms for individual baseball games, which he refers to as Umpire Evaluation Reports ("UERs"), in an attempt to determine whether remarks in the three umpires' year-end evaluations were supported by words or phrases contained in the individual game UERs.[1] Based on Baxter's comparison of the words and phrases in year-end evaluations to words and phrases in UERs—while completely ignoring every other source of information that goes into an umpire's year-end evaluation—Baxter concludes that certain comments contained in year-end evaluations were "unsupported" by UERs, which he characterized as "errors" and an "*unfair* depiction of minority umpire performance."

---

[1] For the Court's convenience, MLB will adopt Plaintiff's naming convention and will refer to individual Field Evaluation Reports as "UERs" for purposes of this motion to exclude.

(Abramson Decl. Ex. E[2] at 6 (emphasis added).) While admitting that he is not qualified to assess umpire performance and has no knowledge of baseball, Baxter nonetheless offers his own subjective view as to whether comments contained in the three umpires' year-end evaluations were positive, negative, or "word salad" (a term he appears to have invented for purposes of his Report, which he defines as any comment in an evaluation that he perceived to be unrelated to an umpire's actual performance), all without utilizing any scientific methodology, much less a sound one. Despite his admitted ignorance of umpiring, Baxter purports to conclude that the information contained in the year-end evaluations of the three umpires was not an accurate reflection of their actual performance and that those evaluations negatively affected their careers, including their failure to be promoted to crew chief or selected to the World Series from 2011 through 2016.[3] (Id., at 7-8.) He reaches these staggering conclusions without reviewing a scintilla of information regarding any of the other 70+ Major League Baseball umpires, much less using any type of control group.

Baxter's analysis and conclusions are eminently unreliable and should be excluded pursuant to Federal Rule of Evidence ("Rule") 702. Indeed, Baxter has been excluded as an expert witness on multiple occasions, including in the Southern District of New York, based on flaws similar to the numerous flaws present here.

**_First_**, Baxter lacks even the most basic qualifications to offer any opinion as to whether MLB fairly evaluated umpires and the effect of those evaluations on their careers because he

---

[2] The deposition transcript excerpts cited herein are attached to the Declaration of Neil H. Abramson ("Abramson Decl."), filed herewith, as follows: Abramson Decl. Ex. A, Deposition Transcript of Dr. Gregory W. Baxter ("Baxter Tr."); Abramson Decl. Ex. B, Deposition Transcript of Denise Martin, Ph.D. ("Martin Tr."); Abramson Decl. Ex. C, Deposition Transcript of Peter Woodfork ("Woodfork Tr."); and Abramson Decl. Ex. D, Deposition Transcript of Matthew McKendry ("McKendry Tr.").

[3] Marquez was selected for the World Series twice during this time span—in 2011 and 2015. Baxter does not explain how this fact affected his conclusions. (_See_ Baxter Tr. 202:4-23, 203:19-204:9.)

admittedly is "utterly unfamiliar" with MLB's rules and the criteria for selection to crew chief or the World Series, and that he is unqualified to assess umpire performance generally.

**Second**, Baxter's analysis requires no specialized knowledge. It consisted of a mere side-by-side comparison of documents in the record, a task that he expressly admitted required no expertise because "[y]ou could probably train most people to do it." (Baxter Tr. 221:8-9.)

**Third**, Baxter's conclusions that the review process was unfair and negatively affected minority umpires were derived from a wholly unreliable "methodology," most notably that he: (i) failed to compare his results regarding Hernandez, Danley and Marquez with a control group of non-minority umpires, claiming that such an exercise was outside the scope of his assignment as defined by Plaintiff's counsel; (ii) deliberately ignored multiple sources of information for the year-end evaluations and alternative reasons underlying MLB's employment decisions independent of the UERs he reviewed; (iii) failed to utilize a uniform protocol and instead injected his own subjective determinations; and (iv) changed his approach partway through the assignment. Baxter exacerbated all of these flaws by failing to memorialize his so-called "methodology" until nearly two months after he submitted his Report (and then only after MLB's expert criticized Baxter's failure to provide a written protocol so that his analysis could be replicated). Indeed, in a desperate attempt to avoid disclosure of his *post hoc* "methodology," Plaintiff made the extraordinary claim that it was privileged, a claim Judge Gorenstein flatly rejected in an opinion and order compelling its disclosure. (Dkt. 153.)

**Fourth**, Baxter's analysis is irrelevant to the claims in this case because it does not and cannot support any claim of intentional discrimination and is silent with respect to any element of Plaintiff's disparate impact claim.

For these reasons and the reasons that follow, Baxter's Report and testimony do not come close to meeting the requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*") and its progeny, and should be excluded in their entirety.

**BAXTER'S REPORT**

### A.  MLB's Umpire Evaluation Processes

UERs are submitted by Umpire Supervisors and Field Observers for each game that they observe in person.  (Abramson Decl. Ex. F at DEF1289; Abramson Decl. Ex. G at DEF1446-48; McKendry Tr. 122:15-124:14.)  Pursuant to the terms of the Basic Agreement, the collective bargaining agreement between MLB and the umpires' union, (the "Basic Agreement"), UERs are limited to the following categories:  (i) Effort and Professionalism; (ii) Game and Situation Management; and (iii) Field Proficiency.  (Abramson Decl. Ex. F at DEF1281-83; Abramson Decl. Ex. G at DEF1446-48.)  UERs do not contain any recommendations for promotion to crew chief or selection for the post season.  (*Id.*)  The Basic Agreement states that "Field Observers shall not be concerned with, or report on, factors beyond the criteria listed on the required forms, and shall not solicit opinions or comments regarding umpires from any other person."  (Abramson Decl. Ex. F at DEF1279; Abramson Decl. Ex. G at DEF1444.)  Field Observers who complete UERs are precluded from commenting on factors beyond those identified on the form, and also must avoid any personal interaction with the umpires.  (Abramson Decl. Ex. G at DEF1444-45, *see also* Abramson Decl. Ex. F, at DEF1280-81.)  Instead, UERs are targeted to help Major League Umpire Supervisors identify whether an umpire is experiencing a trend of being deficient in fundamental umpiring competencies that should warrant consideration of a corrective action plan.  (Abramson Decl. Ex. G at DEF1450-51; Abramson Decl. Ex. F at DEF1286-87.)

