NEIL H. ABRAMSON
ADAM M. LUPION
RACHEL S. PHILION
RACHEL S. FISCHER
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Defendants*
THE OFFICE OF THE COMMISSIONER
OF BASEBALL and MAJOR LEAGUE
BASEBALL BLUE, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGEL HERNANDEZ,<br><br>          Plaintiff,<br><br>   v.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL and MAJOR LEAGUE BASEBALL BLUE, INC.<br><br>          Defendants. | No. 18 Civ. 9035 (JPO) (GWG) |

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF MATERIAL UNDISPUTED FACTS ...........................................5

    A.    The Role of Major League Umpires and Crew Chiefs. ...........................5

    B.    Hernandez's Deficient Performance In Areas Torre Considered Most Important For Permanent Crew Chiefs And World Series Assignments. ..............7

        1.    Hernandez's Lack of Accountability and Inability to Move Past His Mistakes Are Qualities MLB Considers To Be Inconsistent with On-Field Leadership. ..........................................................9

        2.    Hernandez Has Been Unable to Successfully Handle Difficult On-Field Situations with a Calm and Professional Demeanor on a Consistent Basis. ...................................................................... 11

        3.    Hernandez Has Struggled As An Interim Crew Chief In Multiple Seasons. .................................................................................... 12

ARGUMENT ...................................................................................................15

I.     THERE IS NO TRIABLE ISSUE OF FACT ON PLAINTIFF'S DISPARATE TREATMENT CLAIM. ............................................................................17

    A.    Hernandez Cannot Establish A Prima Facie Case Of Discrimination. .................18

        1.    Hernandez Was Not Qualified For Crew Chief or World Series Umpire Roles. ................................................................................ 18

        2.    Hernandez Cannot Show An Inference of Discrimination. ..................... 23

            a.    The Number Of Minority Umpires Promoted To Crew Chief And Selected To The World Series Does Not Support An Inference Of Discrimination. .................................................24

            b.    There Is No Evidence That MLB Treated Hernandez Differently From Non-Minority Umpires. ....................................28

    B.    MLB Had Legitimate, Non-Discriminatory Reasons For Its Decisions. ...............32

    C.    Plaintiff Has Not Raised A Triable Issue Of Pretext. ...........................................33

        1.    There Is No Evidence That MLB's Asserted Reasons Are False. ............ 34

        2.    There Is No Evidence That The Real Reason Was Discriminatory Animus. ................................................................................ 37

II.    THERE IS NO TRIABLE ISSUE OF FACT ON PLAINTIFF'S DISPARATE IMPACT CLAIM...................................................................................39

    A.    Hernandez Cannot Establish A Prima Facie Case of Disparate Impact. ...............40

1.  Hernandez Failed To Present Any Evidence That A Facially Neutral Practice Caused A Statistically Significant Disparity in Crew Chief Selections or World Series Assignments.............................. 40

2.  Hernandez Has Not Shown A Causal Connection................................... 44

B.  MLB's Consideration of Subjective Qualities In Making Decisions For Leadership Positions is Consistent With Business Necessity............................... 46

C.  Hernandez Has Not Shown That An Alternative Practice Would Adequately Serve Defendants' Legitimate Business Needs............................... 47

III.  PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED............................................................................................ 48

CONCLUSION.................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975)......................................................................................40

*Andretta v. Napolitano*,
922 F. Supp. 2d 411 (E.D.N.Y. 2013) ...........................................................30

*Antunes v. Putnam/N. Westchester Bd. of Coop. Educ. Servs.*,
No. 09-CV-3063 (CS), 2011 WL 1990872 (S.D.N.Y. May 19, 2011), *aff'd*,
482 F. App'x 661 (2d Cir. 2012) ...................................................................32

*Ariz. v. Metro. Transp. Auth.*,
No. 17cv4491, 2019 WL 2613476 (S.D.N.Y. June 26, 2019)...................17, 32

*Assistant Deputy Wardens/Deputy Wardens Ass'n v. City of New York*,
No.: 14-cv-4308 (FB)(JO), 2019 WL 4015119 (E.D.N.Y. Aug. 26, 2019) .........39

*Augustine v. Cornell Univ.*,
No. 14-CV-7807 (JPO), 2018 WL 1474402 (S.D.N.Y. Mar. 26, 2018), *aff'd*,
*Brown v. Cornell Univ.*, 758 F. App'x 226 (2d Cir. 2019).................................32

*Aulicino v. N.Y.C. Dep't of Homeless Servs.*,
580 F.3d 73 (2d Cir. 2009)............................................................................18

*Baby v. Nassau Healthcare Corp.*,
No. CV 14-3297 (JMA)(GRB), 2017 WL 3279091 (E.D.N.Y. Feb. 6, 2017) .........27

*Booker v. Fed. Reserve Bank of New York*,
No. 01 CIV 2290 (DC), 2003 WL 1213148, at *13 (S.D.N.Y. Mar. 17, 2003) .......30

*Boyle v. McCann-Erickson, Inc.*,
949 F. Supp. 1095 (S.D.N.Y. 1997)...............................................................38

*Bridgeport Guardians, Inc. v. City of Bridgeport*,
735 F. Supp. 1126 (D. Conn. 1990), *aff'd*, 933 F.2d 1140 (2d Cir. 1991) ...........43

*Brown v. City of Syracuse*,
673 F.3d 141 (2d Cir. 2012)...........................................................................15

*Brown v. Coach Stores, Inc.*,
30 F. Supp. 2d 611 (S.D.N.Y. 1997), *aff'd*, 163 F.3d 706 (2d Cir. 1998)...........41

iii

*Bucalo v. Shelter Island Union Free Sch. Dist.*,
    691 F.3d 119 (2d Cir. 2012)..................................................................49

*Burnett v. Oce N. Am.*,
    No. 11 CIV 6894, 2014 WL 4547037 (S.D.N.Y. Sept. 12, 2014)...........36

*Byrnie v. Town of Cromwell Bd. of Educ.*,
    243 F.3d 93 (2d Cir. 2001)...................................................................40

*Campbell v. Daytop Vill., Inc.*,
    No. 97 Civ. 4362 (JSM), 1999 WL 292576 (S.D.N.Y. May 7, 1999)....................36

*Campbell v. Nat'l Fuel Gas Distrib. Corp.*,
    723 F. App'x 74 (2d Cir. 2018) ............................................................33

*Collins v. City of New York*,
    156 F. Supp. 3d 448 (S.D.N.Y. 2016).....................................................17

*Crews v. Trs. of Columbia Univ. in City of New York*,
    452 F. Supp. 2d 504 (S.D.N.Y. 2006), *aff'd*, 308 F. App'x 518 (2d Cir. 2009).....................18

*Daubert v. Merrell Dow Pharmaceuticals Inc.*,
    509 U.S. 579 (1993)..............................................................................29

*Davis v. City of New York*,
    No. 99 Civ. 4955 (BSJ), 2003 WL 22832165 (S.D.N.Y. Nov. 25, 2003) ..............39

*Davis v. N.Y.C. Hous. Auth.*,
    60 F. Supp. 2d 220 (S.D.N.Y. 1999), *remanded on other grounds*, 205 F.3d
    1322 (2d Cir. 2000)..............................................................................25

*Dimitracopoulos v. City of New York*,
    26 F. Supp. 3d 200 (E.D.N.Y. 2014) ....................................................17

*Eatman v. United Parcel Serv.*,
    194 F. Supp. 2d 256 (S.D.N.Y. 2002).............................................41, 42

*Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*,
    491 F. Supp. 2d 386 (S.D.N.Y. 2007)...................................................30

*Fahmy v. Duane Reade, Inc.*,
    No. 04 Civ. 1798 (DLC), 2006 WL 1582084 (S.D.N.Y. June 9, 2006) ................44

*Fahrenkrug v. Verizon Serv. Corp.*,
    No. 5:11-cv-1014, 2015 WL 13021890 (N.D.N.Y. May 14, 2015), *aff'd*, 652
    F. App'x 54 (2d Cir. 2016) ..................................................................27

*Fleming v. MaxMara USA, Inc.*,
    371 F. App'x 115 (2d Cir. 2010) .......................................................33

*Fletcher v. ABM Building Value*,
    No. 14 Civ. 4712 (NRB), 2018 WL 1801310 (S.D.N.Y. Mar. 28, 2018)..............28

*Fontecchio v. ABC Corp.*,
    No. 12-CV-6998 (CS), 2015 WL 327838 (S.D.N.Y. Jan. 23, 2015)......................32

*Gaddy v. Ports Am.*,
    No. 13 Civ. 3322 (AY), 2015 WL 3929693 (S.D.N.Y. June 15, 2015) ................40

*Gainer v. United Auto. Agric. Aerospace Implement Workers (UAW) Region 9*,
    No. 08-CV-0501-WMS-MJR, 2017 WL 2988286 (W.D.N.Y. June 6, 2017).........44

*Gelin v. Geithner*,
    No. 06-cv-10176 (KMK), 2009 WL 804144 (S.D.N.Y. Mar. 26, 2009), *aff'd*,
    376 F. App'x 127 (2d Cir. 2010) .......................................................28

*Goenaga v. March of Dimes Birth Defects Found.*,
    51 F.3d 14 (2d Cir. 1995) .............................................................15

*Gordon v. New York City Bd. of Educ.*,
    232 F.3d 111 (2d Cir. 2000)...........................................................49

*Griffin v. TNT Int'l Express*,
    No. 05 CIV. 10475 (PKC), 2008 WL 697680 (S.D.N.Y. Mar. 12, 2008)..............18

*Gulino v. N.Y. State Educ. Dep't*,
    460 F.3d 361 (2d Cir. 2006)...........................................................39

*Harding v. Wachovia Capital Mkts., LLC*,
    No. 10 Civ. 3496 (JPO), 2012 WL 4471543 (S.D.N.Y. Sept. 21, 2012), *aff'd*,
    541 F. App'x 9 (2d Cir. 2013) ....................................................32, 35

*Haskell v. Kaman Corp.*,
    743 F.2d 113 (2d Cir. 1984)...........................................................27

*Hussey v. N.Y. State Dep't of Law/Office of Atty. Gen.*,
    933 F. Supp. 2d 399 (E.D.N.Y. 2013) ...............................................23

*In re Refco Inc. Sec. Litig.*,
    No. 07-MD-1902 (JSR), 2013 WL 12191891 (S.D.N.Y. Mar. 11, 2013).............48

*International Brotherhood of Teamsters v. U.S.*,
    431 U.S. 324 (1977)...................................................................28

*Isaac v. City of New York*,
701 F. Supp. 2d 477 (S.D.N.Y. 2010)......................................................................33

*Jones v. Onondaga Cty. Res. Recovery Agency*,
No. 5:08-CV-1045, 2011 WL 1298774 (N.D.N.Y. Mar. 31, 2011) .......................36

*Jones v. R.R. Donnelley & Sons Co.*,
541 U.S. 369 (2004)................................................................................................16

*Judge v. N.Y.C. Police Dept.*,
No. 10 Civ. 4236 (RMB), 2012 WL 98509 (S.D.N.Y. Jan. 12, 2012) ...................35

*Khan v. Abercrombie & Fitch, Inc.*,
No. 01 Civ. 6163 (WHP), 2003 WL 22149527 (S.D.N.Y. Sept. 17, 2003) ............38

*Khan v. Bank of Am., N.A.*,
572 F. Supp. 2d 278 (N.D.N.Y. 2008), *aff'd*, 372 F. App'x 216 (2d Cir. 2010) ....19

*Lester v. M&M Knopf Auto Parts*,
No. 04-CV-8508, 2006 WL 2806465 (W.D.N.Y. Sept. 28, 2006) ..........................36

*Lopez v. Metro. Life Ins. Co.*,
930 F.2d 157 (2d Cir. 1991)....................................................................................44

*Love v. Premier Util. Servs., LLC*,
186 F. Supp. 3d 248 (E.D.N.Y. 2016) ....................................................................18

*M.O.C.H.A. Soc'y, Inc. v. City of Buffalo*,
689 F.3d 263 (2d Cir. 2012).............................................................................40, 47

*Macias v. Barrier Free Living, Inc.*,
No. 16 CIV. 1735 (ER), 2018 WL 1603566 (S.D.N.Y. Mar. 28, 2018)..................16

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................................15

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013)....................................................................................18

*Milano v. Astrue*,
No. 05 Civ. 6527(KMW)(DCF), 2008 WL 4410131 (S.D.N.Y. Sept. 26,
2008), *aff'd*, 382 F. App'x 4 (2d Cir. 2010) ...........................................................19

*Miultinovic v. ColorDynamics, Inc.*,
No. 4:17-cv-00868, 2019 WL 2094432 (E.D. Tex. Jan 13, 2014) .........................49

*Moccio v. Cornell Univ.*,
889 F. Supp. 2d 539 (S.D.N.Y. 2012), *aff'd*, 526 F. App'x 124 (2d Cir. 2013).....26

*Mohan v. City of New York*,
No. 17 CIV 3820 (KPF), 2018 WL 3711821 (S.D.N.Y. Aug. 3, 2018) ..................38

*Nassry v. St. Luke's Roosevelt Hosp.*,
No. 1:13-cc-4719-GHW, 2016 WL 1274576 (S.D.N.Y. Mar. 31, 2016) ..............38

*Nguyen v. Dep't of Corr. & Cmty. Servs.*,
169 F. Supp. 3d 375 (S.D.N.Y. 2016)..................................................................38

*O'Leary v. N.Y. State Unified Court Sys.*,
No. 05 Civ. 6722(HB), 2007 WL 2244483 (S.D.N.Y. Aug. 6, 2007)...................47

*Oluyomi v. Napolitano*,
811 F. Supp. 2d 926 (S.D.N.Y. 2011).............................................................21, 35

*Ottaviani v. State Univ. of N.Y. at New Paltz*,
875 F.2d 365 (2d Cir. 1989)...........................................................................25, 42

*Patterson v. Bakken*,
No. 12-cv-706, 2014 WL 123194 (W.D. Wisc. Jan. 13, 2014) ...........................49

*Pearson v. Merrill Lynch & Bank of Am.*,
No. 10 Civ. 5119 (RJS), 2012 WL 983546 (S.D.N.Y. Mar. 22, 2012) ................27

*Perry v. Cty. Of Westchester*,
No. 06-CV-3000 (KMK), 2008 WL 11438085 (S.D.N.Y. Mar. 31, 2008)...........23

*Phillips v. Long Island R.R. Co.*,
No. CV 13-7317 (JS)(ARL), 2019 WL 1757176 (E.D.N.Y. Mar. 4, 2019)...........39

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000)...........................................................................................18

*Ries v. Winona Cty.*,
Civ. No. 10-1715, 2011 WL 2200622 (D. Minn. May. 6, 2011).........................43

*Rightnour v. Tiffany & Co.*,
354 F. Supp. 3d 511 (S.D.N.Y. 2019)..................................................................18

*Robinson v. Metro-North Commuter R.R. Co.*,
267 F.3d 147 (2d Cir. 2001), *abrogated on other grounds*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)..................................................................39

*Rodriguez v. Beechmont Bus Serv., Inc.*,
173 F. Supp. 2d 139 (S.D.N.Y. 2001)..................................................................41

