NEIL H. ABRAMSON
ADAM M. LUPION
RACHEL S. PHILION
RACHEL S. FISCHER
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000

*Attorneys for Defendants*
THE OFFICE OF THE COMMISSIONER
OF BASEBALL and MAJOR LEAGUE
BASEBALL BLUE, INC.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGEL HERNANDEZ, <br><br> Plaintiff, <br><br> v. <br><br> THE OFFICE OF THE COMMISSIONER OF BASEBALL and MAJOR LEAGUE BASEBALL BLUE, INC. <br><br> Defendants. | No. 18 Civ. 9035 (JPO) (GWG) |

## DEFENDANTS' COUNTERSTATEMENT TO
## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendants The Office

of the Commissioner of Baseball and Major League Baseball Blue, Inc. (collectively, "MLB"),

hereby responds and submits this Counterstatement to Plaintiff's Statement of Material Facts

submitted in support of Plaintiff's Motion for Partial Summary Judgment.

1.      Plaintiff is a Major League umpire and has been since at least 1993.  Dkt. 52-3, ¶ 2.

**ANSWER TO 1**:  Undisputed.

**I.      MLB has been aware of its well-known diversity problem since 2013, but had done little to fix that problem.**

   **I.      Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

2.      In its entire history up until 2020[1], MLB had only one minority permanent crew chief, Richie Garcia.  Exhibit 2, Declaration of Angel Hernandez, ¶ 2; Excerpts of Deposition of Randy Marsh, attached hereto as Collective Exhibit 3 ("Marsh Dep."), 35:17-36:5.

   **ANSWER TO 2**:  Disputed, unsupported by the evidence, and immaterial.  Plaintiff cites only to a declaration that he submits "on information and belief," and the cited testimony from Randy Marsh does not support Plaintiff's factual assertion.  Marsh testified regarding Garcia's termination and does not mention anything regarding MLB purportedly having only one minority permanent crew chief "[i]n its entire history."  (Declaration of Neil H. Abramson ("Abramson Decl.") Ex. J, Deposition Transcript of Randy Marsh ("Marsh Tr.") 35:17-19 ("Q. Why did Richie Garcia get terminated, do you remember? A. I don't know exactly. . . .").)   This assertion is immaterial because employment decisions in the "entire history" of MLB that preceded Plaintiff's employment does not create an inference of discrimination with respect to the failure to promote Plaintiff or assign him to work the World Series and the assertion therefore is irrelevant to Plaintiff's motion for partial summary judgment.

3.      In fact, the only umpire to be a crew chief prior to the 2017 season but that was not born in America is Jim McKeon, who was born in Canada.  Excerpts of Deposition of Matthew

---

[1] In 2020, MLB, for the first time, promoted an African-American umpire to the crew chief position.  MLB also promoted, for only the second time, a Latino umpire to the crew chief position.  However, as stated in Plaintiff's Motion, the facts recited herein are as of the filing of Plaintiff's original complaint on July 3, 2017 unless otherwise stated.
   **ANSWER TO FOOTNOTE 1**:  Undisputed that for the 2020 season, MLB promoted umpires Kerwin Danley, who is African American, and Alfonso Marquez, who is Latino, to the crew chief position.

McKendry, attached hereto as Exhibit 4 ("McKendry Dep."), 201:23-202:6.

> **ANSWER TO 3**: Disputed, unsupported by the evidence, and immaterial. McKendry testified that Jim McKeon was the only crew chief born outside of the United States that he could identify "off the top of [his] head." (Abramson Decl. Ex. E, Deposition Transcript of Matthew McKendry ("McKendry Tr.") 201:23-202:8.) Because Plaintiff has not cited any evidence supporting this assertion, it should be disregarded. This assertion is immaterial because employment decisions that preceded Plaintiff's employment do not create an inference of discrimination with respect to the failure to promote Plaintiff or assign him to work the World Series and the assertion therefore is irrelevant to Plaintiff's motion for partial summary judgment.

4.     From 2011 to at least the beginning of the 2017 season, Peter Woodfork ("Woodfork") held the role of Senior Vice President Baseball Operations. Excerpts of Deposition of Peter Woodfork, attached hereto as Exhibit 5 ("Woodfork Dep."), 20:5-16. During that time frame, Woodfork reported directly to Joe Torre. *Id.*

> **ANSWER TO 4**: Undisputed.

5.     In 2013, Scott Freedman, an MLB employee, sent to Peter Woodfork ("Woodfork") a detailed presentation. *See* Exhibit 6, at DEF 015067. The document in question, titled "2013 Department Overview," contained a slide titled "Active Umpire Demographics." *Id*. at DEF 015070. That slide gives an overview of umpires' demographics at the time, and indicates that only 7% of Major League umpires were minorities. *Id*.

> **ANSWER TO 5**: Undisputed that on August 1, 2013, Scott Freedman, an employee in MLB's Labor Relations Department, sent Peter Woodfork a document entitled Umpire Department Overview ("Umpire Department Overview") that included a slide titled

"Active Umpire Demographics," which speaks for itself and is the best evidence.

6.     Various MLB umpire executives were asked about the "2013 Department Overview" document in their depositions.  Randy Marsh ("Marsh") testified that the 7% number listed in that document for minority MLB umpires "could be better." Marsh Dep., 63:5-23. Woodfork testified that he "felt [MLB] could have improvement in that area." Woodfork Dep., 171:7-23; *see generally id.* at 170:21-174:7.

> **ANSWER TO 6**:  Undisputed that Marsh and Woodfork testified regarding the contents
> of the Umpire Department Overview, and their testimony speaks for itself and is the best
> evidence.

7.     The 2013 Umpiring Department Overview also indicates that the NBA had 48% minority referees in 2012 and that the NFL had approximately 40% minority referees in 2010. Exhibit 6, DEF 015117 and DEF 015122; Woodfork Dep., 206:6-209:6; Marsh Dep., 98:25-99:22. MLB's 7% is better than only the NHL's 1% minority rate.  Exhibit 6 at DEF 015128.

> **ANSWER TO 7**:  Disputed, unsupported by the evidence, and immaterial.  As referenced
> on the NFL Referee Demographics slide of the Umpire Department Overview (Pl. Ex. 6,
> Dkt. 142-7 at DEF15122), the minority percentage of NFL Referees was an unverified
> estimate as of January 1, 2010.  (*Id.* at DEF15122 ("**Estimated by Rich Riker as of
> 1/10/2010"); Abramson Decl. Ex. D, Deposition Transcript of Peter Woodfork
> ("Woodfork Tr.") 206:15-207:19 ("I think, again, that's the issue with this document. . . .
> It's flowing between two different time frames.").)  Woodfork testified that he was
> therefore "not sure how much of [the data was] accurate as we need it to be."  (Woodfork
> Tr. 207:25-208:4.)  The assertion is immaterial because the demographic composition of
> non-party employers' workforces does not create an inference of discrimination with

respect to the failure to promote Plaintiff or assign him to work the World Series and the assertion therefore is irrelevant to Plaintiff's motion for partial summary judgment.

8.      The "2013 Department Overview" document was a revision of a document originally created in or around 2011.  Woodfork Dep., 167:19-170:20.

**ANSWER TO 8**: Disputed, unsupported by the evidence, and immaterial.  Woodfork testified that he believed the Umpire Department Overview was "an update of a document . . . that previously had been done" in 2011.  (Woodfork Tr. 169:9-19.)  Woodfork did not testify regarding, nor is there any evidence demonstrating, which slides were revisions of the 2011 presentation or which were added in 2013.  The assertion is immaterial because whether or when the Umpire Department Overview was revised does not create an inference of discrimination with respect to the failure to promote Plaintiff or assign him to work the World Series and the assertion therefore is irrelevant to Plaintiff's motion for partial summary judgment.

9.      Despite the numbers reflected in the 2013 Department Overview document, Manfred refused to acknowledge that MLB has a diversity problem.  *See*, *e.g.*, Collective Exhibit 7, Excerpts of Deposition of Robert Manfred ("Manfred Dep."), 68:22-70:14, 74:16-75:16.

**ANSWER TO 9**:  Disputed, unsupported by the evidence, and improper argument.  Commissioner Manfred did not "refuse to acknowledge that MLB ha[d] a diversity problem."  In response to a question regarding MLB's diversity efforts, Commissioner Manfred explained that MLB is constantly making efforts to improve its diversity.  (Abramson Decl. Ex. F, Deposition Transcript of Robert Manfred ("Manfred Tr.") 74:21-75:16 ("You know, we are out there working on the issue of diversity whether we think we have a problem in a particular spot or not.").)  Moreover, the testimony Plaintiff cites was

not in response to "the numbers reflected" in the Umpire Department Overview.

10.     A September 15, 2013 email from Matt McKendry ("McKendry") to Woodfork contains the message "[h]ere is the information you were asked about last night . . ." and then proceeds to list (i) the number of minority umpires on the staff for the 2003-2013 seasons, (ii) the number of postseason assignments MLB has given those minority umpires in those seasons, and (iii) the specific postseason assignments given to those umpires in those seasons.  Exhibit 8 at DEF 015066.

> **ANSWER TO 10**:  Undisputed and immaterial.  Undisputed that McKendry sent an email to Woodfork on September 15, 2013, and that document speaks for itself and is the best evidence.  The assertion is immaterial because, to the extent it concerns employment decisions not challenged in the complaint and barred by the applicable statutes of limitation, it does not create an inference of discrimination with respect to the failure to promote Plaintiff or assign him to work the World Series and therefore is irrelevant to Plaintiff's motion for partial summary judgment.

11.     In his deposition, Woodfork asserted ignorance as to the purpose of this email and why he was "asked about" minority umpires and their postseason assignments.  Woodfork Dep., 161:20-164:7.

> **ANSWER TO 11**:  Disputed, unsupported by the evidence, and immaterial.  Woodfork testified that he could not recall the purpose of this email, which was sent nearly six years before Woodfork's deposition.  (Woodfork Tr. 161:20-162:2.)  The assertion is immaterial because, to the extent it concerns employment decisions not challenged in the complaint and barred by the applicable statutes of limitation, it does not create an inference of discrimination with respect to the failure to promote Plaintiff or assign him to work the

World Series and therefore is irrelevant to Plaintiff's motion for partial summary judgment.

12. As that September 15, 2013 email shows, at least one minority umpire was selected for a World Series in five out of the eight years before Joe Torre's ("Torre") tenure at MLB began in 2011. Exhibit 8 at DEF 015066.

> **ANSWER TO 12**: Undisputed that based on the cited email, which speaks for itself and is the best evidence, at least one minority umpire served in the World Series in the years 2004, 2005, 2006, 2007, and 2008. This assertion is immaterial because, to the extent it concerns employment decisions not challenged in the complaint and barred by the applicable statutes of limitation, it does not create an inference of discrimination and therefore is irrelevant to Plaintiff's motion for partial summary judgment.

13. During the years 2011-2016 (during which Torre was in charge of MLB's umpire department), a minority umpire was only given a World Series assignment twice: Alfonso Marquez received World Series assignments in both 2011 and 2015. Exhibit 2, Declaration of Angel Hernandez, ¶ 3.

> **ANSWER TO 13**: Undisputed that from the years 2011 through 2016, Alfonso Marquez was the only minority umpire to serve in the World Series and that he served in the years 2011 and 2015. The assertion is incomplete because Torre remained in charge of the umpiring department after 2016. (Declaration of Joe Torre ("Torre Decl.") ¶ 9; Abramson Decl. Ex. C, Deposition Transcript of Joe Torre ("Torre Tr.") 19:16-20:13.)

14. Neither Hernandez, Kerwin Danley or any other minority umpire (other than Marquez) received a World Series assignment from 2011-2016, despite Hernandez and Danley being two of the most senior umpires on the staff and both having extensive postseason experience prior to 2011. *See* Exhibit 9 at DEF 007654; Exhibit 10, DEF 008083.

**ANSWER TO 14**: Disputed, unsupported by the evidence, and improper argument. Undisputed that Hernandez and Danley did not receive a World Series assignment from 2011-2016. Disputed as improper argument that World Series assignments in those seasons was "despite" Hernandez's and Danley's seniority and postseason experience in that it ignores record evidence regarding the actual qualifications considered in determining World Series selections: each umpire's performance for that year, with the goal of putting the highest performing umpires in the World Series. (Torre Decl. ¶ 16; Torre Tr. 31:7-13; Woodfork Tr. 44:4-19, 67:21-68:25, 213:4-6; Manfred Tr. 33:11-16.) Plaintiff also ignores that an umpire's performance is valued above his seniority. (Torre Tr. 153:23-154:15; Woodfork Tr. 191:2-15; Marsh Tr. 47:25-48:4.) Disputed and unsupported by the evidence that Plaintiff and Danley had "extensive postseason experience prior to 2011." The exhibit Plaintiff cites does not reference Danley and shows multiple umpires with as much as or more postseason experience than Plaintiff.

II. **The path to becoming a Major League umpire is riddled with obstacles that are particularly difficult for minority umpire candidates to overcome.**

II. **Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed, unsupported by the evidence, and irrelevant because Plaintiff's claims do not concern MLB's hiring decisions.**

15. MLB does not begin to oversee umpires' career progression until they begin officiating baseball games at the AAA level. *See* Marsh Dep., 21:7-11. Before that time, umpires must progress through the rookie level of minor league baseball, then to A ball, and then to AA ball. *Id.* at 25:2-12; Woodfork Dep., 188:7-20. At those initial three levels, a for-profit corporation that is separate and distinct from MLB is involved in deciding which umpires get promoted from those earlier three levels and which do not. *See* Marsh Dep., 27:9-21, 69:23-70:4; Excerpt of Deposition of Joe Torre, attached hereto as Exhibit 11 ("Torre Dep."), 172:24-173:21; Woodfork

Dep., 176:24-178:17; Manfred Dep., 58:8-14.

> **ANSWER TO 15**: Disputed and immaterial. Disputed to the extent the assertions contained in Paragraph 15 suggest that MLB is responsible for employment decisions at the AAA level. Undisputed that MLB is not involved in employment decisions for minor league umpires at any level. Immaterial because Plaintiff's assertions regarding the hiring and promotion of minor league umpires are irrelevant to Plaintiff's motion for partial summary judgment because his claims do not concern employment decisions at the minor league level, which MLB does not control. (Woodfork Tr. 177:2-6, 178:18-22)

16.    MLB has only limited financial involvement in minor league baseball. *See* Manfred Dep., 59:9-20.

> **ANSWER TO 16**: Disputed, unsupported by the evidence, and immaterial. Commissioner Manfred testified that MLB subsidizes minor league baseball and that the arrangement is "complicated." (Manfred Tr. 59:9-20.) This assertion is irrelevant to Plaintiff's motion for partial summary judgment, which does not concern the financial arrangement between MLB and the minor leagues.

17.    Though MLB purports to be concerned with diversity, the only attempt to rectify its admitted umpire diversity problem as to umpires is by inviting minority umpire candidates to umpire camps. Marsh Dep., 22:9-14; *see also id.* at 105:17-107:22; Torre Dep., 24:8-22, 178:21-180:15; Woodfork Dep., 209:17-214:25.

> **ANSWER TO 17**: Disputed, unsupported by the evidence, and immaterial. Woodfork testified that MLB has also made efforts to form strategic partnerships with the armed forces and universities to recruit diverse candidates. (Woodfork Tr. 209:23-211:7; *see also* Marsh Tr. 102:3-8.) Commissioner Manfred also described MLB's "scholarshipping

candidates in order to improve the pipeline of candidates so that [MLB] had more qualified minority candidates." (Manfred Tr. 60:10-21; *see also id.* 14:8-16; Marsh Tr. 22:9-14, 67:22-68:10.) Disputed and unsupported by the evidence Plaintiff's assertion that MLB has an "admitted umpire diversity problem." The assertion is irrelevant to Plaintiff's motion for partial summary judgment, because Plaintiff's claims do not concern hiring decisions at the minor league level, which MLB does not control.

18. MLB has never conducted an investigation to determine whether minority minor league umpires are treated the same as white minor league umpires. Manfred Dep., 60:5-61:10.

**ANSWER TO 18**: Undisputed and immaterial. This assertion is irrelevant to Plaintiff's motion for partial summary judgment, which does not concern the alleged treatment of minor league umpires.

19. Most minor league umpires get paid only $12,000-$15,000 over a six-month period, with a maximum salary of only $21,000. Exhibit 6 at DEF 015072; Marsh Dep., 70:14-17; Torre Dep., 173:22-174:15, 177:23-178:20; Woodfork Dep., 179:16-180:9.

**ANSWER TO 19**: Undisputed and immaterial. This assertion is irrelevant to Plaintiff's motion for partial summary judgment, which does not concern compensation of minor league umpires.

20. Commissioner Robert Manfred ("Manfred") testified that he "can't imagine" why the process of becoming a Major League umpire "would be harder on one racial group than another." Manfred Dep., 65:6-17.

**ANSWER TO 20**: Disputed, unsupported by the evidence, and immaterial. Commissioner Manfred testified that he was not aware of any analysis as to whether the time it takes for a minor league umpire to reach the Major Leagues has a more detrimental

effect on minorities. (Manfred Tr. 65:6-17.) He further testified that he "can't imagine why a long difficult process [of becoming a Major League umpire] would be harder on one racial group than another." (*Id*.) This assertion is immaterial to Plaintiff's motion for partial summary judgment, which does not concern the length of time it takes for a minor league umpire to reach the Major Leagues.

