Kevin L. Murphy (*pro hac vice*)
J. Jeffrey Landen (*pro hac vice*)
Nicholas R. Gregg (*pro hac vice*)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
(859) 360-1123

&

Nicholas J. Zaita
LEWIS DIBIASI ZAITA & HIGGINS
420 Lexington Avenue, Suite 300
New York, NY 10107
(212) 772-0943

*Attorneys for Plaintiff Angel Hernandez*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANGEL HERNANDEZ<br><br>     PLAINTIFF,<br><br>V.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL AND MAJOR LEAGUE BASEBALL BLUE, INC.,<br><br>     DEFENDANTS. | CASE NO: 18-CV-09035-JPO-GWG |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION TO EXCLUDE DR. GREGORY BAXTER**

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     ARGUMENT .........................................................................................................2

  A.    *Baxter is qualified to render opinions on the relationship between the UERs and the Year-End Evaluations.* ...................................................................................................2

  B.    *The analysis conducted by Dr. Baxter, as reflected in his Report, requires specialized expertise that a normal lay person does not possess.* ..............................................6

    i.    **Dr. Baxter's analysis of the performance evaluations at issue requires specialized expertise.** .............................................................................6

    ii.   **Dr. Baxter's ability to review and analyze a voluminous number of documents is itself a specialized skill.** ........................................................7

  C.    *Dr. Baxter's testimony is reliable.* ...................................................................11

    i.    **The absence of a control group for purposes of Dr. Baxter's analysis does not warrant excluding his opinion.** .............................................11

      a.    The absence of a control group does not render Dr. Baxter's expert opinion on causation to be unreliable. ..................................................*11*

      b.    The absence of a control group has no bearing on whether the Year-End Evaluations analyzed by Dr. Baxter accurately reflect the corresponding UERs. ................................................................*13*

    ii.   **Dr. Baxter was not required to consider the purported "alternative explanations" identified in MLB's Motion because there is no evidence in the record demonstrating the substance of those "alternative explanations" and what potential impact, if any, those "alternative explanations" had on MLB's employment decisions regarding the umpires at issue.** ..................................................................13

    iii.  **Dr. Baxter's methodology is clearly stated in his Report and is easily replicable.** ....................................................................................19

    iv.   **Dr. Baxter's methodology is reliable.** ..............................................22

    v.    **Dr. Baxter's opinion and testimony are relevant to Plaintiff's claims in this case.** ........................................................................................24

III.    CONCLUSION ...................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Anderson v. Sotheby's Inc. Severance Plan*,
No. 04-cv-8180 (SAS) (DF), 2005 WL 1412965 (S.D.N.Y. June 13, 2005) .................................. 8, 9

*Arista Records LLC v. Lime Grp. LLC*,
No. 06 CV5936KMW, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ............................................. 2, 3

*Arista Records LLC v. Usenet.com, Inc.*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009)................................................................................................3

*Brink v. Union*,
41 F. Supp. 2d 402 (S.D.N.Y. 1997)................................................................................................8

*Campbell v. Nat'l R.R. Passenger Corp.*,
311 F. Supp. 3d 281 (D.D.C. 2018)................................................................................................19

*Caruso v. Bon Secours Charity Health Sys., Inc.*,
No. 14-cv-4447 (VB), 2016 WL 8711396 (S.D.N.Y. August 5, 2016) .............................................19

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*,
No. 99 Civ. 1725, 2003 WL 1878246 (S.D.N.Y. Apr. 11, 2003) ...........................................................3

*Cunningham v. Cornell Univ.*,
No. 16-cv-6525 (PKC), 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ............................................21

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ......................................................... 22, 25

*Doe v. Colgate Univ.*,
760 F. App'x 22 (2d Cir. 2019)..........................................................................................................5

*EMA Fin., LLC v. 5Barz Int'l, Inc.*,
No. 18-CV-4995 (VEC), 2019 WL 8503357 (S.D.N.Y. Sept. 18, 2019)………………………..21

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
No. 11-cv-6201 (DLC), 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015)................................................12

*Forte v. Liquidnet Holdings, Inc.*, No. 14-cv-2185 (AT),
2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015) ..................................................................................18

*Guild v. Gen. Motors Corp.*,
53 F. Supp. 2d 363, 369 (W.D.N.Y. 1999) .................................................................................. 22, 25

*Hatala v. Port Auth. of NY & NJ*,
No. 15CIV9218ATJCF, 2017 WL 9832293 (S.D.N.Y. Oct. 30, 2017) ...................................... 1, 3, 4

*In re Fosamax Prods. Liab. Litig.*,
  645 F. Supp. 2d 164 (S.D.N.Y. 2009) .................................................................................1

*In re Lyondell Chem. Co.*,
  558 D.R. 661 (Br. S.D.N.Y. 2016) ....................................................................................10

*In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*,
  No. 1:00-1898, 2008 WL 1971538 (S.D.N.Y. May 7, 2008) ..................................... 2, 3, 4

*In re Puda Coal Securities, Inc. Litigation*,
  30 F. Supp. 3d 230 (S.D.N.Y. 2014) ................................................................................ 5, 6

*In re Zyprexa Prods. Liab. Litig.*,
  489 F. Supp 2d 230 (E.D.N.Y. 2007 ..................................................................................3

*Koppell v. N.Y. State Bd. of Elections*,
  97 F. Supp. 2d 477 (S.D.N.Y. 2000) ................................................................................21

*Kumho Tire, Co. v. Carmichael*,
  526 U.S. 137, 119 S.Ct. 1167, 143 L.E.2d 238 (1999) .....................................................1

*Lassen v. Hoyt Livery, Inc.*,
  No. 13-CV-1529 (VAB), 2016 WL 7165716 (D. Conn. Dec. 8, 2016) ........................... 7, 9

*Linde v. Arab Bank, PLC*,
  922 F. Supp. 2d 316 (E.D.N.Y. 2013) ............................................................................. 8, 9

*LinkCo, Inc. v. Fujitsu Ltd.*,
  No. 00-cv-7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002) .............................10

*LVL XIII Brands v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016) ..............................................................................21

*McCullock v. H.B. Fuller Co.*,
  61 F.3d 1038 (2d Cir. 1995) ........................................................................................ 22, 25

*Mello v. Siena Coll.*,
  No. 15-cv-0013 (GTS) (ATB), 2017 WL 1013077 (N.D.N.Y. Mar. 14, 2017) .................8

*R.F.M.A.S., Inc. v. So*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010) ..............................................................................18

*Restivo v. Hessemann*,
  846 F.3d 547 (2d Cir. 2017) ..............................................................................................1

*Scott v. Chipotle Mexican Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ..............................................................................1, 7, 9, 22

*Tardif v. City of N.Y.*,
    344 F. Supp. 3d 579 (S.D.N.Y. 2018)................................................................17, 18

*TC Sys., Inc. v. Town of Colonic New York*,
    213 F.Supp.2d 171 (N.D.N.Y. 2002) ..........................................................................2

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    576 F. Supp. 2d 457 (S.D.N.Y. 2007)..........................................................................3

*United States v. Brow*,
    No. 05-CV-1607 (SLT), 2009 WL 4746344 (E.D.N.Y. Dec. 7, 2009)............................21

*Wilson v. Muckala*,
    303 F.3d 1207 (10th Cir. 2002) ..................................................................................8

**Statutes**

Fed. R. Evid. 702 ............................................................................................................2

**Journals**

A. Rexha, M. Kröll, H. Ziak, *et al.*, <u>Authorship identification of documents with high content similarity</u>, Scientometrics 115 ........................................................................24

