```
 1          A.     No document or journal or
 2   deposition, no.
 3          Q.     Any other information that's not a
 4   document, journal or deposition?
 5          A.     Yes, my 40 years of human resources
 6   experience.  My training, education and the
 7   certification tests I have taken for senior
 8   professional in human resources.
 9          Q.     Did you rely on any communications
10   with counsel in forming your opinion?
11          A.     Yes.
12          Q.     What communications did you rely
13   on?
14          A.     They sent me an e-mail specifying
15   the three questions they wanted me to ask
16   that formed the basis of my forming my
17   opinions.
18          Q.     That they wanted you to answer?
19          A.     That they wanted me to -- well,
20   that they wanted me to ask and answer.  Yes.
21          Q.     Any other communications that you
22   relied on in forming your opinions from
23   counsel?
24          A.     Yes.
25          Q.     What communication?
```

```
1      A.    No.
2      Q.    Did you personally prepare the
3  expert report that you submitted in this
4  matter?
5      A.    I did.
6      Q.    Did you have assistance from anyone
7  else in preparing the report?
8      A.    I did.
9      Q.    And who was that?
10     A.    On the last day of the deadline for
11 the report my wife assisted me with some
12 typing but did none of the analysis and
13 contributed no words to it.
14     Q.    When you say she assisted you with
15 the typing, was she typing up notes that you
16 had?
17     A.    Yes.
18     Q.    Do you still have those notes?
19     A.    Yes.
20     Q.    Did anyone else assist you in
21 preparing the report?
22     A.    No.
23     Q.    What expertise are you claiming to
24 provide in this matter?
25     A.    The expertise based on knowledge,
```

Gregory W. Baxter - March 5, 2020

Page 108

```
 1     experience and training in human resources
 2     matters and particularly performance
 3     reviews -- performance review processes,
 4     selection and promotion processes.
 5          Q.    Anything else?
 6          A.    Nothing I can think of right now.
 7          Q.    In your report on page 6 you refer
 8     to yourself as a statistician.
 9          A.    Yes.
10          Q.    What does that mean?
11          A.    It means I have been trained and --
12     I have been trained in some basic and some
13     more advanced statistics and know how they
14     apply in the very narrow area of equal
15     opportunity and employment.
16          Q.    Are you a statistical expert?
17                MR. MURPHY:  Objection.
18                You can answer.
19          A.    I am not being proffered as a -- I
20     am not putting myself forward as a
21     statistical expert in this case and offer no
22     statistical analyses.
23     BY MS. PHILION:
24          Q.    If you could flip to page 1 of your
25     expert report, please.  And I am focused on
```

Gregory W. Baxter - March 5, 2020

1    bottom page of that document, and it might
2    be, typically, 100 to 120 pages long.  I
3    would go to the last page and look for an
4    unusual phrase or the Bates number.  I would
5    go to the top of the document and search for
6    that thing, and if it went all the way to the
7    end and found that thing, only thing would I
8    assume it was word searchable.  Then I would
9    put the UER on the left of my screen and the
10   yes, the year-end review, created at Major
11   League headquarters, on the right side of my
12   screen.  And I would start at the first
13   performance comments in the year-end review
14   and search the section heading, the
15   performance component heading for every UER
16   on the left side of the screen.
17        Q.    How did you determine if a comment
18   in a performance evaluation was positive,
19   negative or neutral?
20        A.    I didn't.  I didn't determine
21   whether anything was neutral.  I determined
22   they were positive using the phrases that I
23   have described.  I decided they were neutral
24   if it said something that I think the
25   employee -- that I took and I think any

1  employee would take to be neutral.  "You had
2  a bad game; you were lazy; you give a bad
3  impression; your performance in this area is
4  deteriorating."  It was -- it was not
5  particularly difficult to find the negatives
6  in the negative comments.
7       Q.   So your evaluation was based on
8  what in your view was a positive or negative
9  word --
10           MR. MURPHY:  Objection.
11 BY MS. PHILION:
12      Q.   -- or phrase?
13           MR. MURPHY:  Objection.
14           You can answer.
15      A.   Yes.
16 BY MS. PHILION:
17      Q.   Was this based on any set of formal
18 criteria other than what you have just
19 described?
20      A.   No.
21      Q.   Have you documented the criteria
22 you used to assess positive and negative
23 comments anywhere?
24      A.   Yes.
25      Q.   Is that in the memo that you

