Kevin L. Murphy (*pro hac vice*)
J. Jeffrey Landen (*pro hac vice*)
Nicholas R. Gregg (*pro hac vice*)
MURPHY LANDEN JONES PLLC
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY  41017
(859) 360-1123

&

Nicholas J. Zaita
LEWIS DIBIASI ZAITA & HIGGINS
420 Lexington Avenue, Suite 300
New York, NY  10107
(212) 772-0943

*Attorneys for Plaintiff Angel Hernandez*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ANGEL HERNANDEZ<br><br>          PLAINTIFF,<br><br>V.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL AND MAJOR LEAGUE BASEBALL BLUE, INC.,<br><br>          DEFENDANTS. | CASE NO: 18-CV-09035-JPO-GWG |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     **INTRODUCTION** ..................................................................................................1

II.     **ARGUMENT** .......................................................................................................2

     *A.*     *Standard* ...........................................................................................................2

     *B.*     *Timeliness* ........................................................................................................2

     *C.*     *Plaintiff's disparate treatment claim should proceed to trial* ...........................3

         i.     Plaintiff's Motion for Partial Summary Judgment should be granted because he can establish and has established a *prima facie* case of disparate treatment discrimination. ....................................................................................4

             a.     **Plaintiff is qualified for both the position of crew chief and for World Series assignments.** ..................................................................4

                 1.     MLB's newfound emphasis on "leadership ability" contradicts the evidence in the record. ...................................5

                 2.     Even assuming MLB's newfound focus on "leadership ability" is the actual criterion for crew chief promotion, Plaintiff is qualified. ...................................................7

                 3.     Plaintiff was also qualified to be given one or more World Series assignments. ...............................................9

                 4.     MLB's purported reasons for not promoting Plaintiff to crew chief or giving him one or more World Series assignments do not give rise to a genuine dispute of material fact as Plaintiff's qualifications. ...........................................................................10

             b.     **Plaintiff can and has shown an inference of discrimination.** ......17

                 1.     MLB's reliance on the statistical data created by its expert does not create a genuine issue of material fact as to an inference of discrimination for purposes of Plaintiff's *prima facie* case. ..........................................................19

                 2.     MLB's assertion that there is no evidence that MLB treated Plaintiff differently from non-minority umpires should also be rejected. .............................................................19

                 3.     Plaintiff's superior qualifications also support a finding of an inference of discrimination. ........................................21

         ii.     There are genuine issues of material fact as to whether MLB's purported reason for not promoting Plaintiff to the crew chief position or assigning him to the World Series is in fact legitimate and non-discriminatory as opposed to pretextual. ..........................................................................22

**a.**   **Plaintiff's qualifications, as compared to the qualifications of those who were promoted to crew chief and assigned to the World Series over him, establish a genuine issue of material fact as to whether MLB's proffered legitimate, non-discriminatory reasons are actually pretext.** ...................................................24

1.   Any "reasonable employer" would have found Plaintiff to be significantly better qualified than the non-minority umpires identified in his Motion for Partial Summary judgment who were promoted to crew chief or assigned to the World Series over him. ...................................................25

2.   MLB's purported explanation for not promoting Plaintiff to crew chief or assigning him to the World Series is unworthy of credence...................................................26

3.   MLB's deviation from its promotion and World Series assignment standards further supports the denial of MLB's Motion. ...................................................32

4.   Current and former MLB employees attest to the quality of Plaintiff's performance as a Major League umpire in contradiction of MLB's current assertions...................................................33

5.   The number of times Plaintiff was rejected for the crew chief position, and the fact that all of those rejections were made by Torre, further undermines MLB's current arguments regarding pretext. ...................................................34

6.   Additional material facts exist that give rise to genuine disputes regarding whether MLB's proffered "legitimate, non-discriminatory" reasons for not promoting Plaintiff or assigning him to the World Series are in fact pretextual........36

B.   *Plaintiff's disparate impact claim should also proceed to trial.* ...................................................39

i.   Plaintiff has proven a *prima facie* case of disparate impact discrimination. .....39

**a.**   **Plaintiff has identified a specific facially-neutral policy or practice.** ...................................................39

**b.**   **Plaintiff has established a causal connection for purposes of his *prima facie* case of disparate impact discrimination.**...................................................43

**c.**   **There are genuine issues of material fact as to whether MLB's reliance on subjective criteria and willful ignorance of objective criteria in making crew chief promotion decisions is consistent with business necessity.**...................................................47

**d.**   **Plaintiff is able to show that an alternative practice or policy would adequately serve MLB's legitimate business needs.**........49

**III.   CONCLUSION** ...................................................50

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Coughlin,*
    64 F.3d 77 (2d Cir. 1995) ................................................................................................2

*Ash v. Tyson Foods, Inc.,*
    546 U.S. 454, 126 S. Ct. 1195, 163 L. Ed. 2d 1053 (2006) ......................................24

*Aurelien v. Henry Schein, Inc.,*
    No. 07-CV-2358(JFB)(AKT), 2009 WL 366148 (E.D.N.Y. Feb. 12, 2009) ...........passim

*Banks v. City of Albany,*
    953 F. Supp. 28 (N.D.N.Y. 1997) ....................................................... 41, 43, 48, 49

*Barner v. City of Harvey,*
    No. 95 Civ. 3316, 1998 WL 664951 (N.D. Ill. Sept. 18, 1998).............................45

*Bos. Chapter, N.A.A.C.P., Inc. v. Beecher,*
    504 F.2d 1017 (1st Cir. 1974) ..........................................................................47

*Burwell v. Eastern Air Lines, Inc.,*
    633 F.2d 361 (4th Cir. 1980) ...........................................................................48

*Byrnie v. Town of Cromwell, Bd. Of Educ.,*
    243 F.3d 93 (2d Cir. 2001) ..............................................................................24

*Capaci v. Katz & Besthoff, Inc.,*
    711 F.2d 647 (5th Cir. 1983) ...............................................................44, 45, 46

*Chuang v. Univ. of California Davis, Bd. of Trustees,*
    225 F.3d 1115 (9th Cir. 2000) .........................................................................17

*E.E.O.C. v. Andrew Corp.,*
    No. 81 C 4359, 1989 WL 32884 (N.D. Ill. Apr. 3, 1989)............................. 44, 45

*Fitzgerald v. Henderson,*
    251 F.3d 345 (2d Cir. 2001) ..............................................................................3

*Ganzy v. Allen Christian Sch.,*
    995 F. Supp. 340 (E.D.N.Y. 1998) ..................................................................33

*Gomez v. Pellicone,*
    986 F. Supp. 220 (S.D.N.Y. 1997) ..................................................................18

*Gordon v. City of New York,*
   No. 14-cv-6115 (JPO), 2018 WL 4681615 (S.D.N.Y. Sept. 28, 2018) ................................4

*Graham v. Long Island R.R.,*
   230 F.3d 34 (2d Cir. 2000) ...............................................................................................18

*Grant v. Bethlehem Steel Corp.,*
   635 F.2d 1007 (2d Cir. 1980) ....................................................................... 45, 46, 48, 49

*Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.,*
   No. 16-CIV-4897 (AT) (JCF), 2017 WL 2258374 (S.D.N.Y. May 22, 2017) ...................3

*Harriss v. Pan Am. World Airways, Inc.,*
   649 F.2d 670 (9th Cir. 1980) ...................................................................................... 2, 48

*Holcomb v. Iona Coll.,*
   521 F.3d 130 (2d Cir. 2008) .............................................................................................23

*Int'l Bhd. Of Teamsters v. United States,*
   431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977) ..................................... 44, 45, 48

*Jackson v. Gonzales,*
   496 F.3d 703 (D.C. Cir. 2007) .........................................................................................24

*Lam v. University of Hawaii,*
   40 F.3d 1551 (9th Cir. 1994) ...........................................................................................17

*Levin v. Delta Air Lines, Inc.,*
   730 F.2d 994 (5th Cir. 1984) ...........................................................................................48

*Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.,*
   964 F.2d 106 (2d Cir. 1992) ...............................................................................................2

*Martin v. Coinmach Corp.,*
   No. 15-CV-8137 (AJN)(SN), 2016 WL 6996182 (S.D.N.Y. Nov. 29, 2016) ..................41

*Ortiz-Del Valle v. Nat'l Basketball Ass'n,*
   42 F. Supp. 2d 334 (S.D.N.Y. 1999) ................................................................................45

*Sandler v. Montefiore Health Sys., Inc.,*
   No. 16-CV-2258 (JPO), 2018 WL 4636835 (S.D.N.Y. Sept. 27, 2018) ..................... 2, 23

*Sandor v. Safe Horizon, Inc.,*
   No. 08-CV-4636 ILG, 2011 WL 115295 (E.D.N.Y. Jan. 13, 2011) .................................24

*Shah v. MTA New York City Transit Auth.,*
   No. 12-CV-4276 ERK RLM, 2015 WL 4139293 (E.D.N.Y. July 9, 2015) ...........passim

*Stern v. Trustees of Columbia Univ. in City of New York,*
    131 F.3d 305 (2d Cir. 1997) .................................................................... 33, 40

*Taylor v. City of New York,*
    207 F. Supp. 3d 293 (S.D.N.Y. 2016) ............................................................. 3

*U.S. v. City of New York,*
    713 F.Supp. 2d 300 (S.D.N.Y. 2010) ..................................................... passim

*U.S. v. City of Yonkers,*
    609 F. Supp. 1281 (S.D.N.Y. 1984) ............................................................ 46

*Victory v. Hewlett-Packard Co.,*
    34 F. Supp. 2d 809 (E.D.N.Y. 1999) ..................................................... 45, 46

*Vidal v. Metro-North Commuter R.R. Co.,*
    No. 3:12-cv-00248 (MPS), 2014 WL 3868027 (D. Conn. Aug. 6, 2014) .......................... 43

*Waisome v. Port Auth. of New York & New Jersey,*
    948 F.2d 1370 (2d Cir. 1991) ............................................................... 47

*Watson v. Fort Worth Bank & Tr.,*
    487 U.S. 977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988) ........................ 39, 40, 41, 43

*Wright v. Stern,*
    450 F. Supp. 2d 335 (S.D.N.Y. 2006) .......................................................... 40

*Zann Kwan v. Andalex Grp. LLC,*
    737 F.3d 834 (2d Cir. 2013) ................................................................ 23

*Zimmerman v. Assocs. First Capital Corp.,*
    251 F.3d 376 (2d Cir. 2011) ................................................................ 18

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................... 2

Plaintiff Angel Hernandez ("Plaintiff"), by and through counsel, hereby submits his Reply Memorandum in Support of his Motion for Partial Summary Judgment and in Opposition to Defendants' Cross-Motion for Summary Judgment.

## I.     INTRODUCTION

Since at least 2011, Major League Baseball has spent considerable expense on supervisors and observers to evaluate umpires on objective criteria. During those years, thousands of these evaluations (what Plaintiff has referred to as "UERs") were completed and sent to MLB, ostensibly so those in charge of the umpires could determine who indeed were the best umpires for promotion to crew chief, and for selection to the World Series.

Despite this substantial investment in umpire supervisors and observers to submit UERs on objective criteria, MLB now asserts that those UERs are of little worth. But the evidence in the record, including the testimony of Joe Torre and Randy Marsh, demonstrates that those very UERs from which MLB now attempts to distance itself are supposed to be the basis of the Year-End Evaluations issued by MLB. The evidence also demonstrates that those Year-End Evaluations do not accurately summarize those UERs.

MLB is doing in their Motion precisely what they do in regards to the evaluations and qualifications of Plaintiff and the non-minority umpires promoted over him:  distorting the performance of non-minority umpires as being more positive than it actually was, inaccurately distorting Plaintiff's performance (and, indeed, the performances of other minority umpires) to appear inferior. MLB then attempts to utilize this manufactured difference as justification for its continued rejection of Plaintiff for the crew chief position and for World Series assignments.  But, as described below, MLB's attempts to do so here are undermined by the evidence in the record and do not provide sufficient bases on which MLB's Motion for Summary Judgment (the "Motion") could be granted.

But the issues with MLB's Motion do not stop there.  MLB also asserts, in contradiction to

substantial legal authority, that Plaintiff has failed to establish a *prima facie* case of disparate impact discrimination and that MLB's Motion on that claim should be granted.  As this memorandum demonstrates, Plaintiff has established such a *prima facie* case, and MLB's contrary arguments are wholly insufficient bases on which summary judgment could be granted.  Plaintiff's Motion for Partial Summary Judgment should therefore be granted, and MLB's Motion denied.

## II.   ARGUMENT

### A.    Standard

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Sandler v. Montefiore Health Sys., Inc.*, No. 16-CV-2258 (JPO), 2018 WL 4636835, at *5 (S.D.N.Y. Sept. 27, 2018) (citing Fed. R. Civ. P. 56(a)). "The court views all 'evidence in the light most favorable to the non-moving party.'"  *Id.* (citing *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995)).

