UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ANGEL HERNANDEZ,

Plaintiff,

-v-

THE OFFICE OF THE COMMISSIONER
OF BASEBALL and MAJOR LEAGUE
BASEBALL BLUE, INC.,

Defendants.

18-CV-9035 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

Plaintiff Angel Hernandez, a baseball umpire, brings this action against Defendants the

Office of the Commissioner of Major League Baseball and Major League Baseball Blue, Inc.

(collectively, "MLB"), asserting claims for employment discrimination under federal and state

law.  (*See* Dkt. No. 35; Dkt. No. 123.)  He claims that he was passed over for "crew chief"

positions and World Series assignments due to unlawful discrimination based on his race,

ethnicity and/or national origin.  Hernandez has moved for partial summary judgment that he has

established his *prima facie* case as to his disparate treatment and disparate impact claims.  (*See*

Dkt. No. 138.)  MLB has cross-moved for summary judgment on all of Hernandez's claims.

(*See* Dkt. Nos. 154, 157, 164.)  For the reasons that follow, MLB's motion for summary

judgment is granted and Hernandez's motion is denied as moot.

## I.     Background

### A.     MLB Major League Umpires

MLB employed 68 full-time Major League umpires between 2011 and 2013, and since

2014 it has employed 76 full-time umpires each season. (Dkt. No. 174 ("MLB SOF") ¶¶ 6–7.)  A

2013 MLB document titled "2013 Department Overview" indicated that only seven percent of

1

umpires were racial or ethnic minorities at the time.  (Dkt. No. 142-1 ("Hern. SOF") ¶ 5.)  For comparison, the same document indicated that 48 percent of NBA referees in 2012 and an estimated 40 percent of NFL referees in 2010 were minorities.  (Hern. SOF ¶ 7.)

Each Major League umpire is assigned to a four-person crew, with one umpire designated crew chief, who leads the other umpires in his crew on the field.  (MLB SOF ¶ 42.)  Between 2011 and 2013, there were 17 permanent crew chief positions each season, and since 2014 there have been 19 such positions.  (MLB SOF ¶¶ 44–45.)

Umpires may be selected to work in the World Series, the annual Major League Baseball championship series.  (MLB SOF ¶¶ 54, 56–57.)  The same umpiring crew works all games in the World Series, absent injury: from 2011 to 2013, six umpires worked each World Series, and since 2014 the World Series has been staffed by eight umpires.  (MLB SOF ¶¶ 56–57.)

### B.      MLB's Umpire Evaluation Process

The Major League umpires' collective bargaining agreement ("CBA") provides that umpires will be evaluated on their ballpark performance over the course of the season by "Field Observers and/or Umpire Supervisors," who rate umpires on specific performance criteria that fall into one of three categories: "Effort and Professionalism," "Game and Situation Management," and "Field Mechanics."  (Dkt. No. 142-13 ("2015 CBA") at DEF1445–48; Dkt. No. 142-14 ("2010 CBA") at DEF1280–83.)[1]  Such reports are designated Field Evaluation Forms ("FEFs").  (2015 CBA at DEF1445; 2010 CBA at DEF1280.)

---

[1] Certain documents relied upon in this opinion are filed under seal or redacted.  Where the Court relies on information that has been filed under seal, the Court has concluded that the parties' interests in continued sealing of the portions referenced in this Opinion and Order are insufficient to overcome the presumption of public access to judicial documents.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119–20 (2d Cir. 2006).

Under the CBA, umpires receive mid-season and end-of-season evaluations.  (2015 CBA at DEF1450; 2010 CBA at DEF1285–86.)  According to the CBA, mid-season evaluations are based on the umpire's performance up to that point in the season, and the end-of-season evaluation represents "a summary of all the reports received during the season," the umpire's ratings on a host of criteria, an overall rating, and "evaluative comments from the Office of the Commissioner."  (2015 CBA at DEF1450; 2010 CBA at DEF1286.)  On both FEFs and the mid- and end-season evaluations, umpires receive grades of "Exceeds Standard," "Meets Standard," or "Does Not Meet Standard."  (2015 CBA at DEF1445, 1450; 2010 CBA at DEF1281, 1286.)

The record is not entirely clear regarding how MLB develops mid- and end-season evaluations.  The CBA says such evaluations are "based on the reports submitted by the Supervisors and Field Observers," observations of MLB executives, and information from the electronic zone evaluation system.  (2015 CBA at DEF1450; 2010 CBA at DEF1285–86.)  In contrast, MLB executives testified that there should not be any comments in the year-end evaluations that are not found in the FEFs for the same period and that the ratings contained in evaluations "come from" the FEFs.  (Dkt. No. 142-3 at 46:7–11; Dkt. No. 142-12 at 34:10–21, 132:15–24.)

### C.    MLB's Umpire Promotion Process

MLB hired Joe Torre as a baseball executive in 2011 and he became Chief Baseball Officer in 2015, remaining in the role until December 2019.[2]  (MLB SOF ¶¶ 8–9; Dkt. No. 189 at ¶¶ 8–9.)  Torre was "the final decision maker" for crew chief promotions from 2013 to 2018 and for World Series assignments from 2011 to 2019.  (MLB SOF ¶¶ 50, 58.)

---

[2] While there is some dispute over what Torre's title was at the time of his hiring (see Dkt. No. 189 ¶ 8), any such dispute is irrelevant to this case.