During the regular season, only half of games are observed in person. (McKendry Tr. 124:4-5; Baxter Tr. 159:24-161:8; Abramson Decl. Ex. E at 2-3.) The remaining games are not observed in person, and no UERs are generated for those games. (*Id.*) The Basic Agreement also states that through a combination of in person review and videotape review, MLB reviews all the games worked by each umpire, including games that are not observed in person. (Abramson Decl. Ex. G at DEF1445; Abramson Decl. Ex. F at DEF1280.) As a result, MLB reviews performance during games for which there may be no UER. (Baxter Tr. at 162:15-21.)

Mid-year and year-end evaluations, in contrast to UERs, evaluate umpires across a wide range of competencies. In completing mid-year and year-end evaluations, MLB considered multiple factors in addition to UERs, including but not limited to, observations of umpires from the MLB executives responsible for umpiring matters; information relayed during weekly conference calls discussing umpire performance; interactions between umpires and with MLB executives responsible for umpiring; performance as a replay official; incidents involving the umpire such as ejections and confrontations with players, managers and coaches; durability; accuracy calling balls and strikes and judging runners on the bases; and umpires' handling of administrative duties. (Baxter Tr. 163:13-165:8, 184:7-25, 189:9-17; Abramson Decl. Ex. F at DEF1285-86; Abramson Decl. Ex. G at DEF1450; McKendry Tr. 136:21-137:5; Woodfork Tr. 35:23-36:19.)

### B. Baxter's Background

Baxter proffers himself as a human resources expert. (Baxter Tr. 19:5, 107:23-108:4.) He has no experience with umpiring or reviewing umpires' performance. (*Id.* 122:20-24, 127:7-14.) Baxter admitted that he is "[u]tterly unfamiliar" with the rules for professional umpires, and that he performed no research to cure that knowledge gap. (*Id.* 105:12-106:4, 122:20-24.) Baxter also admitted that he is not qualified to assess the performance of Major League umpires, and that he

5

has no understanding of the criteria or qualifications to be selected for a crew chief position or for the World Series. (*Id*. 91:22-92:1, 106:5-107:1.) He is not a baseball fan and believes he watched only one baseball game last season. (*Id.* 83:21-84:7.)

## C.     Baxter's Analysis

Baxter testified that he was asked by Plaintiff's counsel to perform three tasks: (1) review deposition testimony and the Basic Agreement to understand MLB's processes for creating performance evaluations; (2) analyze whether MLB actually followed those processes by reviewing only UERs and year-end performance evaluations for Hernandez, Marquez, and Danley for the years 2011-2016 (more recent seasons were excluded from his analysis); and (3) opine on the career effects of MLB's creation of performance evaluations for those three umpires based on a comparison of the words and phrases in their year-end reviews to their UERs. (*Id.* 18:21-19:8; Abramson Decl. Ex. E at 1.)

Baxter states in his Report that he reviewed the Basic Agreement and the deposition transcripts of three MLB witnesses: Joe Torre, Peter Woodfork, and Randy Marsh. (Abramson Decl. Ex. E Cover Sheet.) Baxter never reviewed Plaintiff's testimony or the testimony of other relevant MLB personnel with knowledge of and input into the performance review process.[4] (Baxter Tr. 80:7-10, 99:11-13, 101:7-103:2.) Baxter also did not review any evaluations for any umpire other than Hernandez, Danley and Marquez. (*Id*. 87:6-12.) He testified that he did not need to look at any other umpire's review because it was outside the scope of the assignment as defined by Plaintiff's counsel. (*Id.* 87:6-12, 92:20-21.) Baxter also "[f]requently ask[ed]"

_____

[4] For example, Baxter did not review deposition testimony from Matthew McKendry, an MLB Director involved with the process of creating performance evaluations because Plaintiff's counsel did not inform him of that testimony. (Baxter Tr. 101:7-102:5.)

Plaintiff's counsel whether he needed any additional materials to "honestly answer the three questions [they] ha[d] posed," and was "assured" that he did not. (*Id.* 98:22-99:6.)