*Rolle v. Educ. Bus Transp., Inc.*,
No. CV 11-3855 SJF AKT, 2013 WL 783026 (E.D.N.Y. Feb. 12, 2013)..............23

*Sareen v. Port Auth. Of N.Y. & N.J.*,
No. 12 Civ. 2823 (PAE), 2013 WL 6588435 (S.D.N.Y. Dec. 16, 2013), *aff'd*,
592 F. App'x 34 (2d Cir. 2015) ...................................................................28

*Sattar v. Johnson*,
129 F. Supp. 3d 123 (S.D.N.Y. 2015) ..........................................................33

*Schanfield v. Sojitz Corp. of Am.*,
663 F. Supp. 2d 305 (S.D.N.Y. 2009) ..........................................................26

*Schlosser v. Time Warner Cable Inc.*,
No. 14cv9349, 2017 WL 2468975 (S.D.N.Y. June 6, 2017) ........................46

*Shands v. Lakeland Cent. Sch. Dist.*,
No. 15-CV-4260 (KMK), 2018 WL 3315738 (S.D.N.Y. July 5, 2018), *aff'd*,
771 F. App'x 121 (2d Cir. 2019) .................................................................34

*Song v. Ives Labs., Inc.*,
957 F.2d 1041 (2d Cir. 1992) ......................................................................18

*Sosa v. Rockland Cty. Cmty. Coll.*,
No. 15 Civ. 3329 (JCM), 2017 WL 3105872 (S.D.N.Y. July 20, 2017) .........27

*South v. Cont'l Cas. Corp.*,
No. 15cv1627, 2017 WL 782909 (S.D.N.Y. Feb. 28, 2017) ..........................24

*Spina v. Cartagena*,
No. 18-CV-7801 (JSR), 2019 WL 2655854 (S.D.N.Y. June 3, 2019) .............49

*Stackhouse v. Pa. State Police*,
No. 1:01-CV-223, 2005 WL 8167743 (M.D. Pa. Oct. 4, 2005) .....................43

*Stratton v. Ernst & Young, LLP*,
No. 15-CV-1047 (VEC), 2016 WL 6310772 (S.D.N.Y. Oct. 27, 2016) ......18, 21

*Sullivan v. Standard Chlorine of Del., Inc.*,
845 F. Supp. 167 (D. Del. 1994) .................................................................46

*Sweeney v. U.S. Postal Serv.*,
No. CV 08-4417(ARL), 2013 WL 5744490 (E.D.N.Y. Oct. 23, 2013) ............41

*Tapia v. TWC Admin. LLC*,
No. 17-CV-431 (KMK), 2018 WL 5016608 (S.D.N.Y. Oct. 16, 2018)....21, 22, 37

*Tojzan v. N.Y. Presbyterian Hosp.*,
No. 00-CV-6105 (WHP), 2003 WL 1738993 (S.D.N.Y. Mar. 31, 2003) ..........24

*Tucker v. New York City*,
376 F. App'x 100 (2d Cir. 2010) ........................................................32

*U.S. v. City of New York*,
713 F. Supp. 2d 300 (S.D.N.Y. 2010)..................................................28

*United States v. Yonkers Bd. of Educ.*,
123 F. Supp. 2d 694 (S.D.N.Y. 2000)...................................................25

*Velez v. McHugh*,
No. 09 Civ. 0925, 2011 WL 778693 (S.D.N.Y. Mar. 2, 2011) .............35

*Victory v. Hewlett-Packard Co.*,
34 F. Supp. 2d 809 (E.D.N.Y. 1999) .............................................27, 28

*Vidal v. Metro-North Commuter R.R. Co.*,
No. 3:12-cv-00248 (MPS), 2014 WL 3868027 (D. Conn. Aug. 6, 2014) .............................27

*Wards Cove Packing Co., Inc. v. Atonio*,
490 U.S. 642 (1989)..............................................................................40

*Watson v. Fort Worth Bank & Trust*,
487 U.S. 977 (1988)..............................................................................46

*Weinstein v. Columbia Univ.*,
224 F.3d 33 (2d Cir. 2000).....................................................................15

*Wharff v. State Univ. of N.Y.*,
413 F. App'x 406 (2d Cir. 2011) ...........................................................39

*Whethers v. Nassau Heath Care Corp.*,
956 F. Supp. 2d 364 (E.D.N.Y. 2013), *aff'd*, 578 F. App'x 34 (2d Cir. 2014)......................18

*Williams v. City of New York*,
690 F. Supp. 2d 338 (S.D.N.Y. 2010)...................................................17

*Williams v. J.P. Morgan Chase Bank.*,
No. 02-CIV-4250 (GBD)(MHD), 2005 WL 8167543 (S.D.N.Y. Oct. 11, 2005) ................................30

*Williams v. N.Y.C. Dep't of Educ.*,
No. 19 Civ. 1353 (CM), 2019 WL 4393546 (S.D.N.Y. Aug. 28, 2019) ................................17

*Williams v. Smith*,
781 F.2d 319 (2d Cir. 1986)...................................................................15

*Witkowich v. Gonzales*,
541 F. Supp. 2d 572 (S.D.N.Y. 2008)..............................................34, 35

*Zorn v. Mount Sinai Med. Ctr., Inc.*,
    No. 09 Civ. 3228(LTS), 2012 WL 4320575 (S.D.N.Y. Sept. 20, 2012) ................................29

**STATUTES**

28 U.S.C. § 1658.................................................................................................................16

42 U.S.C. § 1981...................................................................................................16, 17, 18

Civil Rights Act of 1964 ("Title VII").................................................................16, 17, 39

N.Y.C. Admin. Code 8-107(17)(a) .........................................................................................40

N.Y.C. Admin. Code § 8-502(d) ...........................................................................................16

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ...........................................................................................................15

Fed. R. Civ. P. 56(e) ...........................................................................................................29

FRE 702 ...............................................................................................................................29

N.Y. C.P.L.R. § 214(2) ........................................................................................................16

## PRELIMINARY STATEMENT

Plaintiff Angel Hernandez ("Plaintiff" or "Hernandez"), a Major League Baseball umpire, alleges that Defendants The Office of the Commissioner of Baseball and Major League Baseball Blue, Inc. (collectively, "Defendants" or "MLB") did not promote him to a crew chief position or assign him to umpire World Series games in recent years because MLB Chief Baseball Officer Joe Torre ("Torre"), the decision-maker, has a decades-long "history of animosity" towards him wholly unrelated to any protected characteristic. (Complaint, Dkt. 1 ¶ 34.) Instead of unlawful discriminatory animus, Hernandez traces this alleged animosity to an incident that took place during a game in 2001, when Torre, then the Field Manager of the New York Yankees, disagreed with a call that Hernandez made. (*Id.* ¶¶ 34-37.) Hernandez has reiterated the allegation that Torre is motivated ***not*** by discriminatory animus but instead by the ire of a baseball manager against an umpire over an allegedly bad call in each subsequent amendment to his complaint. (First Amended Complaint ("FAC"), Dkt. 35 ¶¶ 34-37; Plaintiff's Amendment to His Complaint, Dkt. 123 ("Amendment to His Complaint") ¶ 153.) Indeed, when asked whether Torre's numerous criticisms of Hernandez—the very reasons Hernandez was not selected for crew chief or for the World Series—had anything at all to do with his race or national origin, Hernandez admitted: "I don't know." (Pl. Tr. 24:6-13[1].) He further admitted that he is not aware of ***any*** specific evidence that would even remotely suggest that Torre, or anyone else at MLB, based their decisions about

---

[1] The deposition transcript excerpts cited herein are attached to the Declaration of Neil H. Abramson ("Abramson Decl."), filed herewith, as follows: Abramson Decl. Ex. A, Deposition Transcript of Angel Hernandez, Day 1 ("Pl. Tr."); Abramson Decl. Ex. B, Deposition Transcript of Angel Hernandez, Day 2 ("Pl. Tr. Day 2"); Abramson Decl. Ex. C, Deposition Transcript of Joe Tore ("Torre Tr."); Abramson Decl. Ex. D, Deposition Transcript of Peter Woodfork ("Woodfork Tr."); Abramson Decl. Ex. E, Deposition Transcript of Matthew McKendry ("McKendry Tr."); Abramson Decl. Ex. F, Deposition Transcript of Robert Manfred ("Manfred Tr."); Abramson Decl. Ex. G, Deposition Transcript of Edward Montague ("Montague Tr."); Abramson Decl. Ex. H, Deposition Transcript of ▮▮▮▮▮▮▮▮▮▮▮▮ Abramson Decl. Ex. I, Deposition Transcript of Denise Martin, Ph.D. ("Martin Tr."); Abramson Decl. Ex. J, Deposition Transcript of Randy Marsh ("Marsh Tr."); and Abramson Decl. Ex. Y, Deposition Transcript of Dr. Gregory W. Baxter ("Baxter Tr.").

him on any protected characteristic. (Pl. Tr. 33:5-34:6.) These stunning admissions doom his defective discrimination claims because, as set forth in Point I, the record otherwise is devoid of any evidence whatsoever that he was qualified for the promotions he sought or of unlawful discrimination.

Although Hernandez's inability to adduce any evidence of discrimination should end the inquiry, the record is replete with undisputed, legitimate and non-discriminatory reasons regarding MLB's employment decisions. Torre believed the most important criteria for permanent crew chiefs and World Series assignments were leadership, superior situation handling, and the ability to perform in the most intense games with a calm and professional demeanor. (*See* Torre Decl.[2] ¶¶ 15-16.) Hernandez does not – and cannot – raise a triable issue with respect to this fact because he admittedly has no evidence Torre believed to the contrary. (Pl. Tr. 38:20-39:4.) Indeed, Plaintiff admitted that these qualities are important for those positions. (Pl. Tr. 54:24-55:7, 70:25-71:9; Pl. Tr. Day 2 160:5-11.)

Yet, instead of these qualities, Hernandez's career has been plagued by a number of incidents that, in Torre's judgment—a judgment Hernandez admittedly has no evidence to dispute—made him unsuitable to serve in a permanent leadership role and umpire in MLB's highest-profile games. Hernandez's inability to move past a mistake and refocus on the game, unwillingness to accept constructive criticism of his performance, profound lack of accountability, poor judgment and inability to defuse tense on-field situations with a professional approach and firm command of the rules are traits that have defined his career since 2012 and have made him a particularly unacceptable candidate for promotion to a permanent crew chief position or umpire World Series games. (*See generally* Torre Decl. ¶¶ 19-42.) In incident after incident, the record

---

[2] "Torre Decl." refers to the Declaration of Joe Torre filed herewith.

establishes that Hernandez engaged in conduct that confirmed Torre's judgment.  For example, Hernandez:

- Committed a flagrant violation of MLB rules when he was interim crew chief by soliciting a pitcher who had just pitched a no-hitter to autograph baseballs for himself and the other members of his crew.  (*Id.* ¶ 36.)

- Compulsively dwelled – even to the present – on a blown call he had made in 2013, refusing to this day to accept responsibility for his mistake, instead blaming others while dismissing countless recommendations from Torre and others to let it go and move on so he might be promotable.  (*Id.* ¶¶ 21-24, 37.)

- Escalated on field situations by confronting players and prematurely ejecting managers.  (*Id.* ¶¶ 29, 31-32.)

- Neglected to defuse situations with a calm and professional demeanor and firm command of the playing rules.  (*Id.* ¶¶ 29-32, 40.)

- Made a spectacle of a recent playoff game in Yankee Stadium when he missed a record three calls that were reversed on instant replay.  (*Id.* ¶ 28.)

- Intentionally and surreptitiously eavesdropped on a confidential interview of another umpire in connection with MLB's investigation of a chaotic on-field incident – an incident caused by Hernandez's failure to comprehend the playing rules while he was again acting as an interim crew chief.  (*Id.* ¶¶ 40-42.)

Against this and substantial additional undisputed evidence, Hernandez offers nothing more than his own subjective belief that he deserves to be a crew chief and umpire in the World Series based on his self-proclaimed ability to accurately call balls and strikes, while ignoring the criteria that Torre deems most important and his sincere belief that Hernandez did not satisfy ***those*** criteria.  In these circumstances, there is nothing in the record to suggest that MLB's stated reasons for its decisions are false, and that the real reason is discrimination, much less a genuine dispute of material fact on this issue.

Given Hernandez's inability to adduce any evidence of intentional discrimination, he amended his complaint for a second time after the close of fact discovery in an effort to add claims of ***un***intentional discrimination under a disparate impact theory of liability, alleging that MLB's

consideration of the skills of leadership and situation management in making crew chief and World Series decisions disproportionately affects minority umpires.  For the reasons set forth in Point II, his disparate impact claims are equally defective.  First, Hernandez has not presented **any** statistical analysis of disparity at all, and instead impermissibly relies on "bottom line" numbers, which courts have repeatedly held is insufficient to establish a prima facie case of disparate impact.  The uncontroverted statistical analysis confirms, however, that there is **no** statistically significant disparate impact in crew chief promotions or World Series selections, entitling MLB to summary judgment as a matter of law.  Second, even if Hernandez had established a prima facie case of disparate impact, there can be no reasonable dispute that MLB's consideration of leadership qualities and ability to perform in high-pressure situations are legitimate factors in deciding which umpires will hold leadership roles and work in the most critical games of the season.  Indeed, Hernandez admitted as much.  (Pl. Tr. Day 2 160:5-11.)  Finally, Hernandez has not shown any alternative policy that possibly could meet MLB's business need to have its very best umpires in these crucial roles.  Hernandez's disparate impact claims must therefore be dismissed.

For largely the same reasons that MLB is entitled to summary judgment, Hernandez is not. He has not proffered a shred of evidence that even suggests—let alone proves—discriminatory animus.  Plaintiff's motion for partial summary judgment on his disparate impact claim is even more puzzling, as he is missing the *sine qua non* of such a claim:  he fails to present any evidence of a statistically significant impact.  Plaintiff's attempt to manufacture a disputed issue of fact by moving for partial summary judgment fails because the undisputed record evidence establishes that Hernandez was not selected for a crew chief role or additional World Series games for reasons that had nothing to do with his race or ethnicity, and had everything to do with Torre's well-

founded belief that Hernandez does not possess the leadership qualities, situation-handling skills, and comportment necessary to meet its legitimate expectations for umpires in those positions.

<u>**STATEMENT OF MATERIAL UNDISPUTED FACTS**</u>

**A. The Role of Major League Umpires and Crew Chiefs.**

Major League umpires are responsible for officiating Major League Baseball games, and for maintaining discipline and order on the playing field. (McKendry Decl.[3] Ex. A at DEF1089.) Each umpire is assigned to a four-person crew, with one umpire designated as the crew chief. (Pl. Tr. 34:21-35-8.) The crew chief is the leader of the crew, is the final decision-maker as to all on-field issues, and ensures his crew's compliance with MLB's rules and policies. (Pl. Tr. 34:21-35:8, 36:23-25.) The crew chief is responsible for, among other things, encouraging, initiating, and leading his crew's discussions of plays and rules; reporting any suspected non-compliance with MLB rules and regulations; and making crucial decisions on the field such as whether a game will be delayed or forfeited. (Pl. Ex. 12, Dkt. 142-13 at DEF1364; Pl. Ex. 13, Dkt. 142-14 at DEF1211; McKendry Decl. Ex. A at DEF1093, Ex. B at DEF2557-2558.)