21. The Basic Agreement between The Office of the Commissioner and the World Umpires Association (the "CBA"), states that "[u]mpires are hired at the absolute and exclusive discretion of the Commissioner's Office." Exhibit 12, Basic Agreement Between The Office of the Commissioner and World Umpires Association, at DEF 01362; Exhibit 13, January 1, 2010 to December 31, 2014 Basic Agreement Between The Office of the Commissioner and World Umpires Association, at DEF 001209; Marsh Dep., 74:5-75:11; Exhibit 6 at DEF 015073. The 2013 Umpire Department Overview states that "quantitative" data is only sometimes used. *See* Exhibit 6 at DEF 015073; Marsh Dep., 75:12-76:19.

> **ANSWER TO 21**: Undisputed and immaterial. Undisputed that the quoted language appears in the Basic Agreement, which speak for itself and is the best evidence. Undisputed that the Umpire Department Overview states that "quantitative data such as AAA evaluations and ZE scores is sometimes used" in MLB's evaluation of Major League umpire applicants. These assertions are immaterial to Plaintiff's motion for partial summary judgment, because Plaintiff's claims do not concern MLB's hiring decisions.

22. When asked to acknowledge that with the current process "Major League Baseball has no power whatsoever to increase the level of minorities until they get to AAA," Marsh answered as follows:

> Yes, but let me explain something. Having taught at umpire school, I know that every year, Harry Wendelstedt, sent, contacted, the athletic directors at many major

colleges and schools that had – that was mostly African American students and sent brochures, everything, trying to get them to come to umpire school. The problem is, yeah, **they** want the job, ***but they want to be in the big Leagues tomorrow, and they don't want to go through all of that.***

Marsh Dep., 100:17-101:8 (emphasis added).

**ANSWER TO 22**: Undisputed and immaterial. Undisputed that Marsh's testimony is accurately quoted, and that his testimony speaks for itself and is the best evidence. This assertion is irrelevant to Plaintiff's motion for partial summary judgment, because Plaintiff's claims do not concern MLB's hiring decisions. The assertion is also immaterial because Marsh is not a decision-maker with respect to hiring decisions. (Torre Tr. 22:6-12, 28:6-9; Woodfork Tr. 23:12-15; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17.)

23. Per the CBA, "the Office of the Commissioner shall, after soliciting written expressions of interest from umpires and consulting with the Union, appoint an umpire to act as the crew chief for each of the crews formed for the championship seasons." *See* Exhibit 12 at DEF 001363.

**ANSWER TO 23**: Undisputed that the language quoted in Paragraph 23 is contained in the Basic Agreement, which speaks for itself and is the best evidence.

24. "The crew chief shall coordinate and direct his crew's compliance with the Office of the Commissioner's rules and policies." *Id.* at DEF 001364. Once promoted to the crew chief position, umpires continue in that position unless removed. *Id.* MLB has not removed an umpire from the crew chief position since Marsh first entered the league as an umpire. Marsh Dep., 103:16-21. Crew chiefs are paid an extra $100 per game for each game in which they are the crew chief of their respective crew, among other benefits. Ex. 12 at DEF 001364.

**ANSWER TO 24**: Disputed as to the first sentence of Paragraph 24, which is an

incomplete description of crew chief duties.  Additional crew chief responsibilities include: (i) making all final decisions as to on-field issues; (ii) maintaining communication with the head groundskeeper; (iii) deciding whether a game must be delayed or forfeited; (iv) discussing all matters with the media; (v) encouraging, initiating, and leading crew discussion of situations, plays and rules; (vi) ensuring each umpire timely checks his MLB email; (vii) ensuring each umpire timely files all required reports; (viii) and reporting any suspected non-compliance with MLB baseball rules and regulations to the Office of the Commissioner. (Abramson Decl. Ex. A, Deposition Transcript of Angel Hernandez, Day 1 ("Pl. Tr.") 34:21-35:8, 36:23-25; Pl. Ex. 12, Dkt. 142-13 at DEF1364; Pl. Ex. 13, Dkt. 142-14 at DEF1211; Declaration of Matthew McKendry ("McKendry Decl.") Ex. B at DEF2557-58; McKendry Decl. Ex. C at DEF1093.)  Undisputed that the second sentence of Paragraph 24 purports to quote from the Basic Agreement, which is the best evidence and speaks for itself.  Undisputed and immaterial as to the third sentence of Paragraph 24 that Marsh could not recall any crew chiefs who had been fired for bad performance since Marsh had started as an Major League umpire.  That assertion is immaterial because whether MLB has removed an umpire from a crew chief position is irrelevant to Plaintiff's motion for partial summary judgment.  Undisputed and immaterial as to the fourth sentence of Paragraph 24 that crew chiefs receive a monetary bonus of one hundred dollars ($100.00) per each game worked as a crew chief regardless of whether they are a permanent or interim crew chief.  (Pl. Tr. 85:10-15; Pl. Ex. 12, Dkt. 142-13 at DEF1364; Pl. Ex. 13, Dkt. 142-14 at DEF1211; Torre Tr. 158:23-159:3.)  This assertion is immaterial to Plaintiff's motion for partial summary judgment, which does not concern compensation paid to interim or permanent crew chiefs.

25.     The CBA states that "[w]hile the Office of the Commissioner may consider seniority along with other factors that it may deem appropriate when exercising its appointment discretion, seniority shall not control in the Office of the Commissioner's choice of crew chiefs." *Id*. at DEF 001363. The CBA is otherwise silent on what specific criteria or factors MLB considers when determining which umpires will be promoted to crew chief. See generally Exhibit 12.

> **ANSWER TO 25**: Undisputed that the quoted language in the first sentence of Paragraph
> 25 appears in the Basic Agreement, which speaks for itself and is the best evidence.
> Disputed as to the second sentence in Paragraph 25. The Basic Agreement states that it
> may rely on "factors that it may deem appropriate," and that "the Office of the
> Commissioner must, if requested, furnish to each umpire who has expressed interest but
> who is not selected a written statement of the reason(s) why the umpire was not chosen."
> (Pl. Ex. 12, Dkt. 142-13 at DEF1363-64; Pl. Ex. 13, Dkt. 142-14 at DEF1210-11.)

**III.     MLB has never consistently explained what factors it *actually* considers when determining which umpires to promote to the crew chief position, and MLB's failure to consider objective data in making those decisions leaves room for unmitigated discrimination against minority Major League umpires.**

> **III. Plaintiff's heading should not be viewed as asserting a fact, but to the extent that
> it is considered, the statement is disputed and unsupported by the evidence.**

26.     In its sworn answers to Plaintiff's interrogatories, MLB states as follows:

> In making crew chief selections, the Office of the Commissioner considers the
> umpire's performance in the most recent season as well as the length and
> consistency of his career contributions. The Office of the Commissioner relies on
> a variety of facts, including but not limited to:
>
> •     Leadership skills, including situation management, maintaining an
>       appropriate pace-of-game, on-field presence, demeanor, hustle, focus, and
>       integrity;
>
> •     Overall quality of performance, including strike zone accuracy,
>       made/missed calls, ability to properly enforce the Replay Regulations and
>       Procedures on the field and as a Replay Official, how much or how often

umpires exceeds/does not meet expectations, keeping the focus of the game on the field, and agility and position accuracy in getting the appropriate angle on calls;

- Fulfillment of duties and responsibilities, including attendance and the umpire's adherence to the Four-Umpire System, as well as other mandates of the Major League Baseball Umpire Manual, the Official Playing Rules, Replay Regulations and the Basic Agreement; and

- Initiative, including whether the umpire takes the initiative to train and mentor junior umpires.

Exhibit 14. This same non-exhaustive list is also cited to by MLB in its letters to crew chief applicants who were not selected to be promoted to the crew chief position. *See*, *e.g.*, Exhibit 15, DEF 001501 – DEF 001503; *see also* Exhibit 16, DEF 001499 – DEF 001500.

**ANSWER TO 26**: Undisputed that Response #4 in Defendants' Objections and Responses to Plaintiff's First Set of Interrogatories, which speaks for itself and is the best evidence, contains the quoted list of considerations for crew chief cited in Plaintiff's assertion. Undisputed that that same language appears in the letters MLB sent to Plaintiff after he requested a written statement of the reasons why he was not selected to crew chief in 2011 and 2017 (except that the 2011 letter did not identify functioning as a Replay Official because replay did not exist in 2011), and those letters speak for themselves and are the best evidence.

27.     Torre is the individual at MLB who made the final decision on crew chief promotions. Woodfork Dep., 23:16-24. Torre testified that an umpire's ability is not the most important aspect of an umpire's job, and that the most important aspect of that job is actually "[h]aving the skills to handle situations." Torre Dep., 82:10-19; Marsh Dep., 198:20-199:20.

**ANSWER TO 27**: Undisputed as to the first sentence in Paragraph 27. Undisputed as to the second sentence in Paragraph 27 that Torre testified that an umpire's situation-handling

skills are more important than the type of technical ability referenced in the summary of the document that was the subject of the question. (Pl. Ex. 25, Dkt. 142-26 at DEF1514; Torre Tr. 81:24-82:22.) The assertions in Paragraph 27 are incomplete because Torre testified that he also considers factors such as leadership, being an educator, being a role model, being able to move on from mistakes, and consistency. (*Id*. 139:16-140:7, 142:18-143:2.)

28. Woodfork testified that Torre "focuses on leadership" in making crew chief promotion decisions. Woodfork Dep., 27:7-13. Woodfork testified that "consistency," "accountability," and "experience" were other factors considered by Torre in making crew chief promotion decisions. *Id*. at 27:17-25. The number of games in which an umpire serves as interim crew chief is also "important" and "part of the decision-making" process for crew chief promotions. Torre Dep., 197:22-199:7; *see also* Woodfork Dep., 136:24-139:22. Torre testified that the duties of an interim crew chief were the same as the duties of a permanent crew chief. Torre Dep., 37:15-18; *see also* Marsh Dep., 54:16-25, 218:8-18.

**ANSWER TO 28**: Undisputed as to the first two sentences of Paragraph 28. Woodfork's testimony, which speaks for itself and is the best evidence, states that Torre focuses on the factors of leadership, consistency, accountability, and experience, with the goal of reaching a determination as to the "total evaluation of the umpire." (Woodfork Tr. 27:10-25.) Undisputed as to the third sentence of Paragraph 28. Torre testified that "[t]he number of games of the crew chief is important; it's part of the decision-making." (Torre Tr. 199:5-7.) Torre also testified that "[t]here's more to it than just the number of games; it's the consistency of behavior and consistency of what's needed by a leader." (Torre Tr. 142:18-21; *see also* Woodfork Tr. 62:4-9 ("One of those – one of those factors [considered] is how

he performs as an interim crew chief."); McKendry Tr. 215:9-14 ("[W]hile number of opportunities as an interim crew chief is a factor that's considered, the quality of the work when you're working in that role is a more important factor.")).  Undisputed and immaterial as to the last sentence of Paragraph 28.  Torre's testimony, which speak for itself and is the best evidence, states that the duties of an interim crew chief are the same as the duties of a permanent crew chief.  This assertion is immaterial to Plaintiff's motion for partial summary judgment because qualifications for permanent crew chief are different than interim crew chief and part of the evaluation of permanent crew chief applicants is the quality of performance in the interim crew chief role.  (Torre Decl. ¶¶ 14, 33; McKendry Tr. 204:20-205:2; Woodfork Tr. 61:24-62:9, 70:8-22.)

29.    Woodfork identified "staying above the fray, handling situations, [and] being a positive influence" as "leadership skills."  Woodfork Dep., 29:2-25.

**ANSWER TO 29**: Undisputed that Woodfork's testimony, which speaks for itself and is the best evidence, identifies these factors as leadership skills.  Woodfork identified these factors as "just some . . . examples" of the leadership skills.  (Woodfork Tr. 29:2-25.)

30.    The testimony of Torre and Woodfork shows that many of the factors listed by MLB in their interrogatory answers were not actually considered by them in making crew chief promotion decisions.  *See* ¶ 26, *supra*.

**ANSWER TO 30**: Disputed, unsupported by the evidence, and improper argument.  Both Torre and Woodfork testified that they consider multiple factors, including those set forth in Defendants' Answer to Interrogatory # 4, in making crew chief determinations, including objective data regarding an umpire's on-field performance, as well as leadership, consistency, work experience, and other factors, with the ultimate goal of choosing the best

umpires for that role. (Woodfork Tr. 23:22-24:9, 25:4-14, 27:17-28:25; 33:4-9; Torre Tr. 139:16-140:7, 142:18-143:2.).

31.     In his deposition, Woodfork described the crew chief promotion process as follows:

I think the process is more fluid than the – the one day you're established as a crew chief or you apply as a crew chief, this information, as I said, I look at part of the midyear process, part of the year end process and part of the daily, weekly phone calls that we have to discuss umpiring, discuss our umpires' performance, all of that continual information, it's continuous. And we're making our decisions.

It's not a slash one moment, one day decision; this is a fluid decision that happens over time. People improve and you provide feedback and you understand these things. And I think that's probably the disconnect we're having.

I reviewed, I understand the midyear reviews, I understand the umpires, I understand how they're performing on a day-to-day basis.

Woodfork Dep., 35:23-36:19.

**ANSWER TO 31**: Disputed and not supported by the evidence. The testimony cited in paragraph 31 was not a description of "the crew chief promotion process." The testimony cited was in response to a question as to what information Woodfork reviews "when [he] come[s] to [his] own decision as to who should be promoted to crew chief." (Woodfork Tr. 34:24-35:3.)

32.     Neither Torre nor Woodfork review the individual game evaluations (discussed in more detail below). *See*, *e.g.*, Woodfork Dep., 26:2-17.

**ANSWER TO 32**: Disputed and unsupported by the evidence cited. In the testimony cited, Woodfork states that he does not review individual game evaluation reports at the time he decides who should be promoted to crew chief.

33.     Woodfork testified that he did not review Mid-Year and Year-End evaluations in connection with making crew chief promotion decisions. Woodfork Dep., 31:24-32:25.

Woodfork instead relied on his memory, "feelings" about or "understanding" of an umpire's performance in making crew chief promotion decisions. *Id*.; *see also* Woodfork Dep., 35:23-36:19.

> **ANSWER TO 33**:  Disputed and unsupported by the evidence.  Woodfork testified that when making crew chief determinations he had "seen midyear evaluations previously" and "reviewed them all before they've gone out." (Woodfork Tr. 32:4-25.)  He also testified that he had "a strong feeling" of umpires' evaluations because he has "seen year-end evaluations through the process, which is usually coinciding with the process of looking at crew chief reviews." (*Id.*)  He testified in response to the specific question if he reviewed mid-year and year-end evaluations "when [he] decide[s]," by stating "usually not." (Woodfork Tr. 32:19-25.)  Woodfork testified that in making crew chief decisions, he relies on "part of the midyear process, part of the yearend process and part of the daily, weekly phone calls that we have to discuss umpiring, discuss our umpires' performance, all of that continual information, it's continuous. . . . I reviewed, I understand the midyear reviews, I understand the umpires, I understand how they're performing on a day-to-day basis." (Woodfork Tr. 35:23-36:19.)

34.     Though MLB began comparing crew chief candidates' performances after the filing of this lawsuit, no document produced by MLB indicates that such a process was used before this lawsuit was filed.  *See* Exhibit 17, DEF 008050 – DEF 008066; Woodfork Dep., 217:25-219:2; *see also* Marsh Dep., 147:15-25.

> **ANSWER TO 34**:  Disputed and unsupported by the evidence.  The testimony cited does not support Plaintiff's assertion that "MLB began comparing crew chief candidates' performances after the filing of this lawsuit," but rather that the witnesses could not recall

a PowerPoint compilation prior to 2018. Plaintiff's assertion that MLB did not compare crew chief candidates' performance before 2017 is contradicted by the evidence. (*See* Woodfork Tr. 61:8-19 ("I think the umpires we selected we thought were going to perform the best in the crew chief role."); McKendry Tr. 137:13-20, 198:11-18 ("[E]ach applicants' entire resume is discussed")).

35. Yet, Woodfork himself admitted in his deposition that, to know Plaintiff's "performance as it relates to year by year," he would need to "look at [Plaintiff's] reviews." Woodfork Dep., 190:12-25. Indeed, Woodfork testified that he could not "recall" or otherwise testified that he had no knowledge of rudimentary elements of Plaintiff's job performance, such as whether Angel "submits timely umpire reports," whether Plaintiff "stays in communication with the Office [of the Commissioner] when he's supposed to, or whether Plaintiff "is one of the most physically fit umpires." *Id*. at 198:12-200:11.