J.K. Arnulf, K.R. Larsen, Ø.L. Martinsen, *et al.,* <u>The failing measurement of attitudes: How semantic determinants of individual survey responses come to replace measures of attitude strength,</u> Behavior Research Methods 50 (2018)..................................................23

Kim Nimon, Brad Shuck, Drea Zigarmi, <u>Construct Overlap Between Employee Engagement and Job Satisfaction: A Function of Semantic Equivalence?,</u> Journal of Happiness Studies (2015)....23

S. Vasudevan, M. Singh, J. Mondal, *et al.*, <u>Estimating Fungibility Between Skills by Combining Skill Similarities Obtained from Multiple Data Sources</u>, Data Sci. Eng. 3 (2018) ..................................23

Vedant Das Swain, Koustuv Saha, Manikanta D. Reddy, Hemang Rajvanshy, Gregory D. Abowd, Munmun De Choudhury, <u>Modeling Organizational Culture with Workplace Experiences Shared on Glassdoor</u>........................................................................................23

**Other**

"Making Sense of 'Word Salad," https://www.merriam-webster.com/words-at-play/word-salad#:~:text=Word%20salad%20began%20as%20a,language%20is%20translated%20into%20another) (last visited June 18, 2020). ........................................................................21

Plaintiff Angel Hernandez, by and through counsel, hereby submits his Memorandum in Opposition to Defendants' Motion to Exclude Dr. Gregory Baxter (Dkt. 157, 158, 161) (the "Motion").

## I.   INTRODUCTION

"When determining the admissibility of non-scientific expert evidence, 'a trial court *may* consider one or more of the . . . factors that *Daubert* mentioned when doing so will help determine that testimony's reliability." *Hatala v. Port Auth. of NY & NJ*, No. 15CIV9218ATJCF, 2017 WL 9832293, at *2 (S.D.N.Y. Oct. 30, 2017) (internal citations omitted) (emphasis in original). As the *Hatala* Court noted, "the *Daubert* inquiry is a flexible one and the factors *Daubert* mentions do not constitute a definitive checklist or test." *Id.* (citing *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017)) (internal quotations omitted). "In light of the admissibility standards of the Federal Rules of Evidence, exclusion of expert testimony is warranted only when the district court finds 'serious flaws in reasoning or methodology.'" *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 43 (S.D.N.Y. 2016) (citing *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)). "Otherwise, if an expert's testimony falls within 'the range where experts might reasonably differ,' the duty of determining the weight and sufficiency of the evidence on which the expert relied lies with the jury, rather than the trial court." *Id.* (citing *Kumho Tire, Co. v. Carmichael*, 526 U.S. 137, 153, 119 S.Ct. 1167, 143 L.E.2d 238 (1999)).

As is explained more fully below, Dr. Gregory Baxter ("Dr. Baxter") is a qualified human resources expert whose specialty in that expertise is "performance reviews – performance review processes, selection and promotion processes." Deposition of Dr. Baxter ("Dr. Baxter Dep."), 107:25-108:4, attached hereto as Exhibit 1. In rendering his Expert Report in this case (Dkt. 162-1, Pages 254-363 of 440) (the "Report"), Dr. Baxter drew from that expertise, which itself is based on Dr. Baxter's decades' worth of knowledge, skill, experience and training in this area. The expert

opinion rendered by Dr. Baxter is precisely the kind of expert opinion that will aid the jury in helping to understand not only the massive amounts of information and documents that were reviewed by Dr. Baxter in connection with rendering his opinion, but also in comprehending and fully appreciating the effects of the discrepancies identified by Dr. Baxter in his Report. As discussed more fully below, MLB's arguments do not provide any legitimate basis for excluding Dr. Baxter from providing his expert opinion to the jury. As such, MLB's Motion should be denied in its entirety, and Dr. Baxter should be permitted to assist the jury by testifying at trial.

## II.   ARGUMENT

### A.   Baxter _is_ qualified to render opinions on the relationship between the UERs and the Year-End Evaluations.

MLB contends in its Motion that Dr. Baxter is not qualified to render the opinion found in his Report, and detailed further in his deposition, because Dr. Baxter is not an expert on Major League umpires. _See, e.g._, Motion, Page 16-17 of 31. But MLB's self-serving mischaracterization of the expertise it asserts is required for Dr. Baxter to render his opinion does nothing to warrant excluding Dr. Baxter and granting MLB's Motion. Dr. Baxter has decades' worth of knowledge, skill experience, training and education on the subjects of performance evaluations, performance evaluation processes, and selection and promotion processes—_the very areas that are the subject of his Report_.

"An expert can be qualified by 'knowledge, skill, experience, training, or education' to offer opinions that will assist the trier of fact." _In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig._, No. 1:00-1898, 2008 WL 1971538, at *5 (S.D.N.Y. May 7, 2008) (citing Fed. R. Evid. 702). "Courts within the Second Circuit have 'liberally construed expert qualification requirements.'" _Id._ (citing _TC Sys., Inc. v. Town of Colonic New York_, 213 F.Supp.2d 171, 174 (N.D.N.Y. 2002)); _see also Arista Records LLC v. Lime Grp. LLC_, No. 06 CV5936KMW, 2011 WL 1674796, at *2 (S.D.N.Y. May 2, 2011) (internal citations omitted).

As MLB acknowledges in its Motion, "[i]n order to determine whether a witness is qualified

to render an expert opinion, a court 'must first ascertain whether the proffered expert has the educational background or training in a relevant field' . . . by looking at the 'totality of [the] witness's background." *Arista Records LLC,* 2011 WL 1674796 at *2 (citing *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, No. 99 Civ. 1725, 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003) and *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009)). "A witness may be qualified based on any one or more of the qualities listed in Rule 702—knowledge, skill, experience, training, or education." *Id.* (citing *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007)). After determining that an expert has "the educational background or training in a relevant field," the Court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *Id.* (citing *In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 2008 WL 1941538 at *6). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *Id.* (citing *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp 2d 230, 282 (E.D.N.Y. 2007)); *see also Hatala*, 2017 WL 9832293 at *3 ("[w]here, as here, a proffered expert has the requisite minimal education or experience in a relevant field, the court will not bar the expert from testifying merely because he or she lacks expertise matching the narrow dispute in the lawsuit").

In its Motion, MLB characterizes Dr. Baxter's opinion as being one about "umpiring baseball games" or "umpire performance." Motion, Page 16 of 31. MLB asserts that Dr. Baxter must therefore be qualified as an expert in "umpiring baseball games" or "umpire performance." But these characterizations of Dr. Baxter's Report are inaccurate. Dr. Baxter's Report does not offer opinions about an umpire's on-field performance, but rather offers opinions about the consistency of MLB's performance review processes and promotion and selection processes. Dr. Baxter's Report involves the comparison of Umpire Evaluation Reports (performance evaluations conducted by MLB umpire

supervisors or observers for individual games) ("UERs") to the corresponding Year-End Evaluations (which are cumulative and purport to reflect an umpire's performance for the whole year). This comparison does not require any particular expertise in "umpiring baseball games," but instead requires "knowledge, skill, experience, training or education" regarding the construction and proper use of performance evaluations such as the UERs and the Year-End Evaluations that are the subject of Dr. Baxter's Report. MLB's insistence on characterizing Dr. Baxter's opinion as one about umpire performance, rather than about MLB's performance review processes and how those processes have affected the minority umpires at issue, is nothing more than an attempt at misdirection.