1    at, it is possible.
2         Q.    What, in your education and
3    experience, informs your conclusion about
4    whether a comment is positive or negative?
5         A.    I just think that a long time in
6    academic training and 40 years as a human
7    resources manager and instructor, I have seen
8    thousands of performance reviews before this
9    case, and it is a specialized skill to do
10   this volume of analysis, but it is not, I
11   think, terribly difficult to look at a phrase
12   and say, "That sounds negative."  So my
13   background is, I have done a lot of this
14   before in scattered assignments; not in the
15   intensity I was given here.
16        Q.    What is "word salad"?
17        A.    It's a phrase that, I think, comes
18   from psychology and politics.  It means a
19   series of phrases that have a surface
20   appearance of being about something or
21   addressing some topic and yet, are much
22   closer to random platitudes, which are
23   unrevealing.
24        Q.    How did you determine here where a
25   phrase or sentence in a performance

```
 1    evaluation was what you concluded was word
 2    salad?
 3         A.    What performance evaluation?
 4         Q.    So in the year-end performance
 5    evaluations that you appended to your
 6    report --
 7         A.    (Nodding affirmatively).
 8         Q.    One of the categories you color
 9    coded was called "word salad," is that
10    correct?
11         A.    There is.
12         Q.    Okay.  So what I am trying to
13    understand is how the criteria you set for
14    determining that something in a year-end
15    performance evaluation was "word salad"?
16         A.    Actually, I found that to be the
17    easiest of things to categorize.  It's any
18    phrase or sentence or paragraph that does not
19    report the on-field -- the performance of
20    that umpire during that season.  It is
21    unrelated to a performance review.
22         Q.    How did you determine what was
23    unrelated to a performance review with
24    respect to Major League Baseball umpires?
25         A.    Any sentence that did not say --
```

1            MR. MURPHY:  Objection.  Asked and
2       answered.  You can answer again.
3       A.    In order to complete the assignment
4   that I had, to see whether the books were
5   cooked or they were abused in writing their
6   performance reviews, I didn't need to look at
7   anyone else's to determine what happened to
8   them.
9   BY MS. PHILION:
10      Q.    How were you able to opine on the
11  effects of the performance evaluation process
12  on these three umpires if you didn't look at
13  the performance evaluations of other umpires
14  outside of their group?
15           MR. MURPHY:  Objection.  You can
16      answer.
17      A.    After weeks and weeks of looking at
18  every single Umpire Evaluation Report
19  submitted on these people, those umpires for
20  six years, I came to the conclusion that
21  their actual excellent performance was not
22  being reported in the year-end review that
23  baseball executives said was the basis of
24  their selections.
25           Leaving out excellent performance

1   from an employee's record is not positive for
2   their career.  It is not neutral for their
3   career.  It is negative for their career.
4   Without comparison to anyone else.
5           MS. PHILION:  Thank you,
6       Dr. Baxter.
7           So I have no further questions, but
8       before we go off the record, we are
9       going to call for the production of the
10      memorandum regarding your methodology
11      that you said you created after you
12      submitted your expert report.
13          We are also going to call for the
14      production of any notes that you took in
15      the process of the analysis in creation
16      of your expert report.
17          We are not closing the deposition
18      and will note that we have requested
19      those documents from your counsel in
20      formal document requests, and they were
21      not provided to us.
22          MR. MURPHY:  That is not correct.
23      Are you done?
24          MS. PHILION:  Yes.
25          MR. MURPHY:  Okay.

```
 1
 2                    EXAMINATION
 3    BY MR. MURPHY:
 4
 5        Q.    Doctor, as you know, I am Kevin
 6    Murphy.
 7        A.    Yes, sir.
 8        Q.    And Jeffrey and I and Nick Gregg
 9    represent Angel Hernández.  You have been
10    asked a lot of questions about your search
11    terms and wild card terms in aid of your
12    review of the MLB records that you examined.
13              By the time you were done, did you
14    read every word of every UER for those six
15    years for these three umpires?
16        A.    Yes, I did.
17        Q.    You have been asked about your
18    occasional use in your report of terms such
19    as fair, unfair and ugly.
20              When you use those terms, did you
21    think that those terms were founded or
22    unfounded?
23        A.    I thought that the terms were well
24    founded based on my years of experience and
25    seeing the kinds of unsupported comments that
```