"The Second Circuit has 'repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent,' since 'direct evidence of [discriminatory] intent will only rarely be available.'"  *Shah v. MTA New York City Transit Auth.*, No. 12-CV-4276 ERK RLM, 2015 WL 4139293, at *15 (E.D.N.Y. July 9, 2015) (citing *Holcomb v. Iona College*, 521 F.3d 130 (2d Cir. 2008)); *see also Maresco v. Evans Chemetics, Div. of W.R. Grace & Co.*, 964 F.2d 106, 113 (2d Cir. 1992) (noting "the familiar rule that summary judgment 'is ordinarily inappropriate where [as here] intent and state of mind are at issue'") (internal citations omitted).

### B.    Timeliness

Respectfully, MLB's request that the Court find Plaintiff's claims regarding the January 2011 and January 2013 crew chief selections, as well as MLB's October 2011 and October 2012 World Series decisions, "untimely under all statutes" (Dkt. 173, Page 27 of 61) must be denied.  Plaintiff's

claims brought pursuant to the New York City Human Rights Law (the "NYCHRL") include his claims based on MLB's conduct in 2011-2013 pursuant to the continuing violations doctrine. *See, e.g.,* *Taylor v. City of New York*, 207 F. Supp. 3d 293, 302 (S.D.N.Y. 2016) ("'New York state courts have,' however, 'held that the prior, more generous continuing violations doctrine continues to apply under' the NYCHRL than that adopted by the Supreme Court in *Morgan*"). "The [continuing violations] doctrine under the NYCHRL considers '[o]therwise time-barred discrete acts . . . timely 'where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice.'" *Id.* (citing *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)); *see also Grimes-Jenkins v. Consol. Edison Co. of New York, Inc.*, No. 16-CIV-4897 (AT) (JCF), 2017 WL 2258374, at *9 (S.D.N.Y. May 22, 2017) (collecting cases and noting that "[c]ourts tend to find that discrete instances of discrimination are sufficiently 'specific and related' where they consist of the same type of conduct or where the same individual targets a plaintiff with similar discriminatory acts over time").

Here, Plaintiff applied for the crew chief position four times between 2011 and the filing of his Complaint in July of 2017. Plaintiff also should have been given one or more World Series assignments during that period. Plaintiff was rejected for the crew chief position four times, and rejected for any World Series assignments, all by the same individual (Joe Torre ("Torre")). And as more fully discussed below, many of these rejections took place in the context of Torre promoting less-qualified, non-minority umpires over Plaintiff. This establishes a pattern of "specific and related instances of discrimination" sufficient to make all of Plaintiff's claims timely under the NYCHRL, and MLB's arguments to the contrary should be rejected.

C.      *Plaintiff's disparate treatment claim should proceed to trial*

MLB requests that the Court both deny Plaintiff's Motion for Partial Summary Judgment as to Plaintiff's *prima facie* case of disparate treatment discrimination, and grant MLB's Motion, on the

basis that Plaintiff has failed to establish a *prima facie* case of disparate treatment discrimination.  For the following reasons, Plaintiff's Motion for Partial Summary Judgment as to this issue should be granted, and MLB's Motion should be denied.

> i.    Plaintiff's Motion for Partial Summary Judgment should be granted because he can establish and has established a *prima facie* case of disparate treatment <u>discrimination.</u>

MLB, through its Motion, requests that the Court deny Plaintiff's Motion for Partial Summary Judgment, and grant MLB's Motion, on the purported bases that (i) Plaintiff was not qualified for the crew chief position or for World Series assignments, and (ii) Plaintiff has not shown an inference of discrimination.  MLB's arguments on these issues ignore not only the relevant, material, facts, of which the record is replete, but also the applicable law.  Plaintiff's Motion for Partial Summary Judgment should therefore be granted, and MLB's own Motion denied, as Plaintiff can and has proven a *prima facie* case of disparate treatment discrimination pursuant to Title VII, § 1981, and the NYSHRL, as well as pursuant to the less-burdensome NYCHRL.[1]

> a.    **Plaintiff is qualified for both the position of crew chief and for World Series assignments.**

"In order to satisfy the qualifications requirement in alleging a *prima facie* case of discriminatory failure to promote, 'all that is required is that the plaintiff establish basic eligibility for the position at issue.'"  *Gordon v. City of New York*, No. 14-cv-6115 (JPO), 2018 WL 4681615, at *13 (S.D.N.Y. Sept. 28, 2018).  Plaintiff does so in his Motion for Partial Summary Judgment.  As discussed therein and as more fully discussed below, Plaintiff is clearly qualified for the position of crew chief and for World Series assignments for purposes of his *prima facie* case of disparate treatment discrimination.

---

[1] Plaintiff's NYCHRL "must be construed 'independently from and more liberally than'" his Title VII, § 1981, and NYSHRL claims, all of which are analyzed under the traditional *McDonnell-Douglas* framework.  *Sandler*, 2018 WL 4636835 at *6-*7.  For purposes of Plaintiff's NYCHRL claim of disparate treatment discrimination, Plaintiff must ultimately show "only that Defendants' actions were based, in part, on discrimination."  *Id.* (internal citations omitted).   As the following discussion shows, Plaintiff has met his burden under Title VII, § 1981, the NYSHRL and the NYCHRL.

Plaintiff's qualifications for the crew chief position are discussed in detail in his Motion for Partial Summary Judgment. *See* Dkt. 139, Pages 8-11 of 28. Rather than address any of Plaintiff's actual qualifications, however, MLB now claims "leadership ability" as being the primary, if not sole, criteria used to determine which umpires will be promoted to the crew chief position, and subsequently asserts that Plaintiff is so lacking in that area that he could not possibly be qualified for the position of crew chief. MLB's newfound emphasis on "leadership ability" is a position seemingly taken for purposes of manufacturing a dispute of material fact, and a position that ignores MLB's previously stated criteria for promoting umpires to the crew chief position.

1.      MLB's newfound emphasis on "leadership ability"
        contradicts the evidence in the record.

Plaintiff propounded interrogatories on MLB at the outset of this litigation, including a request to "[i]dentify and describe the criteria used when determining whether an umpire should be promoted to the crew chief position, including the date and nature of any changes, amendments or revisions to those criteria." *See* Dkt. 141-15. In its sworn answer to that interrogatory, MLB identified the following non-exclusive list of factors:

- Leadership skills, including situation management, maintaining an appropriate pace-of-game, on-field presence, demeanor, hustle, focus, and integrity;

- Overall quality of performance, including strike zone accuracy, made/missed calls, ability to properly enforce the Replay Regulations and Procedures on the field and as a Reply Official, how much or how often the umpire exceeds/does not meet expectations, keeping the focus of the game on the field, and agility and position accuracy in getting the appropriate angle on calls;

- Fulfillment of duties and responsibilities, including attendance and the umpire's adherence to the Four-Umpire System, as well as other mandates of the Major League Baseball Umpire Manual, the Official Playing Rules, Replay Regulations, and the Basic Agreement; and

- Initiative, including whether the umpire takes the initiative to train and mentor junior umpires.

*Id.* at Pages 5-6 of 10. This same list of factors was also communicated by MLB to crew chief

candidates who were not promoted to the position, as evidenced by the letters MLB sent to them pursuant to their requests. *See*, *e.g.*, Dkt. 141-16 and Dkt. 141-17. Moreover, MLB stated that it "considers the umpire's performance in the most recent season as well as the length and consistency of his career contributions" in making crew chief promotion decisions. Dkt. 141-15.

As the UERs indicate, and as further discussed below, Plaintiff would have been promoted to crew chief long ago had MLB utilized the criteria stated in its sworn interrogatory answers. The deposition testimony of MLB officials—and MLB's own Motion—establishes that MLB has totally cast aside many of the criteria listed in its sworn interrogatory answers and in its letters to crew chief candidates who were denied the position. Torre testified that the most important aspect of an umpire's job was not his ability, but was instead "[h]aving the skills to handle situations." Dkt. 141-12, Torre Dep., 82:10-19. Woodfork testified that Torre focuses on "leadership," and also listed "consistency," "accountability" and "experience" as other factors Torre considered. Dkt. 141-5, Woodfork Dep., 27:7-25. Nothing disclosed in discovery suggested that Torre considered factors other than "leadership," "consistency," "accountability" and "experience" in making crew chief promotions.

Contrary to that sworn testimony, MLB now claims in its Motion that it focuses on "leadership ability, including situation management and demonstrating the requisite managerial skills necessary to lead a crew on and off the field." Dkt. 173, Page 30 of 61. For the very first time, however, MLB now claims that Torre also focuses on other "qualifications," including various "qualifications" that were listed in the interrogatory answers and letters discussed above.[2] *Id.* In so doing, MLB does not cite to Torre's deposition—nor could they. That is because Torre does not mention many of those factors in his deposition whatsoever, let alone testify that he relies on them in making crew chief promotion decisions. Any assertion by MLB that Torre actually considers more qualifications than

---

[2] Even MLB's recitation of the "qualifications" it asserts Torre now considers consist of only a limited subset of the factors MLB has previously stated it considers. *Compare*, Dkt. 173, Page 30 of 61 *with* Dkt. 141-15, Dkt. 141-16 and Dkt. 141-17.

those he previously identified in his deposition testimony contradicts that previous testimony and therefore cannot defeat Plaintiff's Motion for Partial Summary Judgment. *See Vos v. Lee*, No. 07-CV-804 (RLM), 2009 WL 10640615, at *7 (E.D.N.Y. Dec. 23, 2009) (finding that "conclusory" assertions in affidavits that were "clearly contradicted" by documentary evidence and prior deposition testimony "cannot be regarded as creating a genuine issue of material fact").

> 2.   Even assuming MLB's newfound focus on "leadership ability" is the actual criterion for crew chief promotion, Plaintiff is qualified.

Plaintiff is certainly qualified for the position of crew chief based on MLB's previously stated criteria for that position, as found in MLB's sworn interrogatory answers and its letters to crew chief candidates who were denied the position. *See* Dkt. 139, Pages 8-11 of 28; Dkt. 141-20 – Dkt. 141-32. However, even if "leadership ability" is the primary or the sole criteria for determining whether an umpire is qualified for the position of crew chief, Plaintiff's "leadership ability" is more than sufficient to be qualified for that position. Plaintiff's UERs (which were supposed to be—but were not actually—the basis for his Year-End Evaluations)[3] consistently commend his leadership abilities.

For example, in the 2012 season when Plaintiff served as an interim crew chief for the vast majority of the season, umpire supervisors and observers complimented Plaintiff's "leadership ability." *See, e.g.,* Dkt. 141-28, Page 111 of 139 ("Angel continues to show strong leadership skills as a[n] acting crew chief. He loves to talk about umpiring before and after the game"); *id.* at Page 115 of 139 "Angel

---

[3] MLB, faced with the indisputable fact that its Mid-Year Evaluations and Year-End Evaluations do not accurately reflect the actual performance of its umpires, is now attempting in its Motion to distance itself from the UERs entirely. But this sudden shift in strategy should not be countenanced by the Court, as it is contradicted by the evidence in the record. Year-End Evaluations are supposed to be nothing more than "[s]upervisors aggregat[ing] all of the end of game reports [(UERs)] an umpire has received through the season and assign[ing] an overall grade to each category." Dkt 141-3, Marsh Dep., 89:19-90:8; *see also* Dkt. 156-3, Exhibit G to Declaration of Matthew McKendry, at DEF 015092. Torre himself testified that the Year-End Evaluations "come from" the UERs issued during that same year. Dkt. 141-12, Torre Dep., 132:15-24. Both Torre and Marsh explicitly testified that there should not be any comments in the Year-End Evaluations that are not found in the UERs issued for that same year. Dkt. 141-12, Torre Dep., 34:10-21; Dkt. 141-3, Marsh Dep., 46:7-11. Simply put, the testimony of MLB's own umpire executive establishes that the UERs should be the sole basis for the Year-End Evaluations. The Year-End Evaluations should therefore accurately reflect the substance of the UERs. The evidence in the record makes clear that they do not, particularly as to Plaintiff's Year-End Evaluations and the Year-End Evaluations of the non-minority umpires promoted to crew chief over him.

continues to show his leadership as a crew chief.  He has had a young umpire with him most of the season and he does a good job communicating with him and the rest of the crew talking about umpiring").  MLB even noted as much in Plaintiff's 2012 Mid-Year Evaluation.  *See* Dkt. 141-25, Page 5 of 18 ("You spent a large portion of the first half of the season as the acting-Crew Chief on Crew C.  Your attitude and effort in the crew chief role has been very solid.  You bring a welcoming team-first attitude to the crew and foster communication both on and off the field.  Continue to show leadership qualities in your present responsibility").[4]

Contrary to MLB's statements in its Motion, Plaintiff also received consistent praise for his performance as an acting crew chief for the majority of that 2012 season.  *See, e.g.*, Dkt. 141-28, Page 41 of 139 ("Angel is doing a good job filling in for Rapuano as crew chief.  He keeps the crew light in the clubhouse and they do things together outside of the game.  He is always enthusiastic and good to be around"); *id.* at Page 63 of 139 ("Angel has done a great job, since he took over as crew chief for Rapuano.  He is constantly discussing umpiring in the locker room and seems to be taking on the job with conviction & pride.  Works very well with the young umpires"); *id.* at Page 79 of 139 ("Angel is doing a very good job as crew chief.  He goes out of his way to interact with the crew on and off the field"); *id.* at Page 90 of 139 ("Angel continues to excel in his role as crew chief"); *id.* at Page 126 of 139 ("Since Angel has taken over crew chief responsibilities, he has done an excellent job.  It's like watching a different umpire, with the way he handles himself on the field in such a professional manner.  He has a great passion for the game and loves to discuss the job of umpiring with his crewmates.  He takes great pride in his work and is an excellent role model for the young umpires"); *id.* at Page 128 of 139 ("It was a pleasure to watch Angel work throughout these five games both in Oakland and San Francisco.  He continues to do a great job as crew chief.  Very passionate about the

---

[4] As discussed below, Plaintiff also consistently demonstrated "situation management" skills, which MLB contends is part of an umpire's "leadership ability" (*see* Dkt. 173, Page 30 of 61).

job and loves to talk about the game with his crew.  I really enjoyed watching Angel work and the job that he did this year").