3

The CBA gives MLB "absolute and exclusive discretion" in umpire hiring and provides that, while the Office of the Commissioner "may consider seniority along with other factors that it may deem appropriate when exercising its appointment discretion, seniority shall not control" in crew chief selections.  (2015 CBA at DEC1362–63; 2010 CBA at DEF1209–10.)  It further provides that MLB must give any umpire who expressed interested in but was not selected for crew chief "a written statement of the reason(s) why the umpire was not chosen," if asked.  (2015 CBA at DEC1363–64; 2010 CBA at DEF1210–11.)

In response to an interrogatory, MLB stated that:

> In making crew chief selections, [MLB] considers the umpire's performance in the most recent season as well as the length and consistency of his career contributions.  The Office of the Commissioner relies on a variety factors, including but not limited to:
>
> - **Leadership skills, including situation management**, maintaining an appropriate pace-of-game, on-field presence, demeanor, hustle, focus, and integrity;
>
> - **Overall quality of performance**, including strike zone accuracy, made/missed calls, ability to properly enforce the Reply Regulations and Procedures on the field and as a Reply Official, how much or how often the umpire exceeds/does not meet expectations, keeping the focus of the game on the field, and agility and position accuracy in getting the appropriate angle on calls;
>
> - **Fulfillment of duties and responsibilities**, including attendance and the umpire's adherence to [various employment requirements]; and
>
> - **Initiative**, including whether the umpire takes the initiative to train and mentor junior umpires.
>
> In addition, the Officer of the Commissioner may consider seniority when exercising its appointment discretion, but seniority does not control the Office of the Commissioner's appointment decisions.

(Dkt. No. 142-15 at 5–6.)  Nearly identical language is also present in at least two letters from MLB informing umpires why they were not selected for crew chief.  (Dkt. Nos. 14-16, -17.)  In a

4

declaration, Torre states that he considered "the consistent display of leadership skills" the "most important" factor in crew chief decisions.  (Dkt. No. 177 ¶ 15.)  Torre "did not place significant weight on [FEFs] for purposes of crew chief decisions and World Series selections."  (Dkt. No. 189 ¶ 74.)

Similarly, MLB has exclusive discretion in selecting umpires for the World Series. (MLB SOF ¶ 70.)  Torre declares that he "emphasized selection of umpires who displayed the highest levels of performance that season and throughout their careers."  (MLB SOF ¶ 72.)  As to his deposition, Torre testified that he considered an umpire's "combination experience and performance for the year" in making World Series assignments, with "experience" including seniority and "performance" including umpires' evaluations.  (Dkt. 168-1 at 143,[3] 31:7–13.)

### D. Hernandez

Hernandez, a Cuban-born Latino, is a Major League baseball umpire employed by MLB since at least 1993. (Hern. SOF ¶ 1; Dkt. No. 188 ¶ 52.)  From 2011 to 2016, Hernandez received nine "Exceeds Standard" ratings and two "Does Not Meet" ratings in his FEFs, receiving at least one "Exceeds Standard" rating each year.  (Hern. SOF ¶ 61.)  Over that same period, he received four "Exceeds Standard" ratings on year-end evaluations and did not receive any such ratings on his year-end evaluations in 2013, 2014, or 2015.  (Hern. SOF ¶¶ 66–67.)

Hernandez applied for crew chief in 2011, 2013, 2014, 2017, and 2018; he did not apply for the two available positions in 2015.  (MLB SOF ¶ 51.)  He was not selected, and MLB chose white umpires to fill those positions.  (Hern. SOF ¶¶ 87–125.)

Hernandez was last assigned to the World Series in 2005.  (Hern. SOF ¶ 140.)  Torre selected Hernandez to umpire in other postseason games — a precondition to serving as an

---

[3] Due to issues with page numbering, the Court uses the ECF-generated page numbers.

umpire in the World Series — in 2011, 2012, 2015, 2016, 2017, and 2018.  (MLB SOF ¶¶ 59, 61–64.)

In his declaration, Torre avers that, in his view, Hernandez "had not consistently demonstrated the high level in those areas of performance" required to be crew chief or assigned to the World Series in 2011.  (Dkt. No. 177 ¶ 19.)  Torre's perspective was "underscored" by certain incidents, most notably a 2013 game in Cleveland in which Torre believes Hernandez made an incorrect call and became "preoccupied" with it.  (Dkt. No. 188 ¶¶ 80–86.)  Torre believes the Cleveland incident demonstrated that Hernandez was "unable or unwilling to take responsibility for his mistakes" in a way that prevented Hernandez from moving on and "remain[ing] 100 percent focused" on the field.  (Dkt. No. 177 ¶ 21.)  This issue was noted in Hernandez's mid- and end-of-season evaluations in 2014 and his end-of-season evaluation in 2016.  (MLB SOF ¶¶ 88, 90, 94.)  For his part, Hernandez alleges that Torre has a "history of animosity" toward Hernandez stemming from a 2001 incident in which Torre, then manager of the New York Yankees, publicly criticized Hernandez after a call Torre believed was incorrect. (Dkt. No. 35 ¶¶ 34–37.)

### E.    Procedural History

After filing an EEOC charge in May 2017, Hernandez filed this action on July 3, 2017. (*See* Dkt. No. 1.)  On July 11, 2019, this Court granted MLB's motion to dismiss the claims under the Ohio Civil Rights Act.  (*See* Dkt. No. 84.)  Hernandez moved for partial summary judgment on April 24, 2020 (*see* Dkt. No. 138), and MLB filed its cross-motion and moved to exclude Dr. Baxter and seal certain information on June 5, 2020 (*see* Dkt. Nos. 154, 157, 164).