Baxter then purported to compare the UERs with the year-end evaluations of the three umpires.[5] Baxter converted the three umpires' 2011-2016 year-end evaluations to Microsoft Word documents, converted each umpire's UERs to word-searchable Adobe PDFs, placed these documents side by side on his computer, and then "searched" the UERs for words and phrases supporting the comments contained in year-end evaluations. (*Id.* 111:24-112:8, 215:9-216:3; Abramson Decl. Ex. E at 5; Abramson Decl. Ex. H ("Baxter Memorandum") ("I then placed the two documents side-by-side on my computer screen and examined whether the UER's (*sic*) supported the phrases and words the Author chose to write in the YE."))[6]

Baxter testified that he never used this kind of "methodology" for any other matter, nor could he name a single job in which he had performed a similar analysis. (Baxter Tr. 16:23-25, 17:6-10, 17:22-18:5.) He further testified that he never saw this methodology described in any publication, nor could he name a single other human resources professional who has engaged in a similar process. (*Id.* 123:7-124:8.) He created this methodology for this case. (*Id.* 123:4-6.) Baxter admitted that no element of this exercise required "special expertise," and that, instead, "[y]ou could probably train most people to do it." (*Id.* 220:15-221:9.) Rather, he was able to perform this analysis through a "thorough review of the Umpire Evaluation Reports," and "not based on any knowledge [he] had about baseball prior to this engagement." (*Id.* 127:7-14.)

_____

[5] Baxter ignored mid-year performance evaluations entirely. (Baxter Tr. 86:9-23.)

[6] Baxter testified that he did not review any materials after the 2016 season because he was told by Plaintiff's "these were the only years . . . on which evidence could be produced, and to limit [him]self to those documents." (Baxter Tr. 87:13-20.) MLB, however, produced evaluations for the 2017 and 2018 seasons.

Initially, Baxter performed his comparison of the year-end evaluations and UERs by only comparing the language offered for each particular category in each document. For example, if Baxter was seeking to verify a comment offered in the year-end evaluation regarding an umpire's "Hustle," he searched only the "Hustle" category of the UERs. (*Id.* 117:3-118:2.) At some undefined point in his review, however, Baxter realized that year-end evaluation comments also could be derived from components of the UER under a different category, so he proceeded to search entire UERs for supporting comments rather than limit his search to a specific category. (*Id.* 139:19-140:12, 143:7-13.) Baxter did not record which UERs he searched in their entirety and which he searched only under a specific category. (*Id.* 143:14-18.)

Baxter then offers conclusions regarding whether each year-end evaluation comment aligned with the results of his "searches." (Abramson Decl. Ex. E at 5-7.) However, Baxter did not identify any criteria for determining whether a comment in the year-end evaluation had, in his view, sufficient support in a UER. (*Id.*; Baxter Tr. 129:7-20.) And he agreed that another individual could reach different determinations as to whether a comment was supported or not. (*Id.* 130:14-131:1.)

Baxter also classified the comments contained in year-end evaluation as either positive, negative, or "word salad," a term which Baxter defines as observations that he perceived to be unrelated to an umpire's actual performance. (Abramson Decl. Ex. E at 7.) In a memorandum prepared two months after his Report (the "Memorandum"), Baxter identified a list of terms he deemed "positive," but does not indicate what words he deemed "negative," or what methods he

used to determine the comments that he deemed unrelated to umpire performance and should be classified as "word salad." (Abramson Decl. Ex. H.)[7]

## D.    Baxter's Conclusions

Baxter concluded that comments offered in Hernandez's, Marquez's, and Danley's year-end evaluations were "unsupported by any UER." (Abramson Decl. Ex. E at 5.) Even though Baxter fully understood that "other material is brought into the year-end review process that weren't (*sic*) observed and UER'd," (Baxter Tr. 161:9-13, 162:15-21, 163:6-18, 189:9-17), he did not consider whether those other factors could have accounted for any discrepancies between a year-end evaluation and UER because doing so was outside the scope of his assignment. (Baxter Tr. 184:7-25.) Instead, he concluded that if evaluation comments were not reflected in the UERs, then they were "errors." (Abramson Decl. Ex. E at 7-8.) Based only on these alleged "errors," Baxter opined that year-end evaluations were "misleadingly negative" and provided an "unfair depiction" of umpire performance. (*Id.* at 5-6.)

Baxter then offers his opinion that these alleged "errors" in year-end evaluations "positioned minority umpires for failure," and "caused damage to [Hernandez's] career advancement, including but not limited to MLB's failure to promote him to permanent crew chief and to assign him to the World Series. (Abramson Decl. Ex. E at 7-8.) He reaches these conclusions despite his lack of knowledge of the qualifications for selection to crew chief or the World Series or the identity of any other applicant. (Baxter Tr. 90:6-11; 106:16-107:1.)

_____

[7] Although Baxter claims that he took notes as he performed his analysis, he testified that he destroyed those notes. (*Id.* 23:7-16.) Instead, he prepared the Memorandum that purported to summarize his alleged "methodology" two months after serving his expert report because he "expected to be deposed about [his] methodology." (*Id.* 15:8-12, 15:22-16:5; Abramson Decl. Ex. H.) Baxter admits he does not have a good memory. (*Id.* 23:25-24:4.)

Baxter never reviewed non-minority umpires' year-end evaluations because he "wasn't assigned to review them." (*Id.* 92:2-21, 210:22-211:8.) He is therefore unaware if the same "errors" that he believes unfairly affected minority umpires similarly affected non-minority umpires. (*Id*. 155:22-156:25 ("Q. If you had undertaken the same analysis for year-end reviews and Umpire Evaluation Reports for white umpires, do you know what the results of that would be? A. No. Could not know."); 192:16-21.)

Baxter failed to consider other potential reasons why these three umpires may not have been promoted to crew chief or selected to the World Series aside from an alleged discrepancy between a year-end evaluation and a UER because it was not part of his assignment. (*Id*. 193:5-12 ("Q. So I am wondering if you considered whether there may have been any other factors to explain why Mr. Hernandez, Mr. Danley and Mr. Marquez have not been promoted to crew chief between 2011 and 2016? A. I certainly considered that but there was no -- I am sorry. It was no[t] part of my assignment."), 194:22-195:4, 197:20-24, 199:19-22, 200:10-201:12.)