From March 2011 through December 2019 Torre, then MLB's Chief Baseball Officer,[4] made the final decisions with respect to umpire-related employment decisions, including crew chief promotions and assignments to work Special Events, including the World Series. (Torre Decl. ¶¶ 8-11; Torre Tr. 20:5-14, 22:3-12; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17; Declaration of Joe Torre, Dkt. 12-1 ("Torre S.D. Ohio Decl.") ¶ 6.)

Hernandez believes that Torre disliked him because of a call Hernandez made against the Yankees in 2001, when Torre managed the New York Yankees. (Pl. Tr. 13:1-14:2, 14:24-15:19,

---

[3] "McKendry Decl." refers to the Declaration of Matthew McKendry filed herewith.

[4] Since January 2020, Torre has served as Special Assistant to the Commissioner of Baseball. (Torre Decl. ¶ 12.)

158:14-25; Torre Tr. 60:10-61:15; *see also* Abramson Decl. Ex. K.) Torre criticized that call. (*Id.*) Hernandez admitted that Torre's criticism of him at that time was not in any way related to Hernandez's race, color, or national origin. (Pl. Tr. 24:6-13, 28:21-25.) Although Torre subsequently apologized to Hernandez for his criticism in 2001, Hernandez continues to believe that Torre harbors animosity towards him because of this game-play incident. (Pl. Tr. 18:5-19:15, 158:14-25.) Neither Torre nor anyone else employed by MLB ever made any comments to Hernandez that he believed to be based on his race, color or national origin. (Pl. Tr. 28:21-29:18.)

Peter Woodfork, currently the Senior Vice President of On-Field Operations, reported directly to Torre and collaborated with Torre in making the decisions for permanent crew chiefs and World Series assignments. (Torre Decl. ¶ 11; Woodfork Decl.[5] ¶¶ 1, 3-5; McKendry Tr. 185:11-17; Torre S.D. Ohio Decl. ¶ 8.)

Vacancies for a permanent crew chief position are rare. From 2011 through 2018, crew chief positions became available only in the following seasons: 2011 (two open positions), 2013 (three open positions), 2014 (two open positions), 2015 (two open positions), 2017 (three open positions), and 2018 (one open position). (McKendry Decl. ¶ 9.) Hernandez did not apply for the 2015 opening. (*Id.* ¶ 11.) There were no crew chief openings for the 2012, 2016, or 2019 seasons. (*Id.* ¶ 9.)[6]

A World Series umpiring assignment also is rare. From 2011 through 2013, only six of the 68 full-time umpires worked each World Series. (Pl. Ex. 13, Dkt. 142-14 at DEF 1251; Torre Tr. 29:14-18; Woodfork Tr. 233:14-18; McKendry Decl. ¶ 3.) Since 2014, only eight of the 76 full-

---

[5] "Woodfork Decl." refers to the Declaration of Peter Woodfork, filed herewith.

[6] Between 2011 and 2013, there were 17 permanent crew chief positions each season among the 68 full-time umpires. (McKendry Decl. ¶¶ 3, 5.) Since 2014, there have been 19 permanent crew chief positions each season among the 76 full-time umpires. (*Id.* ¶ 4, 6.)

time umpires worked each World Series, including one umpire who serves as Replay Assistant. (Pl. Ex. 12, Dkt. 142-13 at DEF 1411; Woodfork Tr. 233:14-234:13; Torre Tr. 29:14-30:8; McKendry Decl. ¶ 4.)  In order to be eligible to umpire in the World Series, an umpire must have worked in that year's Division Series.  (Torre Decl. ¶ 27; Woodfork Tr. 68:3-6, 145:22-146:2.)

**B. Hernandez's Deficient Performance In Areas Torre Considered Most Important For Permanent Crew Chiefs And World Series Assignments.**

Pursuant to the collective bargaining agreement (the "Basic Agreement") between the Office of the Commissioner and the World Umpires Association (subsequently renamed the Major League Umpires Association), the labor union that represents all full-time Major League umpires, MLB has discretion to rely on those factors it "deems appropriate" in making crew chief decisions. (Pl. Ex. 12, Dkt. 142-13 at DEF1363-64; Pl. Ex. 13, Dkt. 142-14 at DEF1210-11.)  The Basic Agreement also vests MLB with discretion to make World Series assignments.  (Pl. Ex. 12, Dkt. 142-13 at DEF1410; Pl. Ex. 13, Dkt. 142-14 at DEF1250-51.)

In exercising MLB's discretion with respect to crew chief appointments, Torre considered a number of factors, including, but not limited to:  leadership skills, situation management, demonstrating the requisite managerial skills necessary to lead a crew on and off the field, the ability to maintain composure and regain focus if an officiating error is made, overall quality of performance, fulfillment of duties and responsibilities, initiative, and success in the role of interim crew chief.  (Torre Decl. ¶¶ 14-16, 29, 33-34; Pl. Ex. 14, Dkt 142-15 at Response #4; Pl. Ex. 16, Dkt 142-17; Torre Decl. Ex. E; *see also* McKendry Tr. 218:22-219:5.)  According to Torre, an umpire's consistent display of leadership skills is the most important attribute for crew chiefs. (Torre Decl. ¶ 15, Torre Tr. 82:10-19, 139:18-140:7, 142:18-143:2; Woodfork Tr. 25:4-14, 27:7-29:25.)  Hernandez, on the other hand, admitted that he does not know what factors MLB considers in connection with crew chief promotion decisions.  (Pl. Tr. 38:20-39:4.)

Similarly, for selection for the World Series – the most important games of the season – Torre considered many of these same factors, with the goal of selecting umpires who have displayed the highest levels of performance that season and throughout their careers, and have demonstrated the ability to perform in critical and visible roles. (Torre Decl. ¶ 16; Woodfork Decl. ¶ 6; Torre Tr. 31:7-13; Woodfork Tr. 44:4-11, 67:21-68:25, 213:4-6; Manfred Tr. 33:11-16.) In making World Series assignments, Torre gave particular consideration to umpires who demonstrated the ability to manage on-field situations under intense pressure; took responsibility for their on-field decisions; maintained composure and regained focus immediately if an officiating error was made; and applied and conveyed rules correctly and clearly. (Torre Decl. ¶¶ 16, 20; Torre Tr. 82:10-19; *see also* McKendry Tr. 265:8-266:18.) Of these considerations, maintaining a high level of focus on the field, being able to quickly refocus if an incorrect call is made, and allowing fans to keep their focus on the game and players rather than on the actions of the umpires during a game are particularly critical. (*Id*.) In Torre's expertise, the foregoing factors are much more important than an umpire's seniority (which, according to the Basic Agreement, is not a controlling factor). (Pl. Ex. 12, Dkt. 142-13 at DEF1363; Pl. Ex. 13, Dkt. 142-14 at DEF1210; Torre Tr. 153:23-154:15, 156:17-25; Woodfork Tr. 191:2-15; McKendry Tr. 218:3-11.)

Similarly, Torre did not place significant weight on field evaluation reports ("Field Evaluation Forms"), for either crew chief or World Series positions. (Torre Decl. ¶ 18; McKendry Tr. 123:25-125:8.) These reports are completed only for individual games that are observed in-person and are strictly limited to predetermined criteria concerning on-field performance in that individual game instead of the specific competencies of leadership ability or ability to perform in high pressure games that Torre considers most important for permanent crew chiefs and World

Series assignments.  (Torre Decl. ¶ 18; Torre Tr. 35:18-23, 191:18-25; Woodfork Tr. 24:19-27:3, 58:9-12; *see also* Manfred Tr. 73:8-25.)[7]

### 1. Hernandez's Lack of Accountability and Inability to Move Past His Mistakes Are Qualities MLB Considers To Be Inconsistent with On-Field Leadership.

In Torre's judgment, effective leaders accept responsibility for their actions and those of their crew, hold themselves accountable for their successes and failures, and seek to learn from the past rather than dwell and shift blame to others.  (Torre Decl. ¶ 37; Torre Tr. 139:20-140:7; Woodfork Tr. 27:7-29:25, 112:24-113:11.)  In Torre's view, Hernandez repeatedly has been unable or unwilling to take responsibility for his mistakes and, as a result, has been unable to move past those mistakes so that he can remain 100 percent focused on the game.  (Torre Decl. ¶ 21; Torre Tr. 139:20-140:7, 142:23-143:2; *see also* McKendry Tr. 227:18-228:21.)

Most notably, Hernandez has for years been preoccupied with an incorrect call he made on May 8, 2013 during a game between the Cleveland Indians and Oakland A's in Cleveland.  (Torre Decl. ¶ 21; Torre Tr. 83:9-84:17, 85:23-86:3; Marsh Tr. 253:8-18, 276:14-277:3; Abramson Decl. Exs. M, N.)  Hernandez was an interim crew chief during that game.  (Hernandez Tr. 148:6-8.) An Oakland A's player hit a long fly ball, which Hernandez ruled a double.  (Pl. Tr. 149:1-2, 149:17-150:3; Pl. Ex. 36, Dkt. 142-37.)  The umpires were asked to review video of the call to determine whether the ball cleared the fence and should be ruled a home run instead.  (Pl. Tr. 148:12-13.)  Although the hit was a home run, Hernandez did not change his original incorrect call after he reviewed the replay, a mistake that affected the outcome of the game.  (Pl. Tr. 149:1-2,

---

[7] In addition, while the ability to accurately call balls and strikes and judge runners on the bases is a consideration, it is not the overriding factor because all Major League umpires are proficient in those metrics (as they would not hold one of only 76 Major League umpire positions).  (Torre Decl. ¶ 34; Torre Tr. 43:5-20; Montague Tr. 18:17-19:2.)  In any event, Hernandez's ability to accurately call balls and strikes and judge runners on the bases has been inconsistent and often below average compared to other umpires.  (Torre Tr. 166:3-6; McKendry Tr. 206:5-22; Woodfork Tr. 189:11-190:11; Pl. Ex. 94, Dkt. 142-96.)

150:10-13, 152:9-23; Torre Tr. 83:9-20.) To this day, Hernandez has refused to admit that the call he made was incorrect and has attempted to blame the quality of the replay equipment. (Torre Decl. ¶ 21; Pl. Tr. 148:17-25, 152:19-20, 153:23-154:13, 157:13-18; Torre Tr. 83:18-84:17.)

Hernandez's inability to put the Cleveland incident behind him and his continued insistence that others were at fault for his wrong decision was emblematic of why Torre considered him to be unsuitable for World Series assignments and a permanent crew chief role. (Torre Decl. ¶ 21; Woodfork Decl. ¶ 7; Torre Tr. 104:3-8; Woodfork Tr. 112:24-113:11.) The issue was not the bad call itself, but Hernandez's reaction to his mistake was what Torre deemed the exact opposite of the type of leadership, personal accountability, and focus he sought of umpires to work the World Series and of permanent crew chiefs. (*Id.*)

MLB repeatedly and emphatically addressed Hernandez's inability to accept and move on from mistakes and attempted to refocus him year-over-year, while Hernandez dismissed these concerns. (Torre Decl. ¶ 22.)

- In 2013, MLB advised Hernandez to "[c]ontinue to work on presenting a positive and professional demeanor on the field. If an issue does arise, do your best to solve it and move on. Try not to harp on the same issue as it can take away from the rest of your umpiring." *(Id.* ¶ 22; Torre Decl. Ex. A at DEF1536.)

- In 2014, MLB told Hernandez that his desire for added responsibility "would only come to fruition with your ability to remain focused on the present and things that you can control," and that "you need to continue to take steps forward in your communication and your accountability before this can happen. . . . [Y]ou need to be accountable to yourself and let things from the past go. You continue to harp on matters that happened many years ago; this behavior is not healthy and not what we expect from a crew chief or any umpire. You need to learn from the past and then move forward." (*Id.* ¶ 23; Torre Decl. Ex. B at DEF1540; *Id.* Ex. C at DEF1548.)

- In 2015, Torre reiterated this message when Hernandez brought up the Cleveland incident yet again, and encouraged ██████████████████████████ ██████████████████ (*Id.* ¶ 24; Abramson Decl. Ex. M; Marsh Tr. 253:8-18; *see also* ███████████████

- In 2016, after observing that Hernandez had missed calls in bunches, MLB again emphasized that it is "vital that you can overcome any issues on the field and move

to the next play.  Try not to dwell too much on past performance." (Torre Decl. ¶ 25; Torre Decl. Ex. D at DEF1564.)

- In 2017, MLB again specifically informed Hernandez that "in order to enhance your candidacy for a Crew Chief position, we would like to see you…continue to improve your situation management, and display an ability to refocus and move forward after missed calls or receiving constructive feedback from the Office." *(Id.* ¶ 26; Torre Decl. Ex. E.)

Despite all of this feedback, Hernandez's inability to recover from a mistake continued to manifest, including at a most inopportune time during the 2018 American League Division Series between the New York Yankees and Boston Red Sox – a high-profile series in that round because of the media markets involved and nature of their historic rivalry.  (Torre Decl. ¶¶ 27-28.)  Torre selected Hernandez for the Division Series in 2018 with the intention to provide him with an opportunity to umpire in the World Series that year.  (*Id.* ¶ 27.)  Hernandez did not capitalize on that opportunity and instead had a professional melt down.  (*Id.* ¶ 28.)  Specifically, in Game 3 of that series, three of Hernandez's calls were overturned via instant replay in the first four innings alone.  (Pl. Tr. 236:20-25; Torre Decl. ¶ 28.)  This was the first time since the advent of expanded instant replay in 2014 that an umpire had three calls overturned in a postseason game.  (Pl. Tr. 237:1-5; Torre Decl. ¶ 28.)  Based on his performance during that game, Torre was not confident in Hernandez's ability to perform effectively on an even more intense stage, and for this reason did not consider him for the World Series that season.  (Torre Decl. ¶ 28.)

## 2. Hernandez Has Been Unable to Successfully Handle Difficult On-Field Situations with a Calm and Professional Demeanor on a Consistent Basis.

Defusing on-field situations involving players and managers while displaying a calm and professional demeanor is even more critical during the World Series than during the regular season.  (Torre Decl. ¶ 29.)  It is also an essential skill for a permanent crew chief.  (*Id.*)  In Torre's judgment, Hernandez has not demonstrated these skills on a consistent basis.  (Torre Decl. ¶¶ 19-20, 29; Torre Tr. 82:10-83:2, 139:18-140:7; Woodfork Tr. 29:19-25, 94:21-95:5.)  For example,

Hernandez has been quick to eject managers, which enflames on-field tensions, rather than issue warnings that potential could defuse the situations. (Torre Decl. ¶¶ 29, 31; Torre Decl. Ex. A at DEF1532; *Id.* Ex. F at DEF1554.) Hernandez also has failed to communicate with other umpires on his crew, which has resulted in confusion on the field and unnecessary game delays. (Torre Decl. ¶¶ 23, 40; Torre Decl. Ex. C at DEF1544; McKendry Decl. Ex. B at DEF2557-58; *see also* McKendry Tr. 209:8-210:9.)