**ANSWER TO 35**: Disputed as to the first sentence in Paragraph 35 and disputed that Woodfork's testimony is an "admission." Woodfork testified at his deposition in June 2019 that to explain Plaintiff's "performance as it relates to year by year" between 2011 and 2016 he would have to look back at Plaintiff's reviews. (Woodfork Tr. 190:20-23.) Disputed as to the second sentence in Paragraph 35. Disputed that Woodfork was unable to recall whether Plaintiff stays in communication with MLB and whether he is "one of the most physically fit umpires." Woodfork testified that "[a]s far as [he] know[s]," Plaintiff stays in communication with MLB (Woodfork Tr. 198:19-23) and that he would "have to look" if Plaintiff was one of the most physically fit umpires on the Major League umpire staff. (Woodfork Tr. 199:17-21.) Disputed as to Plaintiff's improper characterization that Woodfork had "no knowledge" of these factors or that they constitute "rudimentary

elements of Plaintiff's job performance." Undisputed that Woodfork's testimony, which speaks for itself and is the best evidence, states that Woodfork was unable to recall whether Plaintiff submits timely umpire reports to MLB. (Woodfork Tr. 198:16-18.)

**IV.** **MLB has a diversity policy, but MLB umpire executives testified that they had minimal knowledge of that diversity policy's requirements and that the diversity policy did not influence their decision-making regarding crew chief promotion and World Series assignment decisions.**

    **IV.** **Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

36.    MLB has a diversity policy contained in its employee handbook (the "Diversity Policy"). *See* Exhibit 18, at DEF 026058-26302.

**ANSWER TO 36**: Undisputed.

37.    The Diversity Policy states that "Major League Baseball provides equal employment opportunities (EEO) to all employees for employment without regard to race, ancestry, [or] color . . . (*id*. at DEF 026073) and further states that the diversity policy applies "to *all* applicants, employees, contractors, and interns, whether related to conduct engaged in by fellow employees, supervisors, directors, managers, contractors, interns, or someone not directly connected to Major League Baseball . . ." (*id*. at DEF 026075 (emphasis added)).

**ANSWER TO 37**: Undisputed that MLB's 2019 Employee Handbook, which speaks for itself and is the best evidence, contains the language cited in Paragraph 37.

38.    The Diversity Policy applies to The Office of the Commissioner. Manfred Dep., 38:6-39:12.

**ANSWER TO 38**: Undisputed.

39.    When asked whether there was a diversity policy "as it relates to the hiring and promotion of umpires," Torre stated that he did not "know how to answer that" question. Torre

Dep., 21:22-22:21.  Torre further testified that while the diversity policy discussed above applies to him, "[i]t really doesn't influence [his] job."  Torre Dep., 26:3-20.

> **ANSWER TO 39**:  Disputed and unsupported by the evidence.  Torre testified that he did not "know how to answer" whether there was a diversity policy relating to the hiring and promotion of umpires in 2011.  (Torre Tr. 21:22-22:2.)  Torre testified that he is aware of MLB's diversity policy and that it applies to him.  (Torre Tr. 26:3-17.)  Torre explained that the diversity policy ensures that "it's a level playing field" in terms of promotions, but that it does not somehow *require* MLB to promote minority umpires.  (Torre Tr. 27:7-28:5; *see also* Manfred Tr. 22:25-23:7 ("Well, equal employment opportunity . . . does not assure that you're going to have a particular outcome in terms of who gets the job; it's that you treat people fairly.")).  Torre testified that the diversity policy does not influence his job with respect to hiring specifically, because "[a]s far as their elevation from the Minor Leagues, that is recommended by supervisors who see these umpires perform and they spend -- during the course of the season, we have injuries where we have fill-in umpires, but they mainly come from our AAA level.  But I don't really -- I don't see them at all other than at the Major League level."  (Torre Tr. 26:18-27:6.)

**V.      MLB's failure to actually consider objective data in making World Series assignment decisions leaves room for unmitigated discrimination against minority Major League umpires.**

> **V.      Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

40.      When determining which umpires to assign to the World Series, Woodfork testified that MLB looks "at performance, both, in the current season and past performance and consistency in the umpires."  Woodfork Dep., 67:23-68:2.

> **ANSWER TO 40**:  Disputed as incomplete.  Undisputed that Woodfork's testimony,

which speaks for itself and is the best evidence, identifies the non-exhaustive factors quoted in Paragraph 40.  Woodfork also testified that MLB considers diversity, overall consistency, whether the umpire has worked other Special Event assignments (including previous appointments to the World Series), whether the umpire needs time off, and ensuring that other high-performing umpires are available for other post-season games.  (Woodfork Tr. 44:4-19, 67:10-68:25.)

41.     Torre testified that MLB looks at the umpires' "combination [of] experience and performance for the year," as evidenced by that umpires' evaluations for the year in question, when determining which umpires will be assigned to the World Series.  Torre Dep., 31:7-16.  Torre specifically pointed to the Mid-Year Evaluation as an evaluation MLB utilizes in making World Series selections.  Torre Dep., 34:22-35:17.  Torre also confirmed that seniority is a factor in making World Series assignment decisions.

**ANSWER TO 41**:  Undisputed as to the first sentence of Paragraph 41, that Torre's testimony, which speaks for itself and is the best evidence, identified the factors quoted in the first sentence of Paragraph 41.  Vague as to the meaning of "umpires' evaluations" in Plaintiff's assertion and the cited testimony because the witness answered a question as to evaluations generally without reference to the type of written evaluation, if any, or particular year.  Torre also reviews which umpires have been in the World Series and other post season events previously, and tries to include at least one umpire who has never served in the World Series before, as long as that umpire has earned that right.  (Torre Tr. 38:7-39:7, 41:9-42:4.)  Disputed and unsupported by the evidence as to the second sentence of Paragraph 41.  Torre testified that year-end evaluations are not available at the time of MLB's post-season selection determinations, but that mid-year evaluations are available at

that time. (Torre Tr. 35:6-17.) Torre did not testify that mid-year evaluations are "utilized" in making World Series selections. (*Id.*) Undisputed as to the third sentence of Paragraph 41. Torre stated that seniority is not the controlling factor in MLB's World Series determinations. (Torre Tr. 153:23-154:15.)

42.     Marsh stated in his deposition that "seniority, [and] special event experience" were considered, and that "[s]upervisor evaluations that include assessment of leadership skills, [and] overall quality of performance fulfillment of duties and responsibilities" were also considered in making World Series assignment decisions. Marsh Dep., 80:8-82:14.

> **ANSWER TO 42**: Undisputed and immaterial. Marsh's testimony speaks for itself and is the best evidence. This assertion is immaterial because Marsh's understanding of the criteria to be selected for World Series assignments is not relevant to Plaintiff's motion for partial summary judgment, as Marsh was not a decision-maker with respect to any challenged employment decision. (Torre Tr. 22:6-12, 28:6-9; Woodfork Tr. 23:12-15; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17.)

43.     Woodfork testified that MLB's "chief diversity officer" does not get involved in the promotion of umpires to crew chief or the selection of umpires to the World Series. Woodfork Dep., 203:24-204:17.

> **ANSWER TO 43**: Undisputed and immaterial. Undisputed that Woodfork's testimony, which speaks for itself and is the best evidence, states that MLB's Chief Diversity Officer does not get involved in the promotion process of umpires or in World Series selection determinations. This assertion is immaterial because the involvement or lack of involvement of MLB's Chief Diversity Officer in MLB's crew chief promotion and World Series selection determinations does not create an inference of discrimination with respect

to the failure to promote Plaintiff or assign him to work the World Series and the assertion therefore is irrelevant to Plaintiff's motion for partial summary judgment.

## VI.    Overview of MLB's Umpire Evaluation System.[2]

**VI.    Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed to the extent it implies that the paragraphs that follow constitute an accurate "overview" of MLB's umpire evaluation processes.**

44.    Umpire evaluation reports ("UERs") are completed by umpire supervisors or observers for each umpire regarding each of the games that the supervisors or observers actually observe.  Marsh Dep., 158:4-6.  The UERs give umpire supervisors and observers the opportunity to evaluate an umpire's performance for each game they observe in a number of different areas, including "Focus," "Hustle/Mobility," "Professionalism," "MLB Procedures," "Official Baseball Rules and Interpretations," "Ejections and Situation Management," "Application of Pace of Game Procedures," "Style and Form of Calls," and "Four-Umpire Mechanics."  *See*, *e.g.*, Collective Exhibit 26, 2011 UERs for Angel Hernandez.  For each of those areas, umpires receive a rating of "Meets Standard," "Does Not Meet Standard," or "Exceeds Standard."  *Id*.  Supervisors at times also provide written comments relating to one or more of those evaluation areas, though they are not required to do so.  *See generally id*.

**ANSWER TO 44**: Disputed as to the first sentence of Paragraph 44 and unsupported the evidence.   Field Evaluation Forms, which Plaintiff calls "UERs," are completed and submitted only for games that a supervisor or field observer observes in person, which

---

[2] Plaintiff's 2002-2005 Mid-Year and Year-End Evaluations are attached hereto as Collective Exhibit 19, his 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 20, his 2006-2009 Year-End Evaluations are attached hereto as Exhibit 21, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 22, his 2010 Year-End Evaluation is attached hereto as Exhibit 23, his 2011-2016 Mid-Year Evaluations are attached hereto as Exhibit 24, his 2011-2016 Year-End Evaluations are attached hereto as Collective Exhibit 25, and his 2011-2016 UERs are attached hereto as Collective Exhibits 26-31.
        **ANSWER TO FOOTNOTE 2:** Undisputed.

occurs for only about 50% of MLB games. (McKendry Decl. ¶ 7; McKendry Tr. 122:24-124:14.) Undisputed as to the second, third, and fourth sentences of Paragraph 44 based on the contents of the UER form, which speaks for itself and is the best evidence. For the Court's convenience, MLB will adopt Plaintiff's naming convention for Field Evaluation Forms as "Umpire evaluation reports" or "UERs" for purposes of this Counterstatement.

45.     Woodfork testified that the UERs are "important for evaluation as well as the supervisors' comments." Woodfork Dep., 195:8-196:16. Despite the testimony of Woodfork and other MLB executives regarding the UERs' importance in the evaluation of umpires, Manfred inexplicably testified that the UERs were merely "a concession to the union." Manfred Dep., 72:18-73:25.

**ANSWER TO 45**:  Disputed and unsupported by the evidence as to the first sentence in Paragraph 45. In response to a question concerning the contents of a document sent to Woodfork in 2013 and whether MLB found it "important to evaluate an umpire with someone at the field watching them work in-person," Woodfork testified that, between 2008 and 2012, the document stated that "observations and supervisor presence is important for evaluation as well as the supervisors' communication with the umpires." (Woodfork Tr. 195:22-196:8.)  The cited testimony does not mention UERs.  (*Id.*) Disputed and unsupported by the evidence as to the second sentence of Paragraph 45. Plaintiff does not cite to any record evidence to support the assertion that Woodfork or other MLB executives regarded UERs as important to the evaluation of umpires, and that assertion is contradicted by the record. (Woodfork Tr. 27:10-13 ("[T]he game evaluations are not something that I discuss with Joe [Torre]."), 56:22-57:10 ("The game reports are just one small factor . . . ."), 58:9-12 ("So again, I think game reports are one . . . small snapshot . . . .").)  Because Plaintiff's assertion is contradicted by the record evidence, it

should be disregarded. Commissioner Manfred testified that the umpires' union proposed a process for in-person observations, and that in order to reach an agreement during the early stages of the parties' bargaining relationship, MLB agreed to the union's proposal. (Manfred Tr. 73:8-25.)

46. Mid-Year Evaluations rate umpires on a number of different components, including a "Field Evaluation Component," an "Administrative Component," "Plate Judgment," and "Base Judgment." *See*, *e.g.*, Exhibit 24, 2011 Mid-Year Evaluation of Angel Hernandez. "The timing of the midyear evaluation process is done on a rolling basis as games are still being played. Those evaluations run through June 30" of each season. McKendry Dep., 139:8-11. The drafting of the Mid-Year Evaluations is "a collaborative effort among the umpiring department" at MLB. *Id*. at 136:4-9.

**ANSWER TO 46**: Undisputed.

47. The ratings in Mid-Year Evaluations "are decided on a case-by-case basis based on the individual circumstances surrounding them." McKendry Dep., 144:7-20. Torre and Woodfork are responsible for making the "final call in terms of what grade to give on each of the criteria." *Id*. at 152:13-20. Torre testified that the Mid-Year Evaluations "come from" the game evaluations. Torre Dep., 132:15-24. Both Torre and Marsh testified that there should not be any comments in the Mid-Year Evaluations that are not found in UERs issued during that same time period. Marsh Dep., 46:7-11; Torre Dep., 34:10-21. McKendry testified that MLB made no changes to the process of preparing Mid-Year Evaluations for at least the years 2012-2016. McKendry Dep., 155:23-156:10.

**ANSWER TO 47**: Undisputed as to the first sentence in Paragraph 47 based on McKendry's testimony, which speaks for itself and is the best evidence. Undisputed as to

the second sentence in Paragraph 47 based on McKendry's testimony, which speaks for itself and is the best evidence. Disputed and unsupported by the evidence as to the third sentence of Paragraph 47. When asked "[w]ho makes the decision on what box to check between exceeds standard, meets standard or does not meet standard on the midyear and end-of-year evaluations?," Torre testified "I don't know, I don't want to guess, but the supervisors basically make out the game evaluations." (Torre Tr. 132:15-21.) Disputed and unsupported by the evidence as to the fourth sentence of Paragraph 47. When asked why there would be "any language in an umpire's midyear or end-of-year evaluation that was never found in any of the game evaluations," Torre testified "I really can't answer that, I don't see the game evaluations." (Torre Tr. 35:18-23.) Undisputed as to the fifth sentence of Paragraph 47, based on McKendry's testimony, which speaks for itself and is the best evidence.

48. Other information considered in generating the Mid-Year Evaluations are (i) ZE reports (reports regarding an umpire's accuracy calling balls and strikes), (ii) SURE results (accuracy calling plays on the basepaths), (iii) UERs, (iv) "[t]he umpire's functioning as a replay official," and (v) "the umpire's handling of administrative duties, including his interaction with the Office of the Commissioner and his peers and the Clubs." McKendry Dep., 136:21-137:5. While there is no meeting between MLB officials regarding the Mid-Year Evaluations, various MLB officials (including McKendry and Woodfork) provide input and are given the opportunity to edit the Mid-Year Evaluations before they are finalized. McKendry Dep., 137:13-141:18; Woodfork Dep., 86:19-88:9, 231:24-232:6; Marsh Dep., 274:22-275:12.

**ANSWER TO 48**: Disputed as incomplete. MLB also considers personal observations of and interactions with the MLB Umpiring Department, information relayed during weekly

conference calls discussing umpire performance among the MLB Umpiring Department and Umpire Supervisors, incidents involving the umpire such as ejections and confrontations with Players, managers and coaches, and umpire durability. (Pl. Ex. 12, Dkt. 142-13 at DEF1450; Pl. Ex. 13, Dkt. 142-143 at DEF1285-86; McKendry Tr. 136:21-137:5; Woodfork Tr. 85:2-87:17.)

49.     Torre testified that for the Mid-Year Evaluations, the supervisors submit information "and then Peter Woodfork will condense it or take all of the evaluations of the supervisors and put it in the one that [Torre] get[s] to look at." Torre Dep., 32:23-33:8.

**ANSWER TO 49**: Undisputed that Torre's testimony, which speaks for itself and is the best evidence, states that Woodfork will condense information provided by umpire supervisors for mid-year evaluations. Woodfork further explained that other members of the umpiring department also provide comments, and that by the time it gets to Woodfork, he is mainly "making sure there's consistency . . . for the entire group" and providing "edit[s]." (Woodfork Tr. 225:12-227:24.)

50.     Year-End Evaluations are evaluations of umpires issued by MLB after each season and are a result of "[s]upervisors aggregat[ing] all of the end of game reports an umpire has received through the season and assign[ing] an overall grade to each category." Marsh Dep., 89:19-90:8; *see also* Exhibit 6, at DEF 015092. Year-End Evaluations are reviewed not only by MLB officials, but also by MLB's legal and labor relations departments. Marsh Dep., 92:2-14. Like Mid-Year Evaluations, for the Year-End Evaluations supervisors submit information "and then Peter Woodfork will condense it or take all of the evaluations of the supervisors and put it in the one that [Torre] gets to look at." Torre Dep., 32:23-33:8; *see generally* Woodfork Dep., 223:25-228:17. Torre testified that the Year-End Evaluations also "come from" the game

evaluations.  Torre Dep., 132:15-24.

**ANSWER TO 50**:  Disputed and incomplete as to the first sentence of Paragraph 50, as Plaintiff's citation regarding MLB "aggregating" game reports (UERs) to create year-end evaluations is taken from the Umpire Department Overview presentation sent in 2013 that was created by a non-decision-maker, the accuracy of which was called into question by MLB executives.  (Manfred Tr. 68:6-13; Woodfork Tr. 207:25-208:4.)  Marsh testified that the text quoted in the first sentence of Paragraph 50 was included in the Umpire Department Overview presentation and that year-end evaluations contain overall grades.  (Marsh Tr. 89:24-90:8.)  The first sentence of Paragraph 50 is also incomplete.  MLB also considers personal observations of and interactions with the MLB Umpiring Department, evaluative comments from the MLB Umpiring Department, information relayed during weekly conference calls discussing umpire performance among the MLB Umpiring Department and Umpire Supervisors, incidents involving the umpire such as ejections and confrontations with Players, managers and coaches, and umpire durability.  (Pl. Ex. 12, Dkt. 142-13 at DEF1450; Pl. Ex. 13, Dkt. 142-14 at DEF1285-86; McKendry Tr. 136:21-137:5, 155:23-156:5; Woodfork Tr. 85:2-87:17.)  Undisputed and immaterial as to the second sentence of Paragraph 50.  Whether MLB's legal and labor relations department reviews year-end evaluations is irrelevant to Plaintiff's motion for partial summary judgment.  Disputed and unsupported by the evidence and incomplete as to the third sentence of Paragraph 50 based on the additional information MLB considers in creating year-end evaluations.  (Pl. Ex. 12, Dkt. 142-13 at DEF1450; Pl. Ex. 13, Dkt. 142-14 at DEF1285-86; McKendry Tr. 136:21-137:5; Woodfork Tr. 85:2-87:17.)  Disputed and unsupported by the evidence as to the fourth sentence of Paragraph 50.  When asked "[w]ho

makes the decision on what box to check between exceeds standard, meets standard or does not meet standard on the midyear and end-of-year evaluations?," Torre testified "I don't know, I don't want to guess, but the supervisors basically make out the game evaluations." (Torre Tr. 132:15-21.)