Dr. Baxter checks every box required to be deemed qualified under *Daubert* and Fed. R. Evid. 702—Dr. Baxter has knowledge, skill, experience, training *and* education regarding the subject of performance evaluations. Dr. Baxter has over 40 years of human resources experience, and he has undertaken substantial training and education, including various certification tests, in that area. Dr. Baxter Dep., 103:3-8; *see also* Affidavit of Gregory Baxter, Dkt. 145-5, Page 1 of 4, ¶ 2. Moreover, Dr. Baxter himself has taught, among other things, "organizational behavior," "human resources management" and "organizational theory"—subjects directly relating to his Report. *See* Dr. Baxter's curriculum vitae, Dkt. 159-1, Page 263 of 440. Dr. Baxter himself testified in his deposition that his human resources expertise was based on "knowledge, experience and training in human resources matters and **particularly performance reviews – performance review processes, selection and promotion processes**." Dr. Baxter Dep., 107:25-108:4 (emphasis added).

Given Dr. Baxter's extensive knowledge, skill, experience, training *and* education in human resources, with a particular focus on performance reviews, performance review processes, and selection and promotion processes, Dr. Baxter is more than qualified to offer the opinions found in his Report. *See In re Methyl Tertiary Butyl Ether*, 2008 WL 1971538 at *5; *Hatala*, 2017 WL 9832293 at *3. MLB's Motion as to Dr. Baxter's qualifications should thus be denied.

The cases cited by MLB in support of its Motion on this issue do not warrant any contrary result.  In *Doe v. Colgate Univ.*, 760 F. App'x 22 (2d Cir. 2019), the court excluded an expert who offered opinions "about procedural deficiencies in the University's handling of Jon Doe's [Title IX] case."  *Id.* at 29.  The sole qualification the expert had in *Colgate Univ.* is that she wrote "several articles on sexual assault."  *Id.*  at 28.  As to the expert's qualifications, the *Colgate Univ.* court found that the district court "reasonably concluded that Gruber's lack of experience investigating sexual assault and familiarity with Title IX training and investigations rendered her unqualified to opine on the propriety of Brogan's investigation." *Id.* at 29.

Dr. Baxter's qualifications and experience far exceed the qualifications of the expert excluded in *Colgate Univ.* and directly relate to the opinions Dr. Baxter offers in his Report. While the *Colgate Univ.* expert's qualifications were limited to having written "several articles on sexual assault," rather than how to investigate sexual assault, Dr. Baxter's qualifications, as discussed above, include decades' worth of knowledge, skill, experience, training and education in the fields of "human resources," "performance reviews," "performance review processes" and "selection and promotion processes"— the very areas of expertise on which his opinion and Report are based.  Those areas concern the analysis of performance evaluations, whereas the expert in *Colgate Univ.* was found unqualified to be an expert in investigations of sexual assault claims.  *Colgate Univ.* therefore provides no legitimate legal support for MLB's contention that Dr. Baxter is not qualified to offer the opinions found in his Report.  On the contrary, *Colgate Univ.* highlights that the expertise needed is in relation to the function provided (in that case, investigation of sexual assault claims; in this case, review of performance evaluations), which is precisely what is happening here.

MLB's reliance on *In re Puda Coal Securities, Inc. Litigation*, 30 F. Supp. 3d 230 (S.D.N.Y. 2014) ("*Puda*"), is similarly misplaced.  In *Puda*, the Court noted that the relevant standard of care was "the standard of care applicable to auditors conducting an audit of a U.S. registered company pursuant to

PCAOB standards." *Id.* at 254. The expert in *Puda*, while "an expert in Hong Kong and/or PRC generally accepted auditing standards," lacked expertise as to the applicable standard of care. *Id.* As the *Puda* court noted, "[i]t is not a matter of 'not enough' expertise on PCAOB standards; rather, it is that [the expert] has none." *Id.*

Dr. Baxter's Report has nothing to do with any applicable "standard of care" for umpires. Dr. Baxter's Report instead contains opinions regarding MLB's performance reviews, the process resulting in those performance reviews, and MLB's selection and promotion processes. Unlike the expert's qualifications in *Puda*, Dr. Baxter's qualifications, as described in detail above, relate precisely to the opinions found in his Report regarding "performance reviews," "performance review processes," and "selection and promotion processes." *Puda* is therefore also inapplicable to the case currently before the Court.

> B. *The analysis conducted by Dr. Baxter, as reflected in his Report, requires specialized expertise that a normal lay person does not possess.*

> i. **Dr. Baxter's analysis of the performance evaluations at issue requires specialized expertise.**

MLB's next contention in support of its Motion is that Dr. Baxter's expert opinion required no specialized expertise to render because Dr. Baxter purportedly "acknowledged that no 'single specific step' of his analysis 'require[d] special expertise' and that '[y]ou could probably train most people to do it.'" Motion, Page 18 of 31. While MLB selectively chooses individual phrases out of a more detailed answer from Dr. Baxter, MLB fails to acknowledge in its Motion the remainder of Dr. Baxter's statement: "I think that reviewing hundreds of UERs to detect a pattern of performance by the author and then looking at dozens – I don't think anybody had over 95 UERs in a year. Looking at 95 UERs to determine what happened, with regard to the proper reporting of the umpire's performance, **I don't think the average non-human resources manager could do that**. Maybe people with degrees in industrial relations and human resources just have the skills to do it faster and

better.  You could probably train most people to do it." Dr. Baxter Dep., 220:20-221:9 (emphasis added).  That anybody can be taught to do Dr. Baxter's analysis does not mean (i) that everyone knows how to do it, and (ii) that it is easy to teach.

MLB's cherry-picking of Dr. Baxter's testimony, and the portions of that testimony omitted from MLB's Motion, highlight the inadequacy of MLB's position that Dr. Baxter's analysis does not require any specialized expertise.  Using his expertise and extensive knowledge, skill, experience, training and education in human resources—particularly "performance reviews," "performance review processes" and "selection and promotion processes"—Dr. Baxter is uniquely situated to provide an opinion on MLB's performance evaluations and the processes regarding those evaluations. Dr. Baxter's statement that "[y]ou could probably train most people to do it" is correct, and Dr. Baxter's specialized expertise is made evident by the simple fact that **Dr. Baxter has been so trained**. Certainly, neither MLB nor the Court can assume that there would be even one, let alone multiple, jurors in this case that have been trained to undertake the analysis performed by Dr. Baxter.  Dr. Baxter's knowledge, skill, experience, training and education render him particularly suited to perform the analyses found in his Report and provide his opinion to lay jurors.

> ii. *Dr. Baxter's ability to review and analyze a voluminous number of documents is itself a specialized skill.*

Moreover, and as Dr. Baxter testified, undertaking an analysis of the substantial number of documents at issue is itself a specialized skill.  *See* Dr. Baxter Dep., 131:2-15.  An expert's testimony is "admissible where it 'synthesizes' or 'summarizes' data in a manner that 'streamline[s] the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'"  *Scott*, 315 F.R.D. at 45; *see also Lassen v. Hoyt Livery, Inc.*, No. 13-CV-1529 (VAB), 2016 WL 7165716, at *11 (D. Conn. Dec. 8, 2016) (citing to *Scott* and further noting that "[f]reely admitted is expert testimony that is likely to substantially assist the average person in understanding the case—even if it simply explains facts

and evidence already in the record"); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 331-332 (E.D.N.Y. 2013) (permitting an expert to testify and denying a *Daubert* motion to exclude where the expert "synthesize[d]" the material he reviewed "and pull[ed] together common themes in reaching his conclusions"). Dr. Baxter reviewed at least 1,088 UERs and 18 Year-End Evaluations, and conducted a detailed analysis of how those evaluations compared to the minority umpires' respective Year-End Evaluations. *See* Affidavit of Dr. Baxter, attached hereto as Exhibit 2, ¶ 4. Dr. Baxter testified that it took him "weeks and weeks" to simply review those documents (Dr. Baxter Dep., 211:17-212:4), and it is obviously unlikely that there will be enough time at the jury trial in this matter to conduct that same analysis with the jurors themselves.