1    get performance review writers disciplined
2    and fired.
3        Q.    Did your opinion -- do the opinions
4    -- let me start again.
5             Do the opinions that you will
6    provide at the trial in this case depend upon
7    any observation in your report that a
8    statement was fair or unfair or ugly?
9             MS. PHILION:   Objection.
10       A.    If I removed -- if I remove the
11   comments that I made, which I think are
12   valid, that those eight or ten comments out
13   of all the things I wrote, if I removed all
14   of that, my findings -- my conclusions and
15   all of my other comments would remain the
16   same.  The author really did leave out
17   patterns of excellent performance for six
18   years.
19   BY MR. MURPHY:
20       Q.    Does your report intend or your
21   trial testimony intend to provide any
22   statistical analysis?
23       A.    I offer no statistical analysis in
24   my report and don't intend to in testimony.
25       Q.    In light of the approach that you

Gregory W. Baxter - March 5, 2020

Page 215

1     took, was there any need for you to use a
2     formal coding protocol?
3          A.    No.  I don't think so.
4          Q.    Are the opinions in your report and
5     as expressed here today based upon applying
6     your training, education and decades of
7     experience in human resources?
8          A.    Yes.
9          Q.    And as part of that process, did
10    you convert each year-end between 2011 and
11    2016 to an MS Word document?
12         A.    I did.
13         Q.    Did you then convert the related
14    UERs to a word-searchable Adobe Acrobat
15    document?
16         A.    I did.
17         Q.    Did you use nuance power PDF
18    standard to do that?
19         A.    I did.
20         Q.    Did you then place the two
21    documents side by side on your computer
22    screen?
23         A.    I did.
24         Q.    Did you examine then whether the
25    UERs supported the phrases and words the

1     author chose to write in the year-end?
2            MS. PHILION:  Objection.
3        A.   Yes.  I did.
4    BY MR. MURPHY:
5        Q.   If no UER commented on a particular
6    performance component for the full year, did
7    you report that?
8        A.   Yes, I did.
9        Q.   If the author offered a year-end
10   comment despite the lack of a UER comment for
11   that component, did you specify that it was
12   unsupported by any UER?
13       A.   I specified the author's comment
14   was unsupported by UER.
15       Q.   And if the author offered a
16   year-end comment which specified a date or a
17   date range, did you search for the UER for
18   that date or date range and components?
19       A.   Yes, I did.
20       Q.   And did you then examine whether
21   the UER supported the author's comments?
22       A.   I first examined whether such a UER
23   existed, and if it existed, then I searched
24   for whether it said what the author later
25   claims it said.

Gregory W. Baxter - March 5, 2020

Page 217

```
 1        Q.    And if there was no UER in the
 2   record for that date, did you report that as
 3   well?
 4        A.    Yes, I did.
 5        Q.    If the UER included no comment for
 6   that component for that date, did you report
 7   that?
 8        A.    Yes, I did.
 9        Q.    If the UER included a component --
10   I am sorry.  Let me start again.
11              If the UER included a comment for
12   that component for that date, did you check
13   whether the words of the UER supported the
14   words the author used in the year-end?
15        A.    Yes, I did.
16        Q.    And did you report that?
17        A.    Yes.
18        Q.    Did that require word for word
19   correspondence between the UER and the YE
20   comments?
21        A.    I did not require word for word
22   correspondence.
23        Q.    For all the on-field components,
24   did you search all UER for each component
25   headings and then scroll down to see whether
```