Needless to say, the foregoing demonstrates that MLB's recent contentions that Plaintiff lacks the "leadership ability" to be a crew chief is simply unsupported by the direct evidence in the record. Thus, even based on MLB's self-serving (and contradictory) position that "leadership ability" is actually the only real qualification necessary for promoting an umpire to crew chief, there is substantial evidence in the record that Plaintiff is qualified for that position.

> 3. Plaintiff was also qualified to be given one or more World Series assignments.

In determining which umpires to assign to the World Series, MLB contends that it considers "many of th[o]se same factors" discussed above.  MLB also contends that it selects umpires who "have demonstrated the ability to manage on-field situations under intense pressure; took responsibility for their on-field decisions; maintained composure and regained focus immediately if an officiating error was made; and applied and conveyed the rules correctly and clearly."  Dkt. 173, Page 30 of 61.

MLB's stance regarding these factors for World Series assignments, like MLB's previously unstated positions on the "qualifications" for crew chief, are contradicted by the deposition testimony of Torre himself.  When Torre was asked to identify the criteria he "used to select umpires in the World Series," Torre responded that he considers the umpires' "combination experience and performance for the year."  Dkt. 141-12, Torre Dep., 31:7-16.  In so testifying, Torre did not mention, let alone state that he considers, any of the factors MLB lists in their Motion, such as "the ability to manage on-field situations under intense pressure" or whether an umpire "took responsibility for their on-field decisions."  Moreover, Marsh testified, again contrary to MLB's Motion, that "seniority," "special event experience," and the very UERs that MLB now represents that it ignores were also considered in making World Series decisions.  *See* Dkt. 141-3, Marsh Dep., 82:3-14.  Again, Torre's

declaration is contradicted by his and others' deposition testimony, and any assertions premised on Torre's contradictory declaration cannot be sufficient bases for creating a genuine issue of material fact. *See, e.g., Vos*, 2009 WL 10640615 at *7.

As discussed both above and in Plaintiff's Motion for Partial Summary Judgment, Plaintiff's "experience and performance," as well as his "seniority," "special event experience," and UERs, certainly qualify him for World Series assignments for purposes of his *prima facie* case of disparate treatment discrimination.

4.     MLB's purported reasons for not promoting Plaintiff to crew chief or giving him one or more World Series assignments do not give rise to a genuine dispute of material fact as Plaintiff's qualifications.

Rather than address the evaluations it issued regarding Plaintiff's performance, and rather than finding any legitimate basis in those evaluations for arguing that Plaintiff is not actually qualified for the position of crew chief or for World Series assignments, MLB points to several individual instances that it contends demonstrate Plaintiff's lack of qualifications for those positions. But for purposes of establishing Plaintiff's qualifications as to his *prima facie* case of disparate treatment discrimination, "'all that is required is that the plaintiff establish basic eligibility for the position at issue.'" *Gordon*, 2018 WL 4681615 at *13. Plaintiff has certainly done so here.

MLB's unconvincing characterizations of Plaintiff's qualifications are nothing more than a baseless attempt to manufacture a genuine issue of material fact. Randy Marsh[5] ("Marsh") admitted in his deposition that MLB "could actually take isolated incidents . . . from each and every umpire and use that as an excuse to not promote them [to crew chief] or put them in the World Series . . ." Dkt. 141-3, Marsh Dep., 85:21-86:5. That is precisely what MLB is doing here—ignoring consistently excellent performance evaluations in favor of isolated purported "incidents" and using that as

---

[5] Randy Marsh is currently an umpire executive in MLB's front office.

attempted justification for not promoting Plaintiff to crew chief or giving him World Series assignments.  For a variety of reasons, MLB's attempts to do so fail and create no genuine issue of material fact that would warrant the denial of Plaintiff's Motion for Partial Summary Judgment, or the granting of MLB's Motion, on this issue.

MLB first points to the 2012 "incident" in which Plaintiff asked a pitcher to autograph baseballs as a "memento" for a crewmate who called a no-hitter thrown by that same pitcher the prior evening.  *See* Dkt. 173, page 31 of 61; Dkt. 168-1, Deposition of Angel Hernandez ("Hernandez Dep."), Pages 44-45 of 733, 173:21-174:16.  MLB ignores the fact that Marsh, while he was a permanent crew chief, engaged in and was punished for the same exact conduct.  Dkt. 141-3, Marsh Dep., 86:6-89:18.  Not only was Marsh retained in his position as crew chief after his "incident," he was later promoted to (and, at the time Plaintiff initiated this lawsuit, was still in the position of) an MLB umpire executive.  *Id.*  MLB also fails to mention that "past crew chiefs" and "old school guys" engaged in that same conduct.[6]  Dkt. 168-1, Hernandez Dep., Pages 44-45 of 733, 173:21-174:16; *see also* Declaration of Richie Garcia, attached hereto as Exhibit 1, ¶¶ 5, 7.

MLB's position seems to be that when minority umpires such as Plaintiff engage in such conduct, it is grounds to not promote them to crew chief or give them World Series assignments.  But history shows that when non-minority umpires who were at times **already permanent crew chiefs** engage in that conduct, it is apparently not justification for removing them from that position nor, in the case of Marsh, justification for not giving them one of the most powerful positions relating to

---

[6] MLB likewise omits from its Motion its comments that "for the greater part of the [2012] season, [Plaintiff] did a commendable job of operating within the guidelines laid out in the policies distributed to umpires," and that this individual "incident" was "isolated."  *See* Dkt. 141-26, Page 11 of 45.  MLB further noted in Plaintiff's 2012 Year-End Evaluation that Plaintiff "filled in for most of the year as a crew chief and should be proud of a lot of [his] work.  [Plaintiff] made great strides in [his] demeanor and situation handling on the field."  *Id.*  MLB also told Plaintiff in that evaluation that, despite this "incident," Plaintiff had put himself "in a better position to take a leadership role whenever that time may come."  *Id.* ███████████████████████████████████████████████ which further belies MLB's current assertions that this "incident" renders Plaintiff unqualified for the crew chief position.  *See* Dkt. 142-112.

umpires at MLB.  Such a position does not support MLB's contention that Plaintiff is not qualified to be a crew chief or to be assigned to the World Series—it actually supports Plaintiff's claims that he has been subjected to differential treatment by MLB.

MLB next points to Plaintiff's alleged failure to "take accountability for his own mistakes." Dkt. 173, Page 31 of 61.  The only alleged specific instance of any such failure in Plaintiff's decades' long career is the 2013 game in Cleveland.[7]  *Id.*; Declaration of Joe Torre, Dkt. 169, ¶¶ 21-26.  The Cleveland "incident" was discussed at length in Plaintiff's Motion for Partial Summary Judgment.  *See* Dkt. 139, Pages 11-12 of 28.  In that game, Plaintiff followed MLB protocol to the letter.  Rather than support Plaintiff and defend him from the public criticism of which MLB was indisputably aware, MLB publicly stated that Plaintiff's call was incorrect and refused to otherwise defend or support him. *See*, *e.g.*, Dkt. 141-37.  It was with this lack of support that Plaintiff took issue, and for good reason; MLB had previously supported non-minority umpires in similar circumstances.  *See* Dkt. 141-42; *see also* Declaration of Joe West, attached hereto as Exhibit 2, ¶ 45-46.

MLB has also provided absolutely no evidence that Plaintiff's alleged refusal to "take accountability" for the Cleveland "incident" has affected his performance as an umpire in any way whatsoever.  Furthermore, Marsh testified that he told Plaintiff that Plaintiff had "kept himself totally under control in a very difficult situation" after the Cleveland "incident," and that Marsh acknowledged directly to Plaintiff that he knew Plaintiff "had changed, and that was change for the better." Dkt. 141-3, Marsh Dep., 276:24-278:6. Perhaps most significantly, though MLB now asserts that the Cleveland "incident" provides grounds for not promoting Plaintiff to crew chief or assigning him to the World Series, at least one MLB executive confirmed that the Cleveland "incident" did not

---

[7] Though MLB, and Torre in his declaration, make reference to comments in the Year-End Evaluations that purport to relate to this issue, those comments are not supported by any particular reference to any specific instance and are instead purely conclusory.  As discussed below, Plaintiff's UERs—direct evidence of Plaintiff's performance—frequently complimented Plaintiff on his in-game focus.  This is yet another demonstration of how MLB's Year-End Evaluations do not accurately reflect the UERs on which they are supposed to be based.

play any role in MLB's decision not to promote Plaintiff to crew chief. *See*, *e.g.*, Marsh Dep., 128:15-19, attached hereto as Exhibit 3. Nothing about the Cleveland "incident," or Plaintiff's reaction to that "incident," proves that Plaintiff was unqualified for the position of crew chief or for World Series assignments.

MLB's repeated attacks on Plaintiff's purported "inability" to focus likewise do not support its Motion, as those baseless attacks ignore numerous instances where Plaintiff was complimented on his focus. *See*, *e.g.*, Dkt. 141-27, Page 73 of 129 ("Angel always works in a highly focused and engaged fashion"); Dkt. 142-29, Page 83 of 126 (Plaintiff receiving an "Exceeds Standard" rating in "Focus," with the supervisor or observer noting that "[c]onsidering all of the action on the field, Angel was keenly aware, focused on the development of the play, and was in the exact position to accurately call the 'out'"); Dkt. 141-30, Page 8 of 126 ("Umpire Hernandez was the busiest umpire in this game. He had a variety of calls and a lot of them. I counted over fifteen force plays, a couple of pick off attempts and five fair/foul calls. He showed good ready position on every pitch and stayed focused with solid concentration throughout the game. This is why all of his calls were correct and many of them were 'bang-bang' plays…kudos to Umpire Hernandez on his performance in this game"); Dkt. 141-31, Page 23 of 97 ("In this game and during the entire series, the one thing that stood out with Umpire Hernandez was his consistent focus, concentration and intensity when needed. He was always in the game and handled all of his plays correctly. His ready position on every pitch was athletic as well as his movements on the field"); Dkt. 141-32, Page 44 of 102 ("Umpire Hernandez had a fairly busy game at third base and rose to the challenge by calling all of his plays correctly. He had a force play and five fair/foul calls. Started every pitch in a good ready position for anything that might come his way. He backed this up with consistent focus and concentration throughout the game").

MLB next asserts, in conclusory fashion and with no citation to any particular performance evaluation or other document, that Plaintiff "has demonstrated an inability, or unwillingness, to accept

constructive criticism." Dkt. 173, Page 31 of 61. In support of this contention, MLB points to ¶¶ 21, 24 and 26 of Torre's Declaration, as well as excerpts from Torre's and Marsh's deposition testimony. Yet none of these support MLB's current position that Plaintiff is not qualified for the crew chief position or for World Series assignments. The excerpts of Torre's deposition testimony to which MLB cites primarily relate to "incidents" already discussed herein, such as the Cleveland "incident" and a post-complaint "incident" (*see* Dkt. 168-1, Torre Dep., 83:9-84:17, 85:23-86:3), while the excerpt of Marsh's deposition testimony to which MLB cites relates only to the Cleveland "incident," which is itself immediately followed by Marsh's testimony regarding his reminder to Plaintiff that (i) Plaintiff had "kept himself totally under control in a very difficult situation," and (ii) Plaintiff "had changed, and that was change for the better" (*see* Dkt. 141-3, Marsh Dep., 276:24-278:6). Paragraph 21 of Torre's declaration likewise relates to the Cleveland "incident" discussed above, which in no way relates to Plaintiff's alleged "inability, or unwillingness, to accept constructive criticism." Paragraph 24 relates to a meeting with Plaintiff and a request from Torre, but provides no basis for MLB's asserted conclusion that Plaintiff cannot accept constructive criticism. *See* Plaintiff's Counterstatement to MLB's Statement of Material Facts, ¶¶ 91-92. Finally, ¶ 26 of Torre's declaration relates to a post-complaint "incident" that, as discussed below, is immaterial to the instant case, which was initiated in July of 2017. Finally, MLB's own Year-End Evaluations of Plaintiff suggest that Plaintiff actually *did* accept constructive criticism, despite MLB's assertions to the contrary. *See, e.g.*, Dkt. 141-26, Page 41 of 45 ("While working in replay, your interaction with Replay Operations Center staff was always on a positive, respectful level. You readily accepted constructive feedback and criticism if warranted. Additionally, you reminded other umpires to conduct themselves professionally when necessary").