## II.    Legal Standard

Summary judgment under Rule 56 is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  *See Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

"On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense."  *Cohen Lans LLP v. Naseman*, No. 14 Civ. 4045, 2017 WL 477775, at *3 (S.D.N.Y. Feb. 3, 2017) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence."  *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014).  The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal quotation marks omitted) (second quoting *Lund's, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

## III.    Discussion

Hernandez moves for partial summary judgment that he has established his *prima facie* case as to his disparate treatment and disparate impact failure-to-promote claims under Title VII of the Civil Rights Act of 1968, 42 U.S.C. § 2000e-2(a)(1); 42 U.S.C. § 1981; the New York State Human Rights Law (NYSHRL), N.Y. Exec. Law § 296; and the New York City Human

Rights Laws (NYCHRL), N.Y.C. Admin. Code § 8-107.  MLB moves for full summary judgment, to exclude Hernandez's proposed expert Dr. Gregory Baxter, and to seal certain materials filed in connection with the two motions.

### A.     Motions for Summary Judgment

#### 1.     Disparate Treatment Claims

On summary judgment, disparate treatment failure-to-promote claims under both Title VII and New York State Human Rights Law (NYSHRL) are analyzed under the framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  "First, a plaintiff must make a *prima facie* showing that: (1) he is a member of a protected class, (2) he applied for and was qualified for the job in question, (3) he was denied the job, and (4) he was rejected under circumstances which give rise to an inference of unlawful discrimination."  *Ariz v. Metro. Transp. Auth.*, No. 17 Civ. 4491, 2019 WL 2613476, at *3 (S.D.N.Y. June 26, 2019) (citing *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 80 (2d Cir. 2009) (citation and quotation marks omitted).  The defendant must rebut the *prima facie* case by "offer[ing] a legitimate non-discriminatory rationale for its actions."  *Aulicino*, 580 F.3d at 80 (citation and quotation marks omitted).  The plaintiff then must be given the opportunity to demonstrate that the employer's proffered explanation was "unworthy of credence" and in fact a "pretext for discrimination."  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Id.* (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

With regard to the *prima facie* case, the parties do not dispute that Hernandez, a Cuban-born Latino umpire, is a member of a protected class, nor that he applied for and was denied the

positions at issue.  The parties dispute whether Hernandez was qualified for the job and whether

the circumstances under which he was rejected give rise to an inference of unlawful

discrimination.[4]  They also dispute whether the rationales proffered by MLB for its decision not

to promote Hernandez were pretext for discrimination.

But "[g]iven the 'minimal' showing necessary to establish a prima facie case

under *McDonnell Douglas* . . . an increasing number of courts in this Circuit presume that

plaintiffs have sufficiently presented a prima facie case in discrimination suits."  *Ramos v. Piller,*

*Inc.*, No. 07 Civ. 4047, 2009 WL 3401261, at *4 (S.D.N.Y. Oct. 21, 2009) (quoting *Roge v. NYP*

*Holdings, Inc.,* 257 F.3d 164, 168 (2d Cir. 2001)) (citing cases).  This is particularly so following

the Supreme Court's 2000 decision in *Reeves* eliminating the theoretical distinction between a

plaintiff's evidence on the *prima facie* element of an inference of discrimination and his evidence

showing pretext.  *Gorley v. Metro North Commuter R.R.,* No. 99 Civ. 3240, 2000 WL 1876909,

at *6 (S.D.N.Y. Dec. 22, 2000) (construing *Reeves*, 530 U.S. at 143).  Thus, the Court presumes,

without deciding, that Hernandez has met his *prima facie* burden and will analyze whether

Hernandez has offered sufficient evidence on pretext to survive MLB's motion for summary

judgment.

As required by the *McDonnell Douglas* framework, MLB argues that it had a "legitimate

non-discriminatory rationale" for its refusal to promote Hernandez or assign him to the World

Series.  *Aulicino*, 580 F.3d at 80 (citation and quotation marks omitted).  Specifically, it contends

that "according to Torre's judgment, Hernandez has not demonstrated the leadership ability and

situation-management skills in critical, high-pressure roles on a consistent basis."  (Dkt. No. 173

---

[4] MLB also argues that many of Hernandez's claims are untimely, as he first filed an EEOC
charge in May 2017.  (Dkt. No. 165 at 16–17.)  The Court need not reach that argument.

at 32.)  Hernandez cries foul, arguing there are genuine issues of material fact as to whether this rationale is merely pretextual.

"To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (citation and quotation marks omitted).  The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent." *Id.* at 137 (citations omitted).  When an employer intended to discriminate, "direct evidence of that intent will only rarely be available," so courts "must carefully scrutinize[] [evidence] for circumstantial proof which, if believed, would show discrimination." *Id.* (citations omitted).  Courts should conclude that an employer's rationale is pretextual "[o]nly where [such rationale] is so implausible as to call into question its genuineness." *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 118 (2d Cir. 2010).  On a motion for summary judgment, "[t]he ultimate question is whether the plaintiff has proffered sufficient evidence from which 'a reasonable juror could conclude that [Defendants'] explanations were a pretext for a prohibited reason.'" *Sandler v. Montefiore Health Sys., Inc.*, No. 16 Civ. 2258, 2018 WL 4636835, at *7 (S.D.N.Y. Sept. 27, 2018) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)).