## ARGUMENT

Under Federal Rule of Evidence 702 ("Rule 702"), a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer expert opinion testimony if: (i) the expert's opinions "will help the trier of fact to understand the evidence or to determine a fact in issue"; (ii) "the testimony is based on sufficient facts or data"; (iii) "the testimony is the product of reliable principles and methods"; and (iv) "the expert has reliably applied the principles and methods to the facts of the case." Rule 702 ensures that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Baxter's Report and testimony fail to satisfy the requirements under *Daubert* and its progeny.

# I.  BAXTER IS UNQUALIFIED TO OFFER CONCLUSIONS ON MLB's EVALUATION AND PROMOTION PROCESSES

Baxter's Report should be excluded for the threshold reason that he admittedly lacks the qualifications on the very subjects on which he purports to opine.  Baxter admits that he has no experience with or expertise regarding umpiring baseball games and that he is "[u]tterly unfamiliar" with such matters.  (Baxter Tr. 105:12-14.)  He further admits that he does not know the criteria or qualifications for a crew chief or World Series assignment.  (*Id*. 91:22-92:1, 106:5-107:1.)  Yet, this admitted lack of knowledge did not preclude him from offering his opinions regarding whether MLB (i) accurately evaluated the performance of Hernandez, Marquez, and Danley; and (ii) improperly denied crew chief and/or World Series opportunities to those three umpires.  Baxter is eminently unqualified to offer opinions on either issue.

To determine whether a witness is qualified, the trial court "must first ascertain whether the proffered expert has the educational background or training in a relevant field . . . by looking at the totality of the witness's background."  *Arista Records LLC v. Lime Grp. LLC*, No. 06-cv-5936 (KMW), 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (internal citations omitted).  The court then "compare[s] the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *U.S. v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).

Here, Baxter's experience as a human resources manager does not qualify him to opine on umpire performance at all.  Indeed, he expressly admits that he is not "qualified to assess the performance of Major League Baseball umpires."  (Baxter Tr. 91:22-92:1, 106:5-107:1.)  His conclusion that MLB's year-end evaluations "unfairly ignored patterns of excellence by minority umpires"  (Abramson Decl. Ex. E at 5) cannot possibly be squared with his own observation that "[u]mpires' tasks are so complex and varied, and the ***difference between brilliant and improper***

*performance so subtle and situation-dependent, **only another experienced MLB umpire can properly evaluate most tasks**.*" (*Id.* at 2 (emphasis added).) Moreover, he frequently characterized feedback in an evaluation as "word salad," a term that he defined to be words in an evaluation that are "unrelated" to performance (*Id.* at 7) when he admittedly is clueless with respect to what MLB considers related to umpire performance.

Baxter's opinion that Hernandez's, Danley's, and Marquez's written evaluations "had the effect of denying those minorities fair opportunities for promotions and World Series assignments" suffers from the same lack of qualifications. (Abramson Decl. Ex. E at 5.) He reached this sweeping conclusion despite admitting to having no knowledge or expertise regarding the requirements for a crew chief or the selection criteria for the World Series. (Baxter Tr. 106:16-107:1 ("Q. Do you have an understanding about what the requirements for an MLB crew chief are? A. No. Q . . . Do you have an understanding of what the qualifications to be a World Series umpire are? A. No.").)

Because Baxter is admittedly "utterly unfamiliar" with umpiring standards and criteria for promotion, he cannot offer any expert opinion on these subjects. *See Doe v. Colgate Univ.*, 760 F. App'x 22, 29 (2d Cir. 2019) (expert's "lack of experience . . . and lack of familiarity" with the relevant subject matter "rendered her unqualified to opine"); *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 230, 254 (S.D.N.Y. 2014) (proposed expert lacked relevant expertise where she did "not have the requisite training, and . . . concede[d] that she lacks qualifications to opine in this area"), *aff'd sub nom Querub v. Hong Kong*, 649 F. App'x 55 (2d Cir. 2016).

## II.    BAXTER'S ANALYSIS LACKS ANY SPECIALIZED EXPERTISE

Even if Baxter had been qualified to offer opinions regarding the performance of Major League umpires, his analysis here required no expertise. "For an expert's testimony to be admissible under [Rule 702], it must be directed to matters within the witness' scientific, technical,

or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989).

As a general matter, courts are skeptical of expert testimony regarding human resources practices, often holding that this area is "not so complicated as to require the testimony of an expert witness." *Wilson v. Muckala*, 303 F.3d 1207, 1218 (10th Cir. 2002). *See also Brink v. Union Carbide Corp.*, 41 F. Supp. 2d 402, 405 (S.D.N.Y. 1997); *Mello v. Siena Coll.*, No. 15-cv-0013 (GTS) (ATB), 2017 WL 1013077, at *12 (N.D.N.Y. Mar. 14, 2017). Such skepticism is particularly appropriate here.

Baxter's entire "methodology" consisted of comparing words in year-end performance evaluations and words in UERs and stating whether he found any differences between the two. (Baxter Tr. 215:9-216:3.) Indeed, to conclude that this exercise requires no specialized knowledge, the Court need look no further than Baxter's own testimony, where he expressly acknowledged that no "single specific step" of his analysis "require[d] special expertise" and that "[y]ou could probably train most people to do it." (*Id.* 220:15-221:9.) Baxter also offered his opinion on whether evaluation comments were positive, negative, or "word salad," a task which he also acknowledged required no expertise. (*Id.* 131:10-12 ("[I]t is not, I think, terribly difficult to look at a phrase and say, 'That sounds negative.'").)