Hernandez's on-field demeanor has been a problem for him as well. In 2014, Torre observed that Hernandez threw his headset after instant replay review overturned a call he made. (Torre Decl. ¶ 30; *see also* Torre Tr. 85:17-22.) This was particularly troubling to Torre because 2014 was the first year of expanded replay review, and MLB needed all umpires to demonstrate that they embraced this change. (Torre Decl. ¶ 30.) More recently, Torre observed Hernandez confront a pitcher who had walked off the mound after thinking he had thrown a third strike to end the inning, which Hernandez called a ball. (Torre Decl. ¶ 32.)

### 3. Hernandez Has Struggled As An Interim Crew Chief In Multiple Seasons.

When a permanent crew chief is not able to work because of vacation, injury, illness or some other reason, MLB selects umpires to serve as "interim crew chiefs." (McKendry Tr. 203:16-20.) The quality of an umpire's performance while serving as an interim crew chief is an important indicator of an umpire's ability to perform in a more critical, visible role and in a leadership capacity, and is a more important factor, according to Torre, than the mere number of games in an interim crew chief assignment. (Torre Decl. ¶ 33; Torre Tr. 142:12-21; Woodfork Tr. 61:24-62:9; *see also* McKendry Tr. 215:9-14, 221:5-8.) Based on his performance as an interim crew chief, Torre concluded that Hernandez has not demonstrated that he was ready for promotion to a permanent leadership position or to umpire in a more critical and visible role. (Torre Decl. ¶¶ 36-42.)

For instance, in September 2012, while acting as interim crew chief, Hernandez asked Cincinnati Reds Pitcher Homer Bailey to autograph eleven baseballs following a game in which Bailey pitched a no-hitter. (Pl. Tr. 173:5-174:16, 176:24-177:8; Torre Decl. ¶ 36 & Torre Decl. Ex. G.) Hernandez's conduct violated provisions of the Basic Agreement and Umpire Manual, which state, among other things, that umpires cannot directly or indirectly ask players for autographs, must be cautious about casual fraternization with Club employees for the purposes of avoiding appearances of impropriety, and must avoid the appearance of a conflict of interest and/or undue influence. (Torre Decl. ¶ 36; Torre Decl. Ex. G; McKendry Decl. Ex. B at DEF2557; Pl. Tr. 176:24-177:5; Pl. Ex. 13, Dkt. 142-14 at DEF1227-28, 31.) Hernandez's misconduct was exacerbated by the fact that he was serving in a leadership role and he understood that his actions violated MLB rules. (Pl. Tr. 175:14-176:4; Torre Decl. ¶ 36.) Torre advised Hernandez at the time that his actions were unprofessional and demonstrated extremely poor judgment, and were particularly egregious because, as interim crew chief, he was supposed to set a positive example for the rest of his crew. (Torre Decl. ¶ 36; Torre Decl. Ex. G; Pl. Tr. 176:24-177:14.)

Significantly, Hernandez also was interim crew chief during the May 8, 2013 game in Cleveland, discussed above, in which he made an incorrect call and refused to accept responsibility for his mistake. (Torre Decl. ¶ 37; Pl. Ex. 36, Dkt. 142-37; Pl. 148:15-17.)

As a result of Hernandez's performance as an interim crew chief in 2012 and 2013, as well as his other performance issues discussed above, Torre did not ask Hernandez to serve as an interim crew chief for more than one week in each of the 2014-17 seasons. (Torre Decl. ¶ 38.) On those occasions, Hernandez was asked to fill in only on a very limited basis while the crew chief on his crew was unavailable. *(Id.)*

In 2018, Torre gave Hernandez the opportunity to serve as an interim crew chief for nearly one full month of the season.  (*Id.* ¶ 39.)  Hernandez's performance that season merited a post-season assignment to the American League Division Series, with an eye towards placing him in the World Series.  (*Id*.)  There were no crew chief openings at the end of 2018 for the following 2019 season, and Torre did not consider him for the World Series that year based on his performance in the Division Series discussed above.  (*Id.* ¶ 27-28, 39.)

In 2019, Torre provided Hernandez with another opportunity to serve as an interim crew chief.  (*Id.* ¶ 40.)  During a game between the Boston Red Sox and Tampa Bay Rays in July 2019 when Hernandez was the interim crew chief, he misapplied a rule involving the effect of the substitution of players on the lineup – a rule specifically reinforced with Hernandez by his supervisor immediately prior to that series.  (*Id.*; Torre Decl. Ex. H.)  Hernandez compounded his error by not communicating clearly with the Club Field Managers or his crew members, which ultimately led to a 14-minute delay of game and the Red Sox playing the rest of the game under "protest," which, under the rules, could have resulted in the game being replayed from the point of the disputed ruling.  (*Id.*)  In Torre's judgment, this incident further illustrated Hernandez's struggle to maintain control and de-escalate tense on field situations.  (*Id.* ¶ 40.)

Following the game, MLB commenced an investigation into the Red Sox-Rays on-field incident.  (*Id.* ¶ 41; Torre Decl. Ex. H.)  As part of the investigation, MLB interviewed the umpires involved via separate telephone interviews.  (Pl. Tr. Day 2 140:19-141:25; Torre Decl. Ex. H.)  During that investigation, MLB concluded that Hernandez intentionally and deceptively eavesdropped on a confidential conversation with another umpire on the crew for that game in order to hear what that umpire would say concerning the incident, and when MLB asked Hernandez about it, he provided completely implausible and not credible explanations for his

conduct. (Torre Decl. ¶ 41; Pl. Tr. Day 2 142:9-11.) Torre removed Hernandez as interim crew chief from that point forward in the 2019 season. (Torre Decl. ¶ 42.)

As the foregoing makes clear, MLB's decisions always have been strictly based on its legitimate, good-faith assessments of Hernandez's unsuitability to serve as a permanent crew chief and umpire the most critical games in the World Series. Tellingly, Hernandez admitted that he does not know of any specific facts to support the claim that his not being selected for a crew chief position in the years he applied was related to his race, color, or national origin. (Pl Tr. 33:5-34:6.) The record in this case is entirely devoid of any such facts.

## ARGUMENT

### DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO TRIABLE ISSUE OF FACT AS TO THE EXISTENCE OF DISCRIMINATION

Summary judgment should be granted if there "is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). A plaintiff cannot defeat a defendant's well supported summary judgment motion unless he proffers sufficient admissible evidence on which a reasonable jury could rule in his favor with respect to each and every element of his claims. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "Mere conclusory allegations or denials will not suffice," *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986), and "unsupported allegations do not create a material issue of fact." *Weinstein v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (to defeat summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). Summary judgment is "appropriate" in discrimination cases, as "'the salutary purposes of summary judgment— avoiding protracted, expensive and harassing trails—apply no less to discrimination cases than to

. . . other areas of litigation.'" *Macias v. Barrier Free Living, Inc.*, No. 16 CIV. 1735 (ER), 2018 WL 1603566, at *5 (S.D.N.Y. Mar. 28, 2018), citing *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 415 (2d Cir. 2011). Because Hernandez cannot raise any material facts that are subject to a genuine dispute, MLB's motion for summary judgment should be granted.

*     *     *

Before turning to Hernandez's specific claims, we note that many of those claims are untimely. Hernandez first filed a charge with the EEOC on May 11, 2017. (Abramson Decl. Ex. L; Pl. Tr. 30:17-31:13.) Because claims under the Civil Rights Act of 1964 ("Title VII"), are subject to a 300-day statute of limitations, Plaintiff's Title VII claims that accrued before July 15, 2016 are untimely. 42 U.S.C. § 2000e-5(e)(1). NYSHRL and NYCHRL claims are subject to a three-year statute of limitations. N.Y. C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-502(d). Section 1981 has a four-year statute of limitations. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004); 28 U.S.C. § 1658.

Hernandez's claims accrued when he was told that he was not being promoted to crew chief (in January of each season for which he applied) or selected to the World Series (in October of each season).[8] Accordingly, Hernandez's claims with respect to MLB's January 2011 and January 2013 crew chief decisions are untimely under all statutes. Hernandez's claim with respect to MLB's January 2014 crew chief decision is untimely under all statutes except for § 1981. Hernandez's claims with respect to MLB's October 2011 and October 2012 World Series decisions are untimely under all statutes. Hernandez's claims with respect to MLB's October 2013 World

---

[8] As noted above, Plaintiff applied for crew chief roles for the 2011, 2013, 2014, 2017, and 2018 seasons. (McKendry Decl. ¶ 9; Mckendry Decl. Ex. C at 23971, Ex. G, Ex. J, Ex. L; Pl. Ex. 105, Dkt. 142-107.) There were no crew chief openings for the 2012, 2016 and 2019 seasons. (McKendry Decl. ¶ 9.) Although there was an open crew chief position for the 2015 season, Plaintiff did not apply for it. (*Id.* ¶ 11.)

Series decision is untimely under all statutes except for § 1981. Hernandez's claims with respect to MLB's October 2014 and October 2015 World Series decisions are untimely under Title VII.

Plaintiff's untimely claims cannot be salvaged by the "continuing violation" doctrine. The "Supreme Court has held that a failure to promote is a discrete act, not a continuing violation." *Williams v. City of New York*, 690 F. Supp. 2d 338, 343 (S.D.N.Y. 2010), citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002). In any event, the "continuing violation doctrine is heavily disfavored in the Second Circuit." *Collins v. City of New York*, 156 F. Supp. 3d 448, 458 (S.D.N.Y. 2016). "For Federal and State law purposes the 'continuing violation' doctrine applies only to harassment claims." *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014). *See also Williams v. N.Y.C. Dep't of Educ.*, No. 19 Civ. 1353 (CM), 2019 WL 4393546, at *18 (S.D.N.Y. Aug. 28, 2019).

Nevertheless, regardless of any time bar, the indisputable material facts in this case wholly undermine Hernandez's discrimination claims. Accordingly, MLB's motion for summary judgment should be granted, and Hernandez's motion for partial summary judgment should be denied.

## I. THERE IS NO TRIABLE ISSUE OF FACT ON PLAINTIFF'S DISPARATE TREATMENT CLAIM.

To prevail on his race and national origin intentional discrimination claims under Title VII, Section 1981, the NYSHRL, and the NYCHRL, Hernandez must present admissible evidence that: (i) he was a member of a "protected class"; (ii) he applied for and was qualified for the position in question; (iii) he was denied the position; and (iv) he was "rejected under circumstances which give rise to an inference of unlawful discrimination." *Ariz. v. Metro. Transp. Auth.*, No. 17cv4491, 2019 WL 2613476, at *3 (S.D.N.Y. June 26, 2019), citing *Aulicino v. N.Y.C. Dep't of Homeless*

*Servs.*, 580 F.3d 73, 80 (2d Cir. 2009).[9]  As noted above, the only crew chief positions Hernandez applied for within the limitations period – and therefore may even be challenged here – were in 2014 (under Section 1981), 2017 and 2018.

If Hernandez establishes a *prima facie* case, the burden shifts to MLB, which must articulate—but need not prove—a legitimate, non-discriminatory reason for its actions.  *Aulicino*, 580 F.3d at 80.  The burden then "shifts back to the plaintiff to prove that the non-discriminatory basis for the adverse action is mere pretext, and the defendant's true intent was discriminatory." *Griffin v. TNT Int'l Express*, No. 05 CIV. 10475 (PKC), 2008 WL 697680, at *11 (S.D.N.Y. Mar. 12, 2008).  "[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (internal citation omitted).

### A.  Hernandez Cannot Establish A Prima Facie Case Of Discrimination.

1.  Hernandez Was Not Qualified For Crew Chief or World Series Umpire Roles.

Hernandez was not qualified to be a crew chief in the years in which he applied for a vacancy, and has not demonstrated the qualifications necessary to work in the World Series in recent years.  "An employer, and not a job candidate, determines the relevant qualifications for an open position."  *Stratton v. Ernst & Young, LLP*, No. 15-CV-1047 (VEC), 2016 WL 6310772, at *3 (S.D.N.Y. Oct. 27, 2016).  *See also Crews v. Trs. of Columbia Univ. in City of New York*, 452

---

[9] Claims of racial discrimination under Title VII, § 1981 and the NYSHRL are analyzed under the same standards. *See Love v. Premier Util. Servs., LLC*, 186 F. Supp. 3d 248, 251 (E.D.N.Y. 2016); *See Whethers v. Nassau Heath Care Corp.*, 956 F. Supp. 2d 364, 383 (E.D.N.Y. 2013), *aff'd*, 578 F. App'x 34 (2d Cir. 2014); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992).

Under the NYCHRL, Plaintiff must show that he was treated "less well" than his counterparts in part "because of a discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013). "Notwithstanding this different analysis, the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." *Rightnour v. Tiffany & Co.*, 354 F. Supp. 3d 511, 522 (S.D.N.Y. 2019).

F. Supp. 2d 504, 526 (S.D.N.Y. 2006), *aff'd*, 308 F. App'x 518 (2d Cir. 2009). An employer has extremely broad discretion to determine the criteria it deems necessary for a posted position. *See Khan v. Bank of Am., N.A.*, 572 F. Supp. 2d 278, 291 (N.D.N.Y. 2008), *aff'd*, 372 F. App'x 216 (2d Cir. 2010); *Milano v. Astrue*, No. 05 Civ. 6527(KMW)(DCF), 2008 WL 4410131, at *32 (S.D.N.Y. Sept. 26, 2008), *aff'd*, 382 F. App'x 4 (2d Cir. 2010).

The Basic Agreement expressly preserves MLB's discretion to make crew chief decisions and World Series assignments based on criteria it "deems appropriate." (Pl. Ex. 12, Dkt. 142-13 at DEF1363-64, 1409; Pl. Ex. 13, Dkt. 142-14 at DEF1210-11, 1249-50.) Torre deemed leadership ability, including situation management and demonstrating the requisite managerial skills necessary to lead a crew on and off the field, as the most critical qualifications for MLB crew chiefs. (Torre Decl. ¶¶ 15-16, 33-35, Torre Tr. 82:10-19, 139:18-140:7, 142:18-143:2; Woodfork Tr. 25:4-14, 27:7-29:25.) Specifically, the qualifications he considered important included, but were not limited to, quality of performance as an interim crew chief, accountability, on-field presence, demeanor, focus and integrity, overall quality of performance, fulfillment of duties and responsibilities, and initiative, including whether the umpire took the initiative to train and mentor junior umpires. (Torre Decl. ¶ 14; Torre Decl. Ex. E; Pl. Ex. 14, Dkt 142-15 at Response #4; Pl. Ex. 16, Dkt. 142-17; *see also* McKendry Tr. 218:22-219:5.)

In deciding which umpires to staff in the World Series, Torre gave particular consideration to many of these same factors and selected umpires who have demonstrated the ability to manage on-field situations under intense pressure; took responsibility for their on-field decisions; maintained composure and regained focus immediately if an officiating error was made; and applied and conveyed the rules correctly and clearly. (Torre Decl. ¶ 16; Torre Tr. 82:10-19; *see also* McKendry Tr. 265:8-266:18.)