51.     Year-End Evaluations grade umpires on a more expansive set of criteria than those that are included in the UERs and Mid-Year Evaluations discussed above. *See, e.g.*, Collective Exhibit 25, 2011 Year-End Evaluation of Angel Hernandez. For each of these categories, like in the UERs and Mid-Year Evaluations, an umpire is given a rating of "Meets Standard," "Does Not Meet Standard," or "Exceeds Standard." *Id.* Marsh testified that both "Does Not Meet" ratings and "Exceeds Standard" ratings are relatively rare. Marsh Dep., 89:19-91:9. Marsh also admitted in his deposition that MLB has the power to "take isolated incidents . . . from each and every umpire and use that as an excuse to not promote them or put them in the World Series." *Id*. at 85:21-86:5.

> **ANSWER TO 51**: Undisputed as to the first and second sentences of Paragraph 51, based on MLB's year-end evaluation form, which speaks for itself and is the best evidence. Undisputed as to the third sentence of Paragraph 51 based on Marsh's testimony, which speaks for itself and is the best evidence. Disputed, unsupported by the evidence, and immaterial as to the fourth sentence of Paragraph 51 and disputed that Marsh's testimony was an "admission." Plaintiff's counsel asked Marsh a hypothetical question as to whether MLB "could . . . take isolated incidents, … from each and every umpire and use that as an excuse to not promote them or put them in the World Series." (Marsh Tr. 85:21-25.) Marsh responded "Technically, yes." (Marsh Tr. 86:5.) Immaterial because Plaintiff's counsel asked Marsh to testify as to a hypothetical and Marsh's answer was conjecture, and also

because Marsh is a not a decision-maker regarding Major League umpire promotion and World Series selection decisions that are the subject of Plaintiff's motion for partial summary judgment. (Torre Tr. 22:6-12, 28:6-9, 195:10-12; Woodfork Tr. 23:12-24; McKendry Tr. 185:11-186:2; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17.)

52.     Mid-Year and Year-End Evaluations are created and maintained in a computer program called Halogen. McKendry Dep., 150:10-23. The only draft of any Mid-Year or Year-End Evaluation that one could "go back and look at" is the final evaluation that's sent to the umpire. McKendry Dep., 150:24-152:12; *see also* Woodfork Dep., 228:18-230:8. McKendry further testified that he did not believe there is "anything that's consistently maintained from year to year" regarding any "records of the inputs that were received from various participants in the" process of drafting the Mid-Year and Year-End Evaluations. That process has not changed since McKendry began working in MLB's umpire department. McKendry Dep., 158:11-25; *see also* Woodfork Dep., 225:10-231:6.

**ANSWER TO 52**: Undisputed as to the first sentence of Paragraph 52 that as of the date of McKendry's testimony, MLB utilized the Halogen system. Disputed as to the second sentence of Paragraph 52 as to Plaintiff's characterization of "drafts." The mid-year and year-end evaluations are a collaborative and cumulative process that requires input from multiple sources via the Halogen system. Inputs from one particular source are not "drafts" of each evaluation that can be preserved. Each input constitutes a portion of the umpire's review, and each portion is then aggregated to form the umpire's complete review. (McKendry Tr. 150:16-20.) Undisputed as to the third sentence of Paragraph 52 based on McKendry's testimony, which speaks for itself and is the best evidence. Undisputed and immaterial as to the fourth sentence of Paragraph 52 because the software used to evaluate

umpires is not relevant to Plaintiff's motion for partial summary judgment.

53.     Since 2011, MLB has used at least two different systems for analyzing umpires' accuracy calling balls and strikes:  the Sportsvision system and the ZE system.  McKendry Dep., 15:22-16:13, 93:19-96:14.  The ZE system has been used by MLB since at least 2015. *Id*. at 16:8-13.  MLB also uses the SURE system to evaluate umpires' accuracy for calls made on the base paths.  McKendry Dep., 48:2-12.

> **ANSWER TO 53**: Undisputed and immaterial.  The technology used to evaluate umpires' ZE scores is irrelevant to Plaintiff's motion for partial summary judgment.

54.     The strike zone used by MLB for its evaluation of umpires differs from the strike zone used by TV networks when baseball games are broadcast to the public.  *Id*. at 21:22-25:16; Marsh Dep., 92:15-93:7.

> **ANSWER TO 54**:  Undisputed and immaterial.  The manner in which the strike zone is broadcast to the public is irrelevant to Plaintiff's motion for partial summary judgment.

55.     MLB's strike zone consists of two vertical lines, which are based on the width of home plate, and two horizontal lines, which are set based on individual batters and an algorithm used by MLB.  McKendry Dep., 22:4-25:16.  For purposes of evaluating umpires, MLB includes "buffers" around the strike zone.  *Id*. at 28:15-31:7, 82:3-83:23, 84:13-90:25; Torre Dep., 163:2-17; Woodfork Dep., 196:17-197:5.  If a pitch is deemed by MLB to be within the "buffers" surrounding the strike zone, MLB grades the umpires' call of that pitch as "acceptable" in its evaluation of umpires.  McKendry Dep., 28:15-31:7, 106:13-110:21, 117:25-118:8.  These buffers have been used by MLB since at least 2012.  *Id*. at 81:3-23.  MLB employees making those determinations on behalf of MLB are supposed to do so overnight following each individual game.  *Id*. at 77:17-79:9.

**ANSWER TO 55**:  Undisputed and immaterial.  The mechanics of how MLB deems balls and strikes as "acceptable" is irrelevant to Plaintiff's motion for partial summary judgment.

56.     The existence of these "buffers" is not a secret.  *See* McKendry Dep., 26:3-28:14, 98:8-104:22.  MLB's lack of transparency regarding these "buffers" and the strike zone used by MLB has resulted in incomplete publicly available data and unwarranted criticism of umpires, including Plaintiff, for calls perceived by non-MLB individuals to be incorrect when those calls are, in fact, correct by MLB's standards.  *See* Marsh Dep., 93:22-96:18; Woodfork Dep., 195:8-200:11.

**ANSWER TO 56**:  Undisputed and immaterial as to the first sentence of Paragraph 56.  Whether the existence of "buffers" is a "secret" is irrelevant to Plaintiff's motion for partial summary judgment.  Disputed as improper argument and unsupported by the evidence, and immaterial as to the second sentence of Paragraph 56.  Marsh testified that the existence of a buffer zone could result in misunderstandings between players and coaches.  (Marsh Tr. 94:14-19.)  Plaintiff offers no support regarding unwarranted criticism of umpires and the Court should therefore disregard this assertion.  Plaintiff's assertion that there is an alleged "lack of transparency regarding these 'buffers'" is disputed based on the first sentence in Paragraph 56 in which Plaintiff states that the existence of "buffers" is not a secret.  The assertions in the second sentence of Paragraph 56 are immaterial because Plaintiff's motion for partial summary judgment does not concern MLB's alleged "lack of transparency regarding 'buffers.'"

57.     MLB employees also determine whether a pitch should be "adjusted" for purposes of umpire evaluation.  McKendry Dep., 110:22-111:20.  Mr. McKendry described "adjusted pitches" as follows:

That would be a pitch that contacts the strike zone, but *for the reasons [MLB] believes it is reasonable for the umpire not to call that pitch a strike*, things like catcher's influence, if the catcher dropped the pitch or did not present it properly, reached across the strike zone, things of that nature[.]

*Id.* (emphasis added).

**ANSWER TO 57**:  Undisputed and immaterial.  Undisputed that MLB determines whether to adjust certain pitches for purposes of evaluating an umpire's accuracy in calling balls and strikes.  Undisputed that McKendry's testimony, which speaks for itself and is the best evidence, states the criteria for when MLB would determine whether to adjust a pitch for purposes of evaluating an umpire's accuracy in calling balls and strikes.  The manner in which MLB determines whether a strike was properly called a ball, or whether a ball was properly called a strike, is irrelevant to Plaintiff's motion for partial summary judgment.

58.     Outside of this process of "adjusting" pitches, MLB is not supposed to change any pitching data for any umpire—the only avenue for changing that data is via player-initiated appeals.  *See* McKendry Dep., 114:3-117:24.

**ANSWER TO 58**:  Undisputed and immaterial.  Undisputed that outside of MLB's post-game audit process, Major League umpire scores on pitching data are not adjusted except through an appeal initiated by an Major League umpire or an umpire union representative.  (McKendry Tr. 114:2-115:8.)  This assertion is immaterial because the process described in Paragraph 58 is irrelevant to Plaintiff's motion for partial summary judgment.

**VII.     Plaintiff has been qualified to be a crew chief since at least 2013, but MLB has never promoted him to that position.**

**VII.     Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

59.     Plaintiff "comes to work every day" and has never had significant injury issues in his career that have caused him to miss substantial time on the field.  *See* Marsh Dep., 98:2-24; *see*

*also* Torre Dep., 172:13-19.

**ANSWER TO 59**:  Disputed and unsupported by the evidence.  Torre testified that Plaintiff has not missed significant time since 2011.  Marsh testified that in September 1999, Plaintiff said that he could not and did not work the entire month of September ████

████

60.    From 2006-2009, Plaintiff received 24 "Exceeds Standard" ratings in individual games.  *See* Collective Exhibit 21, Plaintiff's 2006-2009 Year-End Evaluations.  During that same time frame, Plaintiff received only one "Does Not Meet" rating, which was for an ejection in 2006.  *See id*. at DEF 015601.  For each year from 2006-2009, Plaintiff received an "Exceeds Standard" rating for his accuracy calling balls and strikes as a home plate umpire.  *Id*. at DEF 15605 (2006), DEF 15625 (2007), DEF 15643 (2008), and DEF 15659-15660 (2009).

**ANSWER TO 60**:  Undisputed and immaterial.  Plaintiff's evaluations for 2006-09 are irrelevant to Plaintiff's motion for partial summary judgment, which does not concern any employment decisions made during those years.

61.    From 2011-2016, Plaintiff received a total of 9 "Exceeds Standard" ratings in his UERs, including at least one "Exceeds Standard" rating in each of those years.  *See* Collective Exhibits 26-31, Angel Hernandez's 2011-2016 UERs. In that same time frame, Angel received two "Does Not Meet" ratings (Collective Exhibit 26 at DEF 01704; Collective Exhibit 28 at DEF 002138-DEF 002139), but at least one of those "Does Not Meet" ratings was incorrectly given to Angel by MLB.

**ANSWER TO 61**:  Disputed and immaterial.  Disputed and unsupported by the evidence that one of Plaintiff's "Does Not Meet" ratings was incorrectly given to Plaintiff, which Plaintiff fails to support with record evidence.  Undisputed that Plaintiff received 9

"Exceeds Standards" in his UERs from 2011 through 2016, that he received at least one "Exceeds Standard" rating in each of those years, and that he received two "Does Not Meet" ratings in those years. The assertions contained in Paragraph 61 are immaterial because the record evidence confirms that the cumulative number of "Exceeds Standards" and "Does Not Meet" ratings contained in individual UERs given by non-decision-makers are insignificant to the decision-making-process for the employment decisions that are the subject of Plaintiff's motion for partial summary judgment. (Torre Decl. ¶ 18; McKendry Tr. 143:4-147:6.)

62. Plaintiff's first "Does Not Meet" rating relates to an incident in Boston—involving the ejection of a manager. *See* Collective Exhibit 26, Plaintiff's 2011 UERs, at DEF 001704. The text of that evaluation reads as follows: "Report of subsequent actions between umpire West and Terry Francona following Francona's ejection by Umpire Hernandez. Umpire West immediately interceded and was overly aggressive in the altercation and made the situation worse."

> **ANSWER TO 62**: Undisputed that Plaintiff's May 6, 2011 Situational Evaluation Report, which speaks for itself and is the best evidence, contains the language quoted in Paragraph 62.

63. Plaintiff received another UER from that same game and involving that same ejection. *Id*. at DEF 001705. On that other UER, Plaintiff received a "Meets Standard" rating, and the supervisor or observer who completed that UER took no issue with Plaintiff's ejection. *Id*. Thus, the "Does Not Meet" rating given to Plaintiff regarding this incident (DEF 001704) was an error. In his deposition, Torre could not provide any explanation or justification for MLB incorrectly giving Plaintiff a "Does Not Meet" rating as to that ejection. Torre Dep., 64:20-66:20.

> **ANSWER TO 63**: Disputed, unsupported by the evidence, and improper argument.

Disputed and unsupported by the evidence as to Plaintiff's assertion that "the supervisor or observer who completed th[is] UER took no issue with Plaintiff's ejection." Disputed, unsupported by the evidence, and improper argument as to Plaintiff's assertion that this demonstrates that the "Does Not Meet" rating that Plaintiff also received for this game was in error, which Plaintiff fails to support with record evidence. Disputed as to Plaintiff's characterization of Torre's testimony that Torre "could not provide any explanation or justification for MLB incorrectly giving Plaintiff a "Does Not Meet" rating. Torre testified that he did not know why Plaintiff received two situational evaluations for the ejection that occurred at this game. (Torre Tr. 66:16-20.) Undisputed that Plaintiff received a second Situational Evaluation Report for the May 6, 2011 game in which he received a "Meets" rating.

64.     MLB also made a similar "mistake" on Plaintiff's 2013 Mid-Year Evaluation regarding an ejection of the Braves manager, where the 2013 Mid-Year Evaluation stated that Plaintiff received a "Does Not Meet" rating for that ejection when Plaintiff actually received a "Meets Standard" rating on his UER regarding that ejection. *See* Marsh Dep., 255:12-265:8; Torre Dep., 121:16-125:21.

**ANSWER TO 64**: Disputed and unsupported by the evidence. Torre testified that the mid-year evaluation "seems to be" "inaccurate" solely based on the individual UER submitted for that game. (Torre Tr. 125:7-21.) Disputed as to Plaintiff's characterization as a "mistake." Mid-year evaluation ratings are not exclusively derived from UERs but rather involve a number of different sources of information. (Pl. Ex. 12, Dkt. 142-13 at DEF1450; Pl. Ex. 13, Dkt. 142-14 at DEF1285-86; McKendry Tr. 136:21-137:5; Woodfork Tr. 85:2-87:17.) Marsh testified that "[i]f . . . the [O]ffice [of the Commissioner

was] watching this game, and wanted to know what happened, maybe that's where they came up with that does not meet." (Marsh Tr. 262:25-263:7.)

65. Additional documents produced by MLB call into question whether Plaintiff's UERs even contain all of the "Exceeds" ratings Plaintiff was actually given by supervisors or observers. For example, Plaintiff's supervisor reported an "EXCEEDS" by email in 2013 for a game that took place on April 4 of that year. *See* Exhibit 32, DEF 007930. Yet, when reviewing Plaintiff's UERs as produced by MLB, no such "Exceeds" rating can be found on a UER of that date. *See* Collective Exhibit 28, at DEF 001852.

**ANSWER TO 65**: Disputed, unsupported by the evidence, and improper argument. Although Plaintiff's supervisor observed in an email that Plaintiff's performance "exceed[ed]" expectations for a single game on April 4, 2013, Plaintiff fails to cite any record evidence that that observation should have been reflected in a UER.

66. While Plaintiff received a total of nine "Exceeds Standard" ratings from 2011-2016, with at least one "Exceeds Standard" rating in each season during that time period, he received only four "Exceeds Standard" ratings on Year-End Evaluations for the 2011-2016 seasons. *See* Collective Exhibit 25, Plaintiff's 2011-2016 Year-End Evaluations.

**ANSWER TO 66**: Undisputed and immaterial. Undisputed that Plaintiff received four Exceeds Ratings in his 2011-2016 year-end evaluations and nine "Exceeds" ratings in his 2011-2016 UERs. Immaterial because this is not a disparity as Plaintiff's assertion suggests. Plaintiff ignores record evidence regarding the other sources of information used in creating year-end evaluations and that the number of Exceeds, Meets, and Does Not Meets that an umpire receives on his UERs do not determine his ratings in mid-year and year-end evaluations. (McKendry Tr. 143:4-147:16.)