MLB asserts that "[c]ourts in this district have held that the simple act of comparing documents utilizes no specialized expertise," and cites to *Anderson v. Sotheby's Inc. Severance Plan*, No. 04-cv-8180 (SAS) (DF), 2005 WL 1412965 (S.D.N.Y. June 13, 2005), as the sole legal authority for that assertion.[1] In *Anderson*, the expert compared two compensation packages for only a two-year period. The Court found that "[e]verything that [the expert] has included in his report, however, will be brought out at trial through lay witnesses," and that it was therefore "highly unlikely" the court "will need the assistance of an expert in the field of executive compensation to make the appropriate comparisons." *Id.* at *3.

---

[1] MLB also cites three cases in support of its broad assertion that "courts are skeptical of expert testimony regarding human resources practices." Motion, p. 18 of 31. But none of those cases support MLB's broad assertion that courts are, or even should be, "skeptical of expert testimony regarding human resources practices." In *Wilson v. Muckala*, 303 F.3d 1207 (10th Cir. 2002), the expert intended to testify about "the Hospital's response plan in cases of sexual harassment, and the reasonableness of the Hospital's response to Ms. Wilson's claim." *Id.* at 1218. The *Wilson* Court found that the specific issues on which the expert intended to testify "were not so impenetrable as to require expert testimony." *Id.* at 1219. In *Brink v. Union*, 41 F. Supp. 2d 402 (S.D.N.Y. 1997), the court found that the human resources expert was not qualified "to evaluate a discrimination claim alleging a claim of age discrimination," and noted that that subject matter did not require expert testimony. *Id.* at 405. Finally, in *Mello v. Siena Coll.*, No. 15-cv-0013 (GTS) (ATB), 2017 WL 1013077 (N.D.N.Y. Mar. 14, 2017), the expert opined as to whether it was appropriate or necessary to demote an individual from Dean to a "tenured faculty position" based on performance issues. *Id.* at *4. The *Mello* court found that it was "questionable" whether the expert's specific opinion in that case was "required in order to better understand the determinative issues." *Id.* at *12. All of those cases are factually distinct from the circumstances here in a number of different ways. More importantly, however, nothing in those cases cited by MLB addresses the purported skepticism of human resources experts MLB baselessly assigns to courts.

Nothing in *Anderson* supports MLB's statement that "[c]ourts in this district have held that the simple act of comparing documents utilizes specialized expertise." Motion, Page 18 of 31. Instead, *Anderson* stands for the limited proposition that a court, in conducting a bench trial, did not need an expert comparing two "compensation packages" over a limited temporal period of two years when such comparison would "be brought out at trial through lay witnesses." *Anderson*, 2005 WL 1412965 at *3.

Needless to say, the circumstances currently before the Court on MLB's Motion are materially distinct from the circumstances presented in *Anderson*. While the expert in *Anderson* was comparing a limited set of documents, Dr. Baxter analyzed at least 1,088 UERs and compared those UERs to 18 Year-End Evaluations. Exhibit 2, Affidavit of Dr. Baxter, ¶ 4. Moreover, the expert in *Anderson* limited his review to a two-year period, while Dr. Baxter's analysis related to documents over a six-year period. Finally, the primary basis for the *Anderson* Court's conclusion that the expert would be unhelpful to the court was that the expert's opinions would "be brought out at trial through lay witnesses." Here, the lay witnesses who *should* be familiar with the UERs and the Year-End Evaluations that are the subject of Dr. Baxter's Report *are not* actually familiar with those documents inasmuch as they rarely, if ever, review them. *See* Dkt. 100, Page 2-3 of 10. Even assuming the lay witnesses were familiar with the performance evaluations that are the subject of Dr. Baxter's report, it would take an inordinate amount of time showing the jury the hundreds of individual documents, having the jurors themselves review the documents, questioning the lay witnesses as to each document, and explaining to the jury the numerous discrepancies identified in Dr. Baxter's Report. This is at least one of the reasons that courts in this district *have* permitted expert opinions such as those rendered by Dr. Baxter, contrary to MLB's baseless assertions in its Motion. *Scott*, 315 F.R.D. at 45; *Lassen*, 2016 WL 7165716 at *11; *Linde*, 922 F. Supp. 2d at 331-332.

MLB next asserts that courts will not "allow expert testimony that merely summarizes,

evaluates, and compares evidence in the record." Motion, Page 18 of 31. Not only is MLB's position on this issue directly contradicted by the legal authority cited by Plaintiff above, it is also once again unsupported by the very case law cited by MLB.

MLB first cites to *LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-cv-7242 (SAS), 2002 WL 1585551 (S.D.N.Y. July 16, 2002), in support of its argument on this issue. In *LinkCo, Inc.*, just as in *Anderson*, the court simply concluded that the testimony offered by the expert would be "more appropriate" coming from "fact witnesses familiar with" the documents the expert reviewed in connection with rendering his opinions. *Id.* at *2. As explained above, such a situation is inapposite to the circumstances here, where the fact witnesses are unfamiliar with the documents at issue. Nothing in *LinkCo, Inc.* addresses the propriety of an expert opinion that "summarizes, evaluates and compares evidence in the record."

MLB next cites to *In re Lyondell Chem. Co.*, 558 D.R. 661 (Br. S.D.N.Y. 2016) in support of that same argument. The expert in *In re Lyondell Chem. Co.* created a timeline in order to create a factual narrative, which the court concluded improperly "invade[d] on the province of the factfinder." *Id.* at 668. Dr. Baxter's task—analyzing over 1,000 documents and providing a detailed summary of the opinions derived from that analysis—is significantly distinct from the *In re Lyondell Chem. Co.* expert's creation of a timeline that would "invade[] on the province of the factfinder."

As discussed above, Dr. Baxter's analysis (as reflected in his Report and discussed in his deposition) consists of a comparison of minority umpires' performance reviews and the conclusions Dr. Baxter drew from that comparison. Dr. Baxter reviewed at least 1,088 individual UERs regarding three different Major League umpires, compared those UERs to 18 Year-End Evaluations, identified discrepancies found between the UERs and the Year-End Evaluations, and summarized those findings into his Report and the accompanying color-coded attachments. The more than 1,000 individual documents reviewed by Dr. Baxter in forming his opinion only highlights (i) the specialized

expertise required to render opinions drawn from the review and summarization of those documents, and (ii) the helpfulness Dr. Baxter's opinion and analyses will provide to the jury.  MLB's arguments to the contrary must be rejected.

> C.      *Dr. Baxter's testimony is reliable.*

MLB advances several arguments in its Motion in support of its assertion that Dr. Baxter's opinion and testimony are not reliable.  Each of those arguments will be discussed in turn, but none of them support granting MLB's Motion and excluding Dr. Baxter from testifying in this matter. Moreover, MLB's Motion on this issue is supposedly supported by Dr. Denise Martin.  But Dr. Martin admitted in her deposition that she was not a human resources expert.  *See* Deposition of Dr. Denise Martin, 58:18-22, attached hereto as Exhibit 3 ("Q: Do you consider yourself an expert in human resources? . . . A: No.").  Any portion of MLB's Motion that relies on Dr. Martin should therefore be rejected outright, as Dr. Martin is not qualified to opine on the matters discussed by Dr. Baxter in his Report.