Gregory W. Baxter - March 5, 2020

Page 218

```
1      there were UER comments?
2          A.    I did for every one of them.
3          Q.    If there are comments like good,
4      great, fine, nice, remarkable, excellent,
5      solid, skillful, what category would you put
6      those comments in?
7          A.    I would have noted those as
8      positive comments about that component.
9          Q.    "Quick," "energetic," "with
10     energy," "promptly," "timely," "good hustle,"
11     "solid job," "worked hard."
12               Are all those commented by you as
13     positive?
14         A.    Those are words actually found in
15     UERs that I added to my search list, and I
16     take them as positive about that performance
17     component.
18         Q.    Working square, working in the
19     slot, clear mechanics, with conviction,
20     emphatic, clear, crisp, were those, too,
21     positive comments?
22         A.    Although they are a little closer
23     to baseball jargon, I took them as positive
24     comments.  Some of those about crisp, clear
25     and emphatic are usually reserved to the
```

Gregory W. Baxter - March 5, 2020

Page 219

| | |
|---|---|
| 1 | section on quality of calls. |
| 2 | MR. MURPHY: That's all I have. |
| 3 | Thank you. |
| 4 | MS. PHILION: I have a couple more |
| 5 | questions, Dr. Baxter. |
| 6 | BY MS. PHILION: |
| 7 | Q. Did the testimony you just provided |
| 8 | in response to Mr. Murphy's questions |
| 9 | comprehensively describe the methodology you |
| 10 | used in the completion of your expert report? |
| 11 | MR. MURPHY: Objection. |
| 12 | A. No. |
| 13 | BY MS. PHILION: |
| 14 | Q. What did it leave out? |
| 15 | MR. MURPHY: The four hours of |
| 16 | testimony. |
| 17 | A. I don't know. I couldn't |
| 18 | accurately tell you right now which parts of |
| 19 | the process he didn't ask about over the last |
| 20 | few minutes. |
| 21 | BY MS. PHILION: |
| 22 | Q. For the parts that he did ask you |
| 23 | about and you just described, are there any |
| 24 | steps that Mr. Murphy himself could not have |
| 25 | performed? |

Gregory W. Baxter - March 5, 2020

Page 220

1		A.	I would be conjecturing.
2		Q.	Well, what parts of that process
3	did you apply expertise to that an ordinary
4	person wouldn't have of what you just
5	testified about in response to Mr. Murphy's
6	questions.  Only about that?
7			MR. MURPHY:  That was asked and
8		answered.
9			MS. PHILION:  Well, no.  You just
10		asked those questions, I am asking about
11		this.
12			MR. MURPHY:  It's the same question
13		that you asked earlier.
14	BY MS. PHILION:
15		Q.	With respect to the questions that
16	you just answered that Mr. Murphy asked you,
17	what specific expertise, what steps required
18	specific expertise that an ordinary person
19	doesn't have?
20		A.	I am not sure that any single
21	specific step requires special expertise like
22	I have.  I think that reviewing hundreds of
23	UERs to detect a pattern of performance by
24	the author and then looking at dozens -- I
25	don't think anybody had over 95 UERs in a

Gregory W. Baxter - March 5, 2020

Page 221

1    year.  Looking at 95 UERs to determine what

2    happened, with regard to the proper reporting

3    of that umpire's performance, I don't think

4    the average non-human resources manager could

5    do that.  Maybe people with degrees in

6    industrial relations and human resources just

7    have the skills to do it faster and better.

8    You could probably train most people to do

9    it.  I don't know.

10         MS. PHILION:  No further questions.

11         Thank you for your time today,

12    Dr. Baxter.

13         THE VIDEOGRAPHER:  This will

14    conclude video number three and end

15    today's recording of the deposition of

16    Dr. Greg Baxter.  We are off the record

17    at 2:25 p.m., March 5, 2020.

18        (Proceedings concluded at 2:25 p.m.)

19

20

21

22

23

24

25