MLB also points to Torre's alleged "observation" regarding Plaintiff's situation-management skills. MLB and Torre selectively chose three individual instances over the course of Plaintiff's 26-

plus year career that MLB believes support Torre's assertion, yet chose not to acknowledge that Plaintiff has consistently received praise for his demeanor and situation management, particularly in handling ejections and defusing conflicts. *See*, *e.g.*, Dkt. 141-29, Page 12 of 126 ("This is the seventh and final game in which I saw Angel in two series, one in Oakland and one in San Francisco. Angel had a good week with a number of close plays and good work in the two games I saw him behind the plate. He showed very good instincts on plays and had good angles and distance in his position. He has good work ethics and is passionate about his job. He shows a calm and professional demeanor on the field"); *id.* at Page 111 of 126 ("[Plaintiff] handled the argument with Joe Maddon in a calm professional manner. This is the way he has been handling arguments when an explanation is called for"); Dkt. 141-30, page 125 of 126 ("Umpire Hernandez showed constraint and kept himself under control through the entire situation" regarding an ejection); Dkt. 141-31, Page 72 of 97 (after a prolonged back-and-forth regarding a player's disagreement with a called strike, Plaintiff "did a good job of recognizing the situation and standing his ground without looking like the aggressor in the situation"); *id.* at Page 86 of 97 (Plaintiff received an "Exceeds Standard" rating in "Ejections and Situation Management," and the supervisor or observer noted that Plaintiff "has made great strides over the years in his demeanor on the field").

Even Plaintiff's Year-End Evaluations noted Plaintiff's efforts in the area of situation management, including in some of the very Year-End Evaluations to which MLB cites in support of its contention that Plaintiff's efforts in that area were supposedly lacking. *See*, *e.g.*, Dkt. 141-26, Page 10 of 45 ("You displayed a calm professionalism on the field. This is an area that you have worked hard on and have shown great improvement to take a less 'noticeable' approach"); *id.* at Page 18 of 45 ("As was mentioned in your Mid-Year evaluation, you made strides in this component once again this year. Throughout the season, you kept a positive and determined demeanor on the field. You handled yourself and each game situation in a calm and positive manner"); *id.* at Page 29 of 45 ("You handled

your situations this season in a calm and professional manner.  During a game in Boston, you warned the Red Sox dugout and effectively defused the argument by informing them that you had heard enough.  You were proactive in attempting to stop a bench-clearing incident during the May 25 game in Tampa"); *id.* at Page 39 of 45 (noting that Plaintiff "took a solid step forward in" the area of situation management in the 2015 season); *id.* at Page 42 of 45 ("You had two ejections during the season and did not issue a warning or equipment violation.  You did a commendable job of making an effort to stay above the fray and not engage with uniformed personnel unnecessarily.  You made tremendous strides in this component over the last couple of years.  Keep up this solid work going forward").

Thus, contrary to MLB's assertions in its Motion, Plaintiff not only did not "struggle to handle difficult situations and to defuse conflicts during games," but actually consistently performed well in that area, with improvements noted in both Plaintiff's UERs and in his Year-End Evaluations.

MLB next asserts that another Torre "observation," this time regarding Plaintiff's purported "negative demeanor on the field," supports its position that Plaintiff was not qualified for the crew chief position or for World Series assignments.  As discussed above, Plaintiff has been consistently praised for his on-field demeanor and handling of situations in both his UERs and his Year-End Evaluations.  Torre's "observation," supported only by Torre's opinion of a single instance in 2014 (*see* Dkt. 169, ¶ 30), contradicts the evidence in the record and does not support MLB's arguments regarding Plaintiff's qualifications.

Finally, and in what amounts to nothing more than a revealing admission that MLB has no legitimate basis for attacking Plaintiff's actual qualifications, MLB points to two purported "incidents" regarding a game that occurred in 2018 and another that took place in 2019.  But what happened in 2018 or 2019 could not possibly have any bearing on MLB's decision to not promote Plaintiff to crew chief or give him World Series assignments in the period prior to the filing of Plaintiff's Complaint in July 2017, because those post-complaint "incidents" had not yet happened.  *See generally* Dkt. 1.

Moreover, MLB's characterization of those "incidents" are disputed by Plaintiff.  *See* Plaintiff's Counterstatement to MLB's Statement of Material Facts, ¶¶ 98-104; 133-139.  In any event, because they have no relation to MLB's decisions not to promote Plaintiff to crew chief or assign him to the World Series during the years 2011-2016, those post-complaint "incidents" do not support a finding that Plaintiff was not qualified for those positions.  The Court should therefore reject any argument advanced by MLB in its Motion that is premised on post-complaint conduct.  *See, e.g., Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1129 (9th Cir. 2000) (finding that an employer's post-complaint hiring of minority employees was not relevant at the summary judgment stage "in disparate treatment cases like th[at] one addressing 'whether discrimination occurred prior to the commencement of a Title VII action'") (citing *Lam v. University of Hawaii*, 40 F.3d 1551, 1561 n.17 (9th Cir. 1994)).

\*   \*   \*

Plaintiff has demonstrated far more than his "basic eligibility for the position at issue'" and has therefore established his qualifications for purposes of his *prima facie* case of disparate treatment discrimination.  *Gordon*, 2018 WL 4681615 at \*13.  MLB's arguments to the contrary are inapplicable, immaterial, irrelevant and/or contradicted by vast amounts of evidence in the record.  Plaintiff's Motion for Partial Summary Judgment regarding his qualifications for the crew chief position and for World Series assignments should therefore be granted, and MLB's Motion to the contrary should be denied.

### b.      Plaintiff can and has shown an inference of discrimination.

"An inference of discrimination may arise if the position remains open and the employer continues to seek applicants of the plaintiff's qualifications [] or **if the position was filled by someone not a member of plaintiff's protected class**." *Aurelien v. Henry Schein, Inc.*, No. 07-CV-2358(JFB)(AKT), 2009 WL 366148, at \*7 (E.D.N.Y. Feb. 12, 2009) (citing *Gomez v. Pellicone*, 986 F.

Supp. 220, 228 (S.D.N.Y. 1997)) (emphasis added); *see also Zimmerman v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2011) ("the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis") (internal citations omitted).  An inference of discrimination can also be found where, as here, an individual was "repeatedly rejected, often multiple times by the same decision-makers, in favor of" non-minority candidates who were less qualified. *Shah*, 2015 WL 4139293 at *16. Finally, Plaintiff can also raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.*, 230 F.3d 34, 38-39 (2d Cir. 2000) (internal citations omitted).

Here, there is no dispute that Plaintiff was not promoted to the position of crew chief and MLB chose to instead fill those positions with individuals who were not members of Plaintiff's protected class.  *See* Dkt. 142, Page 15-20 of 30; Dkt. 156-2, Page 16-21 of 160.  Specifically, MLB promoted only non-minority umpires to the crew chief position, and with only two exceptions assigned non-minority umpires to the World Series, during the years 2011-2017.  *Id.*  Because the position of crew chief and the World Series assignments were "filled by someone not a member of plaintiff's protected class," an inference of discrimination is established for purposes of Plaintiff's *prima facie* case of disparate treatment discrimination.  *Aurelien*, 2009 WL 366148 at *7; *Zimmerman*, 251 F.3d at 381.  Moreover, Torre was the individual who repeatedly rejected Plaintiff in favor of the non-minority umpires identified in Plaintiff's Motion.  *See, e.g.*, Dkt. 169, Pages 13-21 of 23 ¶¶ 43-50.  This further supports a finding of an inference of discrimination for purposes of Plaintiff's *prima facie* case of disparate treatment discrimination.  *Shah*, 2015 WL 4139293 at *16.

MLB cannot—and, upon review of its Motion, does not—dispute the foregoing material facts. Nevertheless, and in contradiction of the legal authority discussed above, MLB contends that Plaintiff

has not established an inference of discrimination for purposes of his *prima facie* disparate treatment case because (i) the statistical disparity between the promotion rates of minority and non-minority Major League umpires promoted to crew chief or assigned to the World Series is purportedly insignificant, and (ii) there is allegedly "no evidence" that Plaintiff was treated differently than non-minority umpires. Each of those arguments fails to create a genuine issue of material fact as to Plaintiff's *prima facie* disparate treatment case and thus do not provide any legitimate basis for denying Plaintiff's Motion for Partial Summary Judgment, and granting MLB's Motion, as to Plaintiff's *prima facie* case of disparate treatment discrimination.

> 1.   MLB's reliance on the statistical data created by its expert does not create a genuine issue of material fact as to an inference of discrimination for purposes of Plaintiff's *prima facie* case.

First, MLB's reliance on statistical evidence does not somehow prove that no inference of discrimination has been or could be established for purposes of Plaintiff's *prima facie* case of disparate treatment.[8] The statistical evidence put forth by MLB not only is in error, it also does not show (i) that the positions were not filled by someone that was not a member of plaintiff's protected class, (ii) that Plaintiff was not repeatedly rejected for those positions by the same decision maker in favor of less qualified non-minority candidates, or (iii) that MLB did not subject Plaintiff to disparate treatment by treating him less favorably than similarly situated employees. MLB's arguments based on its statistical evidence should therefore be rejected.

> 2.   MLB's assertion that there is no evidence that MLB treated Plaintiff differently from non-minority umpires should also be rejected.

MLB's assertion that there is no evidence that MLB treated Plaintiff differently from non-minority umpires not only ignores some of the legal authority discussed above, such as *Aurelien*,

---

[8] Even if it did somehow relate to the establishment of an inference of discrimination for purposes of Plaintiff's *prima facie* case of disparate treatment, MLB's statistical evidence is inapplicable to the situation before the Court due to the small sample sizes at issue and the presence of the "inexorable zero" and is also incorrect, as is more fully discussed below.

*Zimmernan* and *Shah*, it also ignores the indisputable evidence in the record.  MLB has treated Plaintiff differently from similarly-situated, non-minority umpires in a variety of ways.  *See* Dkt. 142, Pages 10-20 of 30.  The most obvious example of differential treatment is that the non-minority umpires identified in Plaintiff's Motion for Partial Summary Judgment were promoted to crew chief or assigned to the World Series over him despite being less qualified.[9]   Additional instances of differential treatment include MLB's treatment of Plaintiff's evaluations as compared to its treatment of the evaluations of non-minority umpires.  For example, though Plaintiff received nine "Exceeds Standard" ratings in his UERs from 2011-2016, he received only four "Exceeds Standard" ratings for the Year-End Evaluations issued by MLB during that same time period.  Compare these numbers to the corresponding numbers of some of the non-minority umpires identified in Plaintiff's Motion for Partial Summary Judgment who were promoted to crew chief over him:



---

[9] A comparison of Plaintiff's qualifications as compared to those umpires is detailed in Plaintiff's Motion for Partial Summary Judgment.  *See* Dkt. 142, Pages 10-12, 15-20 and 22-24 of 30.

Not only do the foregoing discrepancies exist[10] (despite documentary evidence and testimony in the record that establishes that the Year-End Evaluations should reflect the UERs completed for that year), they have been further magnified by MLB's admitted failure to review the underlying UERs, which are direct evidence of an umpire's performance, in favor of instead relying on the Year-End Evaluations that have been distorted by MLB to cast Plaintiff's performance in an inaccurately negative light while casting the performance of white umpires in an inaccurately positive light.

MLB does not dispute any of these alarming discrepancies in its Motion.[11]  Nor does MLB address the difference in treatment made evident by those facts.  MLB's absolute silence only magnifies how the discriminatory treatment discussed above further supports the finding of an inference of discrimination for purposes of Plaintiff's *prima facie* disparate treatment case.

      3.     Plaintiff's superior qualifications also support a finding of an inference of discrimination.

As the foregoing clearly demonstrates, Plaintiff was more qualified than the non-minority umpires who were promoted to crew chief over him, as identified in Plaintiff's Motion for Partial Summary Judgment.  In addition, Plaintiff had more seniority than each of the individuals promoted to the crew chief position over him in the years 2011-2016.  *See generally* Dkt. 142, Pages 15-20 of 30.

---

[10] MLB's conduct of artificially deflating Plaintiff's performance by issuing Year-End Evaluations that do not accurately reflect the UERs issued for that same season is a phenomenon that is not limited to Plaintiff alone.  Indeed, and as discussed in Dr. Baxter's Report, MLB engages in similar conduct with other minority umpires as well.  *See* Dkt. 156-4, Exhibit K.