Hernandez presents several categories of evidence that he argues establish a genuine issue of material fact regarding pretext.  First, Hernandez points out that he was more senior and received more "Exceeds Standard" ratings in his FEFs — and received such ratings more consistently — than the non-minority umpires MLB promoted.  (Dkt. No. 187 at 25.)  This fact,

he argues, demonstrates that MLB's proffered rationale is pretextual.  In support, he also points

out that many of the promoted non-minority umpires had comments in their year-end evaluations

suggesting similar leadership and management issues that Torres cites in having denied

Hernandez a promotion.  (*See* Dkt. No. 187 at 27–30 (collecting critiques of promoted umpires).)

Pretext is established, Hernandez asserts, because he is "by any measurable standard[] more

qualified than the non-minority umpires who were promoted to crew chief over him" due to his

seniority and FEFs.  (Dkt. No. 187 at 25.)

 But, as MLB has established beyond genuine dispute, seniority and FEF ratings were

considered as two of many factors in umpire promotions and were not decisive on their own.  In

multiple seasons, Torre rejected white crew chief candidates who had more seniority than the

white umpires he promoted, such as in 2013 when Torre promoted a white umpire with 16 years

of seniority over a white umpire with 20 years and in 2014 when he picked white umpires with

15 and 16 years of experience over umpires who had between 17 and 25 years.  (Dkt. No. 179

¶¶ 19–25.)[5]

 While the parties dispute precisely what factors MLB considers in umpire promotions,

and how much weight MLB gave each of those factors, the record is clear that seniority and FEF

ratings are not the *exclusive* factors.  In cases where a reasonable employer would have found a

plaintiff "significantly better qualified for the job," but the employer at issue did not, a factfinder

---

[5] Hernandez offers some evidence that MLB considered seniority in promotion decisions:
Director of Major League Umpires Randy Marsh testified in his deposition that promoting an
umpire with low seniority to crew chief before 31 more senior umpires would be concerning.
(Dkt. No. 142-3 at 239:14–240:23.)  Marsh also testified that management could "technically"
take any isolated incidents and use them as an excuse not to promote them or assign them to the
World Series.  (Dkt. No. 142-3 at 85:21–86:5.)  Neither fact gives rise to a genuine dispute as to
the conclusion that, MLB considered seniority in umpire promotions, but did not make decisions
on such basis alone.

may infer the employer consciously chose a less-qualified candidate due to another "strong consideration, such as discrimination." *United States v. City of New York*, 713 F. Supp. 2d 300, 319 (S.D.N.Y. 2010).  This is not such case.  Even were the evidence to show that, on the basis of his FEFs and seniority, Hernandez was equally or slightly more qualified than the candidates selected — a showing that he has not made — it is certainly not the case that Hernandez was so "significantly better qualified" than the promoted umpires that a discriminatory motive may be inferred.  Hernandez does not establish a genuine dispute of fact regarding pretext here.

Second, Hernandez argues that MLB has been inconsistent regarding the employment criteria it relies upon when making promotion decisions.  In some contexts, MLB states that it considers an umpire's recent season performance and "the length and consistency of his career contribution" and promotes based on leadership, overall quality of performance, fulfillment of duties and responsibilities, initiative, and, while not controlling, also considers seniority.  (Dkt. No. 142-15 at 5–6; Dkt. No. 142-16 at DEF1501–02; Dkt. No. 142-17 at DEF1499–1500.)  But, Hernandez continues, MLB asserts elsewhere that it relies on only a subset of those criteria, as when Torres declared that consistent leadership is the "most important" factor for making crew chief promotion decisions (Dkt. No. 177 ¶ 15) and that World Series assignments revolved largely around situation management (Dkt. No. 177 ¶ 16).  And Hernandez argues that this contrasts with Torre's deposition, where he testified that the criteria he used to select umpires for the World Series consisted of "[t]heir combination experience and performance for the year," including umpires' seniority and evaluations.  (Dkt. No. 142-12 at 31:7–16.)

To be sure, the record is not transparent about the weight Torre affords the criteria he uses in promotion decisions.  But there is nothing suggesting that unlawful discrimination is a factor in those decisions.  The undisputed evidence reveals that the promotion determination

takes into account a number of factors — some of which are somewhat subjective — and prioritizes an umpire's leadership and situation management.  MLB's slightly different explanations are not genuinely inconsistent, but are a reflection of the subjective and multi-faceted nature of this determination.  This evidence is insufficient to establish a genuine dispute of fact on pretext.

Third, Hernandez argues that the ratings in his year-end evaluations from 2011 to 2016 were less positive than the ratings in his FEFs — the inverse of the promoted umpires, who had comparatively more negative FEFs but more positive year-end evaluations than Hernandez — and chalks this up to MLB "artificially deflating" his year-end evaluations to "not accurately reflect" the FEFs.  (Dkt. No. 187 at 21 n.10.)  This notion is relevant because, while it is undisputed that Torre does not place "significant weight" on FEFs or use them to make decisions, Torres testified that he considers year-end evaluations in, at least, assigning umpires to the World Series.  (Dkt. No. 142-12 at 31:7–16; Dkt. No. 189 ¶ 74.)  The FEFs and evaluations are also relevant to MLB's stated consideration of an umpire's "performance in the most recent season" in crew chief promotions.  (Dkt. No. 142-15 at 5.)  And, at core, if MLB is purposefully "deflating" the ratings of minority umpires as compared to non-minority umpires, a case for pretext is much stronger.