Courts in this district have held that the simple act of comparing documents utilizes no specialized expertise. *See Anderson v. Sotheby's Inc. Severance Plan*, No. 04-cv-8180 (SAS) (DF), 2005 WL 1412965, at *3 (S.D.N.Y. June 13, 2005). Nor will courts allow expert testimony that merely summarizes, evaluates, and compares evidence in the record. *See LinkCo, Inc. v.*

*Fujitsu Ltd.*, No. 00-cv-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002); *In re*

*Lyondell Chem. Co.*, 558 B.R. 661, 668 (Br. S.D.N.Y. 2016) (internal citation omitted).

Indeed, Baxter previously has been excluded as an expert witness in this District for offering testimony that required no expertise.  In *Bethea v. Equinox Fitness Club*, Judge Rakoff held Baxter's testimony to be inadmissible because it was "addressed to the common understanding of a trier of fact and therefore is not helpful . . . or is simply argument uninformed by any apparent specialized knowledge or reliable methodology."  544 F. Supp. 2d 398, 399 (S.D.N.Y. 2008), *aff'd sub nom Mass v. Equinox Fitness Club*, 354 F. App'x 556 (2d Cir. 2009)*.* Similarly, in *Garcia v. Daniel Industries, Inc.*, the court excluded Baxter, holding his testimony "would be of no help to a lay jury, as a lay jury is clearly capable of making the kinds of determinations (credibility, reading and comparing documents on their face, determining whether pretext exists, etc.) regarding which he contends he could offer advice." (Memorandum & Order, at *20, No. H-97-3475 (S.D. Tex. Nov. 6, 1998); Abramson Decl. Ex. J.)

Baxter merely compared and commented on documents in the record.  His Report and testimony therefore do not offer specialized expertise and should be excluded on this basis as well.

## III.    BAXTER DID NOT APPLY RELIABLE PRINCIPLES AND METHODS

Expert testimony is reliable only if it is: (1) based upon sufficient facts or data; (2) the product of a reliable methodology; and (3) a reliable application of that methodology to the facts. *See* Fed. R. Evid. 702.  "[I]t is critical that an expert's analysis be reliable at every step." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

Baxter's analysis was based on fundamentally unreliable principles and methods.  Most notably, Baxter never compared his results to a control group of non-minority umpires, never considered and rejected alternative explanations for his conclusions, did not utilize a standardized

protocol, and concocted a methodology for purposes of this litigation, which he applied in a haphazard manner.

This is far from the first time that the reliability of Baxter's analysis has been called into question. In *Cross v. FPP Operating Partners, L.P.*, the court determined that Baxter relied "on calculations of a dubious nature." No. CIV. A. 799CV160-R, 2001 WL 1143159, at *8 (N.D. Tex. Sept. 25, 2001). In *Austin v. Mabey*, the court held that Baxter "failed to base his analysis and opinions on sufficient facts and he did not reliably apply an accepted methodology to the facts in this case." (Ruling on Motion to File Supplemental Memorandum, at *5, No. 00-728-D-1 (M.D. La. Nov. 24, 2004); Abramson Decl. Ex. K.) And in *Garcia*, the court struck Baxter's report in part because Baxter "relied on incomplete evidence, misconstrued . . . evaluations and reports, and deliberately ignored relevant job criteria in evaluating Plaintiff's job performance." (Memorandum & Order, at *20, No. H-97-3475 (S.D. Tex. Nov. 6, 1998); Abramson Decl. Ex. J.) Similar flaws permeate his Report and testimony here.

### A. Baxter Did Not Compare His Results With a Control Group of Non-Minority Umpires.

First, Baxter's conclusions regarding the effect of written evaluations on the careers of minority umpires are entirely speculative because he never compared his results to a control group of non-minority umpires. (Baxter Tr. 155:15-18; Martin Decl.[8] ¶¶ 11(a), 12.) Indeed, he did not even attempt to ascertain whether similar so-called "errors" that he found in the reviews of Hernandez, Danley and Marquez existed for anyone else. Nonetheless, Baxter concludes that these alleged "errors" were "harmful to minority umpires" and "caused" their employment outcomes.

---

[8] "Martin Decl." refers to the Declaration of Denise Martin, Ph.D in Support of Defendants' Motion to Exclude Dr. Gregory W. Baxter filed herewith.

(*See* Abramson Decl. Ex. E at 7-8). The absence of a control group renders his conclusion entirely unreliable.

> The use of a control group is essential to reaching a reliable conclusion regarding causation:

> A good study design compares outcomes for subjects who are exposed to some factor (the treatment group) with outcomes for other subjects who are not exposed (the control group) . . . . **Data from a treatment group without a control group generally reveal very little and can be misleading. . . . Unless comparisons can be made, the study has little to say about causation.**

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-cv-6201 (DLC), 2015 WL 539489, at *5 (S.D.N.Y. Feb. 10, 2015) (internal citation and alteration omitted) (emphasis added).

Baxter had access to hundreds of evaluations that MLB had produced for non-minority umpires, yet inexplicably chose not to evaluate a single one to ensure that the alleged "errors" he had observed did not also exist for any other umpire. (Baxter Tr. 192:16-21.) Baxter admitted that he did not know what the results of such a review would have been. (*See Id.* 155:22-156:25 ("Q. If you had undertaken the same analysis for year-end reviews and Umpire Evaluation Reports for white umpires, do you know what the results of that would be? . . . A. No.").)