There is no dispute that Torre believed the importance of these qualifications. Nor is there any dispute that in Torre's judgment, these most important traits are Hernandez's most glaring weaknesses. Plaintiff's career has been plagued with multiple incidents demonstrating what Torre believed to be poor judgment, lack of accountability, inability to move past a mistake in order to refocus on the game, incapacity to take constructive criticism, inability to handle and defuse difficult on-field situations, sharp interactions with colleagues and an overall inability to rise to the occasion whenever given an opportunity to serve in a leadership role or umpire a critical game. (*See generally* Torre Decl. ¶¶ 19-42.) For example:

- While acting as an interim crew chief in 2012, Hernandez violated MLB's rules by asking a pitcher to autograph eleven baseballs for himself and the crew. (Torre Decl. ¶ 36; Pl. Tr. 173:5-174:16, 175:14-176:4, 176:24-177:8; Torre Decl. Ex. G.)

- Plaintiff refused to take accountability for his own mistakes, including his persistent and at times compulsive dwelling on his blown call in Cleveland while he was an interim crew chief. (Torre Decl. ¶¶ 21-26; Torre Decl. Exs. A-E; Torre Tr. 82:20-86:2, 130:22-131:11, 139:18-140:18; Woodfork Tr. 94:21-95:21, 112:24-113:11; *see also* Abramson Decl. Ex. M; Marsh Tr. 253:8-18, 276:14-277:3; Abramson Decl. Ex. N; Torre Decl. Ex. A at DEF1532; McKendry Tr. 227:18-228:21.)

- Torre believes Hernandez has not demonstrated the ability to refocus after an error, as evidenced by his performance in the 2018 American League Division Series when Hernandez missed three calls on the field, which were overturned via replay. (Torre Decl. ¶¶ 27-28; Pl. Tr. 236:20-25.)

- In Torre's judgment, Hernandez has demonstrated an inability, or unwillingness, to accept constructive criticism. When Torre has tried to help Hernandez move past mistakes, Hernandez has rejected that help. (Torre Decl. ¶¶ 21, 24, 26; Torre Tr. 83:9-84:17, 85:23-86:3 Abramson Decl. Ex. N; Marsh Tr. 276:14-277:3.)

- Torre has observed Hernandez struggle to handle difficult situations and to defuse conflicts during games. (Torre Decl. ¶¶ 29-33; Torre Decl. Exs. A, C; *Id.* Ex. F at DEF1554)

- Torre observed that Hernandez has displayed a negative demeanor on the field, including by throwing his headset after having his call overturned on instant replay. (Torre Dec. ¶ 30; Torre Decl. Ex. B at DEF1540; Torre Tr. 85:17-22.)

- In August 2019, Hernandez again failed in the interim crew chief role when he misapplied two rules and failed to actively manage the situation on the field, then

made matters worse by deceptively eavesdropping on his crew's statements to MLB during its investigation of the incident. (Torre Decl. ¶¶ 40-42; Torre Decl. Ex. H.)

Because Hernandez has not met MLB's legitimate requirements for crew chief and World Series roles, he cannot meet even the relatively low burden of showing that he was "qualified" for those positions. *See Tapia v. TWC Admin. LLC*, No. 17-CV-431 (KMK), 2018 WL 5016608, at *8 (S.D.N.Y. Oct. 16, 2018) (finding that plaintiff was not qualified when her supervisor expressed concerns about her "receptiveness to feedback," and ability to demonstrate "full ownership and accountability"); *Stratton*, 2016 WL 6310772, at *3.[10]

MLB determines the relevant qualifications; Hernandez does not. Plaintiff cannot raise a triable issue of fact as to qualification by arguing he satisfied a different criteria that the decision-maker deemed inconsequential. *See, e.g., Oluyomi v. Napolitano*, 811 F. Supp. 2d 926, 944 (S.D.N.Y. 2011). That is precisely what Hernandez is attempting to do when he claims that he is "qualified" for the position he seeks because of his seniority and because he received "exceeds standards" ratings in certain Field Evaluation Forms between 2011 and 2016. (Memorandum In Support of Plaintiff's Motion For Partial Summary Judgment, Dkt. 142 ("Pl. Br.") at 22.) While these facts may be relevant to why Hernandez was qualified to *keep* his job as an umpire, these are not the criteria on which Torre relied in making crew chief promotion decisions or World Series selections. Specifically, seniority expressly does not control because MLB's goal is to promote the best leaders to crew chiefs and select the highest performing umpires in the World Series – not the most senior umpires. (Pl. Ex. 12, Dkt. 142-13 at DEF1363; Pl. Ex. 13, Dkt. 142-14 at DEF1210; McKendry Tr. 218:3-11; Torre Tr. 153:23-154:15, 156:17-25; Woodfork Tr. 191:2-15.)

---

[10] To the extent that Hernandez can make out a prima facie case with respect to his qualifications, as discussed in greater detail below, Hernandez cannot meet his more rigorous burden of establishing a triable issue of fact with respect to pretext. *See* I.B., infra at 33-39.

Similarly, the information contained in Field Evaluation Forms for individual games does not bear on Plaintiff's qualification for the positions at issue. As noted above, it is undisputed that Torre did not rely on these forms for promotion to crew chief or for World Series selection because: (i) Field Evaluation Forms are completed for only about half of all games, and Torre considered an umpire's "complete body of work" – not just one-game snapshots captured by these reports (Torre Decl. ¶ 18; McKendry Decl. ¶ 7; McKendry Tr. 122:15-124:14); and (ii) these reports are purposefully limited to certain technical aspects of an umpire's performance in their current position that do not correspond to the specific qualities that Torre deemed most important for promotion to the crew chief position or for selection to the most-high pressure games each year in the World Series, such as leadership, accountability, and ability to recover from a mistake in order to perform effectively in the season's most critical games. (Torre Decl. ¶¶ 15-16; Woodfork Decl. ¶¶ 6-7; Torre Tr. 35:18-23, 191:18-25; Woodfork Tr. 24:19-27:3, 58:9-12; *see also* Manfred Tr. 73:8-25.) *See Tapia*, 2018 WL 5016608, at *8, citing *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 272 (4th Cir. 2005) ("[T]he performance evaluation is a review of an employee's performance in her current position, while the process of selecting a person for a promotion involves a consideration of how that employee will perform in a different position.")

Plaintiff's suggestion that he was "qualified" to be a crew chief based on the number of games he has served as an interim crew chief is likewise entirely unsupported by the record. To the contrary, the record is undisputed that the number of games worked as an interim crew chief does ***not*** render an umpire qualified for a permanent crew chief role or for the World Series. (Torre Tr. 142:12-21; *see also* McKendry Tr. 215:9-14, 221:5-8.) Rather, it is the quality of an umpire's performance in the interim crew chief role – specifically his ability to perform in a leadership capacity and in a more visible, high-pressure role – that bears on an umpire's qualifications to be

a permanent crew chief and work in the World Series. (Torre Decl. ¶ 33; Torre Tr. 142:12-21; Woodfork Tr. 61:24-62:9; *see also* McKendry Tr. 215:9-14, 221:5-8.) In Torre's undisputed judgment, Hernandez failed as an interim crew chief when he was given the opportunity to serve in that role for any extended period, as evidenced by his flagrant rule violation in 2012 when he asked a pitcher to autograph baseballs; his complete inability to move past his mistake in Cleveland in 2013; and his inability to function as a leader during a game this past season compounded thereafter by his misconduct during the ensuing investigation. (*See* Torre Decl. ¶¶ 36-42.)

2.    Hernandez Cannot Show An Inference of Discrimination.

The undisputed record evidence demonstrates the exact opposite of discriminatory animus. Indeed, the Court need look no further than Plaintiff's amended complaint, which affirmatively alleges that the decision-maker, Torre, was motivated to act against him ***not*** because of any protected characteristic, but because Torre disagreed with a call Hernandez made while Torre was a manager. (FAC ¶ 34; Pl. Tr. 13:1-14:2, 14:24-15:19.) Hernandez expressly admits that he has no reason to believe that Torre's alleged dislike of him or MLB's employment decisions were the result of discriminatory animus. (Pl. Tr. 24:6-13, 28:21-29:18.)

It is well-established that personal dislike is not actionable under the discrimination laws and does not create an inference of discrimination. *See Rolle v. Educ. Bus Transp., Inc.*, No. CV 11-3855 SJF AKT, 2013 WL 783026, at *13 (E.D.N.Y. Feb. 12, 2013), *report and recommendation adopted*, No. 11-CV-3855 SJF AKT, 2013 WL 783011 (E.D.N.Y. Feb. 27, 2013). *See also Perry v. Cty. Of Westchester*, No. 06-CV-3000 (KMK), 2008 WL 11438085, at *13 (S.D.N.Y. Mar. 31, 2008); *Hussey v. N.Y. State Dep't of Law/Office of Atty. Gen.*, 933 F. Supp. 2d 399, 407-08 (E.D.N.Y. 2013).

Moreover, Plaintiff acknowledged that neither Torre, nor anyone else at MLB, has ever made a negative comment related to his race or national origin, (Pl. Tr. 28:21-29:18.), which

further undermines any possible inference of discriminatory intent.  *See, e.g., Tojzan v. N.Y. Presbyterian Hosp.*, No. 00-CV-6105 (WHP), 2003 WL 1738993, at *4 (S.D.N.Y. Mar. 31, 2003); *South v. Cont'l Cas. Corp.*, No. 15cv1627, 2017 WL 782909, at *7 (S.D.N.Y. Feb. 28, 2017).

In the absence of any evidence whatsoever of discriminatory intent, Hernandez's claim rests solely on his subjective beliefs and conclusory assertions that (a) more minority umpires should have been promoted to crew chief and assigned to the World Series; and (b) MLB treated him differently from non-minority umpires in his evaluations and in its public response to a controversial call.  (FAC ¶¶ 68-69, 85; Pl. Tr. 43:23-44:11, 158:2-159:5; Pl. Br. at 22-23.)  Based on this record, these contentions cannot raise a triable issue of fact to establish a prima facie case – let alone, as discussed below, demonstrate pretext.

        *a.   The Number Of Minority Umpires Promoted To Crew Chief And Selected To The World Series Does Not Support An Inference Of Discrimination.*

In the absence of any evidence of discriminatory animus, Hernandez instead seeks to draw an inference of discrimination by relying on the fact that, at the time he filed his complaint, there were no minority crew chiefs and that, according to Plaintiff, minority umpires should have been assigned to the World Series more often.  (Pl. Br. at 22-23.)  However, as a matter of fundamental – and undisputed – statistical analysis, no such inference can be drawn from these facts.  Indeed, the statistical analysis confirms that the numbers of non-minority umpires promoted to crew chief and selected to the World Series are statistically meaningless and unequivocally do not support an inference of discrimination.  (*See generally* Martin Decl.[11] ¶¶ 9-21; Martin Decl. Ex. A at ¶¶ 2, 23-33.)

---

[11] "Martin Decl." refers to the Declaration of Denise Martin, Ph.D., filed herewith.

Based on the results of the Fisher's Exact Tests for the employment decisions at issue, Dr. Denise Martin ("Dr. Martin") concluded that the observed outcomes for crew chief promotions and World Series selections all were "statistically likely" and that there was **no statistical significance** to the fact that there have been no minority umpires promoted to crew chief since 2011 and that only two were selected for the World Series between 2011 and 2018 (one being selected in two separate years). (*See id.*; Martin Tr. 24:14-26:25.)[12]

As a general matter, and consistent with Supreme Court precedent, the Second Circuit has held that an outcome is "statistically significant" if the chances of that outcome occurring randomly are less than or equal to five percent. *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989) (citing *Castaneda v. Partida*, 430 U.S. 482, 496, n.17 (1977). *See also United States v. Yonkers Bd. of Educ.*, 123 F. Supp. 2d 694, 724 n.3 (S.D.N.Y. 2000).[13]

The absence of statistically significant outcomes with regard to MLB's crew chief promotions and World Series selections is unmistakable. Here, the probability of the outcome that no minorities would have been promoted to crew chief given the size of the applicant pool and the number of openings ranged between 59% and 79% in the years in which Hernandez applied – statistically insignificant by orders of magnitude because it is only when the probability is sufficiently low – **below** five percent (or at the most below ten percent) – that the results can be explained by minority status rather than chance alone. (Martin Decl. ¶¶ 15-17.) The high

---

[12] The Fisher's Exact test is the most appropriate test for relatively small sample sizes like those at issue here. (Martin Decl. ¶ 13; Martin Decl. Ex. A at ¶ 29; Martin Tr. 25:15-22, 33:21-34:11.) Dr. Martin also used an alternative Chi-Squared test suitable for larger sample sizes and the results were qualitatively similar. (Martin Tr. 25:9-22; Martin Decl. Ex. A at p.9 n.29.)

[13] This metric has also been described in terms of standard deviations. A "finding of two to three standard deviations can be highly probative of discriminatory treatment," whereas a finding at a lower level of statistical significance lacks probative value. *Ottaviani*, 875 F.2d at 372. Two standard deviations corresponds to a 95% confidence level, meaning that there is a 5% chance that the disparity is random, while three standard deviations correspond to roughly a 99.75% confidence level. *Id.* at 371. *See also Davis v. N.Y.C. Hous. Auth.*, 60 F. Supp. 2d 220, 239 (S.D.N.Y. 1999), *remanded on other grounds*, 205 F.3d 1322 (2d Cir. 2000).

probability levels for the observed outcomes with respect to crew chief promotions are consistent with the notion that the promotion rates for minorities and mon-minorities are the ***same***. (Martin Decl. ¶ 16; Martin Decl. Ex. A. at ¶¶ 30-31; Martin Tr. 26:16-25, 28:15-21.) Likewise, the chances of randomly selecting the number of minority umpires who worked in each World Series between 2011 and 2018 ranged between 28% and 91.6%. (Martin Decl. ¶¶ 18-19; Martin Decl. Ex. A at ¶¶ 32-33) – again, exponentially higher than the extremely low probability levels (i.e., below 5 percent) needed to support a statistically significant difference in selection rates between minority and non-minority umpires. (Martin Decl. ¶ 15; Martin Decl. Ex. A at ¶¶ 32-33.)

Given the limited number of crew chief vacancies each season, applicants for those positions, and the few World Series spots, Plaintiff's reliance on the number of minority crew chiefs and World Series umpires plainly does not permit the inference of discrimination he seeks to draw because "you can infer nothing statistically from those two data points, it's very likely to occur just by chance alone." (Martin Tr. 28:15-21, 39:7-15.) In fact, the undisputed statistical evidence here actually *negates* any inference of discriminatory intent. *See Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 337 (S.D.N.Y. 2009) (absence of statistically significant difference in compensation between employees of different national origins "negates an inference that race and national origin discrimination were behind discrepancies in pay"); *see also Moccio v. Cornell Univ.*, 889 F. Supp. 2d 539, 574 (S.D.N.Y. 2012) (plaintiff could not show an inference of intentional gender discrimination where defendants' expert concluded that the number of females terminated was not statistically significant), *aff'd*, 526 F. App'x 124 (2d Cir. 2013).