67.     MLB failed to give Plaintiff any "Exceeds Standard" ratings for the 2013, 2014 or 2015 seasons, despite Plaintiff receiving one "Exceeds Standard" rating in his 2013 UERs, three "Exceeds Standard" ratings in his 2014 UERs, and one "Exceeds Standard" rating in his 2015 UERs. *Id.*

> **ANSWER TO 67**: Disputed and immaterial. Disputed that MLB "failed" to give Plaintiff any "Exceeds Standard" rating. Undisputed that Plaintiff received one "Exceeds Standard" rating in his 2013 UERs, three "Exceeds Standard" ratings in his 2014 UERs, and one "Exceeds Standard" rating in his 2015 UERs. This assertion is immaterial because this is not a disparity as Plaintiff's assertion suggests. Plaintiff ignores record evidence regarding the other sources of information used in creating year-end evaluations and that the number of Exceeds, Meets, and Does Not Meet that an umpire receives on his UERs do not determine his ratings in mid-year and year-end evaluations. (McKendry Tr. 143:4-147:16.)

68.     Thus, though Year-End Evaluations are supposed to reflect and "come from" the UERs given during that season (*see* Torre Dep., 34:10-21, 132:15-24; Marsh Dep., 46:7-11), Plaintiff's Year-End Evaluations for the 2011-2016 seasons do not accurately summarize Plaintiff's actual performance in those seasons.

> **ANSWER TO 68**: Disputed, unsupported by the evidence, and improper argument. Plaintiff's "actual performance" in 2011-16 consists of much more than his performance reflected in UERs. Around half of Plaintiff's games were the subject of a UER. (McKendry Decl. ¶ 7.) As such, there are other sources of information that go into the year-end evaluations. For example, the Basic Agreement states that evaluations are created by "reports submitted by the Supervisors and Field Observers, observations of the Directors of Umpiring and their superiors, and . . . information generated by the ZE system . . . ***and***

*evaluative comments from the Office of the Commissioner*." (Pl. Ex. 12, Dkt. 142-13 at DEF1450 (emphasis added); *see also* Pl. Ex. 13, Dkt. 142-14 at DEF1285-86.) Woodfork expanded on other sources that are utilized in creating the year-end. (Woodfork Tr. 85:2-87:17; *see also* McKendry Tr. 136:21-137:5.)

69.     Unfortunately, this is a pattern of conduct by MLB that permeates not only Plaintiff's Year-End Evaluations, but also the Year-End Evaluations of other minority umpires as well. *See generally* Exhibit 33, Report of Dr. Gregory Baxter (the "Baxter Report"). As the Baxter Report shows, MLB did not accurately reflect the performance of minority umpires, including Plaintiff, in the Year-End Evaluations for the 2011-2016 seasons. *Id.* Indeed, many of those evaluations contain outright falsehoods and/or material misrepresentations. *Id.*

**ANSWER TO 69**: Disputed and unsupported. This assertion fails to cite evidence that would be admissible. *See* Fed.R. Civ. P 56(c)(2); Local Rule 56.1(d). The "Baxter Report" is inadmissible because an unsworn expert report does not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e) and cannot be used on a summary judgment motion. Even if the Court was willing to consider the assertions in Paragraph 69 notwithstanding the inadmissibility of the evidence cited, the Baxter Report fails to support these assertions for the reasons described more fully in Defendants' Motion to Exclude Dr. Gregory Baxter, filed simultaneously herewith. (*See* also Abramson Decl., Ex. Y, Deposition Transcript of Dr. Gregory W. Baxter ("Baxter Tr.") 87:6-12, 92:20-21, 155:15-18; Declaration of Denise Martin, Ph.D. ("Martin Decl.") Ex. A at ¶¶ 48, 51; Abramson Decl. Ex. I, Deposition Transcript of Denise Martin, Ph.D. ("Martin Tr.") 69:16-70:6, 72:17-24.) In addition, Baxter does not conclude that the "evaluations contain outright falsehoods and/or material misrepresentations" and therefore this assertion lacks any evidentiary support and should

be disregarded.

70.     During that same time frame, Plaintiff only received one "Does Not Meet" rating on his Year-End Evaluations.  *See* Collective Exhibit 25 at DEF 001520.  That "Does Not Meet" rating was for an isolated, off-field incident in which Plaintiff got baseballs autographed for a fellow umpire and a charity in which Plaintiff was involved.  *Id*.  That "Does Not Meet" rating was given by MLB despite MLB acknowledging that "[f]or the greater part of [that] season, [Plaintiff] did a commendable job of operating within the guidelines laid out in the policies distributed to umpires."  *Id*.  This is an example of what Marsh identified in his deposition when he acknowledged that MLB can "take isolated incidents" from any umpire's performance and use it against that umpire.  *See* Marsh Dep., 85:21-86:5.

**ANSWER TO 70**:  Disputed and unsupported by the evidence.  Undisputed that Plaintiff received one "Does Not Meet" rating in his year-end evaluations from 2011-2016. Disputed that this "Does Not Meet" was for "an isolated, off-field incident."  Plaintiff's Does Not Meet rating was for a clear and knowing violation of the Major League Baseball Umpire Manual when Plaintiff, serving as interim crew chief for a game during the 2012 season, asked Cincinnati Reds Pitcher Homer Bailey to autograph eleven baseballs following a game in which Bailey pitched a no-hitter.  (Pl. Tr. 173:5-174:16, 177:6-8.) Plaintiff understood that umpires were not permitted to ask players for autographs.  (Pl. Tr. 175:20-176:4.)  MLB fined Plaintiff ████ and found that his actions were unprofessional and demonstrated extremely poor judgment, because, as interim crew chief, he was supposed to set a positive example for the rest of his crew.  (Pl. Tr. 176:24-177:14; Torre Decl. Ex. G.)  Disputed that Plaintiff's misconduct is an "example" of using an "isolated incident" against Plaintiff as improper argument and further disputed that Marsh identified

any incident when responding to a question calling for a hypothetical response.

71. Marsh himself engaged in similar conduct when Marsh was a crew chief. *See* Marsh Dep., 86:6-89:18. Marsh was also punished by MLB for that conduct. *Id*. Marsh was eventually hired as an MLB umpire executive after retiring as an umpire and crew chief despite that issue. *Id*.

> **ANSWER TO 71**: Disputed, unsupported by the evidence, and immaterial. Marsh testified that he once asked another umpire to get a baseball signed, and that he was suspended for three days and received a fine. (Marsh Tr. 86:12-88:6.) This assertion is immaterial because discipline that Marsh received is irrelevant to Plaintiff's motion for partial summary judgment. Undisputed that Marsh was hired as an umpire supervisor following his retirement. The circumstances of Marsh's hiring after his retirement are also irrelevant to Plaintiff's motion for partial summary judgment.

72. Moreover, in addition to giving Plaintiff a "Does Not Meet" for that isolated incident, MLB fined Plaintiff ▮▮▮▮ which at the time was the largest fine ever given to an umpire by MLB. *See* Exhibit 34, DEF 002451 – DEF 002452; *see also* Exhibit 6, DEF 015106 (showing ▮▮▮▮ as largest ever fine as of 2013). Though Torre testified in his deposition that he returned fines "to a number of umpires," Torre confirmed that he never returned Plaintiff's fine. Torre Dep., 117:16-121:15; *see also* Marsh Dep., 86:6-89:18.

> **ANSWER TO 72**: Disputed that Torre testified that he never returned Plaintiff's fine. Torre testified that he did not remember whether he had returned Plaintiff's fine. (Torre Tr. 121:5-15.) Undisputed that Plaintiff was fined ▮▮▮▮ in connection with his actions seeking autographs from Homer Bailey, and that according to the Umpire Department Overview, ▮▮▮▮ was the largest fine given to a Major League umpire as of August 2013.

(Pl. Tr. 176:24-177:5; Torre Decl. Ex. G; Pl. Ex. 6, Dkt. 142-7 at DEF15106.) Undisputed that Torre's testimony, which speaks for itself and is the best evidence, states that Torre has returned fines to Major League umpires.

73. Plaintiff has served as an interim crew chief for parts of each of the 2011-2016 seasons (Exhibit 35, Excerpts of Deposition of Angel Hernandez ("Hernandez Dep."), 85:16-86:10), and Plaintiff served as interim crew chief for the vast majority of the 2012 season. *See* Collective Exhibit 27, Plaintiff's 2012 UERS. The UERs submitted for the 2012 season heap substantial praise on Plaintiff for his work in that capacity. *See generally id*. Torre agreed in his deposition that Plaintiff "did a great job last year [(2012)] taking over Rapuano's crew and everything seemed to go well." Torre Dep., 210:10-19.

> **ANSWER TO 73**: Undisputed as to the first sentence of Paragraph 73 that Plaintiff served as an interim crew chief for parts of each of the 2011-2016 seasons and for a total of 98 of 162 games in the 2012 season. Disputed as to the second sentence of Paragraph 73 that the UERs "heap substantial praise" on Plaintiff. The UERs submitted for the 2012 season speak for themselves and are the best evidence of the contents of those documents. Undisputed as to third sentence of Paragraph 73 that Torre testified that he agreed with Marsh's assessment, written in an email on January 30, 2013, which stated in part that Marsh "explained to Angel that he did a great job last year taking over Rapuano's crew and everything seemed to go very well" and that Torre's testimony speaks for itself and is the best evidence. (Torre Tr. 210:2-19; Abramson Decl. Ex. Q.)

**VIII.  MLB has used an incident involving Plaintiff as a purported justification for not promoting him to crew chief, when in actuality MLB's conduct regarding that incident is further evidence of its discrimination against Plaintiff.**

> **VIII.  Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

44

74.     When discussing Plaintiff's performance as an MLB umpire, several of the MLB executives deposed by Plaintiff's counsel in this case pointed to an incident during a May 9, 2013 game between the Oakland Athletics and the Cleveland Indians, wherein Plaintiff followed MLB protocol to the letter in determining that a hit late in that baseball game was a double and not a home run.  *See* Exhibit 36, DEF 014664 – DEF 014665.

**ANSWER TO 74**:  Disputed, unsupported by the evidence, and improper argument.  Disputed as to Plaintiff's characterization that "Plaintiff followed MLB protocol to the letter" during this incident.  Plaintiff does not cite any evidence to support this characterization other than his own self-serving report of this incident and the document he cites does not contain any description of the "protocol" or how Plaintiff followed that protocol "to the letter."  The evidence Plaintiff cites confirms that he incorrectly ruled a batted ball a double when it should have been ruled a home run.  Plaintiff admitted in deposition that the play was in fact a home run.  (Pl. Tr. 150:10-13, 152:9-11.)  However, Plaintiff did not change the original incorrect call after he reviewed instant replay video of the play.  (Pl. Tr. 149:1-2; Torre Tr. 83:9-17.)  Plaintiff blamed the quality of the video replay equipment.  (Pl. Tr. 148:19-25, 152:19-20, 153:23-154:1; Torre Tr. 83:21-22.) MLB does not dispute that certain MLB deponents discussed this incident during their depositions as an example of Plaintiff's lack of accountability and inability to admit when he made a mistake and to put an incident behind him.  (Torre Tr. 83:9-84:17, 85:23-86:3; Woodfork Tr. 113:20-114:3.)

75.     The primary reason Plaintiff was required to uphold the call on the field—that the hit was a double and not a home run—was because the screen on which umpires reviewed replay at the time was incredibly small and was not in high definition and the replay was thus

inconclusive.  *See*, *e.g.*, Collective Exhibit 37; Marsh Dep., 120:22-121:2; Torre Dep., 90:12-91:8,

94:13-15, 98:7-99:25.   Indeed, at least one MLB official admitted in his deposition that a high

definition television would have been better.  Marsh Dep., 123:2-9.  At least one media personality

suggested that the replay equipment did not even work correctly.  *See* Exhibit 38, DEF 015031.

Torre expressed ignorance in his deposition regarding why Plaintiff and other umpires at that time

were forced to use inferior replay equipment, including the small, non-high definition TV shown

in Collective Exhibit 37, Torre Dep., 93:4-95:6.  Torre also inexplicably testified that MLB "can't

help" that the TV in use at the time was not high definition, despite the fact that MLB is a "$10

billion business."  *Id*. at 105:12-23; Manfred Dep., 31:11-14.

> **ANSWER TO 75**:  Disputed and unsupported by the evidence as to the first sentence of
>
> Paragraph 75.  The exhibits and testimony Plaintiff cites do not support the assertion that
>
> the size or quality of the video was the "primary reason Plaintiff was required to uphold
>
> the call on the field."   MLB employees all testified that the size or quality of the video
>
> Plaintiff reviewed was not an issue.  (Torre Tr. 99:7-8 ("The replay procedure seemed to
>
> work; I can't agree with that."); Torre Tr. 106:5-6 ("So all umpires had access to the same
>
> screens that Angel did."); Marsh Tr. 124:4-6 ("I think it worked fine in the past, we used it
>
> for a while and I think it worked fine in the past."); Woodfork Tr. 103:21-104:4 ("[I]n my
>
> judgment, he did not make the correct call[.]").  Disputed as to the characterization of
>
> Marsh's testimony in the second sentence of Paragraph 75, who responded "I guess you
>
> could certainly say that" when asked if a widescreen HDTV screen would have better
>
> served umpires for replay review.  (Marsh Tr. 123:2-9.)  Disputed and unsupported by the
>
> evidence as to third sentence of Paragraph 75 that a media personality suggested that
>
> MLB's replay equipment did not work correctly.  Disputed as to the fourth sentence of

Paragraph 75 as to Plaintiff's characterization that Torre "expressed ignorance" at his deposition. Torre stated he was unaware of who was in charge of the decision regarding the type of replay equipment was put in baseball stadiums. (Torre Tr. 93:14-22.) Undisputed as to the fifth sentence of Paragraph 75 that Torre's testimony, which speaks for itself and is the best evidence, stated "[w]e can't help that" regarding the fact that there was no HD replay review at the time of Plaintiff's Cleveland missed call. The assertions contained in Paragraph 75 are immaterial because the type of video replay equipment in use in 2013 is irrelevant to Plaintiff's motion for partial summary judgment.

76. Plaintiff was roundly criticized by the media for that call, and MLB was indisputably aware of that criticism. *See*, *e.g.*, Exhibit 39, DEF 007890 - DEF 007893; Exhibit 40, DEF 007894 – DEF 007895. Due to MLB's prohibition on umpires "mak[ing] public comments that create an appearance of lack of impartiality towards a player or club that are critical to the Commissioner of Baseball or that are otherwise inimical to the best interest of baseball," Plaintiff was unable to defend himself from the onslaught of criticisms, given MLB's failure to defend him and his integrity as an umpire. Torre Dep., 167:24-169:18. MLB failed to do so.

**ANSWER TO 76**: Disputed, unsupported by the evidence, and improper argument. Plaintiff's citation to two newspaper articles fails to support the assertion in the first sentence of Paragraph 76 that he was "roundly criticized by the media." Disputed and unsupported by the evidence as to the second and third sentences in paragraph 76 that MLB "failed" to defend Plaintiff. Following the incident, MLB issued a statement, which stated in part "[i]n the opinion of Angel Hernandez, who was last night's crew chief, there was not clear and convincing evidence to overturn the decision on the field. It was a judgment call, and as such, it stands as final. . . Given what we saw, we recognize that an improper

call was made.  Perfection is an impossible standard in any endeavor, but our goal is always to get the calls right."  (Pl. Ex. 42, Dkt. 142-43.)  Undisputed that MLB was aware that articles were written regarding Plaintiff's missed call.  Disputed as to the second sentence of Paragraph 76 that Plaintiff was unable to defend himself "[d]ue to" the quoted language in the second sentence of Paragraph 76, which is limited to "public statements that create an appearance of lack of impartiality toward a player or Club, that are critical of the Commissioner of Baseball, or that otherwise are inimical to the best interests of Major League Baseball."  An umpire's ability to provide interviews and speak publicly, including with respect to controversial calls, is governed by Article 9.E. of the Basic Agreement, which is the best evidence and speaks for itself.  (Pl. Ex. 12, Dkt. 142-13 at DEF1385; Pl. Ex. 13, Dkt. 142-14, at DEF1229.)

77.  Unfortunately, MLB's pattern of not defending Plaintiff and his integrity as a Major League umpire has continued past the filing of this lawsuit. *See* DEF 015472.

**ANSWER TO 77**:  Disputed, unsupported by the evidence, and improper argument.  Plaintiff has not placed this document before the Court so there is no evidence for the Court to consider to support this assertion, which should be disregarded.  Plaintiff's reference to a single document does not support the existence of a "pattern."  The document Plaintiff cites does not support the assertion of an example of MLB not defending Plaintiff or his integrity because it was a private communication between Woodfork and Torre concerning potential discipline of a player.

78.  Despite the MLB officials' repeated references to that game, Marsh testified that he told Plaintiff that Plaintiff had "kept himself totally under control in a very difficult situation" after that Cleveland game.  Marsh Dep., 276:24-278:6.

**ANSWER TO 78**: Disputed and immaterial. Marsh's testimony regarding Plaintiff's conduct during the Cleveland game is not inconsistent with "MLB officials' repeated references to that game." MLB executives referred to the Cleveland game as a criticism of Plaintiff's lack of accountability, inability to admit a mistake, and to put an incident behind him in order to move forward. (Torre Decl. ¶ 21; Torre Tr. 104:3-8; Woodfork Tr. 112:24-113:11; *see also* McKendry Tr. 275:9-24; Marsh Tr. 277:18-25.) Marsh shared that concern, testifying "Angel had a tough time getting over stuff. He didn't like somebody telling him or talking to him about something he did wrong. . . . When we talked to him, when Joe [Torre] was talking to him, about trying to get him some help, try to get through this stuff, he was in there sobbing like a baby, uncontrollably. When he left we'd say what can we do for this man." (Marsh Tr. 195:16-196:11.) The assertion contained in Paragraph 78 is immaterial because Marsh's reaction to how Plaintiff conducted himself in the Cleveland game is irrelevant to Plaintiff's motion for partial summary judgment because Marsh was not a decision-maker with respect to any of the challenged employment decisions. (Torre Tr. 22:6-12, 28:6-9; Woodfork Tr. 23:12-15; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17.)