> i.      **The absence of a control group for purposes of Dr. Baxter's analysis does not warrant excluding his opinion.**

>> a.      <u>The absence of a control group does not render Dr. Baxter's expert opinion on causation to be unreliable.</u>

The thrust of MLB's position on the issue of a "control group" is that Dr. Baxter was required to compare his results to a "control group" because, MLB states, "Baxter concludes that these alleged 'errors' were 'harmful to minority umpires' and 'caused' their employment outcomes."  Motion, Page 20 of 31.

That argument is premised on a fundamental mischaracterization of Dr. Baxter's opinion as to causation.  Dr. Baxter did not opine that the discrepancies he identified in the umpires' performance evaluations were the sole cause of their "employment outcomes," as MLB repeatedly suggests in its Motion.  Instead, as Dr. Baxter explicitly states in his Report, Dr. Baxter concluded that the

discrepancies he identified (and the processes that resulted in those errors) have "caused damage to [Plaintiff's] career advancement" and had the effect of "denying those [minority umpires] **fair opportunities** for promotions and World Series assignments." Report, Dkt. 159-1, Page2 259, 262 of 440 (emphasis added).

Dr. Baxter's conclusion in this regard—that the discrepancies he identifies have damaged Plaintiff's "career advancement" and denied minority umpires "fair opportunities" for promotions and postseason assignments—is true *regardless of whether similar errors are found in non-minority umpires' evaluations*. As Dr. Baxter testified on this very issue, "[a]fter weeks and weeks of looking at every single Umpire Evaluation Report submitted on these people, those umpires for six years, I came to the conclusion that their excellent performance was not being reported in the year-end review that baseball executives said was the basis of their selections. Leaving out excellent performance from an employee's record is not positive for their career. It is not neutral for their career. **It is negative for their career. Without comparison to anyone else**." Dr. Baxter Dep., 211:10-212:4.

Additionally, Dr. Baxter's task was not to compare one umpire's performance evaluations to another umpire's performance evaluations so as to determine whether any of the minority umpires would have been promoted or selected to the World Series but for the discrepancies in the evaluations identified by Dr. Baxter. Dr. Baxter instead compared an umpire's UERs to the Year-End Evaluations *of that same umpire* and concluded that MLB's pattern of hiding minority umpires' excellent performance had negative effects on their opportunities for career advancement. By so limiting his opinion to that subject matter, Dr. Baxter's analysis did not require a control group.

MLB cites to *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11-cv-6201 (DLC), 2015 WL 539489 (S.D.N.Y. Feb. 10, 2015), in support of their assertion that Dr. Baxter was required to use a "control group" for purposes of his analysis. But *Fed. Hous. Fin. Agency* dealt with an expert's study of "loss causation," which was premised in part on a "regression analysis" and "three benchmark

groups of loans." *Id.* at *2. Here, Dr. Baxter (i) did not offer an opinion as to the ultimate cause of MLB's failure to promote Plaintiff and the other minority umpires identified in his Report, and (ii) did not conduct an analysis even remotely similar to that which is the subject of *Fed. Hous. Fin. Agency.* Nothing in that case supports MLB's position that Dr. Baxter's analysis required a "control group."

No control group is needed for Dr. Baxter to opine on whether the discrepancies he identifies in the performance evaluations "caused damage to [Plaintiff's] career advancement" or had the effect of denying minority umpires "fair opportunities" for promotions and postseason selections, because such conclusions can be reached regardless of what occurred with non-minority umpires' evaluations.

        b.      <u>The absence of a control group has no bearing on whether the Year-End Evaluations analyzed by Dr. Baxter accurately reflect the corresponding UERs.</u>

The arguments in MLB's Motion regarding the purported necessity of a "control group" for Dr. Baxter's Report relate only to Dr. Baxter's limited opinions on causation and not Dr. Baxter's analysis and opinions regarding the discrepancies between the UERs and the Year-End Evaluations that were found as a result of his analysis. *See* Motion, Page 21 of 31 (MLB's assertion that "[t]he use of a control group is essential to reaching a reliable conclusion **regarding causation**") (emphasis added). MLB's Motion as to this issue thus provides no basis whatsoever for excluding Dr. Baxter's opinion regarding the identified discrepancies themselves and Dr. Baxter's analysis that resulted in a summary of those discrepancies.

      *ii.*    *Dr. Baxter was not required to consider the purported "alternative explanations" identified in MLB's Motion because there is no evidence in the record demonstrating the substance of those "alternative explanations" and what potential impact, if any, those "alternative explanations" had on MLB's employment decisions regarding the umpires at issue.*

MLB asserts that Dr. Baxter should have considered, but did not consider, various purported "alternative explanations" for the discrepancies he identifies in his Report. There are multiple issues

with MLB's position regarding these supposed "alternative explanations."

First, Dr. Baxter's Report is explicitly premised on the testimony of MLB umpire executives—including Joe Torre himself—that there should not be anything in the Year-End Evaluations that are not found in the UERs themselves. *See* Dkt. 139, Page 8 of 28; Report, Dkt. 159-1, Pages 257-258 of 440. MLB does not even mention this testimony, and Dr. Baxter's explicit reliance on it, in their Motion. MLB's failure to do so is made more glaring by the fact that this testimony completely undermines its current position that Dr. Baxter was required to consider other sources of information in conducting his analysis because the testimony established that there should not be anything in the Year-End Evaluations that is not in the UERs for that same year. MLB's assertion that Dr. Baxter was somehow required to consider other sources of information is thus contradicted by the testimony of their own umpire executives, who Dr. Baxter assumed were being truthful in their testimony. Therefore, as a threshold matter, MLB's arguments on this issue should be rejected.

Second, Dr. Baxter explicitly acknowledges in his Report that there are other sources of information for certain portions of the Year-End Evaluations (such as replay review and administrative duties), and Dr. Baxter does not purport to offer an opinion on those portions. *See* Report, Dkt. 159-1, Page 257 of 440 ("Scores and comments on administrative duties, written reports, replay activities, ZE (strike and balls) and SURE scores (base calls) are supposedly based on reports from specialists on MLB staff, not veteran umpires' UERS"); *see also* February 6, 2020 Memorandum (Dkt. 159-1, Page 286 of 440) (noting that Dr. Baxter conducted his analysis "[f]or all **on-field** performance components" and further noting that "[s]ince [Dr. Baxter] did not see non-UER reports available to the Author about Submitting Umpire Reports, Communication with Office, or Fraternization (and perhaps other off-field performance), [Dr. Baxter] cannot report whether Author's comments on those components are as lacking in support as comments on on-field performance components") (emphasis added). Thus, for those portions of the Year-End Evaluations that expressly

did not involve on-field conduct—and thus would not have been reflected in the UERs—Dr. Baxter did not offer any opinion at all.

Even assuming, despite the above, that MLB is correct that other sources of information should have been considered by Dr. Baxter in his report, the hypothetical other sources of information to which MLB points are not supported by any documents MLB actually produced in discovery.  For example, MLB first asserts that, because Dr. Baxter "reviewed testimony from Woodfork stating the Umpire Directors have weekly conference calls to discuss umpire performance," he should have considered "what effects those calls would have on year-end evaluations."  Motion, Page 23 of 31. Yet MLB fails to point to any evidence that would show what was *actually* discussed on those calls. Their failure to do so is because no such evidence exists.  While MLB produced emails purporting to schedule those meetings, MLB did not produce any documents such as meeting minutes or other notes that would reflect what was said about the umpires during those calls or what effect those discussions actually had on any promotion or postseason selection decisions regarding the umpires whose evaluations are the subject of Dr. Baxter's Report.