[11] Rather than address any of these discrepancies, which are discussed at length in Plaintiff's Motion for Partial Summary Judgment, MLB attempts to confuse the issue by stating that Plaintiff "relies principally on the report of Gregory Baxter" in support of his claims of differential treatment.  *See* Dkt. 173, Page 40 of 61.  But Plaintiff does not and need not rely on Dr. Baxter's Report in making those claims—rather, Plaintiff relies on those individuals' performance evaluations themselves.  *See* Dkt. 142, Pages 10-12 of 30; Pages 15-20 of 30.  Indeed, Dr. Baxter's Report is not mentioned in the body of Plaintiff's Memorandum in Support of his Motion for Partial Summary Judgment save for a single footnote.  *See* Dkt. 142, Page 12 of 30, n. 19.  Finally, MLB takes issue with the fact that Dr. Baxter's Report was, MLB contends, "unsworn" and therefore "inadmissible hearsay."  Dkt. 173, Page 40 of 61.  Yet, on the same day MLB filed their Motion, MLB's counsel filed a declaration affirming that Dr. Baxter authenticated his December 13, 2019 Report during his deposition.  *See* Declaration of Neil H. Abramson, Dkt. 159, age 2 of 3, ¶ 6.  Dr. Baxter has also authenticated his report via an affidavit that was filed in connection with Plaintiff's opposition to the Defendants' Motion to Exclude Dr. Baxter.  *See* Dkt. 180-2, Page 1 of 2, ¶ 2.  Finally, MLB's attacks on Dr. Baxter's report, as immaterial as they are to the instant motions, are rebutted in detail in Plaintiff's opposition to MLB's Motion to Exclude.  Dkt. 180.

This also is beyond dispute, though MLB is now retroactively attempting to downplay the significance of seniority despite evidence in the record confirming that seniority was an important factor for MLB umpire executives.   *See* ███████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ Marsh Dep., 239:8-240:23; Dkt. 141-11, Page 2 of 2 (listing 2017 crew chief candidates by seniority, with Plaintiff being the most senior by four years, and identifying a protocol for "determining seniority if service time is the same"); Dkt. 156-3, Exhibit G at DEF 015083.  Plaintiff was also far more consistent than the umpires who were promoted to crew chief over him.  Plaintiff received at least one "Exceeds Standard" rating in his UERs for each of the years 2011-2016, ████████████████████████████████████████████████

████████████████████████████████████████ *See* Dkt. 142, Pages 15-20 of 30. That Plaintiff was constantly passed over for less-qualified individuals further negates MLB's argument that Plaintiff has not shown an inference of discrimination for purposes of his *prima facie* case of disparate treatment discrimination.  *Shah*, 2015 WL 4139293 at *16.

\* \* \*

No genuine issue of material fact exists as to Plaintiff's *prima facie* case of disparate treatment discrimination.  Plaintiff was qualified for the position of crew chief and for World Series assignments, and an inference of discrimination can be established in several ways.  Plaintiff's Motion for Partial Summary Judgment as to his *prima facie* case of disparate treatment discrimination should therefore be granted, and MLB's Motion as to those same issues should be denied.

  ii. There are genuine issues of material fact as to whether MLB's purported reason for not promoting Plaintiff to the crew chief position or assigning him to the World Series is in fact legitimate and non-discriminatory as opposed to <u>pretextual.</u>

MLB's alleged "legitimate, non-discriminatory" reason for not promoting Plaintiff to the position of crew chief or assigning him to the World Series is that "[a]ccording to Torre's judgment,

Hernandez has not demonstrated the leadership ability and situation-management skills in critical, high-pressure roles on a consistent basis." Dkt. 173, Page 43 of 61.  MLB proceeds to contend that "Torre promoted umpires to crew chief roles who have, in his professional judgment, demonstrated the required consistency in leadership, judgment, the ability to manage on-field situations with a calm and professional demeanor, and success in the interim crew chief role demonstrating that they were ready to ascend to the role on a full-time basis." *Id.* at Page 44 of 61.  Finally, MLB asserts that "Plaintiff has not raised a triable issue of pretext." *Id.*  For the following reasons, significant genuine issues of material fact exist as to MLB's assertions that its stated reason for not promoting Plaintiff to crew chief or assigning him to the World Series is legitimate and non-discriminatory as opposed to pretextual.  MLB's Motion should therefore be denied.

"To avoid summary judgment . . ., the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Sandler*, 2018 WL 4636835 at *7 (citing *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)) (internal quotations omitted).  "Although direct evidence of discrimination, a smoking gun, is typically unavailable . . . it is well settled that . . . plaintiffs are entitled to rely on circumstantial evidence." *Id.* (citing *Holcomb*, 521 F.3d at 138) (internal quotations omitted).  "The ultimate question is whether plaintiff has proffered sufficient evidence from which 'a reasonable juror could conclude that [defendants'] explanations were a pretext for a prohibited reason.'" *Id.* (citing *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).  Here, Plaintiff is able to show that his race, ethnicity and/or national origin were, at the very least, "motivating factors" for MLB's repeated decisions to not promote him or assign him to the World Series, which precludes MLB's Motion from being granted.

> a. **Plaintiff's qualifications, as compared to the qualifications of those who were promoted to crew chief and assigned to the World Series over him, establish a genuine issue of material fact as to whether MLB's proffered legitimate, non-discriminatory reasons are actually pretext.**

The Supreme Court of the United States has held that "qualifications evidence" may alone be sufficient to show pretext. *See Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457, 126 S. Ct. 1195, 1197, 163 L. Ed. 2d 1053 (2006). However, when there is other evidence in the record as well, the Court must consider those comparative qualifications "in light of the entire record." *Aurelien*, 2009 WL 366148 at *11-*12.

"Where a 'reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters the picture.'" *U.S. v. City of New York*, 713 F.Supp. 2d 300, 319 (S.D.N.Y. 2010) (citing *Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007)). Moreover, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Shah*, 2015 WL 4139293 at *16 (citing *Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001)). "The Second Circuit has also recognized that 'an employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of [its] stated justification for an employment decision.'" *Id.* (citing *Byrnie*, 243 F.3d at 103). Finally, "[t]he lack of direct evidence to support defendant's assertion that plaintiff performed poorly, in contrast to substantial evidence that plaintiff performed well and was ready for promotion, presents a credibility determination properly left to the jury." *Sandor v. Safe Horizon, Inc.*, No. 08-CV-4636 ILG, 2011 WL 115295, at *12 (E.D.N.Y. Jan. 13, 2011).

1.     Any "reasonable employer" would have found Plaintiff to be significantly better qualified than the non-minority umpires identified in his Motion for Partial Summary judgment who were promoted to crew chief or assigned to the World Series over him.

Here, Plaintiff was, by any measurable standard, more qualified than the non-minority umpires who were promoted to crew chief over him, as identified in Plaintiff's Motion for Partial Summary Judgment.[12]  It is undisputed that Plaintiff had more seniority than each of those individuals.  ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Though MLB relies on the Year-End Evaluations of Plaintiff and those non-minority umpires in attempting to justify its proffered "legitimate, non-discriminatory" reasons for repeatedly passing over Plaintiff for the position of crew chief, Plaintiff has demonstrated that the Year-End Evaluations are inaccurate and unreliable inasmuch as they fail to accurately reflect those umpires' actual performances as those performances are recorded in the UERs.  Based on Plaintiff's *actual* performance, as compared to the performances of those non-minority umpires, any "reasonable employer" would have found Plaintiff to be significantly better qualified for the position of crew chief, and MLB's "disregard" and "misjudgment" of Plaintiff's qualifications substantially undermine its proffered legitimate, non-discriminatory reasons for repeatedly passing him over.  *City of New York*, 713 F. Supp. 2d at 319; *Shah*, 2015 WL 4139293 at *16.

The same result is reached as to MLB's failure to assign Plaintiff to the World Series.  Torre testified, contrary to MLB's current assertions, that the only criteria for selecting umpires for the World Series are (i) experience, and (ii) performance for that year.  Dkt. 141-12, Torre Dep., 31:7-11.

---

[12] Indeed, MLB's only proffered "legitimate, non-discriminatory" reasons for not promoting Plaintiff to crew chief or assigning him to the World Series was that, "[a]ccording to Torre's judgment," Plaintiff supposedly lacked the "leadership ability" and "situation management skills" MLB asserts were necessary for those positions.  Dkt. 173, Page 43 of 61.  But this reason, which is premised solely on "Torre's judgment" of subjective criteria, is by its very nature immeasurable and subjective.  MLB advances no legitimate, non-discriminatory for not promoting Plaintiff to crew chief or assigning him to the World Series based upon his objective performance as reflected in Plaintiff's performance evaluations.

The indisputable evidence in the record suggests that Plaintiff was on track to be selected for the 2015 World Series before as yet unexplained interventions from one or more MLB officials, including Commissioner Robert Manfred himself. *See* Dkt. 142, Page 23 of 30. Plaintiff also could have been selected for the World Series in 2016, a year in which he received three "Exceeds Standard" ratings in his UERs and one "Exceeds Standard" rating in his Year-End Evaluation, and a year in which Marsh confirmed Plaintiff's performance was "very good." *See* Dkt. 141-32; Dkt. 141-26; Dkt. 141-3, Marsh Dep., 251:11-21. Instead, MLB chose to assign to the 2016 World Series four individuals who had never before been assigned to a World Series, a phenomenon that Marsh had previously noted was "unusual." *See* Dkt. 141-162, Page 3 of 3; Dkt. 141-163. Genuine issues of material fact thus exist at least as to MLB's failure to assign Plaintiff to either the 2015 or 2016 World Series.

2. MLB's purported explanation for not promoting Plaintiff to crew chief or assigning him to the World Series is unworthy of credence.

Rather than use the actual criteria for crew chief promotion it listed in its sworn interrogatory answers and letters to crew chief candidates, or the actual criteria for World Series assignments identified by Torre in his deposition, MLB has shifted focus from those previously stated criteria and instead focused on "leadership ability" and "situation management skills." Dkt. 173, Page 43 of 61. This is evidenced further by the fact that there is scant discussion of Plaintiff's or those non-minority umpires' on-field performance in MLB's Motion or the accompanying declaration of Torre. MLB's Motion and Torre's declaration focus instead ███████████████████████████

███████████████████████████████████

████████████████████████████████████

████████████████████████████

██████████████████████████████

████████████████████████████████████









As Marsh affirmed in his deposition, MLB can take isolated incidents from any umpire's career and use that against the umpire in making crew chief promotion and World Series assignment decisions.  Dkt. 141-3, Marsh Dep., 85:21-86:5.  The evidence in the record demonstrates that MLB did so as to Plaintiff, but simply chose not to do so as the non-minority umpires promoted to crew chief over him.

MLB would like the Court to believe that the non-minority umpires it repeatedly promoted over Plaintiff were umpires with no issues regarding their "leadership ability" or "situation management" skills, while Plaintiff is an individual who has struggled in those capacities for his entire career.  As the detailed discussion herein shows, MLB's characterizations of these umpires' performances could not be further from the truth.  MLB continues in its Motion the pattern its performance evaluation process reveals of misrepresenting the performance of non-minority umpires as being more positive than it actually was, incorrectly misrepresenting Plaintiff's performance as being inferior, then utilizing this manufactured difference as purported justification for its continued rejection of Plaintiff for the crew chief position.  But the evidence in the record demonstrates that MLB's proffered legitimate, non-discriminatory reasons for not promoting Plaintiff to crew chief—

that he lacked "leadership ability" and "situation management" skills the non-minority umpires purportedly possessed—"is unworthy of credence," thereby precluding summary judgment for MLB. *Shah*, 2015 WL 4139293 at \*16.

MLB contends in its Motion that "there is no evidence" Plaintiff was more qualified than those non-minority umpires or that no reasonable person could have chosen those umpires over him. Dkt. 173, page 45 of 61.  But the foregoing discussion of Plaintiff's qualifications and how those qualifications compare to the non-minority umpires who were promoted to crew chief, as identified in Plaintiff's Motion for Summary Judgment, demonstrates that MLB's contention is simply untrue— there *is* ample evidence that Plaintiff was more qualified than those non-minority umpires, and there *is* ample evidence that MLB's stated justification for not promoting Plaintiff to crew chief is nothing more than pretext.

MLB's only factual support for its assertion that there is no such evidence is Plaintiff's deposition testimony, wherein Plaintiff acknowledges that he did not know the qualifications of the other umpires who were promoted to crew chief or assigned to the World Series over him.  *See* Dkt. 173, Page 45 of 61.  But Plaintiff's lack of knowledge of the other umpires' qualifications is not surprising, as MLB has labeled every piece of paper it produced in discovery that could even remotely constitute a "performance evaluation" of a third-party umpire as "CONFIDENTIAL – ATTORNEYS EYES ONLY," thereby barring Plaintiff from viewing them at all.[13]  *See*, *e.g.*, Dkt. 154, Dkt. 183.   MLB should not be permitted to wield its over-designation of documents as "CONFIDENTIAL – ATTORNEYS EYES ONLY" as a weapon against Plaintiff by using his lack of knowledge regarding those very documents against him.

MLB's further arguments in support of its Motion as to pretext regarding Plaintiff's

---

[13] In fact, due to MLB's over-designation of documents, Plaintiff's counsel is left with no choice but to respond to MLB's Motion without being able to show key documents to Plaintiff himself as well as to witnesses who might have submitted material information to the Court.

qualifications are equally unavailing.  As discussed above, MLB is suddenly deemphasizing seniority as a factor despite evidence in the record that shows that MLB viewed seniority as a particularly significant factor. ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████; Marsh Dep., 239:8-240:23; Dkt. 141-11, Page 2 of 2.  Additionally, MLB's continued attempts to convince the Court that Plaintiff's position as to his qualifications is only "subjective" is contradicted by the vast amount of evidence in the record, including MLB's own performance evaluations of Plaintiff, that supports Plaintiff's position that his qualifications are superior to those who were promoted to crew chief or assigned to the World Series over him.