To illustrate Hernandez's point, while he received nine "Exceeds Standard" ratings (and two "Does Not Meet" ratings) in his FEFs from 2011-2016, he received only four "Exceeds Standard" ratings in year-end evaluations over those same years.  (Hern. SOF ¶¶ 61, 66–67.)  Across the same time period, one white umpire who was promoted to crew chief received five "Exceeds Standard" ratings and two "Does Not Meet" ratings in his FEFs while receiving five "Exceeds Standard" ratings in evaluations.  (*See* Dkt. Nos. 142-60 to -67.)  Another white

umpire, also promoted to crew chief, received five "Exceeds Standard" ratings in FEFs and yet received ten "Exceeds Standard" ratings in evaluations from 2011-2016, including four such ratings in 2015, a year in which he received zero "Exceeds Standard" ratings in FEFs.  (*See* Dkt. No. 142-70 to -77.)

The end-of-season evaluations are designed, per the CBA, to be broader in scope than the FEFs.  (2015 CBA at DEF1450; 2010 CBA at DEF1285–86; Dkt. No. 189 ¶¶ 29, 33, 41.)  In addition to the FEFs, the evaluations are to be based on observations by MLB executives and information from the electronic plate judging system.  (2015 CBA at DEF1450; 2010 CBA at DEF1285–86.)  Moreover, the evaluations are supposed to "represent a summary of all the reports received during the season" under the 2015 CBA — or to "set forth" such summary under the 2010 CBA — and additionally include umpire ratings and evaluative comments from the Office of the Commissioner.  (2015 CBA at DEF1450; 2010 CBA at DEF1285–86.)

Torre testified that the year-end evaluations "come from" the FEFs, and both Torre and Marsh testified that there should not be any comments in the year-end evaluations that are not found in the FEFs for the same period.  (Dkt. No. 142-3 at 46:7–11; Dkt. No. 142-12 at 34:10–21, 132:15–24.)  Asked who determines the ratings on mid- and year-end evaluations, Torre testified: "I don't know, I don't want to guess, but the supervisors basically make out the game evaluations . . . [a]nd that's where it would come from."  (Dkt. No. 142-12 at 132:15–23.)

While there is some uncertainty in the record as to the relationship between FEFs and umpire evaluations, this evidence fails to give rise to a genuine dispute of fact on the issue of pretext for discrimination.  First, it is undisputed that Torre — the decisionmaker — did not review FEFs for any umpire when making crew chief and World Series decisions.  (Dkt. No. 188 ¶ 74; Dkt. No. 142-12 at 35:18-23, 191:18-25.)  Second, Hernandez's handful of cherry-picked

14

examples does not reliably establish any systematic effort on MLB's part to artificially deflate Hernandez's evaluations, much less an effort to do so in order to cover up discrimination.

Finally, Hernandez points to several additional facts that he claims are suggestive of pretext.  First, he cites a 2013 MLB document titled "Umpiring Department Overview," which notes that only seven percent of MLB's Major League umpires were minorities in 2013 — dramatically behind the proportion of minority referees in the NBA, 48 percent in 2012, and the NFL, an estimated 40 percent in 2010 — and described the situation as "MLB's diversity issue." (Dkt. No. 155-3 at DEF15068, DEF15070, DEF15117, DEF15122, DEF15146.)  This document, and MLB's failure to address the issues it described, Hernandez argues, "demonstrate[] MLB's attitude toward diversity, minority umpires and minority umpire candidates."  (Dkt. No. 187 at 37.)  Second, Hernandez also references comments made by Marsh, an MLB umpire executive, in his deposition.  In one, Marsh said that the lack of Black umpires is because Black candidates at schools where umpires are recruited "want to be in the big Leagues tomorrow, [but] they don't want to go through all of that."  (Dkt. No. 142-3 at 100:17–101:8.)  In another, asked why a Latino umpire had not been promoted to crew chief, Marsh testified that the umpire "lacked knowledge in rules.  *And he's Hispanic*, *but* he has worked really hard . . . ."  (Dkt. No. 142-3 at 197:17–198:7 (emphasis added).)  Finally, Hernandez points to Torre's testimony that, while MLB's diversity policy applies to him, it "really doesn't influence [his] job."  (Dkt. No. 142-12 at 26:3–20.)

None of these facts establish a genuine issue of material fact regarding pretext.  The evidence shows beyond genuine dispute that an umpire's leadership and situation management carried the day in MLB's promotion decisions.  Torre testified that the candidates he appointed to crew chief instead of Hernandez "have not demonstrated the same pattern of issues and to the

same extent that have manifested with Hernandez over the years." (Dkt. No. 177 ¶ 43.) And indeed, the promoted umpires have evaluations with comments that lend support to Torre's statement. (*See* Dkt. No. 177 ¶¶ 43–51.)

In contrast, beginning in 2013, comments reflecting Torre's view that Hernandez did not possess the requisite leadership ability appeared in Hernandez's evaluations. For example, Hernandez's 2014 year-end evaluation read, *inter alia*:

> On several occasions in the past, you requested a greater leadership role among the staff. However, you need to continue to take steps forward in your communication and your accountability before this can happen. As you discussed with Joe Torre (as well as written in your past evaluations), you need to be accountable and let things from the past go.

(Dkt. No. 177-1 at DEF1548.)