As MLB's expert, Dr. Denise Martin, explained, without a control group, "there is simply no basis for [Baxter] to conclude that the differences he identifies in the UERs and YE Reviews for the minority umpires are even potentially responsible for the alleged (but unsupported) disparate impact" because to cause such impact, "it must be the case that such differences *do not exist* for white umpires." (Martin Ex. A at ¶¶ 48, 51; Martin Decl. ¶¶11(a), 12-13; Martin Tr. 69:16-70:6, 72:17-24, 77:19-78:6, 78:19-79:17.)

Because Baxter's conclusions were not tested against a control group of non-minority umpires, they are entirely speculative, unreliable and should be excluded.[9]

**B.    Baxter Deliberately Ignored Alternative Explanations For His Observed Outcomes.**

In opining that the written performance evaluations he reviewed "had the effect of denying those minorities fair opportunities for promotions and World Series assignments" and "caused damage to [Hernandez's] career advancement," (Abramson Decl. Ex. E at 5, 8) Baxter deliberately ignored other potential factors. More specifically, he (1) failed to consider individualized circumstances for why Hernandez, Marquez, and Danley were not promoted or selected for the World Series, and (2) failed to consider all other sources of information utilized in creating year-end evaluations.

In determining whether expert analysis is reliable, the court must consider "[w]hether the expert has adequately accounted for obvious alternative explanations." 2000 Amendments to Adv. Committee Notes to Fed. R. Evid. 702. "While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes . . . ." *Tardif v. City of N.Y.*, 344 F. Supp. 3d 579, 601 (S.D.N.Y. 2018) (internal citation omitted). Baxter's failure to consider alternative explanations makes his conclusion unfounded and unreliable. *See Forte v. Liquidnet Holdings, Inc.*, No. 14–cv-2185 (AT), 2015 WL 5820976, at *7 (S.D.N.Y. Sept. 30, 2015), *aff'd* 675 F. App'x 21 (2d Cir. 2017); *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010).

---

[9] For illustrative purposes only, Dr. Martin analyzed evaluations of non-minority umpires' for the same types of "errors" that Baxter found for Hernandez, Danley, and Marquez. Through this review, she was able find numerous examples of what Baxter would have classified as discrepancies between their evaluations and UERs, demonstrating that the same phenomena exist for non-minority umpires. (Martin Ex. A at ¶ 52; Martin Tr. 83:7-84:2.)

Here, Baxter was fully aware of and deliberately ignored alternative explanations disproving his conclusion that the so-called flawed performance reviews resulted in the denial of promotion and selection opportunities for the three minority umpires.

First, Baxter was fully aware of the other sources of information for year-end evaluations in addition to UERs, and yet never considered whether those additional sources of information could account for the differences he observed between UERs and year-end evaluations. Baxter reviewed testimony from Woodfork stating that Umpire Directors have weekly conference calls to discuss umpire performance, but chose not to consider what effect those calls would have on year-end evaluations. (Baxter Tr. 78:23-79:4, 165:4-8 ("Q. But you did not consider Mr. Woodfork's testimony regarding conference calls at all in your analysis, is that correct? A. Correct.").) Woodfork also described that MLB decision-makers "discuss our umpires' performance" and "understand how they're performing on a day-to-day basis." (Woodfork Tr. 35:23-36:19, 85:17-86:4.) Matt McKendry, an Umpire Director that Baxter chose to ignore in his review, testified that in creating evaluations, MLB considers "ZE reports, SURE results, field evaluations, incident evaluation reports[,] [t]he umpire's functioning as a replay official, the umpire's handing of administrative duties; including his interaction with the Office [of the Commissioner] and his peers and the [baseball] Clubs." (McKendry Tr. 136:21-137:5.) And the Basic Agreement that Baxter reviewed similarly states that year-end evaluations will consist of "a summary of all the reports received [by an umpire] during the season," "a cumulative overall rating," and "*evaluative comments from the Office of the Commissioner*." (Abramson Decl. Ex. G at DEF1450 (emphasis added).) It also describes that evaluations are created "based on the reports submitted by the Supervisors and Field Observers, observations of the Directors of Umpiring and their superiors, and for Plate Judgment, information generated by the ZE System."

(*Id.*)  As Baxter ultimately conceded, "[t]here is (*sic*) a number of performance components Major League Baseball says are important that don't come from UERs." (Baxter Tr. 163:13-18, 189:9-17.)

Baxter also understood that only around 50% of MLB games are observed live, meaning no UERs are submitted for the other 50% of games.  (*Id*. 159:24-160:12; Abramson Decl. Ex. E at 2-3.)  He understood that "games are televised" and "if somebody heard that an unobserved game went really bad they could go to the tape."  (Baxter Tr. 162:13-21.)  And, despite the fact that roughly half of all games are observed in person, as well as all of the other sources of information described above, Baxter wrote that he was "surprised and distressed to find the Author wrote so much of the minority umpires YEs without reference to any supporting UER" and that the lack of a corroborating UER meant the year-end comment was "unsupported," and "unfair" to Hernandez, Marquez or Danley.  (*See* Abramson Decl. Ex. E at 5-6.)

In other words, Baxter understood that the year-end evaluation process considers multiple components, yet consciously chose to only consider **one** component of that process, and then concluded that if it did not support the year-end evaluation, the evaluation was in "error."  This is illogical.  (*See* Baxter Tr. 161:9-13 ("Q. So you have no information concerning whether other feedback could have been generated for that game that was not contained on UER? A. I don't.")