Dr. Martin's undisputed conclusion that no inference of discrimination can be drawn here is reinforced by a number of decisions holding that having few or no members of a protected class in a particular position is insufficient to establish the existence of discriminatory intent. *See Sosa*

*v. Rockland Cty. Cmty. Coll.*, No. 15 Civ. 3329 (JCM), 2017 WL 3105872, at *5 (S.D.N.Y. July 20, 2017); *Fahrenkrug v. Verizon Serv. Corp.*, No. 5:11-cv-1014 (BKS/ATB), 2015 WL 13021890, at *16 (N.D.N.Y. May 14, 2015), *aff'd*, 652 F. App'x 54 (2d Cir. 2016); *Pearson v. Merrill Lynch & Bank of Am.*, No. 10 Civ. 5119 (RJS), 2012 WL 983546, at *9 (S.D.N.Y. Mar. 22, 2012).

This is especially true given the relatively small number of vacancies, crew chief applicants, and World Series spots; "courts in this Circuit have held consistently that statistics are unreliable indicators of discrimination where, as here, they were calculated from a small set of data." *Vidal v. Metro-North Commuter R.R. Co.*, No. 3:12-cv-00248 (MPS), 2014 WL 3868027 (D. Conn. Aug. 6, 2014).[14] *See Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir. 1984); *Baby v. Nassau Healthcare Corp.*, No. CV 14-3297 (JMA)(GRB), 2017 WL 3279091, at *15-16 (E.D.N.Y. Feb. 6, 2017)

Hernandez's reliance on the "inexorable zero" to meet his burden – whether viewed in the context of a claim for disparate treatment or disparate impact (Pl. Br. at 25) – is simply inapplicable to the undisputed facts of this case and does not support either claim. Indeed, the authority on which Hernandez relies actually underscores why there can be no inference of discrimination here. In *Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 823 (E.D.N.Y. 1999), for example, the plaintiff did not rely on bottom line numbers alone as Hernandez does here, but rather presented expert statistical evidence, specifically results of the Fisher's Exact test (the same test that Dr. Martin used here to confirm the ***absence*** of a statistically significant disparate impact) concluding

---

[14] Between 2011 through 2018, there have never been more than three vacant crew chief positions in a single season. (McKendry Decl. ¶ 9, McKendry Decl. Exs. B, G, J, L; Pl. Ex. 105, Dkt. 142-107.) Similarly, only six to eight umpires work each World Series. (Pl. Ex. 12, Dkt. 142-13 at DEF 1411; Pl. Ex. 13, Dkt. 142-14 at DEF 1251; Torre Tr. 29:14-30:8; Woodfork Tr. 233:14-18.)

that there was only a five percent chance that no women would have been promoted.  *Id.* at 823.
The facts in both *International Brotherhood of Teamsters v. U.S.*, 431 U.S. 324 (1977), and *U.S. v. City of New York*, 713 F. Supp. 2d 300 (S.D.N.Y. 2010), are a far cry from the extremely limited number of crew chief vacancies and World Series assignments at issue in this single plaintiff case, as well as the restricted nature of the labor pool (*i.e.*, full-time Major League umpires) from which those umpires are selected.[15]

Hernandez's related assertion that an inference of discrimination can be drawn because white umpires were selected and he was not is even less compelling.  (Pl. Br. at 22)  Indeed, "the fact that the person who was hired . . .  is outside of plaintiff's protected group, without more, is insufficient to support an inference of discriminatory intent."  *Sareen v. Port Auth. Of N.Y. & N.J.*, No. 12 Civ. 2823 (PAE), 2013 WL 6588435, at *9 (S.D.N.Y. Dec. 16, 2013), *aff'd*, 592 F. App'x 34 (2d Cir. 2015).  *See also Gelin v. Geithner*, No. 06-cv-10176 (KMK), 2009 WL 804144, at *18 (S.D.N.Y. Mar. 26, 2009), *aff'd*, 376 F. App'x 127 (2d Cir. 2010).   Moreover, the evidence demonstrates that Hernandez was ***not*** similarly situated to the umpires who were selected because of his history of poor judgment, lack of accountability, and an struggles handling high-pressure situations, and, therefore, no discriminatory inference is possible.  *See, e.g., Fletcher v. ABM Building Value*, No. 14 Civ. 4712 (NRB), 2018 WL 1801310 (S.D.N.Y. Mar. 28, 2018).

> b.  *There Is No Evidence That MLB Treated Hernandez Differently From Non-Minority Umpires.*

Hernandez also claims that MLB treated him differently from non-minority umpires in his performance evaluations and in its public responses to two controversial calls.  (Pl. Br. at 23)  The

---

[15] In *Teamsters*, the court relied on the fact that there were only thirteen minority hires for nearly ***2,000*** driver positions. 431 U.S. at 336-37.  And in *City of New York*, while the Court found it to be "relevant' that a "municipal department in the country's largest city repeatedly select[ed] only applicants of one sex for job vacancies," it based its findings on anecdotal evidence that was "more than sufficient" to show intentional discrimination.  713. F. Supp. at 318.  Here, by contrast, Hernandez has presented no evidence whatsoever of discrimination—intentional or otherwise.

undisputed facts belie these conclusory assertions. First, Plaintiff cannot point to any facts to support his specious claim of differential treatment with respect to his performance evaluations. Instead, he relies principally on the report of Gregory Baxter ("Baxter"), his purported "human resources expert." (*See* Pl. Br. at 9 n. 19; Pl. 56.1 at ¶ 69.) The Court should disregard the unsworn Baxter report in its entirety because it is inadmissible hearsay. *See Zorn v. Mount Sinai Med. Ctr., Inc.*, No. 09 Civ. 3228(LTS), 2012 WL 4320575, at *2 (S.D.N.Y. Sept. 20, 2012) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e) and cannot be used to defeat a summary judgment motion.") (citing cases). Even if the Court overlooks that defect, Baxter's report and testimony should be excluded because they are wholly unreliable and fail to satisfy FRE 702 and *Daubert v. Merrell Dow Pharmaceuticals Inc.*, 509 U.S. 579 (1993).[16] Among other fatal flaws in Baxter's report, and one that precludes the inference Plaintiff seeks to draw here, is that Baxter never used a control group to compare the reviews of minority umpires with the reviews of non-minority umpires. (Baxter Tr. 155:15-18; Martin Decl.[17] ¶ 11(a), 12-15; Martin Decl. Ex. A at ¶¶ 48, 51; Martin Tr. 69:16-70:6, 72:17-24.) Although Baxter purports to conclude that MLB's performance evaluations negatively affected Plaintiff and other minority umpires, his opinion is pure conjecture and entirely unreliable because he never reviewed a single evaluation for a non-minority umpire because, according to Baxter, doing so was beyond the scope of his assignment. (Baxter Tr. 87:6-12, 92:20-21.)

---

[16] Baxter's report and testimony should be excluded for the reasons set forth in MLB's Motion to Exclude, filed simultaneously herewith.

[17] Dr. Martin's filed a separate declaration in support of MLB's Motion to Exclude, which is being filed with that motion.

Second, there is no evidence that remotely suggests that any references in Hernandez's year-end evaluations relating to his "perception" somehow demonstrates racial animus. There is nothing discriminatory about MLB's legitimate concerns about how Hernandez, an umpire working before tens of thousands of spectators and many millions more viewing on television, was perceived on the field. (Pl. Br. at 11.) *See, e.g., Andretta v. Napolitano*, 922 F. Supp. 2d 411, 422 (E.D.N.Y. 2013) ("Neutral comments unrelated to a Plaintiff's protected group are insufficient to give rise to an inference of age discrimination."); *Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491 F. Supp. 2d 386, 401 (S.D.N.Y. 2007) (criticisms of plaintiff's "work and her attitude" did not show discriminatory intent when they never referred to plaintiff's race). Additionally, white umpires received similar comments in their evaluations.[18] *See, e.g., Williams v. J.P. Morgan Chase Bank.*, No. 02-CIV-4250 (GBD)(MHD), 2005 WL 8167543, at *17 (S.D.N.Y. Oct. 11, 2005) (no inference of discrimination where alleged discriminatory comments were not specifically directed at members of a protected class); *Booker v. Fed. Reserve Bank of New York*, No. 01 CIV 2290 (DC), 2003 WL 1213148, at *13 (S.D.N.Y. Mar. 17, 2003) (no evidence of discrimination where Caucasian and African-American employees received similar criticisms).

Third, Plaintiff's claim that MLB treated him differently from white umpires in "similar" situations is equally baseless. The only incident Plaintiff cites is a comparison between MLB's

---

[18] MLB commented about "perception" in a number of white umpires' performance evaluations.

public statement following Plaintiff's blown call in Cleveland and an incident involving another umpire, Jerry Meals. (Pl. Br. at 11, 23.) The undisputed facts reflect that these incidents – and Hernandez's and Meals's respective reactions to them – were profoundly *dissimilar*. At the time Meals missed a call, in 2011, MLB did not yet use instant replay to review that particular call. (Torre Tr. 103:21-24; McKendry Tr. 135:18-21.) In contrast, two years later, Hernandez confirmed his incorrect call on the field even after he had the opportunity to correct his error through instant replay review, but failed to do so. And while Meals immediately acknowledged his mistake, Hernandez, in sharp contrast, refused to take accountability up to today and instead blamed the quality of the video replay equipment. (Torre Tr. 104:3-19.) MLB responded to both incidents based on the unique circumstances of each situation. Hernandez's complaint concerning MLB's response is relevant only because it shows his inability to accept constructive criticism and admit he was wrong. In any case, to the extent there were any perceived differences in MLB's responses, there is nothing in the record that suggests that any difference was based on Hernandez's race or national origin and thus cannot create an inference of discrimination.

*    *    *

In light of the foregoing, Plaintiff's motion for partial summary judgment on his prima facie case should be seen for exactly what it is: an attempt to manufacture a disputed issue of fact in order to survive summary judgment. The inevitable consequence of his failure to even *raise* a material disputed issue of fact based on admissible record evidence – as opposed to his own subjective beliefs regarding his qualifications and his rank speculation concerning MLB's treatment of other umpires – is that he cannot *prove* that he is entitled to judgment on his prima facie case as a matter of law.

**B.  MLB Had Legitimate, Non-Discriminatory Reasons For Its Decisions.**

At the second stage of the *McDonnell-Douglas* framework, the defendant "need not prove nondiscrimination; it need only introduce evidence, which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *Antunes v. Putnam/N. Westchester Bd. of Coop. Educ. Servs.*, No. 09-CV-3063 (CS), 2011 WL 1990872 (S.D.N.Y. May 19, 2011) (internal citations omitted), *aff'd*, 482 F. App'x 661 (2d Cir. 2012).  A defendant meets its burden by articulating that the plaintiff was not qualified for the job benefits at issue **or** that the candidates who were selected were better qualified than the plaintiff.  *Harding v. Wachovia Capital Mkts., LLC*, No. 10 Civ. 3496 (JPO), 2012 WL 4471543, at *8 (S.D.N.Y. Sept. 21, 2012), *aff'd*, 541 F. App'x 9 (2d Cir. 2013).  MLB has done both.

MLB has articulated legitimate, non-discriminatory reasons for not promoting Plaintiff to a crew chief position or assigning him to the World Series in recent years:  according to Torre's judgment, Hernandez has not demonstrated the leadership ability and situation-management skills in critical, high-pressure roles on a consistent basis.  (*See* Torre Decl. ¶¶ 19-42; Torre Tr. 82:20-86:3, 130:22-131:11, 139:20-140:18, 142:23-143:2; Woodfork Tr. 94:21-95:21,  112:24-113:11; *see also* McKendry Tr. 206:5-207:3, 210:10-211:19, 227:18-228:21.)

Concerns about an employee's performance and ability to respond to difficult situations constitute legitimate, non-discriminatory reasons for deciding not to select that employee for a promotion or job benefit.  *See Ariz*, 2019 WL 2613476, at *4; *Tucker v. New York City*, 376 F. App'x 100, 102 (2d Cir. 2010); *Fontecchio v. ABC Corp.*, No. 12-CV-6998 (CS), 2015 WL 327838, at *7 (S.D.N.Y. Jan. 23, 2015); *Augustine v. Cornell Univ.*, No. 14-CV-7807 (JPO), 2018 WL 1474402, at *6 (S.D.N.Y. Mar. 26, 2018), *aff'd*, *Brown v. Cornell Univ.*, 758 F. App'x 226 (2d Cir. 2019).

The undisputed evidence further shows that Torre promoted umpires to crew chief roles who have, in his professional judgment, demonstrated the required consistency in leadership, judgment, the ability to manage on-field situations with a calm and professional demeanor, and success in the interim crew chief role demonstrating that they were ready to ascend to the role on a full-time basis. (Torre Decl. ¶¶ 43-51; Torre Tr. 139:18-140:18.) Hernandez admittedly has no evidence to the contrary. (Pl. Tr. 58:6-22.)

### C. Plaintiff Has Not Raised A Triable Issue Of Pretext.

Because MLB had legitimate, nondiscriminatory reasons for its decisions, Hernandez has the burden to establish "sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action." *Campbell v. Nat'l Fuel Gas Distrib. Corp.*, 723 F. App'x 74, 75 (2d Cir. 2018) (internal citation omitted). The burden of establishing pretext "is a higher burden than that required to establish the *prima facie* case." *Isaac v. City of New York*, 701 F. Supp. 2d 477, 488 (S.D.N.Y. 2010). "Only where an employer's business decision is so implausible as to call into question its genuineness should this Court conclude that a reasonable trier of fact could find that it is pretextual." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010).

Plaintiff's burden to establish pretext in the context of a failure to promote case is particularly high. To satisfy that burden, Hernandez's "credentials would have to be so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Sattar v. Johnson*, 129 F. Supp. 3d 123, 139 (S.D.N.Y. 2015), citing *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 103 (2d Cir. 2001). *See also Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 582 (S.D.N.Y. 2008) (finding no pretext where plaintiff was not objectively better

qualified than others and "merely asserted that [defendants] judged the applicants' qualifications incorrectly"). On the other hand, Plaintiff's "subjective assessment of [his] own qualifications is insufficient to create a genuine issue as to whether the defendant's proffered reason for its [] decisions are pretext for discrimination." *Shands v. Lakeland Cent. Sch. Dist.*, No. 15-CV-4260 (KMK), 2018 WL 3315738, at *17 (S.D.N.Y. July 5, 2018), *aff'd*, 771 F. App'x 121 (2d Cir. 2019) (internal citations omitted).

Hernandez cannot dispute that Torre's sincere beliefs as to his performance are false. Likewise, there certainly is no evidence that discrimination was the real reason. Hernandez himself admits that he does not know whether the criticisms of his performance were racially motivated, and that he has no evidence to suggest that MLB's employment decisions were based on any protected characteristic. (Pl. Tr. 24:6-13, 33:5-23.) Accordingly, there is no triable issue on pretext.

### 1. There Is No Evidence That MLB's Asserted Reasons Are False.

There is no evidence that Plaintiff was more qualified than the umpires who received crew chief and World Series roles, let alone that no reasonable person could have chosen the other umpires over him. Indeed, Hernandez expressly admitted that he does not know the qualifications of the other umpires regarding the factors that even *he* deems important and that it would be "impossible" for him to make such a comparison. (Pl. Tr. 58:6-22) And, he certainly has failed to present any evidence that he is more qualified based on the criteria that the decision-makers actually apply.