79.     MLB had publicly supported white umpires in similar situations. For example, in 2011, umpire Jerry Meals incorrectly called a player "safe" at home plate, ending a 19-inning baseball game. *See* Exhibit 41 (Exhibit 79 to Torre Dep.). Following the game, MLB issued a public statement acknowledging that the call was missed and saying that Umpire Meals is a "hard-working, respected umpire, and no one feels worse than him" about the missed call. *Id*. MLB further stated that it knew that the mistake "was not a product of a lack of effort." *Id*. Despite that incident, Jerry Meals was ultimately promoted to crew chief in the 2014 season. Marsh Dep.,

142:3-10.

**ANSWER TO 79**: Disputed and unsupported as to the first sentence of Paragraph 79, which Plaintiff fails to support with any record evidence. Disputed and unsupported by the evidence as to the second sentence of Paragraph 79, which Plaintiff supports with only one newspaper article, which is not admissible evidence on summary judgment. In any event, undisputed that Meals made an incorrect call in July 2011, but disputed and unsupported by the evidence that Meals's incorrect call in 2011 was "similar" to Plaintiff's missed call in Cleveland in 2013. Torre testified these situations were different because Meals's missed call was before the advent of replay. (Torre Tr. 103:21-24; *see also* McKendry Tr. 135:18-21.) The situations were not similar because Meals "admitted to making a mistake," while Plaintiff did not. (Torre Tr. 104:3-8.) Undisputed as to the third sentence of Paragraph 79 that MLB issued a statement following Meals's missed call, and that statement speaks for itself and is the best evidence. Disputed and unsupported by the evidence as to the fourth sentence of Paragraph 79 as Meals was promoted to crew chief for the 2015 season, not 2014. Meals's promotion is not relevant to Plaintiff's motion for partial summary judgment because Hernandez did not apply for the open crew chief positions for the 2015 season. (McKendry Decl. ¶ 11.)

80. MLB did not do the same with Plaintiff. *See* Exhibit 42, DEF 007950. While MLB publicly praised and supported Umpire Meals despite his missed call, MLB simply stated as to Plaintiff and his incident in Cleveland that "[i]n the opinion of [Plaintiff], who was last night's crew chief, there was not clear and convincing evidence to overturn the decision on the field. It was a judgment call, and as such, it stands as final." *Compare id.* and Exhibit 41.

**ANSWER TO 80**: Disputed. Undisputed that the statements MLB issued on July 27,

2011 and May 9, 2013 were not identical because the circumstances were not the same and the conduct of the umpires involved was not identical. Disputed as to Plaintiff's characterization of those statements as unsupported by the evidence cited. The statements speak for themselves and are the best evidence.

**IX.     MLB's has repeatedly made baseless criticisms of the "perception" of Plaintiff.**

> **IX.     Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

81.     As discussed in Plaintiff's Complaints, after Torre arrived in the MLB front office for the 2011 season, Plaintiff's Year-End Evaluations contained numerous references to the "perception" of Plaintiff. *See generally* Dkt. 35; *see also*, *e.g.*, Collective Exhibit 26 at DEF 001505, DEF 001508, DEF 001519, DEF 001527, DEF 001530.

**ANSWER TO 81**:  Disputed, unsupported by the evidence, and immaterial. Plaintiff's assertion that Plaintiff's year-end evaluations contain "numerous references" to Plaintiff's perception after Torre's arrival is unsupported by the evidence. The documents cited speak for themselves and are the best evidence. Disputed as to Plaintiff's suggestion that references to Plaintiff's perception in his evaluations were due to Torre's arrival, as Plaintiff does not cite any evaluations prior to Torre's arrival. The assertion is immaterial because the number of references to Plaintiff's "perception," without any comparison to the reviews of other umpires, does not give rise to an inference of discrimination and therefore is irrelevant to Plaintiff's motion for partial summary judgment. The record evidence demonstrates that white umpires received similar comments in their evaluations.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



83.    Kerwin Danley is an African-American umpire.   Exhibit 2, Affidavit of Angel Hernandez.

**ANSWER TO 83**:  Undisputed.

84.    At times, MLB went so far as to supplement Plaintiff's one of Plaintiff's Mid-Year

Evaluations to specifically include comments on perception, and that supplementation was praised by at least one MLB executive.  *See*, *e.g.*, Exhibit 43, DEF 008045; Exhibit 44, DEF 014826.

> **ANSWER TO 84**:  Disputed, unsupported by the evidence, and improper argument.  Plaintiff cites to a single email that Rich Rieker sent requesting that certain language be included in Plaintiff's 2011 mid-year evaluation.  Rieker is one of the supervisors who has input into the mid-year reviews of umpires.  (Torre Tr. 186:3-13.)  This exhibit does not support the assertion that "at times" MLB "supplement[ed]" Plaintiff's evaluation to include comments regarding his "perception."  Disputed that at least one MLB executive "praised" Rieker's comment.  Marsh testified that his response, which stated "Well done, Rich!" signified that Marsh believed that Rieker had submitted a well-written report.  (Marsh Tr. 228:10-12.)

85.     Though MLB repeatedly harped on the "perception" of Plaintiff (and, as discussed below, other minority umpires), Marsh testified that he knew of nothing other than certain balks called by Plaintiff that warranted MLB comments about the "perception" of him.  Marsh Dep., 174:24-175:23.

> **ANSWER TO 85**:  Disputed, unsupported by the evidence, and improper argument.  Plaintiff fails to cite any evidence to support the assertion that MLB "repeatedly harped" on the perception of Plaintiff and as such the Court should ignore this assertion.  Disputed that Marsh testified he knew of nothing other than certain balks called by Plaintiff that warranted MLB comments about the "perception" of him.  (*See, e.g.,* Marsh Tr. 144:18-22; 162:5-163:10; 256:17-23.)

86.     "Perception" is not a listed criterion for promotion to crew chief.  *See* Exhibit 14, MLB's Answers to Plaintiff's Interrogatories.

**ANSWER TO 86**: Disputed. Defendants' Response #4 listed multiple factors in the consideration for promotion to crew chief that bear on the "perception" of an umpire, including, but not limited to, "on-field presence," "demeanor," "hustle," and "agility and position accuracy in getting the appropriate angle on calls." Moreover, the Basic Agreement states that MLB can consider "factors that it may deem appropriate when exercising its appointment discretion." (Pl. Ex. 12, Dkt. 142-13 at DEF1363; Pl. Ex. 13, Dkt. 142-14 at DEF1210.)

X.    **Plaintiff has continuously applied for the crew chief position, only to be turned down by MLB in favor of white umpires who are less qualified than Plaintiff.**

   X.    **Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

87.    Plaintiff submitted written applications for the crew chief position for at least the 2013, 2014 and 2017 seasons. *See* Hernandez Dep., 64:25-65:9; Exhibit 45, AH 000823; Exhibit 46, DEF 015661.

**ANSWER TO 87**: Undisputed that Plaintiff applied for the crew chief position for the 2013, 2014, and 2017 seasons.

88.    MLB officials have told Plaintiff that he would one day be a crew chief. *See* Marsh Dep., 157:6-9; Exhibit 47, DEF 023960.

**ANSWER TO 88**: Disputed, unsupported by the evidence, and immaterial. Plaintiff's Exhibit 47, dated January 30, 2016, does not state that Torre "told Plaintiff that he would one day be a crew chief," only that Torre had Plaintiff "on the radar for a possible Crew Chief position in the future." This assertion is immaterial because whether MLB officials told Plaintiff that he was being considered for crew chief positions does not create an inference of discrimination with respect to the failure to promote Plaintiff or assign him to

work the World Series and the assertion therefore is irrelevant to Plaintiff's motion for partial summary judgment.

89.     MLB is acutely aware of Plaintiff's desire to be a crew chief and that MLB continually passing him over for that position in favor of white umpires has greatly upset Plaintiff. *See*, *e.g.*, Exhibit 48, DEF 015066 – DEF 015067; Exhibit 49, DEF 015528 – DEF 015529; Exhibit 50, DEF 023961 – DEF 023963; Marsh Dep., 218:19-219:12 (discussing an email wherein Marsh states that Plaintiff is "really into being a crew chief" and expressing concern "if umpires with less seniority were picked over him"); Marsh Dep., 248:7-14, 267:2-269:2; Woodfork Dep., 167:10-18.

**ANSWER TO 89**:  Disputed and immaterial.  Undisputed that MLB is aware that Plaintiff wanted to be a crew chief.  Disputed that it has "continually pass[ed] him over for that position in favor of white umpires."  Plaintiff was not promoted because he did not consistently demonstrate the qualities that the decision-makers deemed to be most important for a permanent crew chief, including but not limited to leadership ability, accountability, the ability to move on from past mistakes, the ability to handle and defuse difficult on-field situations, and lack of confidence in his ability to perform in a more critical and visible role.  (Torre Decl. ¶¶ 19-42; Declaration of Peter Woodfork ("Woodfork Decl.") ¶ 7; Pl. Ex. 108, Dkt. 142-110; Torre Tr. 82:20-86:3, 130:22-131:11, 139:18-140:18; Woodfork Tr. 94:21-95:21, 112:24-113:11 *see also* McKendry Tr. 206:5-207:3, 210:10-211:19, 228:4-21; Marsh Tr. 38:17-43:11.)  These assertions are immaterial because Plaintiff's "desire to be a crew chief" and his state of mind are irrelevant to Plaintiff's motion for partial summary judgment.

90.     By the 2017 season, Plaintiff had been a major league umpire for at least 24 years,

and in fact was the most senior umpire to apply for the crew chief position for the 2017 season. *See* Exhibit 51 at DEF 008083.

**ANSWER TO 90**:  Undisputed.

91.    Marsh confirmed in his deposition that Plaintiff had "a very good umpiring year in 2016."  Marsh Dep., 251:11-21.

> **ANSWER TO 91**:  Undisputed and immaterial.  Undisputed that that March testified that Plaintiff had "a very good umpiring year in 2016."  The assertion is immaterial because Marsh was not a decision-maker with respect to any of the decisions that are the subject of Plaintiff's motion for partial summary judgment.

92.    Despite Plaintiff's performance and experience at the time MLB made crew chief promotion decisions for the 2017 season, Plaintiff was not promoted, and instead MLB promoted three white umpires:  Paul Emmel, Mike Everitt and Sam Holbrook.  *See* Exhibit 52, DEF 008032.

> **ANSWER TO 92**:  Disputed, unsupported by the evidence, and improper argument regarding Plaintiff's "performance and experience."  Plaintiff fails to cite any evidence in support of his assertion that he was not promoted "[d]espite [his] performance and experience," and the Court should therefore disregard it.  (*See also* Pl. Tr. 58:6-18 (Plaintiff admitting he does not know his qualifications compare to those promoted to crew chief).)  Undisputed that Paul Emmel, Mike Everitt and Sam Holbrook were promoted to the crew chief position in 2017 because they were the most qualified applicants at that time based on the legitimate, non-discriminatory criteria MLB decision-makers applied.  In MLB's judgment, unlike Plaintiff, Emmel, Everitt and Holbrook demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players.  (Torre Decl. ¶¶ 48-50.)

Additionally, MLB concluded that Emmel, Everitt and Holbrook would be able to handle the additional responsibilities and increased visibility associated with the permanent crew chief role. (*Id*.)

93.     MLB's pattern of promoting white umpires to crew chief over Plaintiff has continued even after this lawsuit was filed. *See*, *e.g.*, McKendry Dep., 230:12-231:10; Exhibit 17, DEF 008050 – DEF 008066.

**ANSWER TO 93**:  Disputed, unsupported by the evidence, and improper argument.  The evidence cited does not establish a "pattern," and Plaintiff's assertion fails to cite any evidence regarding promotions after this lawsuit was filed.  The assertion is also contradicted by paragraph 2, footnote 1 of Plaintiff's 56.1 Statement.

94.     Manfred approved the umpire promotions for the 2017 season.  *See* Exhibit 53, DEF 008044.

**ANSWER TO 94**:  Disputed and unsupported by the evidence.  The document cited does not support the assertion that Commissioner Manfred "approved" the promotions for the 2017 season.  The email sent to the Commissioner identified the umpires who had already been "named" crew chiefs for the 2017 season at the time the email was sent.  Commissioner Manfred testified that he "would usually be informed" of crew chief decisions, but did not have to "sign off" on those decisions.  (Manfred Tr. 15:20-16:5 ("I think that usually my involvement would be just acknowledging receipt of an e-mail telling me what they were going to do.").)

95.     At the time of his promotion to crew chief for the 2017 season, Paul Emmel[3] had

---

[3] Umpire Emmel's 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 54, his 2006-2009 Year-End Evaluations are attached hereto as Exhibit 55, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 56, his 2010 Year-End Evaluation is attached hereto as Exhibit 57, his 2011-2016 Mid-Year Evaluations are attached hereto

only 17.5 years of experience as a Major League umpire—at least 6.5 years less than Plaintiff. *See* Exhibit 51 at DEF 008083.

**ANSWER TO 95**: Undisputed that at the time of Paul Emmel's promotion to crew chief, he had 17.5 years of experience and that Plaintiff had 24 years of experience.

██   ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

**ANSWER TO 96**: Disputed and immaterial. Undisputed as to the first sentence of Paragraph 96. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████  In

---

as Exhibit 58, his 2011-2016 Year-End Evaluations are attached hereto as Collective Exhibit 59, and his 2011-2016 UERs are attached hereto as Collective Exhibits 60-65.

**ANSWER TO FOOTNOTE 3**: Undisputed.

MLB's judgment, unlike Plaintiff, Emmel demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players. (Torre Decl. ¶ 48.) Additionally, MLB concluded that Emmel, demonstrated the ability to read and react to situations, which made him a strong crew chief candidate, and he exemplified those qualities while serving as acting crew chief prior to his appointment to a full-time role. (*Id.*)

█████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

██   █████████████████████████████████████████

██████████████████████████████████████   When Plaintiff

missed five calls on the bases in one season, Plaintiff received only a "Meets Standard" rating, and

MLB stated that it was a "trend" that was a "slight concern" to them.  *See* Collective Exhibit 25,

Plaintiff's 2012 Year-End Evaluation, at DEF 001523.

**ANSWER TO 99**: ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████.  Undisputed as to the

second sentence of Paragraph 99 that in Plaintiff's 2012 year-end evaluation Plaintiff

received a Meets standard in Base Judgment, which stated "Three of your [Hernandez's]

missed calls were on force plays at first base.  This trend is a slight concern to the

Commissioner's Office and you should look at your positioning on the plays you missed

at first base to see if there are any notable differences when compared to the plays you are

getting correct." (Pl. Ex. 25, Dkt. 142-26 at DEF1523.) The comparisons Plaintiff seeks to make between these two assertions are immaterial because the "concerning trend" with Hernandez's performance was not that he missed five calls but that three of his missed calls were on force plays at first base. (*Id.*) Further, the performance rating in Paragraph 99 concern different years, making the comparison irrelevant to Plaintiff's motion for partial summary judgment.

100. Plaintiff has at least 6.5 years more experience than Emmel. *See* Exhibit 51 at DEF 008083; Exhibit 12 at DEF 001443.

**ANSWER TO 100**: Duplicative of Plaintiff's Paragraph 95. In any event, undisputed that at the time of Paul Emmel's promotion to crew chief, he had 17.5 years of experience and that Plaintiff had 24 years of experience.

101. Mike Everitt[4] was also promoted to crew chief for the 2017 season. Exhibit 52, DEF 008032.

**ANSWER TO 101**: Undisputed.

102. Everitt was promoted to crew chief by having his "interim" tag removed during the offseason. *See id.*; Torre Dep., 184:13-185:15, 189:17-190:11.

**ANSWER TO 102**: Undisputed and immaterial. Undisputed that following the 2016 season, Mike Everitt was notified by MLB that the "interim" was being removed from his crew chief appointment for the 2017 season. This assertion is immaterial because the circumstances of MLB's notifying Everitt that he would be a crew chief for the 2017 season

---

[4] Umpire Everitt's 2010 Mid-Year Evaluation is attached hereto as Exhibit 66, his 2010 Year-End Evaluation is attached hereto as Exhibit 67, his 2011-2016 Mid-Year Evaluations are attached hereto as Collective Exhibit 68, his 2011-2016 Year-End Evaluations are attached hereto as Collective Exhibit 69, and his 2011-2016 UERs are attached hereto as Collective Exhibits 70-75.
**ANSWER TO FOOTNOTE 4**: Undisputed.

are irrelevant to Plaintiff's motion for partial summary judgment.

103.    Everitt was not put through the same process as the other umpires promoted for the 2017 season, who were subject to a voting procedure used by MLB.  *See* Exhibit 76, DEF 008041 – DEF 008042.