Similarly, MLB asserts that "Woodfork also described that MLB decision-makers 'discuss our umpires' performance' and 'understand how they're performing on a day-to-day basis.'"[2]  Motion, Page 23 of 31.  Again, MLB does not point to any evidence or the existence of any evidence that would indicate the substance of those purported discussions because no such evidence exists—MLB did not produce any minutes, notes or other documents that would reflect what was *actually* being said or talked about during those discussions.  MLB is again blaming Dr. Baxter for not considering or addressing a hypothetical scenario that is inconsistent with the information that has actually been produced by MLB.

---

[2] Plaintiff has previously explained to the Court the limits of Woodfork's "understanding" of Major League umpires' performance and why MLB's alleged reliance on that "understanding" is misplaced.  *See* Dkt. 141-1, Page 7-8 of 32, ¶¶ 33, 35.

MLB next cites to Matt McKendry's deposition testimony that "in creating evaluations, MLB considers 'ZE reports, SURE results, field evaluations, incident evaluation reports[,] [t]he umpire's functioning as a replay official, the umpire's handling of administrative duties; including his interaction with the Office [of the Commissioner] and his peers and the [baseball] Clubs." Again, there is little underlying evidence, if any, that shows what effect the umpires' "functioning as a replay official" or "the umpire's handling of administrative duties" had on MLB's promotion and postseason selection decisions regarding those umpires. As to the other sources of information identified in the specific portion of McKendry's deposition testimony cited by MLB, Dr. Baxter *did* consider those documents. Dr. Baxter considered, relied upon and listed in his report "Defendant's data sheets on umpires (DEF 010814 – DEF 010831)", which contains information reflecting ZE scores and SURE results.[3] Dr. Baxter in fact *did* consider those scores when viewed in conjunction with the comments found in the Year-End Evaluations. *See* Report, Dkt. 159-1, Page 259 of 440 (noting that Dr. Baxter "expected to find ZE and SURE scores placed in context" when reviewing the Year-End Evaluations, but that "[t]he Author reports ZE and SURE scores without important context").

Finally, MLB points to provisions in the CBA that state that Year-End Evaluations also take into account "evaluative comments from the Office of the Commissioner" and "observations of the Directors of Umpiring and their supervisors." The first issue with MLB's position on this issue is that the CBA simply reflects an agreement of what MLB *can* do, not a description of what they *actually* did. Furthermore, MLB did not produce any documents or other information that would demonstrate to Plaintiff or Dr. Baxter that any "evaluative comments" were actually made by MLB itself or what

---

[3] Though Plaintiff requested more detailed data regarding umpires' ZE scores and SURE results, MLB produced only the spreadsheets found at Bates range DEF 018014 – DEF 010831 (found in the record at Dkt. 141-95), stating that those spreadsheets "are performance summary documents used in connection with consideration of umpires for post-season assignments and preparation for year-end performance evaluations." *See* April 3, 2019 Letter from Neil H. Abramson, attached hereto as Exhibit 4. Dr. Baxter also considered the letter attached hereto as Exhibit 4. *See* Report, Dkt. 159-1, Page 254 of 440. MLB should not be permitted to rely on the hypothetical existence of some of its own documents that MLB did not produce, and it is fundamentally unfair to criticize Dr. Baxter for not having considered hypothetical documents that do not exist.

those hypothetical comments were, nor what "observations of the Directors of Umpiring and their supervisors," if any, were actually put into the Year-End Evaluations. The issue is compounded by MLB's failure to save individual drafts of the Year-End Evaluations which at least **could** have shown (i) what changes were made to the text of the Year-End Evaluations, and (ii) which individuals made those changes. *See* Dkt. 141-1, Page 12 of 32, ¶ 52. Had those drafts been kept in such a way that MLB's "evaluative comments" or "observations" were made apparent to Plaintiff, there would have been additional evidence for Dr. Baxter to consider. But the undisputed reality is that no such documentation exists.

There is a common flaw in each of the foregoing arguments advanced by MLB criticizing Dr. Baxter's report for what he did not consider. MLB's suggestion in its Motion that Dr. Baxter was required to consider evidence or information that does not exist is not only illogical, but also beside the point. MLB umpire executives testified that the on-field components of the Year-End Evaluations should directly reflect that year's UERs for each umpire. Dr. Baxter, relying on the information MLB actually *did* produce in discovery, determined that they did not. Dr. Baxter was under no obligation to address information that MLB has never provided, the existence and potential content of which is merely hypothetical. MLB's contentions that Dr. Baxter should have considered other information or "alternative explanations" that are not supported by evidence in the record are thus meritless.

MLB cites to a handful of cases in support of its assertion that Dr. Baxter was required to consider "alternative explanations" for MLB's decision to not promote the umpires to crew chief or select them for the World Series, but all of them are inapplicable here. First, MLB cites *Tardif v. City of N.Y.*, 344 F. Supp. 3d 579 (S.D.N.Y. 2018). *Tardif* is a case involving an expert witness who opined that the plaintiff's trauma was caused solely by the defendants' conduct, while failing to consider whether the other "traumatic experiences" suffered by the plaintiff could have also caused that trauma. *See id.* at 601. Unlike the expert's opinion in *Tardif*, Dr. Baxter does not opine as to the ultimate cause

of MLB's promotion and selection decisions regarding the minority umpires.  More significantly, Dr. Baxter does not render any medical opinion on any of the umpires that are the subject of his Report. *Tardif*'s conclusion that "control groups" are necessary for medical expert opinions such as the one at issue in that case does not somehow support MLB's argument that Dr. Baxter was required to utilize a control group for purposes of his opinion, which compared an umpire's UERs to that same umpire's Year-End Evaluations as opposed to comparing one umpire's performance against another umpire's performance.

MLB also cites *Forte v. Liquidnet Holdings, Inc.*, No. 14-cv-2185 (AT), 2015 WL 5820976 (S.D.N.Y. Sept. 30, 2015), and *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244 (S.D.N.Y. 2010), but those cases likewise do not support MLB's conclusion that Dr. Baxter was required to utilize a "control group" for purposes of his analysis.  *Forte* involved an expert who performed various tests and statistical analyses regarding salaries, bonuses and equity compensation between the defendants' male and female employees (2015 WL 5820976 at *7-*8), while *R.F.M.A.S., Inc.* similarly concerns experts who offered opinions as to the sole causation of sales to a certain third party (748 F. Supp 2d at 271-272).  Neither of those cases are applicable here.  In this case, Dr. Baxter conducted an analysis of performance evaluations for three minority umpires and concluded that MLB's treatment of those evaluations, and the discrepancies that resulted from that treatment, "caused damage to [Plaintiff's] career advancement" and had the effect of "denying those [minority umpires] fair opportunities for promotions and World Series assignments."  Moreover, Dr. Baxter considered all alternative explanations that were apparent based on the information actually produced by MLB in discovery.  Neither *Forte* nor *R.F.M.A.S., Inc.*, which dealt with types of analyses that are not remotely comparable to the analyses undertaken by Dr. Baxter, justify granting MLB's Motion.