> 3. MLB's deviation from its promotion and World Series assignment standards further supports the denial of MLB's Motion.

As discussed above, MLB had previously stated both to Plaintiff and to other umpires the various criteria it relies on in making crew chief promotion decisions, including so stating in sworn interrogatory answers issued in this litigation.  *See* Dkt. 141-15; Dkt. 141-16; Dkt. 141-17.  MLB now asserts, contrary to that direct evidence, that it actually considers only a small, limited subset of those factors, with a substantial focus on "leadership ability" and "situation management" skills.[14]  *See, e.g.,* Dkt. 173, Page 30 of 61.  In addition, Torre testified that "experience" and "performance for the year" were the only factors he considered in making World Series assignment decisions.  Dkt. 141-12, Torre Dep., 31:7-11.

MLB's attempts to shift the focus of its promotion procedures from the factors it previously identified for crew chief promotion, and the factors for World Series assignments Torre previously identified in his deposition, to a focus primarily, if not solely, on "leadership ability" and "situation

---

[14] MLB also asserts that it considers several other factors listed in its interrogatory answers but, as discussed above, that assertion is contradicted by the deposition testimony of Torre himself.

management" is a deviation from MLB's standard promotion procedures that further supports the conclusion that a genuine issue of material fact exists as to whether MLB's proffered "legitimate, non-discriminatory" reasons are, in reality, pretextual.  *See, e.g., Ganzy v. Allen Christian Sch.*, 995 F. Supp. 340, 349 (E.D.N.Y. 1998) (noting that "deviation from the employer's normal employment policies" can be "relevant to the issue of pretext"); *Stern v. Trustees of Columbia Univ. in City of New York*, 131 F.3d 305, 313 (2d Cir. 1997); *Aurelien*, 2009 WL 366148 at *12.

> 4.      Current and former MLB employees attest to the quality of Plaintiff's performance as a Major League umpire in contradiction of MLB's current assertions.

As is shown by the accompanying declarations of Joe West[15] and Richie Garcia[16], Plaintiff's performance and qualifications are of a far greater quality than MLB leads the Court to believe.  West Dec., ¶¶ 4-7; Garcia Dec., ¶¶ 11-14.  In addition to those declarations, the deposition testimony of Fieldin Culbreth (an umpire who, as discussed above, was promoted to crew chief for the 2013 season) ("Culbreth") further contradicts MLB's current assertions that Plaintiff was not promoted to crew chief or given World Series assignments because he was unqualified.  Culbreth testified that Marsh, an umpire executive, called Culbreth and directed him to apply for the crew chief opening for the 2013 season after Culbreth initially chose not to apply.  Deposition of Field Culbreth, attached hereto as Exhibit 4, 16:6-18:8; *see also* West Dec., ¶ 44.  Culbreth would not have applied but for that contact from Marsh.  *Id.* at 19:16-22.  Culbreth testified that he would not have applied at that time at least in part because Plaintiff was "senior to [Culbreth] and every bit as capable," and that it was "right" for Plaintiff to be promoted to crew chief in 2013.  *Id.* at 15:3-16:11.  This evidence reinforces the

---

[15] Joe West is among the most accomplished umpires in Major League Baseball history.  *See* Declaration of Joe West ("West Dec."), attached hereto as Exhibit 2, ¶¶ 1-3.  As discussed in Mr. West's declaration, Mr. West has worked with Plaintiff on the same crew.  *Id.* at ¶¶ 5-6.

[16] Richie Garcia was the only minority permanent crew chief in the history of Major League Baseball at the time this lawsuit was initiated in July of 2017.  Declaration of Richie Garcia ("Garcia Dec."), attached hereto as Exhibit 1, ¶ 3.  Following his career as a Major League umpire and crew chief, Richie Garcia served as an umpire supervisor.  *Id.* at ¶ 6.  During his time both on the field as a Major League umpire and as an umpire supervisor, Richie Garcia personally observed Plaintiff's performance.  *Id.* at ¶ 11.

conclusion that MLB's Motion on the issue of pretext should be denied.  *See Shah*, 2015 WL 4139293 at *21.

> 5.    The number of times Plaintiff was rejected for the crew chief position, and the fact that all of those rejections were made by Torre, further undermines MLB's current arguments regarding pretext.

It is undisputed that Plaintiff applied for the crew chief position for at least the following seasons:  2011, 2013, 2014 and 2017.  *See* Dkt. 173, page 27 of 61, n. 8.  Based upon the declaration of Torre that was submitted in connection with MLB's Motion, it was Torre alone, in the exercise of only his "judgment," that repeatedly made the decision to reject Plaintiff for the position of crew chief and for World Series assignments.  *See, e.g.*, Dkt. 169, Pages 5, 13-21 of 23, ¶¶ 19-20, 43-50.  While it is true that this fact, standing alone, could not support Plaintiff's claim of pretext, it does lend further support to the conclusion that a genuine issue of material fact exists as to whether MLB's proffered legitimate, non-discriminatory reasons are pretextual.  *See, e.g., Shah*, 2015 WL 4139293 at *21.

MLB contends at various times in its Motion that summary judgment should be granted in its favor and/or that Plaintiff's Motion for Partial Summary Judgment should be denied because, MLB asserts, Torre's decision to not promote Plaintiff to crew chief or assign him to the World Series was based on personal animus arising from a 2001 incident and not based on any discriminatory motive.  *See, e.g.*, Dkt. 173, Pages 34, 48 of 61.  In so doing, MLB cites to a single paragraph of the First Amended Complaint and limited excerpts of Plaintiff's deposition.  The paragraph to which MLB repeatedly cites (¶ 34) reads as follows: "Torre has a history of animosity towards Hernandez stemming from Torre's time as manager of the New York Yankees.  This dates back to at least May 4, 2001."  Dkt. 35, Page 6 of 24, ¶ 34.

Nowhere in that paragraph, or anywhere else in Plaintiff's First Amended Complaint, does Plaintiff plead that this history of animosity and MLB's subsequent conduct was a result of Torre's personal, but non-discriminatory, dislike of Plaintiff.  To the contrary, Plaintiff pled that "[t]hough it

may seem as if Major League Baseball's problems with Hernandez begin and end with some personal animus Torre and some other individuals in the Office of the Commissioner may have towards Hernandez, an overview of how Major League Baseball has treated minorities such as Hernandez shows a much deeper and troubling trend." Dkt. 35, Page 11 of 24, ¶¶ 66.  Plaintiff then proceeds to detail those trends at length, with a particular focus on how Torre himself has treated minority Major League umpires, including Plaintiff, since his arrival in MLB's front office in 2011.  *See id.*, ¶¶ 67-102.  Plaintiff's allegations in his First Amended Complaint thus do not show, despite MLB's representations, that the "real reason" for Plaintiff's claims is because "Torre allegedly disliked him" for non-discriminatory reasons.[17]

The limited excerpts of Plaintiff's deposition to which MLB also cites likewise do not support the position that Plaintiff's claims are based on Torre's personal dislike of Plaintiff as opposed to MLB's discriminatory conduct.  In those deposition excerpts, Plaintiff discusses the 2001 incident with Torre but never once testifies, or even suggests, that his claims are based on any non-discriminatory dislike of Plaintiff as opposed to MLB's discriminatory conduct.   Dkt. 168-1, Hernandez Dep., 13:1-14:2, 14:24-15:19.  MLB also again tries to take advantage of the fact that Plaintiff had not yet been permitted, at the time of his deposition, to view any document MLB had designated as "CONFIDENTIAL – ATTORNEYS EYES ONLY" in asserting that Plaintiff "admits that he has no reason to believe that Torre's alleged dislike of him or MLB's employment decisions were the result of discriminatory animus."  Dkt. 173, Page 34 of 61.  Again, such reliance on the fact that Plaintiff cannot view the majority of the documents produced by MLB should not be permitted by the Court.  Additionally, MLB's reliance on Plaintiff's comments in this regard is further weakened by the fact that, at the time Plaintiff was deposed in April of 2019, Plaintiff's counsel had not yet

---

[17] The inaccurate Year-End Evaluations of other minority umpires likewise undermines MLB's assertion that Torre's "dislike" of Plaintiff was for non-discriminatory reasons.

deposed a single MLB employee.  Regardless of the context of Plaintiff's testimony, however, it is beyond dispute that nothing in Plaintiff's testimony supports MLB's position that Plaintiff's claims are based not on MLB's discriminatory conduct, but instead based on Torre's alleged personal, non-discriminatory dislike of Plaintiff.

6.  Additional material facts exist that give rise to genuine disputes regarding whether MLB's proffered "legitimate, non-discriminatory" reasons for not promoting Plaintiff or assigning him to the World Series are in fact pretextual.

In addition to all of the above, various pieces of evidence in the record further demonstrate that genuine issues of material fact exist as to MLB's arguments regarding pretext.  These facts shine light on MLB's disturbing attitude towards diversity as an organization, which has itself permeated its promotion practices regarding Major League umpires.

- The 2013 Umpiring Department Overview and MLB's response

MLB knew as early as 2013 that it had a diversity problem amongst its umpire ranks. In 2013, an MLB employee sent to Peter Woodfork a document entitled "Umpiring Department Overview." In that document, MLB noted the following facts:

- Only 7% of MLB's Major League umpires at the time were minorities.  *See* Dkt. 156-3 at DEF 015070.[18]  The document also references the percentage of minority NBA referees (48%) and NFL referees (an estimated 40%), both of which were far greater than MLB's percentage of minority umpires. *Id.* at DEF 015117, DEF 015122.  MLB's 7% of minority umpires bested only the NHL's 1%.  *Id.* at DEF 015126.

- MLB particularly took notice of the NFL's "major focus" on diversity "from the lowest levels of officiating to the top levels"—something MLB sorely lacked then, and sorely lacks now.  *Id.* at DEF 015124.

- The recommendations found in that document include establishing "[s]trategic

---

[18] This document was originally filed under seal by Plaintiff in connection with his Motion for Partial Summary Judgment, per MLB's direction that Plaintiff must do so. MLB later filed a version of the document with only slight redactions, in contradiction of its previously stated position that Plaintiff was required to file the entire document under seal. *See* Dkt. 156-3, Exhibit G.  Due to the overlay of the filing stamps found at the top of the document as it was filed by MLB, however, it is difficult to make out what page numbers are attributable to which pages.  Thus, Plaintiff refers to specific pages of that document by Bates number as opposed to the page number typically found at the top of filed documents.

partnerships with armed forces, universities and social organizations to shore up [the] pipeline of diversity candidates." *Id.* at DEF 015132.

• MLB notes in that document that "[g]iven the long-term nature of umpire development, the only way to approach **MLB's diversity issue** is through lower-level recruitment of minorities." *Id.* at DEF 015146 (emphasis added).

In response to this document, which confirmed that MLB had a "diversity issue," MLB did next to nothing. Indeed, all MLB did was invite minority umpire youths to occasional one-day umpire camps in a few cities. *See* Dkt. 141-3, Marsh Dep., 22:9-14, 105:17-107:22; Dkt. 141-12, Torre Dep., 24:8-22, 178:21-180:15; Dkt. 141-6, Woodfork Dep., 209:17-214:25.

MLB attempts to brush this document, and its acknowledgement of MLB's "diversity issue," aside by characterizing this document as "an irrelevant diversion from the defects in [Plaintiff's] claims." Dkt. 173, page 49 of 61. But the contents of MLB's Umpiring Department Overview document, the acknowledgement of MLB's "diversity issue," and MLB's utter failure to adequately address that issue all constitute material evidence that demonstrates MLB's attitude towards diversity, minority umpires and minority umpire candidates. Because the Court must view the evidence of pretext "in light of the entire record" (*Aurelien*, 2009 WL 366148 at *11-*12), this evidence further establishes that a genuine issue of material fact exists regarding the issue of pretext.

• Marsh's comments made during his deposition.

In his Motion for Partial Summary Judgment, Plaintiff identified two disturbing comments made by Marsh, an umpire executive, regarding Major league umpires or minority candidates for that position:

• The first comment by Marsh was made in response to a question asking Marsh to acknowledge that the current procedures for getting minor league umpires into the major leagues left MLB with "no power whatsoever to increase the level of minorities until they get to AAA." Marsh responded that that was technically accurate before going on to state that the lack of African-American umpires in the minor leagues was not due to any fault on the part of MLB, but was instead because African-American students of schools to which MLB had sent brochures for umpire camps "want to be in the big Leagues tomorrow, [but] they don't want to go through" all that it takes to

37

get there.  Dkt. 141-3, Marsh Dep., 100:17-101:8; Dkt. 142, Page 6-7 of 30.