Moreover, the numbers involved only further support this conclusion. From 2011 to 2013 there were 68 full-time umpires and 17 crew chiefs, and since 2014 there have been 76 full-time umpires and 19 crew chiefs. (Dkt. No. 179 ¶¶ 3–6.) In 2013, an MLB document noted that only seven percent of umpires were minorities. (Dkt. No. 155-3 at DEF15068.) Between 2011 and 2019, a total of 13 crew chief positions opened, ranging from zero to three openings a year, with a pool of full-time umpires ranging from 68 to 76. (Dkt. No. 179 ¶¶ 3–6, 9.) Hernandez did not apply for two of those openings. (Dkt. No. 179 ¶ 11.) As MLB's expert opines, the combination of a small applicant pool, proportionately fewer minority umpires within those pools, and a small number of promotion opportunities, means the fact that no or very few minorities were promoted is "statistically meaningless." (Dkt. No. 178-1 at 2.)[6]

---

[6] In addition to an unelaborated allegation of "error," Hernandez argues that the Court should reject arguments based on statistical evidence seemingly because they do not go to the heart of his arguments. (Dkt. No. 187 at 19.) But the expert opinion is presented merely for the notion that the numbers at play in umpire hiring do not, on their own, suggest any unlawful discrimination is involved. Such discrimination, of course, may be shown by other means.

Additionally, Hernandez barely grapples with two additional facts that bely a finding of pretext.  First, MLB assigned a Latino umpire to the World Series in 2011 and in 2015, a promotion that seemingly would not have been made were MLB discriminating on the basis of race or national identity.  (Dkt. No. 179 ¶¶ 15–16.)  And Hernandez's point that he is among the most senior umpires who has not been promoted is undermined by MLB's regular promotion of white umpires with less seniority over white umpires with more seniority.  (Dkt. No. 179 ¶¶ 19–25.)  These facts, especially when considered alongside MLB's other evidence, preclude this Court from finding a genuine dispute of material fact on pretext.

While Hernandez does not explicitly challenge it under his disparate treatment claim, a recurring issue throughout this case is the subjectivity in MLB's umpire evaluation and promotion process.  There is apparently some degree of subjectivity in compiling FEFs into mid- and season-end evaluations.  And in the promotion decision, there is both natural subjectivity in many of the criteria, such as "leadership ability," that Torre used in promotion decisions, as well as subjectivity and uncertainty in which factors Torre used in the first place and how much weight he gives each of those factors.

The Second Circuit has held that there is "nothing unlawful" when an employer uses subjective criteria in hiring.  *Byrnie v. Town of Cromwell, Bd. Of Educ.*, 243 F.3d 93, 104 (2d Cir. 2001) (citation and quotation marks omitted), *superseded in part and on other grounds by* Fed. R. Civ. P. 37(e).  Yet at the same time, an employer "may not use wholly subjective and unarticulated standards to judge employee performance for purposes of promotion" because "[a]ny defendant can respond to a [discrimination charge] with a claim of some subjective preference or prerogative and, if such assertions are accepted, prevail in virtually every case." *Id*. at 104–05 (citations omitted).  Thus, an employer's explanation "must be clear and specific in

order to afford the employee a full and fair opportunity to demonstrate pretext." *Id*. at 105

(citation and quotation marks omitted).  And when such explanation is "offered in clear and

specific terms" and "reasonably attributable to an honest even though partially subjective

evaluation" of the employee's qualifications, a court cannot draw an inference of discrimination.

*Id*. (citation omitted).

The explicit reason MLB offers — that according to Torre, Hernandez "has not

demonstrated the leadership ability and situation-management skills in critical, high-pressure

roles on a consistent basis" (Dkt. No. 173 at 32) — is presented in clear and specific terms.  And

the comments regarding leadership in Hernandez's evaluations support MLB's position that, in

Torre's eyes, Hernandez was not as qualified as the umpires who were promoted.  The

subjectivity of these processes, while challenging to analyze, does not affect this Court's

conclusions.

The "ultimate question," of course, is whether Hernandez has produced sufficient

evidence from which a reasonable juror could infer that MLB's explanation was pretext for

discrimination.  *Sandler*, 2018 WL 4636835, at *7.  That question must be answered in the

context of the Second Circuit's warning against granting summary judgment too readily to

employers when the merits turn on an employer's intent, and the need for district courts to

examine evidence for circumstantial proof.  *Holcomb*, 521 F.3d at 137.

The evidence in this case falls short of that standard.  To find for Hernandez, a juror

would have to find that the discrepancy between FEFs and year-end evaluations is the result of

MLB intentionally deflating Hernandez's performance.  That juror would then have to find that,

despite the elements of subjectivity inherent in promotion determinations, Hernandez's

qualifications were so superior in whatever criteria Torre used that the only explanation is

18

discrimination.  The Court concludes that no reasonable juror could find that MLB's stated

explanation is a pretext for discriminatory motive.  This is particularly the case given (1) MLB's

and Torre's consistent assessment of Hernandez's leadership and performance; (2) the evidence

that Torre promoted less-senior umpires over more senior umpires and assigned a Latino umpire

to the World Series twice between 2011 and 2016; and (3) the fact that there are so few MLB

minority umpires and a dearth of crew chief positions and World Series assignments.

Because MLB's explanation is "reasonably attributable to an honest even though partially

subjective evaluation," a reasonable factfinder could not draw an inference of discrimination.

*Byrnie*, 243 F.3d at 105 (citation omitted).

While Hernandez's Title VII, Section 1981, and NYHRL claims are all analyzed under

the same framework, his New York City Human Rights Law (NYCHRL) claim "must be

construed 'independently and more liberally than" his federal claim.  *Sandler*, 2018 WL

4636835, at *7 (quoting *Ben–Levy v. Bloomberg L.P.*, 518 F. App'x 17, 19–20 (2d Cir. 2013)

(quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).  The

NYCHRL framework, guided by *Mihalik v. Credit Agricole Cheuvreux North America, Inc*., 715

F.3d 102 (2d Cir. 2013), requires a plaintiff to introduce sufficient evidence to show an employer

treated her "less well" and did so "at least in part for a discriminatory reason," after which such

employer must present "legitimate non-discriminatory motives to show the conduct was not

caused by discrimination" and is entitled to summary judgment "only if the record establishes as

a matter of law that discrimination played *no* role in its actions."  *Sandler*, 2018 WL 4636835, at

*7 (emphasis in original) (quotation marks omitted) (quoting *Mihaik*, 715 F.3d at 110 n.8).