Second, Baxter chose not to consider whether factors independent of any written performance evaluation could have caused Hernandez, Marquez, and Danley to not be promoted or selected for the World Series.  He testified that he did not consider any such factors because "[i]t was not part of [his] assignment" as defined by Plaintiff's counsel, and instead limited his analysis to a comparison of the three umpires' year-end performance evaluations to their UERs. (Baxter Tr. 193:5-12, 194:22-195:4, 200:10-201:12 ("Q. . . . [D]id you encounter any other reasons

. . . for Mr. Hernandez's inability to be promoted to crew chief? A. I don't recall that I did, but it's no part of the questions I was asked. . . . Q. And because you were not asked that question, you did not consider it? A. I did not.").)

Baxter testified that this willful blindness was attributable to the scope of his assignment, which did not require him to consider factors other than a comparison of year-end evaluations to UERs. (Baxter Tr. 184:23-25 ("Since that's not part of my report, I didn't see any information about it, nor need any.").) But an expert may not blindly follow the task he was assigned without considering if it would produce a reliable analysis. *See Caruso v. Bon Secours Charity Health Sys. Inc.*, No. 14-cv-4447 (VB), 2016 WL 8711396, at *6 (S.D.N.Y. Aug. 5, 2016) (excluding expert who "relie[d] solely on facts that plaintiff's counsel chose to share with her and did not conduct an independent review of evidence upon which her conclusions [were] based"), *aff'd* 703 F. App'x 31 (2d Cir. 2017); *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 300 (D.D.C. 2018) (expert's "blind reliance on 'facts' provided by plaintiffs' counsel—combined with his failure to review other sources of information that he conceded could have affected [defendant's] hiring, promotion, and disciplinary practices—render[ed] his expert report unreliable").

### C. Baxter Failed to Use A Replicable Protocol.

Third, Baxter did not utilize a uniform protocol in reaching his conclusions, meaning his results cannot be replicated. A trial court must consider "whether the expert's technique can be challenged in some objective sense, or whether it is simply a subjective, conclusory approach that cannot reasonably be assessed for reliability." *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 324 F. Supp. 3d 387, 393-94 (S.D.N.Y. 2018).

As Dr. Martin explains, "a protocol can be used to train those who will be conducting the document review and to allow verification by a second reviewer." (Martin Ex. A at ¶ 65; Martin Decl. ¶¶11(b), 18-20; Martin Tr. 64:9-66:2, 73:8-19, 106:2-24.) Here, Baxter offered conclusions

as to whether comments in year-end evaluations were (i) supported or unsupported by UERs; and (ii) positive, negative, or "word salad." He offers no protocol to test these either of his conclusions.

Although nearly two months after serving his expert report, Baxter created a list of terms he deemed "positive," he did not indicate what words he deemed "negative," nor how he determined what was, in his view, "word salad" unrelated to umpires' performance. (*See* Abramson Decl. Ex. H.) Similarly, the Memorandum does not describe how Baxter determined whether an evaluation comment was supported by the language contained in the UERs. (*Id*.) He states only that "[i]f the UER included a comment for [a] component for that date, I checked whether the words of the UER supported the words the Author used in the YE, and reported that." (*Id.*)

This vague description demonstrates that Baxter's "methodology" was no more than his own nebulous determinations of what constituted a sufficient level of "matching" between a UER and year-end evaluation that cannot possibly be replicated and is infected with his own subjectivity. (*See* Martin Decl. ¶15; Martin Tr. 73:8-19, 143:15-144:4 (explaining that failure to have a protocol "introduce[s] subjectivity in to an exercise, which is not the role of an expert").

There are many examples of Baxter's subjective assessments that are easily susceptible to different interpretations. For instance, Baxter coded as "word salad" the following comment in Hernandez's review that reasonably can be characterized as a positive assessment of umpire performance: "Your instincts and timing are above average and allow you to anticipate where you need to be to get the best look at a play." (Martin Ex. A at ¶ 67(b); Martin Tr. 110:25-111:13.) In addition, while Baxter determined that certain performance evaluations could have earned an "Exceeds" rating, he admitted in deposition that it is entirely possible for a different reviewer to reach the opposite conclusion. (Baxter Tr. 177:16-21.)

Without standardizing his conclusions according to some underlying metric or coding protocol, Baxter's methodology is unreliable. *Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2019 WL 4735876, at *10 (S.D.N.Y. Sept. 27, 2019) (the failure to use "some recognizable, describable methodology . . . is a flaw that is large enough to warrant exclusion of [the expert]'s testimony") (internal citation omitted); *LVL XIII Brands v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 645 (S.D.N.Y. 2016) (excluding expert report where it was "impossible for a court or adversary to test—or a jury to assess—[the expert's] methodology . . . for veracity and reliability"), *aff'd* 720 F. App'x 24 (2d Cir. 2017); *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2000) (striking report that did "not rely upon any discernible methodology" and was instead "essentially a compendium of [the expert's] opinions"). Because Baxter's results cannot be replicated or objectively tested, they must be excluded.

### D.    Baxter's Methodology is Inherently Unreliable.

Finally, Baxter's methodology is fundamentally unreliable for multiple reasons. First, Baxter concocted this side-by-side comparison for purposes of his assignment here. "In general, a court should consider the extent to which the expert's theory has been subjected to peer review and publication, whether the technique is subject to standards controlling the technique's operation, the known or potential rate of error, and the degree of acceptance within the relevant scientific community." *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 403 (S.D.N.Y. 2019) (internal citation omitted). Baxter's Report lacks any of these attributes.