Plaintiff's conclusory assertion that he is more qualified than all of the other individuals who were selected for crew chief and World Series roles fails as a matter of law to satisfy his burden to establish that his credentials are "so superior" to those who were selected. *See, e.g., Harding*, 2012 WL 4471543, at *11 (plaintiff's belief that he was more qualified insufficient),

citing *Ascione v. Pfizer, Inc.*, 312 F. Supp. 2d 572, 578 (S.D.N.Y. 2004), *aff'd*, 138 F. App'x 347 (2d Cir. 2005) (plaintiff's "subjective evaluations that she was better qualified than her coworkers are insufficient to demonstrate discrimination").

Any claim by Plaintiff that MLB's actions were somehow pretextual because MLB did not rely on the unimportant considerations that Hernandez has focused on—his seniority and small number of "exceeds" ratings in his Field Evaluation Forms—is meritless, because, as discussed above, MLB is entitled as a matter of law to establish its own standards for making crew chief and World Series decisions and determining which umpires are the most qualified based on those standards. This is particularly true at the pretext stage. *Judge v. N.Y.C. Police Dept.*, No. 10 Civ. 4236 (RMB), 2012 WL 98509, at *7 (S.D.N.Y. Jan. 12, 2012) ("Defendants' decisions regarding the professional experience and characteristics sought in a candidate are entitled to deference."); *Oluyomi*, 811 F. Supp. 2d at 943 (("An employer has the right to decide how it will value the qualifications of different candidates"); *Witkowich*, 541 F. Supp. 2d at 582 (rejecting showing of pretext based on qualifications of candidates because "[a]n employer has the right to decide how it will value the various qualifications different candidates bring to the table").

Hernandez's seniority is particularly irrelevant to any showing of pretext because, as noted above, seniority does not play a critical role in MLB's crew chief and World Series decisions. (Pl. Ex. 12, Dkt. 142-13 at DEF1363; Pl. Ex. 13, Dkt. 142-14 at DEF1210; Torre Tr. 153:23-154:15, 156:17-25; Woodfork Tr. 191:2-15; McKendry Tr. 218:3-11.) *See Velez v. McHugh*, No. 09 Civ. 0925, 2011 WL 778693, at *4 (S.D.N.Y. Mar. 2, 2011) (rejecting plaintiff's argument that the defendants' reasons for not promoting him were pretextual because he had more years of experience than the selected candidate); *Lester v. M&M Knopf Auto Parts*, No. 04-CV-8508, 2006 WL 2806465 (W.D.N.Y. Sept. 28, 2006) (finding no evidence of pretext where it was "undisputed

that Defendants [did] not have a policy of making layoff decisions based on seniority"); *Campbell v. Daytop Vill., Inc.*, No. 97 Civ. 4362 (JSM), 1999 WL 292576 (S.D.N.Y. May 7, 1999) (promotion of employee with less seniority than plaintiff is insufficient to establish pretext, where it is undisputed that qualifications and experiences, and not seniority, were the factors considered in selecting a candidate for promotion).

Further undercutting any claim of pretext here is that Torre has, in multiple seasons, rejected white umpires for crew chief roles who had more seniority than the umpires who were promoted. (McKendry Decl. ¶¶ 19-25.)[19]  *See Jones v. Onondaga Cty. Res. Recovery Agency*, No. 5:08-CV-1045, 2011 WL 1298774, at *8 (N.D.N.Y. Mar. 31, 2011).

In addition, the undisputed record evidence confirms that Torre's promotion decisions were based on his assessment that other applicants excelled in the very same skills that he found wanting in Hernandez.  Indeed, the record is chock-full of undisputed evidence that, year-over-year, Torre promoted umpires who consistently displayed leadership, an ability to handle on-field situations in a calm and professional demeanor, and had success as an interim crew chief.  (*See* Torre Decl. ¶¶ 43-51.)  Against this overwhelming evidence, there can be no credible assertion, much less a triable issue of fact, that Torre's reasons for not selecting Hernandez were not the real reasons. *See, e.g., Burnett v. Oce N. Am.*, No. 11 CIV 6894, 2014 WL 4547037, at *7 (S.D.N.Y. Sept. 12, 2014) (finding no evidence of discrimination when employer used "the same, non-discriminatory criteria" for the employment decisions at issue.)

---

[19] For example, in 2013 Torre selected Ted Barrett, who had 16 years of Major League service at the time, over another white umpire who had 20 years of Major League service. (McKendry Decl. ¶ 20.)  In 2014, Torre selected Bill Miller, who had 15 years of service, and Jeff Nelson, who had 16 years of service, over white umpires with between 17 and 25 years of service.  (*Id.* ¶¶ 21-22.)  In 2017, Torre promoted three umpires with 16.5 to 18 years of MLB service over twelve white umpires who had more seniority than at least one of the selected umpires.  (*Id.* ¶ 23.)

2. <u>There Is No Evidence That The Real Reason Was Discriminatory Animus.</u>

An employer can be wrong without it being discriminatory. Plaintiff must further show that the real reason for the decision was discrimination. Plaintiff cannot raise a triable issue of discriminatory intent because he has affirmatively pled that the real reason Torre allegedly disliked him was not unlawful discrimination, but because of a disagreement over a call Plaintiff made in 2001. (FAC ¶ 34; Pl. Tr. 13:1-14:2, 14:24-15:19.)

Moreover, Plaintiff cannot possibly create a triable issue on pretext because there is not a scintilla of evidence of differential treatment.

First, Hernandez's disagreement with Torre's assessment of his abilities on the factors Torre considered important does not suffice. A plaintiff's "subjective disagreement with Defendants['] assessment of [his] qualifications does not make their decision discriminatory." *Tapia*, 2018 WL 5016608, at *10 (internal citation and alteration omitted) (collecting cases).

Second, Plaintiff's suggestion that MLB either ignored or did not give appropriate weight to positive ratings or comments in his Field Evaluation Forms also is not evidence of pretext. Torre considered these reports of limited value with respect to crew chief promotion decisions and World Series selections for *all* umpires – not just Hernandez – and therefore did not review *any* Field Evaluation Forms when making these decisions. (Torre Decl. ¶ 18; Torre Tr. 35:18-23, 191:18-25; Woodfork Tr. 24:19-27:3, 58:9-12; *see also* Manfred Tr. 73:8-25) There is nothing in the record to suggest that MLB treated the Field Evaluation Forms for other umpires any differently than Hernandez's, much less differently because of Hernandez's race or national origin.

Hernandez's subjective belief that these reports are entitled to greater weight – indeed, his view that they should be dispositive of promotion and selection decisions – is inconsequential.[20]

Third, Plaintiff's purported reliance on an alleged "diversity problem" is an irrelevant diversion from the defects in his claims, and is equally insufficient to establish a triable issue of fact regarding pretext. (Pl. Br. at 2-3.) Plaintiff appears to take issue with MLB's efforts to improve the hiring of umpires at the ***minor league*** level in order to create a more diverse pipeline of candidates to ***hire*** at Major League level. Leaving aside the total absence of any evidence of a demonstrable "problem" – as well as the undisputed fact that MLB does not make hiring or other employment decisions for minor league umpires (Woodfork Tr. 177:2-6, 178:18-22) – decisions involving umpires at the minor league level are so far divorced from the claims in this case challenging MLB's decisions with respect to crew chief promotions and World Series selections.[21] *See Nguyen v. Dep't of Corr. & Cmty. Servs.*, 169 F. Supp. 3d 375, 394–95 (S.D.N.Y. 2016)

---

[20] Moreover, as noted above, the record is completely devoid of any evidence of differential treatment in the content of these reports because Plaintiff's purported expert did not use a control group or review a single evaluation of any non-minority umpire. *See supra* at 25.

[21] What can only be characterized as an attempt to generate a favorable soundbite, Plaintiff makes the inflammatory claim that discovery in this case confirms MLB's history of "racism." (Pl. Br. at 1). In support of this ridiculous assertion, Plaintiff relies solely on an isolated remark Randy Marsh made during his deposition that another umpire, not Hernandez, is Hispanic. First, there is nothing derogatory or offensive about merely referencing this fact. *See, e.g., Mohan v. City of New York*, No. 17 CIV 3820 (KPF), 2018 WL 3711821, at *12 (S.D.N.Y. Aug. 3, 2018) (neutral reference to another employee's race insufficient to establish discriminatory intent). Second, Marsh is not a decision-maker with respect to any crew chief promotions or World Series assignments. (Torre Tr. 22:6-12, 28:6-9; Woodfork Tr. 23:12-15; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17.) Third, even if he was a decision-maker, this remark about another umpire is so far attenuated from Plaintiff's claims because the remark had nothing to do with Hernandez or the myriad reasons why he was not promoted to crew chief or assigned to the World Series. *See, e.g. Nassry v. St. Luke's Roosevelt Hosp.*, No. 1:13-cc-4719-GHW, 2016 WL 1274576, at *7 (S.D.N.Y. Mar. 31, 2016) (stray remarks by supervisor were not probative because "he was not the final or sole decision maker" and "the context in which they were made was completely divorced from the decision-making process") (internal citation omitted); *Khan v. Abercrombie & Fitch, Inc.*, No. 01 Civ. 6163 (WHP), 2003 WL 22149527, at *7 (S.D.N.Y. Sept. 17, 2003) ("[Employee] played no role in [defendant's] decision to terminate [plaintiff] . . . and therefore his statements, even if uttered, do not raise an inference of discrimination."); *Boyle v. McCann-Erickson, Inc.*, 949 F. Supp. 1095, 1102 (S.D.N.Y. 1997) (statements by non-involved supervisors cannot form the basis of a discrimination claim).

("Plaintiff has failed to set forth any link between the failure to promote him and the allegedly discriminatory hiring practices of Defendants.").

Plaintiff cannot point to **any** evidence on which a factfinder could conclude that MLB's reasons for not promoting him or assigning him to the World Series were false, but instead were discriminatory. Accordingly, even assuming Hernandez has made out a prima facie case, his contention that MLB intentionally discriminated against him must be dismissed.

## II.    THERE IS NO TRIABLE ISSUE OF FACT ON PLAINTIFF'S DISPARATE IMPACT CLAIM.

To establish a *prima facie* case of disparate impact discrimination under Title VII, the NYSHRL, and the NYCHRL, Hernandez must: "(1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." *Wharff v. State Univ. of N.Y.*, 413 F. App'x 406, 408 (2d Cir. 2011) (internal citation omitted); *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001), *abrogated on other grounds*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011); *Davis v. City of New York*, No. 99 Civ. 4955 (BSJ), 2003 WL 22832165, at *5 (S.D.N.Y. Nov. 25, 2003).[22]

If the Plaintiff establishes these elements, the "defendant may rebut a plaintiff's prima facie showing by 'demonstrating that the challenged practice is job related for the position in question and consistent with business necessity.'" *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d

---

[22] Disparate impact claims under the NYCHRL are analyzed similarly to claims under Title VII and the NYSHRL. *See, e.g., Phillips v. Long Island R.R. Co.*, No. CV 13-3317 (JS)(ARL), 2019 WL 1757176, at *16 (E.D.N.Y. Mar. 4, 2019) ("The elements of a prima facie case of disparate impact under NYCHRL are identical" to those under Title VII."), *report & recommendation adopted,* 2019 WL 1758079 (E.D.N.Y. Mar. 25, 2019). *See also Assistant Deputy Wardens/Deputy Wardens Ass'n v. City of New York*, No.: 14-cv-4308 (FB)(JO), 2019 WL 4015119, at *2 (E.D.N.Y. Aug. 26, 2019).

Cir. 2006) (citing 42 U.S.C. § 2000e-2(k)(1)(A)(i)) (internal alteration omitted).[23]  If the defendant

meets its burden, the burden shifts back to the plaintiff "to show that other tests or selection

devices, without a similarly undesirable racial effect, would also serve the employer's legitimate

interest." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975); *M.O.C.H.A. Soc'y, Inc. v.*

*City of Buffalo*, 689 F.3d 263, 274 (2d Cir. 2012) (citing *Watson v. Fort Worth Bank & Trust*, 487

U.S. 977, 998 (1988)).

### A.  Hernandez Cannot Establish A Prima Facie Case of Disparate Impact.

1.  <u>Hernandez Failed To Present Any Evidence That A Facially Neutral
Practice Caused A Statistically Significant Disparity in Crew Chief
Selections or World Series Assignments.</u>

Plaintiff's disparate impact claim fails because he has not identified a facially neutral policy

or practice that caused a disparate impact.  The identification of a particular employment practice

is an "integral part of the plaintiff's prima facie case" because "a Title VII plaintiff does not make

out a case of disparate impact simply by showing that at the bottom line there is racial *imbalance*

in the work force."  *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 656-57 (1989).

"Simply gesturing towards the hiring process as a whole will not satisfy the requirement that the

plaintiff identify a 'specific employment practice' that is the cause of the statistical disparities."

*Byrnie*, 243 F.3d at 111.  *See also Gaddy v. Ports Am.*, No. 13 Civ. 3322 (AY) (HBP), 2015 WL

3929693, at *5 (S.D.N.Y. June 15, 2015) ("To state a disparate impact claim under Title VII, a

plaintiff must allege sufficient facts to support a plausible claim that an employer's facially neutral

practice or policy disproportionately and adversely affects a particular protected group.").

---

[23] Under the NYCHRL, the defendant may rebut any inference of discrimination by demonstrating that the "policy or practice bears a significant relationship to a significant business objective . . . or does not contribute to the disparate impact." N.Y.C. Admin. Code 8-107(17)(a).  A "significant business objective" includes "successful performance of the job." *Id.*

Here, Plaintiff has failed to identify a "policy or practice" other than to claim that he is challenging "the process" used by MLB to make crew chief and World Series decisions. (Pl. Br. at 24.) He has not met his burden of identifying a specific policy or practice. *See, e.g., Sweeney v. U.S. Postal Serv.*, No. CV 08-4417(ARL), 2013 WL 5744490, at *12 (E.D.N.Y. Oct. 23, 2013) (plaintiff's "generalized complaints of discriminatory conduct" do not constitute a specific employment policy); *Rodriguez v. Beechmont Bus Serv., Inc.*, 173 F. Supp. 2d 139, 148 (S.D.N.Y. 2001) (dismissing complaint that "failed to adequately identify a neutral policy"); *Brown v. Coach Stores, Inc.*, 30 F. Supp. 2d 611, 613 (S.D.N.Y. 1997), *aff'd*, 163 F.3d 706 (2d Cir. 1998) (dismissing complaint that "identifie[d] no affirmative policy, practice, or criteria that has resulted in the alleged disparities in defendant's workforce").

Even if he had identified a discernible policy or practice, Hernandez's disparate impact claim fails for the obvious reason that he failed to present any evidence of a statistically significant disparity in crew chief selections and World Series assignments. The entire purported basis of Hernandez's disparate impact claim is that MLB has not promoted any minority umpires to crew chief roles between 2011 and 2016 and that, according to Hernandez, an insufficient number of minority umpires have been assigned to the World Series. (Dkt. 123 ¶¶ 168, 175; Pl. Tr. 43:23-44:8, 227:5-14.) These facts fail as a matter of law to establish a prima facie case of disparate impact. Indeed, courts have held repeatedly that a statistically significant disparity cannot be established on "bottom line" numbers alone, and have dismissed claims where the plaintiff fails to offer statistical analysis demonstrating that a statistically significant disparity exists. *See, e.g., Eatman v. United Parcel Serv.*, 194 F. Supp. 2d 256, 267 (S.D.N.Y. 2002) (finding no statistically significant disparity where plaintiff failed to adduce evidence comparing selection rates); *Sweeney*, 2013 WL 5744490, at *16 (finding no disparity where plaintiffs "ha[d] not provided any statistics

to establish a causal relationship between a challenged employment policy or practice and disparity on employees").