**ANSWER TO 103**:  Disputed and unsupported by the evidence.  Torre testified that "Everitt ha[d] to go through the same process as the other crew chief candidates."  (Torre Tr. 184:13-185:3.)

███  ████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

███  ████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ This assertion is immaterial because Plaintiff does not provide any evidence that the number of Exceeds, Meets, and Does Not Meet that an umpire receives on his UERs determines his ratings on his year-end evaluations, and it ignores the additional sources of information used for creating year-end evaluations. In MLB's judgment, unlike Plaintiff, Everitt demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players. (Torre Decl. ¶ 49.) Additionally, MLB concluded that Everitt, displayed a composed and professional demeanor on and off the field that earned the respect of his peers, Club personnel, and players, and he mentored less experienced umpires. On multiple occasions during the 2016 season, MLB asked Everitt to join other crews to fill staffing gaps. This created trying demands on his travel schedule and required him to work collaboratively with a wide cross-section of umpires, all while serving as an interim crew chief with on multiple crews. MLB determined that he excelled under those difficult circumstances. (*Id.*)

███ ████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████
██████████████████████████████████████████████████



108. Plaintiff has at least six years more experience as a Major League umpire than

Everitt.  *See* Exhibit 12 at DEF 01443.

**ANSWER TO 108**:  Undisputed that as of the end of the 2014 season, Mike Everitt had 16 years of experience and Plaintiff had 22 years of experience.

109.    Sam Holbrook had 16.5 years of experience at the time he was promoted to crew chief for the 2017 season.[5] Exhibit 51, DEF 008083. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████  In MLB's judgment, unlike Plaintiff, Holbrook demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players. (Torre Decl. ¶ 50.)  Additionally, MLB concluded that Holbrook, demonstrated the ability to deescalate difficult on-field situations, and he has a strong command of the rules. Holbrook has served on a joint committee of MLB and the umpire's union on training,

---

[5] Umpire Holbrook's 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 78, his 2006-2009 Year-End Evaluations are attached hereto as Exhibit 79, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 80, his 2010 Year-End Evaluation is attached hereto as Exhibit 81, his 2011-2016 Mid-Year Evaluations are attached hereto as Collective Exhibit 82, his 2011-2016 Year-End Evaluations are attached hereto as Collective Exhibit 83, and his 2011-2016 UERs are attached hereto as Collective Exhibits 84-88.

**ANSWER TO FOOTNOTE 5**:  Undisputed.

which assists the parties in vetting rule changes and rules interpretations.  MLB determined

that when given interim crew chief responsibilities, Holbrook excelled in the role.  (*Id.*)

████  ████████████████████████████████████

██████████████████████████████

**ANSWER TO 110**:  Undisputed.

████  ████████████████████████████████████

████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

112.    Plaintiff had more seniority than each of the umpires promoted to crew chief for

the 2017 season.  *See* Exhibit 51 at DEF 008083; Exhibit 12 at DEF 001443.

**ANSWER TO 112**:  Undisputed.

113.    Torre did not conduct any side by side comparison of the umpires that applied for

the crew chief position for the 2017 season.  Torre Dep., 191:18-25.

**ANSWER TO 113**:  Disputed and unsupported by the evidence.  Torre testified that he

did not perform a "side-by-side comparison of game evaluations [UERs] between Angel

Hernandez" and the three umpires promoted to crew chief for the 2017 season.  (Torre Tr.

191:18-25.)

114.    Though MLB officials seemed to downplay this in their depositions (*see*, *e.g.*,

Woodfork Dep., 191:2-193:3), MLB has previously placed great emphasis on the seniority of crew chief candidates and expressed concern for promoting umpires to crew chief when those umpires have less seniority than other candidates. *See*, *e.g.*, Exhibit 89, DEF 008128; Marsh Dep., 239:8-240:23.

> **ANSWER TO 114**: Disputed, unsupported by the evidence, and immaterial. Plaintiff cites to an isolated incident in which Marsh, a non-decision-maker, expressed concern regarding promoting an umpire to crew chief over 31 umpires with more experience. (Marsh Tr. 239:16-24.) The cited materials do not establish that MLB had "previously" placed great emphasis" on "seniority." Disputed as to Plaintiff's assertion that MLB officials allegedly "downplay[ed]" anything at deposition. This assertion is contradicted by the record as MLB deponents testified that seniority was not "the overriding important factor[] in the decision." (McKendry Tr. 218:3-11; Torre Tr. 156:17-25; Marsh Tr. 47:25-48:4, 270:19-23.) This assertion is immaterial because whether MLB "previously placed" greater emphasis on seniority prior to 2011 is irrelevant to Plaintiff's motion for partial summary judgment.

115. No contemporaneous documentation has been provided about MLB's reasoning for why some umpires are promoted to crew chief and others are not. The only documentation asserting any rationale of that decision are letters sent to umpires who applied for but were not promoted to the crew chief position. *See* Exhibit 90, DEF 008127 – DEF 008131; Exhibit 91, DEF 008019 – DEF 008021; Exhibit 92, DEF 008046 – DEF 008049. Those letters are created after the promotion decisions are made, and seem to contain after-the-fact rationales for not promoting those umpires. *Id*. MLB at times may have held a conference call to discuss crew chief candidates, but no minutes or other written notes reflecting those meetings were produced by MLB. *See*, *e.g.*,

Exhibit 93, at DEF 007620.

**ANSWER TO 115**: Disputed, unsupported by the evidence, and improper argument. Disputed and unsupported by the evidence as to the first sentence of Paragraph 115. Defendants have provided numerous documents regarding the factors that it considers in making promotions to crew chief. (Torre Decl. Ex. E; Pl. Ex. 14, Dkt 142-15 at Response #4; Pl. Ex. 16, Dkt 142-17; Torre Tr. 82:10-19, 139:18-140:7, 142:18-143:2; Woodfork Tr. 25:4-14, 27:7-29:25; *see also* McKendry Tr. 218:22-219:5.) Disputed and unsupported by the evidence as to the second and third sentences of Paragraph 115 as to Plaintiff's assertion that MLB's letters sent to umpires not selected for crew chiefs contain "after-the-fact rationales." McKendry testified that these letters "memorialize the reason that [MLB] made the decision[s]" for crew chief. (McKendry Tr. 251:2-14; 255:19-22.) Woodfork also described that the rationales provided in the letters are the same as what is "provided when the [crew chief] decision is made." (Woodfork Tr. 139:5-11.) Disputed as to the fourth sentence of Paragraph 115 as to Plaintiff's characterization that MLB "at times may have a conference call." As the exhibit Plaintiff cites and the testimony reflects, the MLB umpiring department has a weekly conference call during the crew chief decision-making process to discuss crew chief candidates. (Pl. Ex. 93, Dkt 142-95; Woodfork Tr. 35:23-36:8, 85:17-86:4.)

116.   Plaintiff's on-field statistics also compares favorably to the white umpires who were promoted to crew chief over Plaintiff. *See* Exhibit 94, DEF 010814 – DEF 010831.

**ANSWER TO 116**: Disputed and unsupported by the evidence. An actual review of Plaintiff's Exhibit 94, which Plaintiff presents to the Court with no analysis at all, does not demonstrate that Plaintiff's "on-field statistics" compared favorably to nonminority

umpires. In fact, the statistics contained in this spreadsheet demonstrate that Plaintiff was below average in most seasons when compared to other umpires. Plaintiff's ZE rankings (his accuracy in calling balls and strikes compared to other umpires) were as follows: (i) In 2011, Plaintiff was 9 out of 67 ranked umpires; (ii) In 2012, Plaintiff was 46 out of 66 ranked umpires; (iii) In 2013, Plaintiff was 25 out of 68 ranked umpires; (iv) In 2014, Plaintiff was 61 out of 71 ranked umpires; (v) In 2015, Plaintiff was 49 out of 76 ranked umpires; (vi) In 2016, Plaintiff was 39 out of 75 ranked umpires; (vii) In 2017, Plaintiff was 45 out of 74 ranked umpires; and (viii) In 2018, Plaintiff was 39 out of 74 ranked umpires. Plaintiff's SURE rankings (measuring correct calls on the bases compared to other umpires) were as follows (SURE rankings are not available for the 2011 season): (i) In 2012, Plaintiff was 31 out of 66 ranked umpires; (ii) In 2013, Plaintiff was 56 out of 68 ranked umpires; (iii) In 2014, Plaintiff was 59 out of 71 ranked umpires; (iv) In 2015, Plaintiff was 40 out of 76 ranked umpires; (v) In 2016, Plaintiff was 55 out of 75 ranked umpires; (vi) In 2017, Plaintiff was 61 out of 75 ranked umpires and; (vii) In 2018, Plaintiff was 56 out of 74 ranked umpires. As Torre and Woodfork testified, Plaintiff is not better than most umpires on a statistical basis and can at times be below average. (Torre Tr. 166:3-15; Woodfork Tr. 190:4-11; *see also* McKendry Tr. 206:5-22.)

117.    Plaintiff's excellence calling balls and strikes continued even after the filing of this lawsuit. *See*, *e.g.*, Exhibit 95, DEF 014699 – DEF 014703.

**ANSWER TO 117**: Disputed and unsupported by the evidence. Disputed that Plaintiff was excellent at calling balls and strikes as contradicted by the record for the reasons cited in MLB's Answer to Paragraph 116, above. The assertion that his excellence calling balls and strikes "continued after the filing if this lawsuit" is not supported by the record because

he was below average in the 2018 season.  Plaintiff's cited document consists of Plaintiff's

ZE Score for one single game on October 6, 2017.

118.    When Bill Miller was promoted to crew chief for the 2013 season, he had 15 years

of experience as a Major League umpire.[6]  *See* Exhibit 105, DEF 007959 (showing Umpire Miller

had 14 years of experience entering the 2013 season).  ███████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████    ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████████

      █████████████████████████████████████████████████████████████████████████

---

[6] Umpire Miller's 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 96, his 2006-2009 Year-End Evaluations are attached hereto as Exhibit 97, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 98, his 2010 Year-End Evaluation is attached hereto as Exhibit 99, his 2011-2013 Mid-Year Evaluations are attached hereto as Exhibit 100, his 2011-2013 Year-End Evaluations are attached hereto as Collective Exhibit 101, and his 2011-2013 UERs are attached hereto as Exhibits 102-104.
      **ANSWER TO FOOTNOTE 6**:  Undisputed.

[REDACTED] In MLB's judgment, unlike Plaintiff, Miller demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players. (Torre Decl. ¶ 47.) MLB concluded that Miller, remained composed during tense situations, had strong situation-handling skills, and a firm command of the rules that was an asset to other crew members in the years leading up to his appointment to crew chief. (*Id.*)

119. Plaintiff has at least six years more experience than umpire Miller. *See* Exhibit 109 at DEF 007959.

**ANSWER TO 119**: Undisputed that as of November 2012, Bill Miller had 14 years of experience and Plaintiff had 20 years of experience.

121.    Marsh's only explanation for dropping Plaintiff from a "finalist" for the crew chief position was the incident in Cleveland discussed above.  Marsh Dep., 237:25-239:7.

**ANSWER TO 121**:  Disputed and unsupported by the evidence.  Disputed that Marsh "dropp[ed]" Plaintiff from the finalist position because, as discussed above, he is not a decision-maker.  Marsh testified that he did not "know if [the Cleveland incident] was the only thing [that happened to Plaintiff in 2013], but that was a major thing."  (Marsh Tr. 238:7-10.)

122.    Plaintiff was also more qualified than the other umpire promoted to crew chief in 2014, Jeff Nelson.  Jeff Nelson's 2011-2013 Mid-Year Evaluations are attached hereto as Exhibit 111, his 2011-2013 Year-End Evaluations are attached hereto as Exhibit 112, and his 2011-2013 UERs are attached hereto as Exhibits 113-115.

**ANSWER TO 122**:  Disputed, unsupported by the evidence, and improper argument.  Plaintiff does not cite to any evidence to support his conclusory assertion that he is more qualified than Jeff Nelson and it should therefore be disregarded.  Plaintiff attaches a compilation of Nelson's mid-year and year-end evaluations and his individual field observation reports without any analysis and without regard to the factors that MLB considers in making crew chief promotion decisions.  (*See* Woodfork Tr. 27:7-29:25, 61:8-19;  Torre Tr. 82:10-18, 139:16-140:7, 142:18-143:2.)   In MLB's judgment, unlike Plaintiff, Nelson demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players.  (Torre Decl. ¶ 46.)  Additionally, MLB concluded that Nelson, had strong situation handling and interpersonal skills, particularly while serving in an interim crew chief role in the years leading up to his appointment.  (*Id*.)

123.    Fieldin Culbreth had 16 years of experience at the time he was promoted to crew chief for the 2013 season.[7]  *See* Exhibit 105, DEF 007959.  ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████

        ████████████████████████████████████████████████

        ████████████████████████████████████████████████

        ████████████████████████████████████████████████

████████████████████████████████████████████████████████  In

MLB's judgment, unlike Plaintiff, Culbreth demonstrated consistency in leadership, the

ability to manage on-field situations, and communicated effectively with other umpires,

the Office, Club personnel, and players.  (Torre Decl. ¶ 44.)  Additionally, MLB concluded

that Culbreth, in contract to Plaintiff, had a demeanor on the field allowed him to defuse

on-field incidents and maintain control of games, and his interpersonal skills positively

contributed to the cohesiveness of his crew.  MLB commended Culbreth's demeanor and

situation-handling in the years leading up to his appointment, particularly while filling in



---

[7] Umpire Culbreth's 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 116, his 2006-2009 Year-End Evaluations are attached hereto as Exhibit 117, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 118, his 2010 Year-End Evaluation is attached hereto as Exhibit 119, his 2011-2012 Mid-Year Evaluations and his 2011-2012 Year-End Evaluations are attached hereto as Collective Exhibit 120, and his 2011-2012 UERs are attached hereto as Collective Exhibits 121-122.
    **ANSWER TO FOOTNOTE 7**:  Undisputed.

as an interim crew chief.  (*Id.*)

124.    As mentioned above, for the promotions made for the 2013 season, Plaintiff was a finalist but was not promoted to the crew chief position.  *See* Exhibit 110, at DEF 8001; Marsh Dep., 223:14-25.  Instead of promoting Plaintiff to the crew chief position, Marsh called Umpire Culbreth and asked Umpire Culbreth if he had applied for that position.  *See* Culbreth Dep., 16:6-18:8.  Umpire Culbreth would not have applied for that position had he not been contacted.  *Id*. at 19:16-22.  In fact, Umpire Culbreth testified that he did not initially apply at least in part because Plaintiff was "senior to [Umpire Culbreth] and every bit as capable," and that it was "right" for Plaintiff to be promoted to crew chief in 2013.  *Id*. at 15:3-16:11.

> **ANSWER TO 124**:  Disputed and immaterial.  Undisputed that for the 2013 season, Fieldin Culbreth did not initially apply to crew chief.  Marsh called Culbreth and asked if he had applied for the crew chief position.  (Culbreth Tr. 15:8-13, 17:9-18.)  After Culbreth's call with Randy Marsh, Joe West, another Major League umpire and president of the umpires' union, called Culbreth and asked him to apply for crew chief consideration. (Culbreth Tr. 17:19-18:3.)  Culbreth had applied for a crew chief position before 2013. (Culbreth Tr. 17:9-18:8, 27:25-28:10.)  The last sentence of Paragraph 124 is immaterial because Culbreth's personal motivation for not initially applying does not create an inference of discrimination and therefore is irrelevant to Plaintiff's motion for partial summary judgment.

125.    Plaintiff was also more qualified than one other umpire promoted to crew chief in 2013, Jim Joyce.  Jim Joyce's 2011-2012 Mid-Year Evaluations are attached hereto as Exhibit 123, his 2011-2012 Year-End Evaluations are attached hereto as Exhibit 124, and his 2011-2012 UERs are attached hereto as Exhibits 125-126.

**ANSWER TO 125**:  Disputed, unsupported by the evidence, and improper argument. Plaintiff does not cite to any evidence to support his conclusory assertion that he is more qualified than Jim Joyce, and it should therefore be disregarded.  Plaintiff attached a compilation of Joyce's mid-year and year-end evaluations and his individual field observation reports without any analysis and without regard to the factors that MLB considers in making crew chief promotion decisions.  (*See* Woodfork Tr. 27:7-29:25, 61:8-19;  Torre Tr. 82:10-18, 139:16-140:7, 142:18-143:2.)  In MLB's judgment, unlike Plaintiff, Joyce demonstrated consistency in leadership, the ability to manage on-field situations, and communicated effectively with other umpires, the Office, Club personnel, and players.  (Torre Decl. ¶ 45.)  Additionally, MLB concluded that Joyce, was adept at situation handling and excelled as an interim crew chief the year prior to his appointment.  (*Id.*)

**XI.**    **Other minority umpires, in addition to Plaintiff, have suffered as a result of the policies and practices implemented by MLB regarding crew chief promotion and World Series assignment decisions.**

   **XI.**    **Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

126.    Alfonso Marquez, like Plaintiff, is a Latino Major League umpire.[8]  Declaration of Angel Hernandez, ¶ 3.

**ANSWER TO 126**:  Undisputed.

███  ████████████████████████████████████████████████████████████

---

[8] Umpire Marquez's 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 127, his 2006-2009 Year-End Evaluations are attached hereto as Collective Exhibit 128, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 129, his 2010 Year-End Evaluation is attached hereto as Exhibit 130, his 2011-2016 Mid-Year Evaluations are attached hereto as Collective Exhibit 131, his 2011-2016 Year-End Evaluations are attached hereto as Collective Exhibit 132, and his 2011-2016 UERs are attached hereto as Exhibits 133-138.
       **ANSWER TO FOOTNOTE 8**: Undisputed.