Finally, MLB cites two cases regarding the scope of Dr. Baxter's task in forming his expert opinion, neither of which are applicable here.  In *Caruso v. Bon Secours Charity Health Sys., Inc.*, No. 14-

cv-4447 (VB), 2016 WL 8711396 (S.D.N.Y. August 5, 2016), the court determined that the expert's opinion was unreliable because "she did not conduct her own review of the evidence" and instead "relie[d] upon a list of statements sent to her by plaintiff's counsel." *Id.* at *6. Unlike the expert in *Caruso*, Dr. Baxter *did* conduct his own review of the evidence. *See, e.g.*, Report, Dkt. 159-1, Page 254 of 440 (listing the depositions and documents he considered in forming his opinions); *id.* at 259 of 440 (noting that Dr. Baxter "carefully read the depositions" cited in his Report and "review[ed] and compare[d] the allegedly supporting UERs to the three minority umpires' YE performance reviews for 2011 to 2016"). Dr. Baxter therefore did conduct his own independent review of the relevant evidence, unlike the excluded expert in *Caruso*.

Similarly, in *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281 (D.D.C. 2018) (another case cited by MLB), the expert did not review any deposition testimony, and instead "relied on a document titled 'Selection Roulette' in which plaintiffs' counsel 'summed up' the testimony of select supervisors." *Id.* at 299-300. As discussed above, Dr. Baxter conducted his own review of the minority umpires' performance evaluations and the depositions of those who claimed to be the decisionmakers on umpire promotion and postseason selection. Additionally, Dr. Baxter was never provided any document remotely resembling the "Selection Roulette" document at issue in *Campbell*. MLB's reliance on *Campbell* is thus also misplaced.

### iii. *Dr. Baxter's methodology is clearly stated in his Report and is easily replicable*.

Contrary to MLB's assertions in its Motion, Dr. Baxter's methodology is clearly described in his Report. First, Dr. Baxter "carefully read" the depositions of Joe Torre, Randy Marsh and Peter Woodfork. Report, Dkt. 159-1, Page 259 of 440. Dr. Baxter then "converted each 2011 to 2016 minority umpire [Year-End Evaluation] to a Word document and converted the related UERs to a word-searchable Adobe Acrobat document, using Nuance Power PDF Standard." *Id.* He then placed

the UERs and the Year-End Evaluations "side-by-side on [his] computer screen and searched the 'supporting' UERs for the same or similar words the Author wrote in the Year-End [Evaluations]." *Id.* Dr. Baxter provided further detail as to his methodology in his deposition. *See* Dr. Baxter Dep., 213:13-219:1. Finally, and as MLB mentions in their Motion, Dr. Baxter created a document titled "Methodology for Comparing Minority Year End Performance Reviews ('YE') to Umpire Evaluation Reports ('UER')," wherein Dr. Baxter provides yet further details about his methodology used in reaching the conclusions found in his Report. *See* Dkt. 159-1, Page 386 of 440.

Dr. Baxter's methodology is not only extensively detailed in his Report, as well as in his deposition testimony and his memorandum, it is easily replicable. An individual with Dr. Baxter's knowledge, education, skill, training and experience in the fields of human resources, "performance reviews," "performance review processes," and "selection and promotion processes" could undergo the same analysis performed by Dr. Baxter, as detailed above, by reviewing the UERs identified by Dr. Baxter, carefully comparing those UERs to the Year-End Evaluations in the method described by Dr. Baxter, and categorizing the identified discrepancies between those evaluations according to the color-coding framework found in Dr. Baxter's Report.

MLB also takes issue with Dr. Baxter not indicating "what words he deemed 'negative,' nor how he determined what was, in his view, 'word salad' unrelated to umpires' performance." Motion, Page 26 of 31. As explained above, Dr. Baxter had a detailed list of words and phrases that he considered to be "positive." Dr. Baxter also described in his deposition what he meant by the term "word salad": "It's a phrase that . . . comes from psychology and politics. It means a series of phrases that have a surface appearance of being about something or addressing some topic and yet, are much closer to random platitudes, which are unrevealing."[4] Dr. Baxter Dep., 131:16-23. Dr. Baxter also

---

[4] The term "word salad" was added to the dictionary in 2017 and has been used for this same purpose in articles dating back to at least 1985, including by the Associated Press in 1990, the New York Times in 1999 and 2008, and the Boston Globe in 2004. *See* "Making Sense of 'Word Salad," https://www.merriam-webster.com/words-at-play/word-

testified that "word salad" was "any phrase or sentence or paragraph that does not report the on-field – the performance of that umpire during that season.  It is unrelated to a performance review."  Dr. Baxter Dep., 132:12-21.  Finally, as to Dr. Baxter's categorization of certain comments as "negative."  Dr. Baxter testified in his deposition that comments such as "you had a bad game; you were lazy; you give a bad impression; your performance in this area is deteriorating" were examples of "negative comments," before observing that for an expert such as him "it was not particularly difficult to find the negatives in the negative comments."  Dr. Baxter Dep., 128:20-129:6; *see also* Dr. Baxter Dep., 131:5-15.

In sum, Dr. Baxter *did* use a methodology that (i) was based upon information found in documents and deposition testimony produced in discovery, (ii) was readily identifiable, and (iii) was easily replicable, unlike the experts in the cases cited by MLB.  *See Cunningham v. Cornell Univ.*, No. 16-cv-6525 (PKC), 2019 WL 4735876, at *10 (S.D.N.Y. Sept. 27, 2019) (excluding an expert where the expert "provided **no** explanation" for how he reached his opinions "and **made no attempt**" to connect his opinions with the underlying evidence) (emphasis added); *LVL XIII Brands v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 645 (S.D.N.Y. 2016); *Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481 (S.D.N.Y. 2000).

MLB's arguments that Dr. Baxter's methodology is not replicable ignore all of the above and focus instead on Dr. Denise Martin's[5] purported disagreement with Dr. Baxter's conclusions.  If MLB and its expert, Dr. Martin, disagree with Dr. Baxter's methodology, they are free to cross-examine him at trial.  But such disagreement does not provide a basis for excluding Dr. Baxter's testimony.  *See*

---

salad#:~:text=Word%20salad%20began%20as%20a,language%20is%20translated%20into%20another) (last visited June 18, 2020).  The term "word salad" has also been used by courts in this Circuit.  *See United States v. Brow*, No. 05-CV-1607 (SLT), 2009 WL 4746344, at *2 (E.D.N.Y. Dec. 7, 2009); *EMA Fin., LLC v. 5Barz Int'l, Inc.*, No. 18-CV-4995 (VEC), 2019 WL 8503357, at *2, n.4 (S.D.N.Y. Sept. 18, 2019).

[5] As described above, MLB's Motion contains numerous citations to Dr. Martin's report, testimony and declaration.  Unlike Dr. Baxter, Dr. Martin does not even consider herself an expert in human resources.  Dr. Martin is therefore unqualified to opine on the matters described in Dr. Baxter's Report or to criticize his approach.

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043-1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony"); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786, 2798, 125 L. Ed. 2d 469 (1993); *Guild v. Gen. Motors Corp.*, 53 F. Supp. 2d 363, 369 (W.D.N.Y. 1999).

>        *iv.*    *Dr. Baxter's methodology is reliable.*

Despite MLB's efforts to attack Dr. Baxter's Report, MLB was able to identify only one example of a purported "mistake" made by Dr. Baxter.[6]  The alleged "mistake" identified by MLB relates to a comment in a UER that MLB contends should have been characterized by Dr. Baxter in a way that differs from the characterization included in Dr. Baxter's Report.  Motion, Page 28-29 of 31.  The "difference of opinion" between MLB and Dr. Baxter on this isolated so-called "mistake" is not grounds for excluding Dr. Baxter, and instead goes to the weight of his testimony at trial.  *See Guild*, 53 F. Supp. 2d at 369 ("Although defendant questions plaintiff's experts' methodologies and cites to a number of studies and reports which conclude that inertial release does not occur in 'real world' accidents, **the mere fact that a difference of opinion exists does not make plaintiff's experts' conclusions inherently unreliable**.  Such differences of opinion and alleged weaknesses in the experts' methodologies **will go to the weight to be given the expert testimony, not its admissibility**") (emphasis added) (internal citations omitted).