- The second comment made by Marsh relates to 



MLB understandably attempts to distance itself from the second of Marsh's comments[19] by (i) casting Plaintiff's reference to it as "an attempt to generate a favorable soundbite" (despite the fact that that portion of Plaintiff's Motion for Partial Summary Judgment was, and remains, filed under seal), (ii) describing the comments as not being "derogatory or offensive," (iii) stating that Marsh is not a decision-maker, and (iv) stating that "this remark about another umpire is so far attenuated from Plaintiff's claims" ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  Dkt. 173, Page 49 of 61, n. 21.  MLB's characterizations of the second comment are shocking and self-serving, to say the least.  Needless to say, a jury could very well consider either or both of the foregoing comments to be further evidence of MLB's continued attitude towards minorities and further evidence that MLB's proffered "legitimate, non-discriminatory" reasons for not promoting Plaintiff to crew chief or assigning him to the World Series are actually pretext.

- Umpire executives' failure to rely on MLB's diversity policy.

Finally, Torre himself testified that MLB's diversity policy did not "really . . . influence [his] job," despite the diversity policy explicitly applying to him.  Dkt. 141-12, Torre Dep., 21:22-22:21, 26:3-20; Dkt. 141-19, Pages 16-17 of 245.  MLB does not dispute this in its Motion; in fact, it does not discuss it at all.  When this evidence is viewed "in light of" all of the foregoing, it lends further support for the denial of MLB's Motion as to the issue of pretext.  *See Aurelien*, 2009 WL 366148 at

---

[19] MLB does not appear to reference or otherwise discuss Marsh's first comment anywhere in its Motion.

*11-*12.

* * *

Plaintiff has put forth more than enough evidence to demonstrate that genuine issues of material fact do exist as to MLB's proffered "legitimate, non-discriminatory" reasons for not promoting Plaintiff to crew chief or assigning him to the World Series were pretext. For these reasons, Plaintiff's Motion for Partial Summary Judgment as to his disparate treatment discrimination claim should be granted, and MLB's Motion as to that claim should be denied.

   B.   *Plaintiff's disparate impact claim should also proceed to trial.*

MLB contends that Plaintiff has not proven a *prima facie* cases of disparate impact discrimination because, it argues, (i) Plaintiff has not identified a facially neutral policy or practice, and (ii) Plaintiff has not identified a statistically significant disparity. *See* Dkt. 173, Page 51 of 61. Even if Plaintiff had established a *prima facie* case of disparate impact discrimination, MLB argues, MLB's Motion should still be granted because its processes are allegedly consistent with business necessity and Plaintiff has not shown an alternative practice would serve MLB's legitimate business needs. Dkt. 173, Pages 57-59 of 61. For the following reasons, Plaintiff's Motion for Partial Summary Judgment should be granted, and MLB's Motion should be denied, allowing Plaintiff's disparate impact discrimination claims under Title VII, the NYSHRL and the NYCHRL to proceed to trial.

   i.   <u>Plaintiff has proven a *prima facie* case of disparate impact discrimination.</u>

   **a.   Plaintiff has identified a specific facially-neutral policy or practice.**

It is well-established that subjective employment practices or policies can be the basis for a disparate impact discrimination claim. *See, e.g., Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 978, 991, 108 S. Ct. 2777, 2787, 101 L. Ed. 2d 827 (1988) ("disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests, since in either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are

indistinguishable from intentionally discriminatory practices"); *see also Wright v. Stern*, 450 F. Supp. 2d 335, 365 (S.D.N.Y. 2006) ("Multiple courts have observed that greater possibilities for abuse . . . are inherent in subjective definitions of employment selection and promotion criteria"). The absence of objective hiring standards, and the use instead of subjective hiring standards, have explicitly been found to be policies or practices that can form the basis of disparate impact discrimination claims. *See United States v. City of New York*, 713 F. Supp. 2d 300, 318 (S.D.N.Y. 2010) ("*City of New York*"). Moreover, "[d]epartures from procedural regularity … can raise a question as to the good faith of the process where the departure may reasonably affect the [employment] decision." *Id.* (citing *Stern*, 131 F.3d at 313).

In *City of New York*, the employer "departed from procedural regularity in multiple respects" regarding the provisional hiring of bridge painters. *Id.* First, the employer's "hiring system lacked written standards with specific instructions to guide [the employer's] personnel in provisional hiring." *Id.* As the *City of New York* court noted, "[t]here were simply no mechanisms to ensure that the persons tasked with hiring were employing permissible criteria in their selection of applicants." *Id.* "Instead," the *City of New York* court found, "the only consistent practice at [the employer] was that complete discretion and authority was vested in the head of the Bridge Painter Section." *Id.* at 319. "Bridge Painter hiring was not the result of a deliberative and straightforward process, but subject to the personal proclivities of the director of the Bridge Painter Section." *Id.* The *City of New York* court found that "[t]he opportunities were plentiful for giving preferential treatment to one group over another in th[at] environment of minimal oversight unblemished by papers trails." *Id.*

In *Watson v. Fort Worth Bank and Tr.*, 487 U.S. 977, 108 S. Ct. 2777, 101 L. Ed. 2d 827 (1988), the Supreme Court held "that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases." *Id.* at 991; *see also id.* at 978. The employer in *Watson*, like the employer in *City of New York*, "had not developed precise and formal criteria for

evaluating candidates for the positions for which [the plaintiff] unsuccessfully applied. [The employer] relied instead on the subjective judgment of supervisors who were acquainted with the candidates and with the nature of the jobs to be filled." *Id.* at 982. The Supreme court in *Watson* held that "a subjective or discretionary" promotion system, such as the one utilized by the employer in that case, could be the basis of a disparate impact claim. *Id.* at 999.

Moreover, cases in the Second Circuit have held that vesting all power to make subjective promotion decisions in an individual can likewise be the basis of a disparate impact claim, particularly when that individual is himself a non-minority. *See Banks v. City of Albany*, 953 F. Supp. 28, 33-34 (N.D.N.Y. 1997) (finding that the plaintiff "sufficiently isolated and identified a suspect employment practice" when the plaintiff alleged there was only one official "vested with the sole power to determine which certified candidates are appointed to firefighter, that the official "never spoke with any of the candidates with respect to their appointments," and that "the actual criterion used [by the official] in making his appointments is improperly subjective"); *Martin v. Coinmach Corp.*, No. 15-CV-8137 (AJN)(SN), 2016 WL 6996182, at *6 (S.D.N.Y. Nov. 29, 2016) ("[d]rawing all inferences in the plaintiffs' favor, the company's policy of making all merit increases dependent entirely on the discretion of a white supervisor, in the absence of any objective criteria to cabin or direct that individual's judgment is a 'specific employment practice,' as the term is used in *Watson*").

Here, Plaintiff has sufficiently identified specific facially-neutral practices or policies utilized by MLB: the reliance on only Torre's opinion and "judgment" of subjective criteria, such as "leadership ability," in determining which umpires are promoted to crew chief and which umpires are given World Series assignments while ignoring candidates' objective qualifications as reflected in their performance evaluations, which are rarely, if ever, reviewed in connection with making those promotion and World Series assignment decisions. *See, e.g.*, Dkt. 99, 100, 106, and 139. In his declaration, Torre has confirmed that such a policy is in place and has been used since at least 2011,

when Torre arrived in MLB's front office as an umpire executive.  *See, e.g.*, Dkt. 177, ¶¶ 43-50 (noting

that Torre, "in [his] judgment," determined that the other umpires were better qualified than Plaintiff

for crew chief positions); *id.* at ¶ 19.  MLB also confirms as much in its own Motion.  *See, e.g.*, Dkt.

173, Pages 13, 19, 32, 34, 43-44 of 61.  MLB also confirms in its Motion that Torre ignored the UERs,

the most direct evidence of an umpire's performance, when he was making crew chief promotion and

World Series assignment decisions.  *See, e.g., id.* at Page 19 of 61 ("Torre did not place significant weight

on field evaluation reports . . ., for either crew chief or World Series positions"); *see also* Dkt. 100-3,

Torre Dep., Page 2 of 4, 32:15-19 (Torre confirming that he "do[es] not" see the UERs).

Nowhere in any performance evaluation, whether a UER, a Mid-Year Evaluation, or a Year-

End Evaluation, is there a specific place for MLB to evaluate an umpire's "leadership ability."  *See

generally* Dkt. 141-20 – Dkt. 141-32.  MLB did not produce in this litigation any documents that would

evidence what discussions or determinations, if any, were made regarding (i) how an umpire's

"leadership ability" was to be evaluated, or (ii) why one umpire's "leadership ability" qualified him to

be promoted over other umpires.  Furthermore, there is no documentary evidence that Torre

compared the performance or "leadership ability" of any umpires who were candidates for the crew

chief positions or for World Series assignments.  Nor is there any evidence that Torre *ever* considered

*any* objective criteria.

Due to "this environment of minimal oversight unblemished by papers trails," all that is left

is MLB's conclusory assertion that Torre's judgment alone is sufficient to rightly determine, without

creating any disparate impact, which umpires are promoted to crew chief and which umpires are

assigned to the World Series.  But this assertion identifies with precision the practice or policy that

forms the basis of Plaintiff's disparate impact claim.  MLB has vested in Torre, a non-minority, full

reign to determine which umpires are promoted to crew chief and which umpires are given World

Series assignments and to base that decision on nothing more than Torre's "judgment" as to subjective

promotion or selection criteria.   Pursuant to the legal authority discussed above, Plaintiff's identification of this practice or policy is more than sufficient to establish a *prima facie* case of disparate impact discrimination.   Plaintiff's Motion for Partial Summary Judgment should therefore be granted, and MLB's Motion to the contrary should be denied.

> **b.     Plaintiff has established a causal connection for purposes of his *prima facie* case of disparate impact discrimination.**

MLB contends that, because Plaintiff relies on what MLB characterizes as "bottom line numbers," Plaintiff has failed to show a causal connection for purposes of his *prima facie* case of disparate impact discrimination.   Dkt. 173, Pages 52-56 of 61.   MLB's arguments as to this aspect of Plaintiff's *prima facie* case of disparate impact discrimination must also be rejected.

"[A] plaintiff in a disparate impact case need only offer statistical evidence of a kind and degree sufficient to show that the practice in question has a greater negative impact on a minority group; the Supreme Court has dictated that no particular mathematical formula must be implemented and satisfied."   *Banks*, 953 F. Supp. at 34 (citing *Watson*, 487 U.S. at 994-995).   As MLB itself states in its Motion, "courts in this Circuit have held consistently that statistics are unreliable indicators of discrimination where, as here, they were calculated from a small set of data."   Dkt. 173, Page 38 of 61 (citing *Vidal v. Metro-North Commuter R.R. Co.*, No. 3:12-cv-00248 (MPS), 2014 WL 3868027 (D. Conn. Aug. 6, 2014)).   MLB's own expert witness, Dr. Denise Martin, confirmed that it is impossible to "infer" anything "statistically" in reference to the data points of applicants for the crew chief position or the "few World Series spots" in any given season.   *See* Dkt. 173, Page 37 of 61 (citing to Martin Tr. 28:16-21, 39:7-15).   Indeed, the sample sizes are even smaller than Dr. Martin indicates in her report. While Dr. Martin's World Series statistics are based on the number of total Major League umpires, she fails to include any statistical analysis based on the sample size that is actually applicable:   only those umpires who were selected to that season's Division Series, which MLB admits is the only

sample of Major League umpires that can be selected for a World Series in any given year.[20]  *See* Dkt. 170-1, Pages 72-95 of 100; Dkt. 166, Page 12 of 44, ¶ 59 ("In order to be eligible to umpire in the World Series, an umpire must have worked in that year's American League or National League Division Series").  To the extent that MLB relies on the opinions of Dr. Denise Martin to support its Motion, that improper reliance on inadmissible evidence constitutes an independently sufficient basis to deny the Motion.

MLB would lead the court to believe that, because the sample sizes are too small to render any statistically significant disparity, Plaintiff's disparate impact discrimination claim must fail.  The necessary result of MLB's specious argument is that MLB is immune from any disparate impact discrimination claim because the number of umpires is simply too small to ever establish a causal connection for purposes of such a claim.

Unfortunately for MLB, that is not the law.   The Court must consider against MLB's arguments and purported statistical evidence "what is called 'the inexorable zero.'" *E.E.O.C. v. Andrew Corp.*, No. 81 C 4359, 1989 WL 32884, at *13 (N.D. Ill. Apr. 3, 1989).  Since the Supreme Court acknowledged the "inexorable zero" in *Int'l Bhd. Of Teamsters v. United States*, 431 U.S. 324, 97 S. Ct. 1843, 52 L. Ed. 2d 396 (1977), "the courts, when confronted with Title VII defendants who have employed or **promoted zero or near zero minorities** or women, have avoided permitting labor market and statistical analyses to obscure the discrimination inherent in the 'inexorable zero.'" *Andrew Corp.*, 1989 WL 32884 at *13; *see also Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 662 (5th Cir. 1983) ("[t]o the noble theoretician predicting the collisions of weightless elephants on frictionless roller skates, zero may be just another integer, but to [the courts] it carries special significance in discerning firm policies and attitudes … **Perhaps for this reason, the Courts have been particularly dubious**

---

[20] Dr. Martin's statistics are made even more suspect because they do not account for umpires who missed the season or played in only a limited amount of games in a season.  *See* Plaintiff's Answers to ¶¶ 200 - 230 of MLB's Statement of Material Fact.

of attempts by employers to explain away 'the inexorable zero'") (internal citations omitted) (emphasis added). Indeed, the *Andrew Corp.* court found that "[t]he data in [that] case respecting Black office and clerical workers is dominated by the 'inexorable zero' and cannot be 'explained away.'" *Andrew Corp.*, 1989 WL 32884 at *14.