The parties do not separately brief the NYCHRL claim.  But based on this Court's analysis above, Hernandez has not shown that MLB treated him less well than other umpires "at least in part for discriminatory reasons."  *Id.*

Thus, summary judgment for MLB is granted on Hernandez's disparate treatment claims.

### 2.    Disparate Impact Claims

To succeed on a disparate impact claim, "a plaintiff must (1) identify a policy or practice, (2) demonstrate that a disparity exists, and (3) establish a causal relationship between the two." *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001) (citing *Byrnie*, 243 F.3d at 111), *overruled in part and on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).  "Allegations which contend only that there is a bottom line racial imbalance in the work force are insufficient." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 712 (2d Cir. 1998).  If a plaintiff establishes these initial elements, a defendant may rebut by demonstrating that the challenged practice is related to the position in question and consistent with business necessity, after which a plaintiff must show that another process, without discriminatory effect, would serve the employer's legitimate interest. *Gulino v. N.Y. State Educ. Dep't*, 460 F.3d 361, 382 (2d Cir. 2006).

The parties dispute whether Hernandez has identified a sufficiently specific employment practice for a disparate impact claim.  Hernandez argues that the relevant employment practices are "the process actually employed by MLB in determining which umpires will be promoted to crew chief" and "the process employed by MLB in determining which umpires will be given World Series assignments.  (Dkt. No. 142 at 24.)  He further explains that these processes involve relying "almost exclusively on the whim of Joe Torre" and using subjective and amorphous criteria such as leadership and situation management.  (*Id.*)

"Simply gesturing towards the hiring process as a whole will not satisfy the requirement that the plaintiff identify a 'specific employment practice' that is the cause of the statistical disparities." *Byrnie*, 243 F.3d 93 at 111 (citation omitted).  MLB argues this is what Hernandez has done here.  But Title VII allows plaintiffs to "demonstrate to the court that the elements of [MLB]'s decisionmaking process are not capable of separation for analysis," which would require this Court to "analyze[]" such process "as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  In *Port Authority Police Asian Jade Soc. of N.Y. & N.J. Inc. v. Port Authority of N.Y. & N.J.*, for example, the court found that the several steps of a promotion process "[could] not be separately analyzed both because records do not exist for every step and because the causal role of each step is called into doubt by the records that do exist."  681 F. Supp. 2d 456, 464 (S.D.N.Y. 2010).  Thus, the steps could not be individually analyzed to determine whether any particular step caused a disparate impact, requiring analysis of the promotion practices as a whole.  *Id.*

But even were the Court inclined to follow the example of *Port Authority Police* and analyze the promotion processes as a whole, Hernandez still fails to demonstrate a genuine issue of material fact on the remaining elements of a disparate impact failure-to-promote claim.  For his claim to survive, Hernandez must show that a disparity exists, prove a causal connection between the processes and disparity, and provide an alternative practice that would meet MLB's business needs without inflicting discrimination.  Absent a curveball in Hernandez's favor, this is a tall order.  As MLB's expert has opined — and Hernandez has done little to rebut — the small applicant pools involved, proportionately fewer minority umpires within the pools, and a small number of promotion opportunities, render the fact that no or very few minorities were promoted "statistically meaningless."  (Dkt. No. 178-1 at 2.)

To escape this quandary, Hernandez attempts to rely on the "inexorable zero," or the notion that courts should set aside statistical analyses in circumstances where Title VII defendants have employed or promoted "zero or near zero minorities or women." *E.E.O.C. v. Andrew Corp.*, 1989 WL 32884, at *13 (N.D. Ill. Apr. 3, 1989) (referencing *Teamsters v. U.S.*, 431 U.S. 324 (1977)); *see also Waisome v. Port Auth. of New York & New Jersey*, 948 F.2d 1370, 1379 (2d Cir. 1991) ("[W]here statistics are based on a relatively small number of occurrences, the presence or absence of statistical significance is not a reliable indicator of disparate impact.").

But while the inexorable zero may be compelling in the case of a larger employer who has hired or promoted no minority candidates, it is less compelling in the present context, where both the pool of umpires and the number of available promotions are small. *See, e.g.*, *Woodson v. Pfizer, Inc.*, 34 F. App'x 490, 492 (7th Cir. 2002) (requiring a "statistically large enough workforce" for the inexorable zero to be relevant); *City of New York*, 713 F. Supp. 2d at 318 ("[A] court cannot help but be circumspect where a municipal department in the country's *largest city* repeatedly selects only applicants of one sex for job vacancies . . . ." (emphasis added)). Also relevant is that Torre assigned a minority umpire twice to the World Series between 2011 and 2016, and that MLB has had a minority crew chief before the filing of this suit (albeit one who was terminated in 1999).

As MLB recognized internally, during the period at issue in this case it employed an unfortunately low proportion of minority umpires. Ironically, the case for the "inexorable zero" in this non-promotion case might be stronger if MLB employed a greater number of minority umpires, or if the promotion pool were large enough to lend the "inexorable zero" theory more weight. But the fact that MLB promoted few minority umpires flows from MLB's "diversity

problem," rendering Hernandez's "inexorable zero" argument inert.  Hernandez has not

established a genuine dispute of material fact on his disparate impact claim.