Baxter never performed such a comparison prior to this case. (Baxter Tr. 16:23-17:10.) Similarly, he could not name a single other person, much less any other expert, who has used this approach. (*Id.* 123:25-124:4.) Nor has he seen any publications concerning this kind of methodology. (*Id.* 124:5-8.) *See LVL XIII Brands*, 209 F. Supp. 3d at 646 (striking expert conclusions that has never been peer reviewed, had no "known or potential error rate," had no

"standards controlling [its] application," and had not "gained acceptance within the relevant expert community").

Second, Baxter's methodology changed partway through his assignment. Baxter started his analysis by comparing the comments offered for each performance component in the year-end evaluation with that same component in the UERs. (*See* Baxter Tr. 117:3-118:2.) After realizing partway through his analysis that year-end evaluation comments could also be derived from UER comments under other categories, Baxter decided to employ a word search of the entire UER rather than limiting his search to the specific category at issue. (*Id.* 139:19-140:2 ("Q. When did you decide to do a word search? That's what I am trying to understand. A. Partway through the project. Q. . . . So for some of the UERs you . . . you did a word search and for others, you did not? A. Correct."); *see also* Baxter Tr. 141:17-20.) Baxter did not keep track of which UERs he searched in their entirety and which were limited to only the specific performance component. (*Id.* 143:7-18.) He also added words to his search-term inventory throughout his process. (*Id.* 119:24-120:6.) *See In re Fed. Home Loan Mortgage Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 181 (S.D.N.Y. 2012) (finding unreliable and unpersuasive a report that was internally inconsistent where analysis changed many times in important ways).

Not surprisingly, this inconsistency resulted in mistakes. As one illustrative example, Baxter took issue with comments offered in ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████ Baxter was unable

to explain how he failed to notice this comment, and conceded that these comments were similar.

(*Id*. 147:9-148:25.)

## IV.   BAXTER'S ANALYSIS IS IRRELEVANT TO HERNANDEZ'S CLAIMS

Baxter's Report should be excluded for the additional reason that it bears no relevance to the claims in this case.  Where an expert's analysis is "so far afield from the specific allegations and statutory elements at issue," it will be struck based on the "appreciable risk of prejudice, jury confusion, and misleading the jury."  *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 286 (E.D.N.Y. 2011).

First, Baxter's analysis is irrelevant to Hernandez's claims of intentional discrimination based on his race, color or national origin because Baxter specifically disavows any opinion regarding MLB's intent, stating "[n]o evidence I considered allows me to offer findings or expert opinions about MLB's intent."  (Abramson Decl. Ex. E at 8; *see also* Baxter Tr. 175:12-19 (denying reaching any opinion regarding MLB's motive).)  Without intent, his conclusions with respect to the effects of MLB's review process on minority umpires have no bearing on Plaintiff's claim for international discrimination.  Moreover, the Report "is based largely on [Baxter's] interpretation of the factual record" meaning that it could not establish pretext or an issue of fact that the underlying documents themselves would not establish.  *See Knight v. City of N.Y.*, 303 F. Supp. 2d 485, 498 (S.D.N.Y. 2004), *aff'd* 147 F. App'x 221 (2d Cir. 2005).  That is especially true

here because Baxter failed to use a control group or review even a single evaluation of any of the other 70+ umpires.

Second, Baxter's analysis also is irrelevant to Plaintiff's disparate impact claims Baxter's Report has nothing to do with the alleged employment practice on which Plaintiff's disparate impact claim is based, namely that MLB's reliance on subjective criteria, such as leadership and situation management, has a disparate impact on minority umpires. (*See* Dkt. 123 ¶¶ 164, 174; *see also* Abramson Decl. Ex. I, at 52:4-21; Dkt. 142, at 24.) Baxter's Report is devoid of any analysis of MLB's consideration of these factors on minority umpires. *Toth v. 59 Murray Enters., Inc.*, No. 15-cv-8028 (NRB), 2019 WL 95564, at *9 (S.D.N.Y. Jan. 3, 2019) (granting motion to strike expert report that was "methodologically flawed and not probative of the relevant issues" to the claim at issue).

In addition, Baxter's report does not contain any statistical analysis. An essential element of any disparate impact claim is that the challenged employment practice causes a statistically significant disparate impact. *See, e.g., Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 267 (S.D.N.Y. 2002). Not only does Baxter fail to offer any statistical analysis, he admitted that he is "not being proffered… as a statistical expert in this case and offer[s] no statistical analyses." (Baxter Tr. 108:16-22, 214:20-24 ("I offer no statistical analysis in my report and don't intend to in testimony.").)

Because Baxter's analysis is not relevant to either Plaintiff's claims of intentional or unintentional discrimination, his Report should be excluded.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should exclude Baxter's Report in its entirety and preclude him from testifying in this matter.

Dated: New York, New York
      June 5, 2020

PROSKAUER ROSE LLP

By:    <u>/s/ *Neil H. Abramson*</u>
Neil H. Abramson, Esq.
Adam M. Lupion, Esq.
Rachel S. Philion, Esq.
Rachel S. Fischer, Esq.

Eleven Times Square
New York, New York 10036-8299
Phone: 212.969.3000
Fax: 212.969.2900
nabramson@proskauer.com
alupion@proskauer.com
rphilion@proskauer.com
rfischer@proskauer.com

*Attorneys for Defendants*
THE OFFICE OF THE
COMMISSIONER
OF BASEBALL AND MAJOR
LEAGUE BASEBALL BLUE, INC.