Bottom line numbers, without regard to the population of the workforce, applicant pools and selection rates, are simply not probative of disparate impact. Statistical proof "almost always occupies center stage in a prima facie showing of a disparate impact claim." *Teasdale v. City of New* York, No. 08-CV-1684 (KAM), 2013 WL 5300699, at *8 (E.D.N.Y. Sept. 18, 2013), *aff'd*, 574 F. App'x 50 (2d Cir. 2014), citing *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001). Statistics "must reflect a disparity so great that it cannot be accounted for by chance." *Teasdale*, 2013 WL 5300699, at *8, citing *EEOC v. Joint Apprenticeship Comm. Of the Joint Indus. Bd. Of the Elec. Indus.*, 186 F.3d 110, 117 (2d Cir. 1998). When a plaintiff alleges that a policy disparately impacts employees, "the relevant population for statistical analysis consists of those employees potentially subject to the policy." *Eatman*, 194 F. Supp. 2d at 267. That population is then "divided into protected and non-protected groups and the selection rates of the two groups are compared." *Id.* (citing *Smith v. Xerox Corp.*, 196 F.3d 358, 368 (2d Cir. 1999).

As noted above (*see supra* at 25), courts consistently hold that an outcome is "statistically significant" where the chances of that outcome occurring randomly are less than 5 percent. *See Ottaviani*, 875 F.2d 365, 371 (citing *Castaneda v. Partida*, 4301 U.S. 482, 496, n.17 (1977). Because Hernandez has not provided *any* analysis comparing the selection rates of protected and non-protected groups, he cannot meet his burden of establishing a statistically significant disparity with regard to crew chief and World Series selections.

Even if the Court were inclined to overlook Plaintiff's failure to offer any evidence of statistical significance, MLB still would be entitled to summary judgment because the undisputed statistical evidence dispels any claim of a statistically significant disparity. As explained above,

*see supra* at 24-27, MLB's expert, Dr. Martin, analyzed all possible outcomes for crew chief and World Series selections.  According to the undisputed testimony of Dr. Martin, "promotion rates and selection rates for minorities . . . d[id] not differ from the promotion rates and selection rates for white umpires."  (Martin Tr. 26:16-25.)  The probabilities of the observed outcomes for crew chief promotions and World Series selections all were significantly higher than the low probability required to establish a statistically significant difference (i.e., below five percent or at most below ten percent).  *See supra* at 25-26.  Courts routinely grant summary judgment where, as here, the chance of the challenged outcome having occurred randomly was greater than five percent, relying on the exact same statistical test, the Fisher's Exact test, that Dr. Martin used to conduct her analysis.  *See, e.g., Bridgeport Guardians, Inc. v. City of Bridgeport*, 735 F. Supp. 1126, 1131-32 (D. Conn. 1990) (granting judgment to defendants on disparate impact in promotions claim where defendant relied on Fisher's exact test results showing that the difference between actual results and expected results was not statistically significant.), *aff'd*, 933 F.2d 1140 (2d Cir. 1991); *Ries v. Winona Cty.*, Civ. No. 10-1715 (JNE/JJK), 2011 WL 2200622, at *7-8 (D. Minn. May. 6, 2011) (Defendants' expert's use of Fisher's Exact test shows a "probability equaled to 1.0, which is substantially less than two standard deviations, and statistically insignificant"), *report & recommendation adopted*, 2011 WL 2173698 (D. Minn. Jun. 1, 2011); *Stackhouse v. Pa. State Police*, No. 1:01-CV-223, 2005 WL 8167743, at *2-3 (M.D. Pa. Oct. 4, 2005) (in disparate impact case, expert appropriately used Fisher's Exact test on small sample size and determined "promotion rate occurring by chance was not statistically significant, having a 12.2% chance of occurring randomly").

For these reasons, Hernandez has not demonstrated – and cannot demonstrate given the facts in this case – the existence of any statistically significant disparity in crew chief and World

Series selections.  MLB is entitled to summary judgment on Plaintiff's disparate impact claim on this basis alone.

### 2.    Hernandez Has Not Shown A Causal Connection.

Assuming the reliance upon leadership and situation management in making crew chief and World Series decisions can be a "practice" giving rise to an adverse impact theory, Hernandez has not demonstrated a causal connection between that practice and any disparity in MLB's promotion and selection decisions with regard to minority umpires.  He has presented no evidence or testimony whatsoever that there would have been any effect on the promotion and selection rates of minority umpires had Defendants considered solely objective criteria, such as accuracy in calling balls and strikes and judging runners on the bases.[24]  In fact, he has presented no analysis whatsoever on how non-minority umpires compare to minority umpires on ***any*** metric.  Nor has he demonstrated that the same factors that held Hernandez back from promotion and selection to the World Series—primarily leadership, situation-handling—similarly affected even one other minority umpire.

Instead, Hernandez has done "precisely what previous disparate-impact opinions have barred" by relying on "the bottom line numbers in an employer's workforce' instead of identifying a specific employment practice and showing that the practice in question has caused the exclusion of minorities."  *Fahmy v. Duane Reade, Inc.*, No. 04 Civ. 1798 (DLC), 2006 WL 1582084, at *5 (S.D.N.Y. June 9, 2006).  *See also Lopez v. Metro. Life Ins. Co.*, 930 F.2d 157, 160 (2d Cir. 1991) (affirming judgment for the employer where the "[a]ppellant did not show that [the defendant's]

---

[24] Hernandez's disparate impact claim as to World Series assignments is completely undermined by the fact that MLB has in fact assigned other minority umpires to the World Series.  *See Gainer v. United Auto. Agric. Aerospace Implement Workers (UAW) Region 9*, No. 08-CV-0501-WMS-MJR, 2017 WL 2988286, at *12 (W.D.N.Y. June 6, 2017) (no causal connection between consideration of bargaining experience and lack of African Americans and women in certain union leadership positions where members of both protected classes had held such positions), *report & recommendation adopted*, No. 08-CV-0501-WMS-MJR, ECF Dkt. 244 (W.D.N.Y. Sept. 22, 2017) (text order).

on-the-job training practices bear any causal relationship to the dearth of black employees in the regional offices of [defendant]").

*    *    *

As the foregoing demonstrates, Plaintiff's motion for partial summary judgment on his disparate impact claim is especially frivolous given that he has ignored two essential elements of his prima facie case.  First, Plaintiff does not even attempt to establish that MLB's policies created a "statistically significant" disparate impact, as is required to establish a prima facie disparate impact discrimination claim.  *See supra* at 24-28*.*  Plaintiff's motion does nothing more than regurgitate the allegations in the Complaint.  (Pl. Br. at 24-25; Amendment to His Complaint, Dkt. 123 ¶¶ 168, 175.)  In fact, Plaintiff suggests in his brief that "all of the elements of a prima facie case of disparate impact discrimination are present here" for reasons "previously discussed with the Court."  (Pl. Br. at 23-24).  The only prior discussion with the Court was whether Plaintiff's proposed disparate impact claim was adequately pled – not whether he established the essential elements of that claim.  Indeed, at argument in connection with Plaintiff's motion to amend his complaint, Judge Gorenstein cautioned Plaintiff that although "you don't have to be very detailed about statistics" in *pleading* a disparate impact claim, to prove discrimination Plaintiff "would have to do a lot more than what [he] did in the complaint . . . ."  (Abramson Decl. Ex. W at 52:8-16; *see also id.* 42:15-16 ("They have to show a statistically significant adverse impact from this process.")  Plaintiff failed to heed that advice, as he has failed to proffer any statistical analysis whatsoever.

Instead, the only "evidence" that Plaintiff has presented in support of his disparate impact claim is the same "bottom line" numbers pled in his complaint.  (Pl. Br. at 24-25; Amendment to His Complaint, Dkt. 123 ¶¶ 168, 175.)  However, as noted above, this is insufficient as a matter of

law because courts require statistical analyses to determine whether a "statistically significant" disparity exists. *See supra* 24-28. Hernandez has not proven a statistically significant disparity because none exists; the irrefutable statistical evidence confirms that there is no statistically significant adverse impact. Far from it. (*See id*.)

Second, Plaintiff's motion for partial summary judgment completely ignores causation— *i.e.*, how MLB's policies purportedly caused a statistically significant disparate impact – another essential element of a *prima facie* disparate impact claim. His failure to advance any argument amounts to a waiver. *Schlosser v. Time Warner Cable Inc.*, No. 14cv9349, 2017 WL 2468975, at *6 (S.D.N.Y. June 6, 2017) (citing cases).

### B. MLB's Consideration of Subjective Qualities In Making Decisions For Leadership Positions is Consistent With Business Necessity.

Even if Hernandez could establish a prima facie case, the record fully demonstrates legitimate business reasons for MLB's reliance on subjective criteria in making crew chief and World Series decisions. "In the context of subjective or discretionary employment decisions, the employer will often find it easier than in the case of standardized tests to produce evidence of a 'manifest relationship to the employment in question.'" *Watson*, 487 U.S. at 999. The Supreme Court has held that, "[i]n evaluating claims that discretionary employment practices are insufficiently related to business purposes, it must be borne in mind that '[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it.'" *Id.* citing *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 578 (1978).

MLB's consideration of leadership ability and situation management for umpires to serve in leadership positions and work the highest profile games is eminently reasonable and fully comports with business necessity. *See Sullivan v. Standard Chlorine of Del., Inc*., 845 F. Supp.

167, 177 (D. Del. 1994) (qualifications for managerial position "including leadership ability, interpersonal skills, and communication skills, necessarily involve some subjective evaluation"). Indeed, Hernandez admitted that these are valid considerations. (Pl. Tr. Day 2 160:5-11.) The Court should decline Hernandez's belated invitation to act as a roving commission to second-guess the factors that the experts in professional baseball deem important in the evaluation of Major League umpires to serve as permanent crew chiefs and in the World Series. It is simply impossible for the Court to second-guess MLB's assessments of umpires' leadership qualities and situation management based on the record before it. *See O'Leary v. N.Y. State Unified Court Sys.*, No. 05 Civ. 6722(HB), 2007 WL 2244483, at *7 (S.D.N.Y. Aug. 6, 2007) ("Defendant's decisions regarding the professional experience and characteristics sought in a candidate . . . are entitled to deference.") (internal citation omitted).

For these reasons, even if Hernandez could state a *prima facie* case of disparate impact discrimination, MLB has established that the challenged practice of including subjective criteria is consistent with its need to have umpires who demonstrate leadership in leadership roles, and having its highest performing umpires assigned to the World Series.

### C. Hernandez Has Not Shown That An Alternative Practice Would Adequately Serve Defendants' Legitimate Business Needs.

If the defendant can show that the challenged practice is job related, the burden returns to the plaintiff "to show that a different test or selection mechanism would have served the employer's legitimate interests 'without a similarly undesirable racial effect.'" *M.O.C.H.A. Soc'y, Inc.*, 689 F.3d at 274, citing *Watson*, 487 U.S. at 998. Plaintiff has not identified an alternative practice that would be equally effective in serving MLB's goals because none exists. Plaintiff's contention that MLB should ignore leadership ability and situation management and instead base crew chief and World Series decisions solely on an umpire's seniority or balls and strikes statistics

is illogical. Doing so would not serve a basic business need to have individuals who have the ability to lead in leadership positions, and to have umpires who will not buckle under pressure assigned to umpire the most critical games on the biggest stage. In any event, because all umpires at the Major League level are highly proficient in making accurate calls and there is not a wide disparity between high performing and low performing umpires across those metrics, (Torre Tr. 43:5-20; Montague Tr. 18:17-19:2.), distinguishing the umpires on this basis for purposes of leadership positions and to umpire on the brightest stage would not be particularly meaningful. Moreover, to the extent that Plaintiff suggests that employment decisions be based on objective criteria alone, such as seniority and "numbers," that is directly contradicted by the Basic Agreement, which vests MLB with the "discretion" to make crew chief and World Series selections based on factors it deems "appropriate," and expressly says that seniority shall not control. Consideration of qualities such as leadership and situation management must be part of the exercise of that discretion.

## III. PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED.

As discussed above, Plaintiff has not established a prima facie case based on the record so obviously he cannot obtain summary judgment. Indeed, Hernandez does not cite a single case where a court granted summary judgment in favor of a plaintiff in an employment discrimination claim.

Plaintiff's motion for partial summary judgment should be denied for the additional reason that by moving for partial summary judgment only as to his *prima facie* case, Hernandez has not presented any claim on which he is "entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56. The purpose of a partial summary judgment motion is "to promote efficiency and narrow the scope of a trial to the issues that are reasonably disputed." *In re Refco Inc. Sec. Litig.*, No. 07-

MD-1902 (JSR), 2013 WL 12191891, at *3 (S.D.N.Y. Mar. 11, 2013).  *See also Spina v. Cartagena*, No. 18-CV-7801 (JSR), 2019 WL 2655854, at *2 (S.D.N.Y. June 3, 2019) (declining to enter partial summary judgment because it "would not streamline the trial in any way.")

Summary judgment on Hernandez's prima facie case would be futile because it would not relieve him of his ultimate burden to prove unlawful discrimination; the prima facie case is simply the first step in that inquiry.  It is established that "juries should not be charged on the *McDonnell Douglas* burden shifting framework."  *Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, n.6 (2d Cir. 2012).  Instead, juries are "asked to determine whether plaintiff had met [his] ultimate burden" of proving discrimination.  *Id.  See also Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 118 (2d Cir. 2000).  This is precisely why courts that have addressed motions seeking partial summary judgment on a prima facie case in employment discrimination claims consistently have denied such motions.  *See Miultinovic v. ColorDynamics, Inc.*, No. 4:17-cv-00868, 2019 WL 2094432, at *7 (E.D. Tex. Jan 13, 2014), *report and recommendation adopted*, 2019 WL 2088057 (E.D. Tex. May 13, 2019); *Patterson v. Bakken*, No. 12-cv-706, 2014 WL 123194, at *1 (W.D. Wisc. Jan. 13, 2014).  That same result should obtain here.

## CONCLUSION

For the foregoing reasons, MLB's Cross-Motion for Summary Judgment should be granted, and Plaintiff's Motion for Partial Summary Judgment should be denied.

Dated: New York, New York
June 5, 2020

PROSKAUER ROSE LLP

By: /s/ *Neil H. Abramson*
Neil H. Abramson, Esq.
Adam M. Lupion, Esq.
Rachel S. Philion, Esq.
Rachel S. Fischer, Esq.

Eleven Times Square
New York, New York 10036-8299
Phone: 212.969.3000
Fax: 212.969.2900
nabramson@proskauer.com
alupion@proskauer.com
rphilion@proskauer.com
rfischer@proskauer.com

*Attorneys for Defendants*
THE OFFICE OF THE
COMMISSIONER
OF BASEBALL AND MAJOR
LEAGUE BASEBALL BLUE, INC.