**ANSWER TO 127**: Disputed and immaterial. Disputed that the cited testimony was in response to a question as to why Marquez has not been promoted to crew chief. This assertion is immaterial because Marsh was not a decision-maker with respect to any decision that is the subject of Plaintiff's motion for partial summary judgment. (Torre Tr. 22:6-12, 28:6-9; Woodfork Tr. 23:12-15; Manfred Tr. 29:22-30:4; McKendry Tr. 185:11-17.)

128.     Marquez, like Plaintiff, has served as an interim crew chief. Woodfork Dep., 70:25-71:7. Torre also confirmed that Marquez was still being considered for the crew chief position at the time of Torre's deposition. Torre Dep., 143:13-15.

**ANSWER TO 128**: Undisputed that Marquez has served as an interim crew chief and that Torre's testimony, which speaks for itself and is the best evidence, states that as of Torre's deposition in June 2019, Marquez was being considered for a permanent crew chief position.

129.     Kerwin Danley is an African-American Major League umpire.[9] Declaration of

---

[9] Umpire Danley's 2006-2009 Mid-Year Evaluations are attached hereto as Exhibit 139, his 2006-2009 Year-End Evaluations are attached hereto as Exhibit 140, his 2010 Mid-Year Evaluation is attached hereto as Exhibit 141, his 2010 Year-End Evaluation is attached hereto as Exhibit 142, his 2011-2016 Mid-Year Evaluation is attached hereto as Exhibit 143, his 2011-2016 Year-End Evaluations are attached hereto as Collective Exhibit 144, and his 2011-2016 UERs are attached hereto as Collective Exhibits 145-150.
**ANSWER TO FOOTNOTE 9**: Undisputed.

Angel Hernandez, ¶ 4.  Umpire Danley has been a Major League umpire for at least 20 years at the time crew chief promotion decisions were made for the 2017 season.  Exhibit 89 at DEF 008128.

**ANSWER TO 129**:  Duplicative of Plaintiff's Paragraph 83.  In any event, undisputed.





132. Though McKendry was evasive in his answers to basic questions regarding the qualifications of Marquez and Danley, McKendry confirmed in his deposition that both Umpire Marquez and Umpire Danley were qualified to be interim crew chief. McKendry Dep., 267:14-272:21. Both Torre and Marsh confirmed in their depositions that the duties of an interim crew chief were the same as the duties of a permanent crew chief. Torre Dep., 37:15-18; *see also* Marsh Dep., 54:16-25; Marsh Dep., 218:8-18.

ANSWER TO 132: Disputed and unsupported by the evidence and improper argument as to the first sentence of Paragraph 132 that McKendry was evasive in his answers, but undisputed that Danley and Marquez were qualified to be interim crew chiefs. Undisputed as to the second sentence of Paragraph 132 that the testimony of Torre and Marsh, which speaks for itself and is the best evidence, state that the duties of an interim crew chief are the same as the duties of a permanent crew chief. This assertion is immaterial to Plaintiff's motion for partial summary judgment because qualifications for permanent crew chief are different than interim crew chief and part of the evaluation of permanent crew chief applicants is the quality of performance in the interim crew chief role. (Torre Decl. ¶¶ 14, 33; McKendry Tr. 204:20-205:2; Woodfork Tr. 61:24-62:9, 70:8-22.)

133.    For the 2016 season, Plaintiff and Umpires Marquez and Danley were the most senior "number two" umpires on MLB's staff.  *See* Dkt. 52-6; Torre Dep., 201:4-202:5.

**ANSWER TO 133**:  Disputed and unsupported by the evidence.  Plaintiff supports this assertion by citing to a document that contains a list of umpire crews for the 2018 season and Torre's testimony regarding the contents of that document.  This document does not demonstrate whether Plaintiff, Marquez, and Danley were the most senior "number two" umpires on the MLB staff for the 2016 season.

134.    Curiously, Plaintiff and Umpires Marquez and Danley were the *only* number two umpires on MLB's umpire staff in 2016 to have crew chiefs with less seniority than them.  Dkt. 52-6.

**ANSWER TO 134**:  Disputed and unsupported by the evidence.  Plaintiff supports his assertion by citing to a list of umpire crews for the 2018 season.  This evidence does not demonstrate whether Plaintiff, Marquez, and Danley were the "only number two umpires on MLB's umpire staff in 2016 to have crew chiefs with less seniority than them."

135.    In his deposition, Manfred claimed not to know that the only number two umpires with more seniority than their crew chiefs were Plaintiff, Umpire Danley and Umpire Marquez— all minorities.  Manfred Dep., 63:1-10.

**ANSWER TO 135**:  Disputed, unsupported by the evidence, and immaterial.  Commissioner Manfred's testimony, which speaks for itself and is the best evidence, states that Commissioner Manfred was unaware whether "there [were] only two [umpire] crews [in 2019] where the number two umpire ha[d] more seniority than the crew chief" and "that both those number twos are minority umpires."  (Manfred Tr. 63:1-10.)  The Commissioner was not asked any questions concerning the seniority of Plaintiff, Danley or Marquez.  (*Id.*)

The Commissioner testified that "seniority is not a determining factor in terms of who is going to be a crew chief." (*Id*. at 63:12-14.) Disputed as to Plaintiff's improper characterization that Commissioner Manfred "claimed" not to know this as improper argument and immaterial.

136.     Plaintiff and Kerwin Danley were the most senior umpires who applied for the crew chief positions for the 2017 season. *See* Exhibit 89 at DEF 008128. Neither were promoted to crew chief—instead, individuals with far less experience were selected. *See id*.; Torre Dep., 156:3-14 (Torre answering "[if] we did, we did" when asked if he would agree that MLB passed over Plaintiff and Umpire Danley for crew chief positions).

> **ANSWER TO 136**: Undisputed as to the first sentence of Paragraph 136 that Plaintiff and Kerwin Danley had the most seniority among the 2017 crew chief applicant pool. Disputed as to the second sentence of Paragraph 136 as to Plaintiff's characterization that Mike Everitt, Paul Emmel, and Sam Holbrook had "far less experience" than Plaintiff and Kerwin Danley. At the time of their consideration for crew chief, Everitt had 18 years of experience, Emmel had 17.5 years of experience, Holbrook had 16.5 years of experience, Plaintiff had 24 years of experience and Danley had 20 years of experience. (Pl. Ex. 12, Dkt. 142-13 at DEF1443; Pl. Ex. 89, Dkt. 142-91.)

**XII.     Like its crew chief promotion process, MLB's World Series selection process is based on the subjective opinions of a handful of MLB umpire executives, all of whom largely ignore the objective data that is gathered for each umpire.**

> **XII.     Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

137.     In his deposition, Woodfork described the World Series selection process as follows:

> I think it's changed slightly over time, but predominantly the process is the group

81

meets, the supervisors, directors, Joe Torre, myself, other umpire department members discuss the umpires in a meeting, multiple days usually. Umpires are asked – I mean supervisors are asked usually previously to come up with their umpires that they think is deserving of the post season, the post season process. And then there's phone calls after that, make sure everyone is kind of on the same page, the supervisors, the directors, myself, usually Joe Torre, and that sets your post season.

Those post season umpires that work in the Division Series are usually the ones that are – have the opportunity to work in or are eligible to work in the World Series. Those World Series umpires are then discussed, those, excuse me, those Division Series umpires are then discussed with the group, supervisors, directors, again, to see who [is] the best and most deserving of the World Series. I discuss it with Joe Torre among those groups. There's recommendations that come, and Joe after discussions with myself, Joe usually – is the final decision maker.

Woodfork Dep., 22:14-23:15.

**ANSWER TO 137**: Undisputed that Woodfork's testimony, which speaks for itself and is the best evidence, is accurately quoted.

138. Torre testified that supervisors' subjective recommendations were "a big consideration" in World Series assignment decisions. Torre Dep., 154:16-155:8.

**ANSWER TO 138**: Disputed and unsupported by the evidence. In his testimony, which speaks for itself and is the best evidence, Torre agreed that Umpire Supervisor's recommendations are a big consideration for special events generally. (Torre Tr. 155:2-8.) Plaintiff does not cite any evidence to support the assertion that supervisor recommendations were "a big consideration" for World Series assignment decisions.

139. To be eligible to work in the World Series, MLB must first give the umpire an assignment to the Division Series in that same postseason. Woodfork Dep., 68:3-6. MLB has moved away from seniority as a factor in determining which umpires will receive World Series assignments. Torre Dep., 153:23-154:15. Instead, MLB focuses on "the combination [of] experience and performance for the year." Torre Dep., 31:7-11. Woodfork testified that the

umpires selected to the World Series may, in fact, "not be [the] highest performing umpires." Woodfork Dep., 67:21-68:25.

**ANSWER TO 139**:  Undisputed as to the first sentence of Paragraph 139 that in order to be eligible to umpire in the World Series, an umpire must have worked in that year's Division Series.  (Woodfork Tr. 68:3-6, 145:22-146:2.)  Undisputed as to the second sentence of Paragraph 139 that seniority is not a determinative factor, and since Torre started with MLB, an umpire's merit is always valued above his seniority.  (Torre Tr. 153:23-154:15; Woodfork Tr. 191:2-15; Marsh Tr. 47:25-48:4.)  Undisputed as to the third sentence of Paragraph 139 that in determining which umpires to select for the World Series, Torre testified that MLB focuses on "their combination [of] experience and performance for the year", and that MLB's goal is to put the highest performing umpires into the World Series.  (Torre Tr. 31:7-13; Woodfork Tr. 44:4-19, 67:21-68:25, 213:4-6; Manfred Tr. 33:11-16.)  Undisputed as to the fourth sentence of Paragraph 139 that Woodfork's testimony, which speaks for itself and is the best evidence, states that "it may not be your highest performing umpire[s] . . . based on all factors" including having worked the World Series previously, needing time off, not working back to back World Series, and ensuring that strong umpires are available to work in other postseason games.  (Woodfork Tr. 68:7-22.)

**XIII.  Plaintiff was qualified for both the 2015 and 2016 World Series, but MLB chose to not assign him to either.**

**XIII.  Plaintiff's heading should not be viewed as asserting a fact, but to the extent that it is considered, the statement is disputed and unsupported by the evidence.**

140.    Plaintiff was last selected to umpire a World Series in 2005.  Exhibit 9 at DEF 007654.  Prior to the 2016 season, Plaintiff had umpired in 18 total postseason games: the Division

Series eight times, the League Championship series eight times, and the World Series twice. *See id*.

**ANSWER TO 140**: Undisputed.

141. Plaintiff was qualified for the 2015 World Series, and indeed was a candidate for the 2015 World Series. *See* Exhibit 151, DEF 008002. Plaintiff received at least one supervisor vote for the 2015 World Series. *See* Exhibit 152, DEF 007615; Exhibit 153, DEF 007813.

**ANSWER TO 141**: Disputed and unsupported by the evidence as to the first sentence of Paragraph 141. Plaintiff presents no record evidence that he was "qualified" for the 2015 World Series or that MLB considered him to be qualified in 2015. MLB did not consider him to be qualified to umpire the most critical games of that season because of, among other things, his inability to move past his mistakes and refocus on the game, lack of accountability, and difficulties in handling and diffusing on-field situations. (Torre Decl. ¶¶ 19-42.) From 2011 through 2016, Torre believed that each umpire chosen for the World Series was more deserving of it than Plaintiff. (Torre Tr. 46:24-47:4.) Disputed as to Plaintiff's characterization of recommendations from umpire supervisors as "votes" in the second sentence of Paragraph 141, but otherwise undisputed.

142. Plaintiff also received votes for at least the 2011 and 2012 World Series. *See* Exhibit 154, DEF 007608; Exhibit 155, DEF 007884; Exhibit 156, DEF 007991; Exhibit 157, DEF 007999; Marsh Dep., 220:5-9, 222:6-8.

**ANSWER TO 142**: Disputed as to Plaintiff's characterization of recommendations from MLB Supervisors, who are not decision-makers with respect to World Series assignments, otherwise undisputed.

143. In an email titled "WS Totals," sent by Rich Rieker (an MLB employee) to

Woodfork on October 16, 2015, Mr. Rieker writes to Woodfork that Woodfork can "[t]ake Angel out if [he] want[s]" and that Woodfork and Torre should put "who they want in from the suggestions." Exhibit 158, DEF 007912.

> **ANSWER TO 143**: Undisputed and immaterial. Undisputed that the cited email, which speaks for itself and is the best evidence, accurately quotes Rieker. Immaterial because Rieker is not a decision-maker with regard to the World Series.

144. That same day, Woodfork texted Torre that "Angel is going to be a no for Rob." Exhibit 159, DEF 0015451.

> **ANSWER TO 144**: Undisputed that Woodfork's October 16, 2015, text to Torre, which speaks for itself and is the best evidence, states that "Angel is going to be a no for Rob." (Pl. Ex. 159, Dkt 142-166.) The assertion is immaterial because Woodfork testified that his text was based on his "presumption on the situation" and that he did not "recall having conversations with . . . Commissioner [Manfred] about Angel Hernandez and the World Series in 2015." (Woodfork Tr. 155:15-156:18.) Commissioner Manfred testified that he "certainly did not have a conversation with [Woodfork] about it." (Manfred Tr. 55:4-20.)

145. Woodfork testified that the text message to Torre was an "assumption" on Woodfork's part that Robert Manfred would not approve of Plaintiff being given a World Series assignment. Woodfork Dep., 151:16-156:11. The dates of that email and text message support that Plaintiff was on track to be selected for the 2015 World Series before MLB officials intervened and--without explanation--removed him from consideration. *See* Marsh Dep., 265:18-266:4 ("[w]ell, going by the date [of the text], that is usually when [MLB] make[s] the World Series selections"); Woodfork Dep., 151:25-153:19.

> **ANSWER TO 145**: Undisputed as to the first sentence of Paragraph 144 that Woodfork's

testimony, which speaks for itself and is the best evidence, states that Woodfork's text was his "presumption" regarding Commissioner Manfred's thoughts for the umpires to be assigned to the 2015 World Series. Disputed as improper argument as to Plaintiff's unsupported conclusion in the second sentence of Paragraph 145 that these documents "suggest" that MLB officials "intervened" and removed Plaintiff "without explanation." Plaintiff fails to cite to any record evidence to support this assertion and it should therefore be disregarded.

146.    MLB considered giving Plaintiff a Division Series assignment in 2016, thereby qualifying Plaintiff for the 2016 World Series, but ultimately chose not to. *See* Exhibit 160 at DEF 014727 (noting that "Diaz and/or Hernandez" could be moved to the Division Series).

**ANSWER TO 146**: Disputed, and unsupported by the evidence. Plaintiff cites to a September 2016 email from McKendry providing a draft of possible permutations of umpires for postseason assignments. That draft shows Plaintiff slated to work in the National League Championship Series. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████McKendry's email does not support Plaintiff's assertion that "MLB considered giving Plaintiff a Division series assignment in 2016," nor that MLB "ultimately chose not to."

147.    Umpires Guccione, Hirschbeck, Holbrook, Hudson, Randazzo, Vanover and West were assigned to the 2016 World Series. *See* Exhibit 2, Declaration of Angel Hernandez, at ¶ 5.

**ANSWER TO 147**: Undisputed.

148.    At the time of that selection, four of those umpires—Guccione, Hudson, Randazzo and Vanover—had never been selected for a World Series. *See* Exhibit 161 at DEF 007618.

**ANSWER TO 148**:  Undisputed.

149.    Marsh had previously pointed out to MLB supervisors and Woodfork that using "four new umpires in the World Series" was "unusual" and that MLB had "usually used two or three [new umpires] at the maximum."  Exhibit 162 at DEF 007813.

**ANSWER TO 149**:  Undisputed and immaterial.  Undisputed that Marsh's October 16, 2015 email, which speaks for itself and is the best evidence, contains Marsh's view that it "was unusual when [MLB] used four new umpires in the World Series" in 2014.  This statement is immaterial because it was not related to the selection of Guccione, Hudson, Randazzo, and Vanover for the 2016 World Series.  It is also immaterial because Marsh was not a decision-maker with respect to any of the employment decisions that are the subject of Plaintiff's motion for partial summary judgment.

Dated:  New York, New York
         June 5, 2020

PROSKAUER ROSE LLP

By:     /s/ *Neil H. Abramson*
        Neil H. Abramson, Esq.
        Adam M. Lupion, Esq.
        Rachel S. Philion, Esq.
        Rachel S. Fischer, Esq.

        Eleven Times Square
        New York, New York 10036-8299
        Phone:  212.969.3000
        Fax:  212.969.2900
        nabramson@proskauer.com
        alupion@proskauer.com
        rphilion@proskauer.com
        rfischer@proskauer.com

        *Attorneys for Defendants*
        THE OFFICE OF THE
        COMMISSIONER

OF BASEBALL AND MAJOR
LEAGUE BASEBALL BLUE, INC.