"The test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on his experience."  *Scott*, 315 F.R.D. at 45 (internal citations omitted).  "In cases where experts 'draw a conclusion from a set of observations based on extensive and specialized experience,' . . . 'the method is the application of experience to facts.'"  *Id.*  As the

---

[6] This single "mistake" was the only identified by MLB out of Dr. Baxter's review of at least 1,088 UERs and 18 Year-End Evaluations.

foregoing shows, nothing in MLB's Motion on the issue of the so-called unreliability that MLB claims is "inherent" in Dr. Baxter's methodology warrants granting their Motion and excluding Dr. Baxter from offering his opinion at trial, particularly given Dr. Baxter's 40-plus years of experience in the relevant areas of expertise.

Dr. Baxter's methodology, which MLB attacks, applies analytical techniques known as "semantic similarity" or "content similarity" analyses.  Semantic similarity analysis and content similarity analysis are widely used by human resources professionals in the context of inputs from multiple sources.  *See, e.g.,* S. Vasudevan, M. Singh, J. Mondal, *et al.,* Estimating Fungibility Between Skills by Combining Skill Similarities Obtained from Multiple Data Sources, Data Sci. Eng. 3 (2018)[7] (application of semantic similarity approach to identify the array of skills within a workforce based on inputs from multiple sources); Kim Nimon, Brad Shuck, Drea Zigarmi, Construct Overlap Between Employee Engagement and Job Satisfaction: A Function of Semantic Equivalence?, Journal of Happiness Studies (2015)[8] (application of semantic similarity analysis to correlating employee responses to job satisfaction surveys and employee engagement surveys); J.K. Arnulf, K.R. Larsen, Ø.L. Martinsen, *et al.,* The failing measurement of attitudes: How semantic determinants of individual survey responses come to replace measures of attitude strength, Behavior Research Methods 50 (2018)[9] (application of semantic similarity analysis to textual survey responses from employees); Vedant Das Swain, Koustuv Saha, Manikanta D. Reddy, Hemang Rajvanshy, Gregory D. Abowd, Munmun De Choudhury, Modeling Organizational Culture with Workplace Experiences Shared on Glassdoor (2020)[10] (application of semantic similarity analysis to employee inputs posted on Glassdoor); A. Rexha, M. Kröll, H. Ziak, *et al.,* Authorship identification of documents with high

---

[7] This article can be accessed at https://doi.org/10.1007/s41019-018-0075-3.
[8] This article can be accessed at
https://www.researchgate.net/publication/275891552_Construct_Overlap_Between_Employee_Engagement_and_Job_Satisfaction_A_Function_of_Semantic_Equivalence.
[9] This article can be accessed at https://doi.org/10.3758/s13428-017-0999-y.
[10] This article can be accessed at https://koustuv.com/papers/CHI20_OrganizationalCulture.pdf.

content similarity, Scientometrics 115 (2018)[11] (application of content similarity analysis to employee-generated content).  As applied by Dr. Baxter in this case, semantic similarity analysis revealed significant inconsistencies between the UER inputs and the Year-End Evaluations for the minority umpires discussed in his Report, including Angel Hernandez.[12]

> v.    *Dr. Baxter's opinion and testimony are relevant to Plaintiff's claims in this case.*

In a last-ditch effort to exclude Dr. Baxter from offering his opinion and testimony in this case, MLB briefly argues that Dr. Baxter's opinions are not relevant.  Motion, Page 29-30 of 31.

Dr. Baxter's expert opinions are certainly relevant to this case.  They describe the numerous discrepancies between the UERs and the Year-End Evaluations. This is especially significant for a number of reasons.  As described in previous filings with the Court, MLB decisionmakers like Torre and Woodfork do not review the UERs, which are the only performance evaluations (i) that reflect umpire performance on a game-by-game basis, and (ii) that are created by individuals who attend or observe games on an individual basis.  Dkt. 100, Page 2-3 of 10.  Instead, only some (but not all) umpire executives review the Year-End Evaluations in making promotion and postseason selection decisions.  If the Year-End Evaluations do not accurately reflect the UERs (as Dr. Baxter's Report shows), then MLB is relying on inaccurate and faulty information when determining whether to promote an umpire to crew chief or select an umpire for the World Series.  That phenomenon, which was identified, analyzed and summarized by Dr. Baxter in his Report, is also one of the inherent consequences of MLB's practice of refusing to analyze the UERs and other, more reliable sources of information and instead rely on (i) the faulty Year-End Evaluations, and (ii) their subjective beliefs about an umpire's performance.

---

[11] This article can be accessed at https://doi.org/10.1007/s11192-018-2661-6.
[12] That Dr. Baxter had not previously applied this methodology in the particular context of professional umpires is not surprising, given that professional umpires comprise a very small percentage of the workforce.

Moreover, the phenomenon identified by Dr. Baxter (MLB artificially *deflating* minority umpire performance) provides stark contrast for its treatment of non-minority umpires, as set forth in detail in Plaintiff's Motion for Partial Summary Judgment and supporting memorandum, and further highlights the effects MLB's promotion and selection processes have on minority umpires.

Serious questions arise when an employer ignores objective data and provides allegedly cumulative year-end performance evaluations that do not accurately reflect the employee's actual performance for that year. The jury will ultimately determine whether the negative discrepancies in minority umpires' performance evaluations identified by Dr. Baxter support Plaintiff's claims, but whether Dr. Baxter's Report is relevant is beyond dispute.

## III.   CONCLUSION

Dr. Baxter should be permitted to testify as to his opinions at trial in this matter. It is no surprise that MLB disagrees with Dr. Baxter's conclusions, but those disagreements can be addressed on cross-examination—they do not provide any sufficient basis for granting MLB's Motion. *Daubert*, 509 U.S. at 596; *McCullock*, 61 F.3d at 1044; *Guild*, 53 F. Supp. 2d at 369. For the foregoing reasons, MLB's Motion should be denied.

Dated: June 19, 2020

Respectfully submitted,

MURPHY LANDEN JONES PLLC

By: *Kevin L. Murphy*
Kevin L. Murphy (*pro hac vice*)
J. Jeffrey Landen (*pro hac vice*)
Nicholas R. Gregg (*pro hac vice*)
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: 859-360-1123
KMurphy@MLJfirm.com
JLanden@MLJfirm.com
NGregg@MLJfirm.com

&

LEWIS DIBIASI ZAITA & HIGGINS
Nicholas J. Zaita
420 Lexington Avenue, Suite 300
New York, NY 10107
Tel: (212) 772-0943
nzaita@ldzhlaw.com
***Attorneys for Plaintiff Angel Hernandez***

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:  Neil H. Abramson, Esq., Rachel S. Philion, Esq., Rachel S. Fischer, Esq., and Adam M. Lupion, Esq., PROSKAUER ROSE LLP, Eleven Times Square, New York, New York 10036-8299.

Respectfully Submitted,

MURPHY LANDEN JONES PLLC

By: *Kevin L. Murphy*
Kevin L. Murphy (*pro hac vice*)
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: 859-360-1123
*Attorney for Plaintiff Angel Hernandez*