As the Second Circuit stated in *Grant v. Bethlehem Steel Corp.*, 635 F.2d 1007 (2d Cir. 1980), "[d]espite evidence of some weaknesses in the statistics, where they disclose a glaring absence of minority representation in the jobs at issue, the burden on the employer increases since 'fine tuning' of the statistics will not rebut an inference of discrimination derived not from a misuse of statistics but from the inexorable zero." *Id.* at 1015 (citing *Teamsters*, 431 U.S. at 342, n.23) (internal quotations omitted). Courts in this circuit have explicitly held that "evidence of the absence of a single minority employee being hired, labeled the 'inexorable zero,' **would in and of itself support an inference of discrimination**." *Victory v. Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 823 (E.D.N.Y. 1999) (emphasis added).

In *City of New York*, a case from this district, the "case was litigated without resort to statistical evidence other than the elephant in the room—the incontrovertible fact that [the employer] has never hired a provisional female bridge painter." 713 F. Supp. 2d at 317. As the *City of New York* court stated, "a court cannot help but be circumspect where a municipal department in the country's largest city repeatedly selects only applicants of one sex for job vacancies—after all, 'zero is not just another number.'" *Id.* at 318 (citing *Barner v. City of Harvey*, No. 95 Civ. 3316, 1998 WL 664951 (N.D. Ill. Sept. 18, 1998) and *Capaci*, 711 F.2d at 662). The *City of New York* court further stated that "even in cases where there is a weak inference of an inexorable zero or scant evidence of other women who applied and were rejected, a court should consider that this lack of evidence may itself be attributable to the 'inexorable zero.'" *Id.* (citing *Ortiz-Del Valle v. Nat'l Basketball Ass'n*, 42 F. Supp. 2d 334, 337-338 & n.1 (S.D.N.Y. 1999)).

Here, the inexorable zero exists and is apparent for Plaintiff, MLB and the Court to see. Up to the time of the filing of Plaintiff's Complaint in July of 2017, there has only been one minority permanent crew chief in the history of professional baseball. *See* Dkt. 151-1, Page 2 of 32, ¶ 2[21]; *see also* Garcia Dec., ¶ 3. That umpire was terminated in 1999; thus, since 2000 (when the National League and the American League merged into what is now known as Major League Baseball), there has not been a single minority permanent crew chief.[22] *Id.* This includes the period 2011-2016, during which Torre was in charge of Major League umpires and all promotion decisions. Every crew chief Torre selected during that period was white, as well as every umpire for the World Series, with the exception of one minority umpire who was selected twice.[23]

MLB asserts that Plaintiff relies only on "bottom line numbers" and his disparate impact discrimination claim must therefore fail. But, as the foregoing legal authority demonstrates, "zero is not just another number." *See City of New York*, 713 F. Supp. 2d at 318; *Capaci*, 711 F.2d at 662. Here the presence of the inexorable zero—for the entirety of professional baseball's history, with one exception, and from 2000-2017 with no exceptions—establishes an inference of discrimination. *Victory*, 34 F. Supp. 2d at 823; *Grant*, 635 F.2d at 1015. MLB's attempts at "fine tuning" the statistics by proffering a statistical expert and arguing that the sample sizes are too small to render a statistically significant result are insufficient "to rebut an inference of discrimination" that is, as here, "derived not from a misuse of statistics but from the inexorable zero." *Id.* at 1015 (internal citations and quotations omitted).

But the Court need not rely solely on the presence of the inexorable zero in finding that Plaintiff has established causation for purposes of his *prima facie* case of disparate impact

---

[21] Though MLB purports to "dispute" that fact, MLB does not actually "dispute" its accuracy. *See* Dkt. 167, Page 2 of 88, ¶ 2. MLB had the opportunity to rebut that fact and failed to do so.

[22] Because Dr. Martin's opinion in this case related only to her analysis of promotions and selections from 2011-2016, her opinion could not possibly rebut the inexorable zero present in either or both of (i) professional baseball's entire history, and (ii) MLB's history since 2000. *See generally* Dkt. 170-1, Pages 3-39 of 100.

[23] During that time, Torre made at least eight crew chief selections and 42 World Series selections.

discrimination.  *See U.S. v. City of Yonkers*, 609 F. Supp. 1281 (S.D.N.Y. 1984) ("[W]here the sample

size is relatively small, it is appropriate to look to nonstatistical evidence").  Indeed, "where statistics

are based on a relatively small number of occurrences," as is the case here, "the presence or absence

of statistical significance is not a reliable indicator of disparate impact."  *Waisome v. Port Auth. of New*

*York & New Jersey*, 948 F.2d 1370, 1379 (2d Cir. 1991).  "For smaller samples the value of the standard

deviation rules drops off . . . and gives emphasis to Mark Twain's comment that there are 'lies, damned

lies and statistics.'"  *Id*; *see also Bos. Chapter, N.A.A.C.P., Inc. v. Beecher*, 504 F.2d 1017, 1019–20 (1st Cir.

1974).

Here, the Court can—and should—consider, in addition to the incontrovertible presence of

the inexorable zero, the other evidence in the record discussed above.  This includes, but is certainly

not limited to, (i) MLB's disparate treatment of Plaintiff, (ii) MLB's knowledge of its alarmingly small

percentage of minority umpires, (iii) MLB's subsequent failure to adequately remedy that problem,

and (iv) MLB's failure to consistently apply its diversity policy to its employees, including its umpire

executives.  This additional evidence supplements and further strengthens Plaintiff's *prima facie* case of

disparate impact as to both MLB's crew chief promotion process and its World Series selection

process.  For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment regarding his

*prima facie* case of disparate impact discrimination should be granted, and MLB's Motion as to this

issue should be denied.

> **c.    There are genuine issues of material fact as to whether MLB's reliance on subjective criteria and willful ignorance of objective criteria in making crew chief promotion decisions is consistent with business necessity.**

MLB asserts that its "consideration of leadership ability and situation management for umpires

to serve in leadership positions and work the highest profile games is eminently reasonable and fully

comports with business necessity."[24]  Dkt. 173, Page 57 of 61.  MLB does not cite to any evidence in the record in making this assertion, and simply requests that the Court take its word for it that the practice or policy that forms the basis of Plaintiff's disparate impact claim is consistent with business necessity.

Such a conclusory statement is insufficient for MLB to meet its burden of rebutting Plaintiff's *prima facie* case of disparate impact discrimination.  "The employer's burden of proving job-relatedness to rebut a claim of disparate impact is greater than its burden of merely showing a legitimate, non-discriminatory reasons in response to a claim for disparate treatment."  *Grant*, 635 F.2d at 1015.  The burden increases when there is "a glaring absence of minority representation in the jobs at issue," and the "inference of discrimination [is] derived not from a misuse of statistics but from the inexorable zero."  *Id.* (internal quotations omitted) (citing *Teamsters*, 431 U.S. at 342 n.23).  "[M]erely asserting a business necessity rationale does not suffice to prove the defense."  *Banks*, 953 F. Supp. at 36.  "An employer's subjective belief that a practice is necessary, without any supporting evidence, is insufficient to justify a discriminatory practice."  *Id.*  Courts have gone so far as to hold that "[i]n order to establish a business necessity defense, employers have been required to present convincing expert testimony demonstrating that a challenged practice is in fact required to achieve the desired goal."  *Id.* (citing *Burwell v. Eastern Air Lines, Inc.*, 633 F.2d 361, 365-366 (4th Cir. 1980); *Harris v. Pan Am. World Airways, Inc.*, 649 F.2d 670, 675 (9th Cir. 1980); *Levin v. Delta Air Lines, Inc.*, 730 F.2d 994, 997 (5th Cir. 1984)).

Here, MLB attempts to characterize its practice or policy of vesting sole power in Torre to consider only subjective criteria in promotion and selection decisions as "eminently reasonable" and

[24] In its Motion, MLB frequently mischaracterizes the practice or policy that is the subject of Plaintiff's disparate impact discrimination claim.  Plaintiff's disparate impact claim is not premised on, as MLB asserts, MLB's mere consideration of subjective criteria such as "leadership ability" in addition to objective criteria—it is premised on the indisputable fact that MLB relies solely on subjective criteria and the subjective "judgment" of Torre alone, while concurrently ignoring the wealth of objective information it collects on umpires' performance.  *See, e.g.*, Plaintiff's Amendment to his Complaint, Dkt. 123, Pages 3-4 of 10, ¶¶ 162-167, 172-174.

as a practice or policy that "fully comports with business necessity."  MLB cites to no evidence, from an expert witness or otherwise, to support that assertion.  MLB's belief that this practice or policy "comports with business necessity" is insufficient to meet their burden of rebutting Plaintiff's *prima facie* case of disparate impact discrimination, particularly in light of the inexorable zero and the complete absence of any evidence supporting that belief.  *Grant*, 635 F.2d at 1015; *Banks*, 953 F. Supp. at 36.  MLB's Motion as to this issue must therefore be denied.

> ### d.   Plaintiff is able to show that an alternative practice or policy would adequately serve MLB's legitimate business needs.

MLB argues that Plaintiff is unable to show that an alternative practice would adequately serve MLB's legitimate business needs.  MLB puts words into Plaintiff's mouth in stating that "Plaintiff's contention that MLB should ignore leadership ability and situation management and instead base crew chief and World Series decisions on an umpire's seniority or balls and strikes statistics is illogical." Dkt. 173, Pages 58-59 of 61.  But Plaintiff has simply never made any such contention.  Instead, an alternative practice or policy that would adequately serve MLB's legitimate business needs—while eliminating the discriminatory impact of MLB's current practice or policy—is simply to view the entire body of an umpire's work as opposed to focusing solely on the subjective criteria MLB identifies in its Motion and Torre's opinion as to those criteria.  Moreover, rather than vesting in Torre alone the full authority to make these decisions, MLB could require its umpire department to collaborate and reach a consensus as to which umpires are best suited for crew chief promotion and World Series assignments.  Such a practice or policy would not only serve MLB's legitimate business needs by identifying those umpires that are actually most qualified for those positions and assignments, it would also comport with common sense and is far more "reasonable" than MLB's current practice or policy. *See Banks*, 953 F. Supp. at 36 ("common sense dictates that a better procedure for finding the *most qualified* candidate might be to review the background information of *all* eligible candidates who scored an 85 before deciding which candidates have the greatest 'familiarity with the work and unusual

schedule of the Department, and would work well within the organization'" (emphasis in original)).

## III.   CONCLUSION

MLB's *ad hominem* attacks on Plaintiff's character are unsupported by the evidentiary record, which is replete with performance evaluations and other evidence that contradict MLB's assertions as to Plaintiff's job performance and the performances of the non-minority umpires MLB consistently chose over him.   MLB's Motion amounts to nothing more than artificially deflating Plaintiff's performance and inaccurately inflating the performances of non-minority umpires—exactly as MLB did with respect to the Year-End Evaluations.   As the foregoing shows, MLB's attempts to create a genuine issue of material fact fail and its Motion should be denied.

MLB's proffered "legitimate, non-discriminatory" reason for not promoting Plaintiff to crew chief or assigning him to the World Series, however, gives rise to a number of genuine issues of material fact that should preclude the Court from granting MLB summary judgment.   Moreover, MLB's asserted business necessity defense is conclusory and unsupported by any evidence in the record, thereby making it a wholly insufficient basis on which summary judgment could be granted. Even if MLB's asserted business necessity defense were legitimate and supported by any evidence at all, there are certainly other practices or policies MLB could employ other than emphasizing subjective criteria and leaving all decision-making to the "judgment" of one, non-minority individual.

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment should be granted, MLB's Motion should be denied, and Plaintiff's claims should proceed to trial.

Dated:  July 17, 2020

Respectfully submitted,

MURPHY LANDEN JONES PLLC

By: *Kevin L. Murphy*

Kevin L. Murphy (*pro hac vice*)
J. Jeffrey Landen (*pro hac vice*)
Nicholas R. Gregg (*pro hac vice*)
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: 859-360-1123
KMurphy@MLJfirm.com
JLanden@MLJfirm.com
NGregg@MLJfirm.com

&

LEWIS DIBIASI ZAITA & HIGGINS
Nicholas J. Zaita
420 Lexington Avenue, Suite 300
New York, NY 10107
Tel: (212) 772-0943
nzaita@ldzhlaw.com
**Attorneys for Plaintiff Angel Hernandez**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on July 17, 2020, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to: Neil H. Abramson,

Esq., Rachel S. Philion, Esq., Rachel S. Fischer, Esq., and Adam M. Lupion, Esq., PROSKAUER

ROSE LLP, Eleven Times Square, New York, New York 10036-8299.

Respectfully Submitted,

MURPHY LANDEN JONES PLLC

By: *Kevin L. Murphy*

Kevin L. Murphy (*pro hac vice*)
2400 Chamber Center Drive, Suite 200
Fort Mitchell, KY 41017
Tel: 859-360-1123
*Attorney for Plaintiff Angel Hernandez*