Even assuming, *arguendo*, that the Court accepted Hernandez's "inexorable zero" theory,

and that MLB demonstrated the business necessity of its promotion practices, Hernandez's

offered alternative practice "is simply to view the entire body of an umpire's work as opposed to

focusing solely on the subjective criteria MLB identifies . . . ."  (Dkt. No. 187 at 49.)  He also

proposes that "rather than vesting in Torre alone the full authority to make these decisions, MLB

could require its umpire department to collaborate and reach a consensus as to which umpires are

best suited for crew chief promotion and World Series assignments."  (*Id.*)  It is unclear how

such alternative practices would eliminate the disparity at issue.  Hernandez understandably

critiques the promotion processes for being overly subjective; neither of his proposed alternatives

changes that fact.  Hernandez would be unable to prevail on this point, too.

The Court is mindful of the reality of unconscious bias and of the "built-in headwinds"

that can "freeze out protected groups from job opportunities and advancement."  *Wright v. Stern*,

450 F. Supp. 2d 335, 367 (S.D.N.Y. 2006) (Chin, J.) (citation omitted).  With respect to

Hernandez's non-promotion claims in this case, however, there is insufficient evidence to show a

triable issue on either a disparate treatment or disparate impact theory.

### B.      Motion to Exclude

MLB also seeks to exclude the opinion and testimony of Hernandez's expert Dr. Gregory

W. Baxter.  Given that the Court has granted summary judgment in MLB's favor, and nothing in

Baxter's report alters the Court's analysis, this motion is denied as moot.

### C.      Motion to Seal

Finally, MLB moves to seal documents related to (1) nonparty umpire employment records; (2) medical and personal contact information; and (3) MLB's confidential and proprietary business information that is peripheral to Hernandez's claims.  (Dkt. No. 154.) Hernandez does not dispute the sealing of nonparty umpire employment compensation or medical and personal contact information, but argues that, under the standard set forth in *Lugosch*, nonparty umpire employment evaluations and MLB's proprietary business information should be made public.[7]  (Dkt. No. 183.)

*Lugosch* instructs this Court to determine whether the documents at issue have a presumption of public access, consider the weight of that access, then balance competing considerations.  *Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 621–22 (S.D.N.Y. 2011). Whether the subject matter is "traditionally considered private" is relevant: "financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public."  *United States v. Amodeo*, 71 F.3d 1044, 1051 (2d Cir. 1995).

Hernandez argues that the nonparty umpire employment evaluations should receive a strong presumption of public access because "one would be hard pressed to find something more public than the performance of Major League umpires."  (Dkt. No. 183 at 2–3.)  But while their *performances* may be public, their employer's *evaluations* of their performances — the documents Hernandez seeks to unseal — are not.  Such evaluations are provided only to each umpire (and not their peers), a "select few individuals in MLB's Umpiring and Labor

---

[7] The Court notes that it received a letter from a reporter requesting that all documents be unsealed, as the case "concerns alleged racial discrimination, an issue of current heightened public interest."  (Dkt. No. 190.)

Departments," and, in the case of mid- and end-of-season evaluations, the Major League Baseball Umpires Association.  (Dkt. No. 154 at 3; Dkt. No. 155 ¶¶ 6–7.)  This case is similar to *Oliver Wyman, Inc. v. Eielson*, in which the court "agree[d] that the allegations in the exhibits detailing internal employee evaluations would likely cause embarrassment to third parties and that the third parties' privacy interests outweigh the public's interest in disclosure."  282 F. Supp. 3d 684, 707 (S.D.N.Y. 2017).

Should the Court rule in favor of keeping documents sealed, Hernandez asks the Court to consider narrowly tailored redactions.  But in the employee evaluation context here, such redactions are difficult: given the small number of umpires and relative level of detail provided in evaluations, redactions that would effectively protect employee anonymity would be so broad as to almost entirely negate any public value from their disclosure.

Admittedly, there is documented public interest in the employee evaluations, particularly in the context of racial discrimination.  (*See* Dkt. No. 190.)  But the public is unlikely to discover anything from the evaluations regarding racial discrimination that it cannot already discover from examining the very public makeup of MLB's umpires, including MLB's promotion and World Series assignments.  As an internal MLB document acknowledged in 2013 that, as only seven percent of MLB's umpires were minorities, it had a "diversity issue."  (Dkt. No. 155-3 at DEF15070, DEF15146.)  Placing nonparty umpires' employment evaluations in the public eye will contribute little of value to this important public issue.

Hernandez also objects, without significant argument, to the sealing of MLB's private business information in the case.  (Dkt. No. 183 at 5.)  MLB claims such sealing is appropriate because the business records at issue are irrelevant or peripheral to Hernandez's arguments in the underlying motions.  Having reviewed the business information MLB seeks to keep sealed, the

Court finds that the information is irrelevant to Hernandez's case and that the redactions are narrowly tailored, except as already included above.

MLB's motion to seal is granted, and the documents filed under seal may remain so.

## IV.   Conclusion

For the foregoing reasons, MLB's motion for summary judgment is GRANTED. Hernandez's motion for partial summary judgment is DENIED as moot.  MLB's motion to exclude the testimony of Dr. Baxter is DENIED as moot.  MLB's motion to seal is GRANTED.

The Clerk of Court is directed to close the motions at Docket Numbers 138, 154, 157, 164, 184, 185, and 191 and to close the case.

SO ORDERED.

Dated: March 31, 2021
New York, New York

_____
J. PAUL OETKEN
United States District Judge